COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO

- - -

STATE OF OHIO,              :

        Plaintiff.    :

vs.                        :Case Number B1003262

RUBEN JORDAN,              :Appeal Number C1100833

        Defendant.    :Volume I of X


        - - -

TRANSCRIPT OF PROCEEDINGS

        - - -

APPEARANCES:

    Seth S. Tieger, Esq.
    Megan E. Shanahan, Esq.
        On behalf of the State of Ohio.

    William P. Whalen, Jr., Esq.
    Amy R. Williams, Esq.
        On behalf of the Defendant.



        BE IT REMEMBERED that upon the Jury

Trial of this cause, on January 10, 2011, before

the Honorable NADINE L. ALLEN, a judge of the

said court, the following proceedings were had,

to wit:

MORNING SESSION, January 10, 2011

THE COURT:  Okay.  Regarding the
matter of Ruben Jordan.  Presently it's
on Case Number B1003262.  State vs. Ruben
Jordan.  At this time, Counsel, what we
are going to ask the bailiff to do is we
would like to call the Jury Commission
and preserve 30 first-week jury members.
We would like to do that now.  And we
would like to have them sent to an early
lunch, which will be now, and we are
going to commence this jury at 1:00.
Counsel are present.  State your names.

Seth Tieger for the State.  We
have -- State?  I mean, I'm sorry --
yeah, for the State.

MR. TIEGER:  Seth Tieger and Megan
Shanahan.

THE COURT:  For the defendant?

MR. WHALEN:  Bill Whalen.

MS. WILLIAMS:  Amy Williams.

THE COURT:  Ms. Williams, are you
assigned on as designated counsel yet?

MS. WILLIAMS:  I have not.  She
said she was going to type me up

something.

        THE COURT:  We are going to ask
that now for the record, Counsel is
asking in this matter, you would like to
have jury questionnaires right now?

        MR. WHALEN:  Yes.

        THE COURT:  So we are going to
ask -- we get the jury questionnaires and
we'll start this jury proceeding at
1:00 p.m. this afternoon, and the jury is
to be collected, preserved and sent to
lunch.  Select 30 first-week jurors.

        BAILIFF:  Preserve.

        THE COURT:  Preserve them right now
and then send them to lunch and tell them
they are going to be back to the jury at
one, not here, we'll go up and get them.
Okay.  1:00 p.m. to return to the Jury
Commission, and we'll pick them up.

        We would like to have your
questionnaires right now, Counsel needs
their questionnaires now.  Okay.  Did
that cover everything we were discussing,
Counsel?

        MR. TIEGER:  I think that sounds

1    good, Judge.

2         THE COURT:  Okay.  All right.  And

3    so let us wait until you --

4         MR. TIEGER:  We'll just wait here

5    until --

6         THE COURT:  Okay.  That might take

7    a while.

8         (Luncheon recess.)

AFTERNOON SESSION, January 10, 2011

THE COURT:  I'm going to ask persons on this side of the room seated in the back to move to the opposite side of the room because we are going to use the jury.  No, ma'am.  Ma'am, you have to move on the other side also.

MR. WHALEN:  She works for me.

THE COURT:  She can stay because she's in front of the bar there.  So I'm going to ask, Counsel, you ready to proceed now?

MR. TIEGER:  Yes, Your Honor.

MS. SHANAHAN:  Yes.

THE COURT:  Okay.  Bring in the jury.

MR. BRENNER:  All rise for the jury.

(The jury entering the courtroom at 1:15 p.m.)

THE COURT:  And we have them seated.  All right.  Is everyone seated?  Now, in order -- I think there is some people that got out of order a little bit.  You may all be seated.  Where is

he?  Why is he standing up in the back?

Okay.  All right.

Ladies and gentlemen of the jury,
good afternoon.  I am Judge Nadine Allen.
I will be presiding over this trial.  You
have been summoned as prospective jurors
in a case involving the State of Ohio vs.
Ruben Jordan, the defendant, in this
case.

Service as a juror is one of the
most important functions and part of a
democracy that we enjoy in the United
States.  It's one of the most valuable
civic duties that you'll ever be asked to
perform.

So trial by jury is what we possess
in the United States.  The preservation
of this right is strengthened by your
willingness to respond to the call for
juror duty.  So we appreciate you already
for just coming in here today, for
getting dressed, finding transportation,
arriving on time and being here right
now.  We appreciate every bit of that,
and so do the parties involved in this

1    case.

2        So it is recognized that some of

3    you might be making a sacrifice although

4    we will be paying for parking.  I believe

5    the fee should cover parking.  But on

6    behalf of the Court and the community, I

7    do want to commend you, and I want to

8    thank you right now for being here at

9    this very important moment in this trial.

10        What a jury trial begins with is

11   the selection of jury.  But before I do

12   that, I would like to introduce the

13   parties who will be taking part in this

14   case today.  The attorneys for the State

15   of Ohio are?  Would you stand up.  Seth

16   Tieg (sic).

17        MR. TIEGER:  Good among everyone.

18   Good afternoon.

19        THE COURT:  And also Megan

20   Shanahan.

21        MS. SHANAHAN:  Good afternoon,

22   everyone.

23        THE COURT:  And they will be

24   referred to as the prosecutor in this

25   case.  The attorney for the -- for the

defendant are Mr. William Whalen, would
you stand?

MR. WHALEN:  Good morning -- or
good afternoon.

THE COURT:  And also Amy Williams.

MS. WILLIAMS:  Good afternoon.

THE COURT:  The defendant, Ruben
Jordan, is seated by attorney Amy
Williams, and they may be referred to
throughout this trial as the defense.
The words attorneys, the law and counsel
are all interchangeable.  And references
to the Court usually means to me as a
judge or something that this Court is
doing.

I would like to introduce the
courtroom, my staff, my bailiff Dee-Dee,
just raise your hand today because she
has a little foot/ankle injury right now,
and she will help with the coordination
of courtroom activities and see that your
needs are met.  And, obviously, also you
have already met Mr. Scott Brenner, who
is also my bailiff, acting as bailiff in
these proceedings.

1           I'm going to administer the oath

2   and also the clerk, they maintain

3   official court documents.  And now I'm

4   going to roll call to make sure we have

5   everybody in the right place and I'm

6   going to administer your oath of office.

7   Leon Rozier.  Plus, I want to get the

8   proper pronunciation.

9        PROSPECTIVE JUROR ROZIER:  Rozier.

10        THE COURT:  Rozier.

11        PROSPECTIVE JUROR ROZIER:  Rozier.

12        THE COURT:  Is number one.  And

13   Lena McKinney and Beverly Messerschmitt.

14        PROSPECTIVE JUROR MESSERSCHMITT:

15   Yeah.  Messerschmitt, yes.

16        THE COURT:  Kalisha Williams.

17   Carmen McKeehan.

18        PROSPECTIVE JUROR MCKEEHAN:  Yes.

19        THE COURT:  Brian Fitzgerald.

20   Janet Binkley.

21        PROSPECTIVE JUROR BINKLEY:  Yes.

22        THE COURT:  Sally Coffman.  Michael

23   Smith.  Is there another way to pronounce

24   that?

25        PROSPECTIVE JUROR COFFMAN:  No.

1    THE COURT:  Okay.  That was a

2    little attempted humor there.  Catherine

3    Heintz, Heintz.

4         PROSPECTIVE JUROR HEINTZ:  Heintz.

5         THE COURT:  Heintz.

6         PROSPECTIVE JUROR HEINTZ:  Yes.

7         THE COURT:  Christine Bessey.

8         PROSPECTIVE JUROR BESSEY:  That is

9    correct.

10        THE COURT:  And Michael Burke.

11        PROSPECTIVE JUROR BURKE:  Yes.

12        THE COURT:  All right.  We said the

13   names properly.  We do have some

14   prospective jurors.  I think I will call

15   their names too so we don't forget to do

16   that.  Number 13, where are you located?

17   Are we in the right seat?  Number 13.

18        MR. TIEGER:  Judge, I don't know if

19   they know their numbers.

20        THE COURT:  They may not be on

21   right numbers, just have them get seated,

22   we are going do this this way.  Thirteen,

23   so that you know, Number 13 is Dorothy

24   Spencer, correct?  Ms. Spencer.  Okay.

25   Number 14, raise your hand.  David Burck,

Number 14.  Okay.  David Burck, you're
Number 14.  Where are you?  There you
are.  Number 14, so that we know.  Gary
Obst.  Obst is that the right
pronunciation?

PROSPECTIVE JUROR OBST:  Obst.

THE COURT:  Obst.  You're Number
15.  Carol Krieg, you are 16.  Did I say
that right?

PROSPECTIVE JUROR KRIEG:  Hum.

THE COURT:  Sherri Kemper, Number
17.  Sarah Lavelle.

PROSPECTIVE JUROR LAVELLE:  Yes.

THE COURT:  How do you say that?

PROSPECTIVE JUROR LAVELLE:
Lavelle is correct.

THE COURT:  Gregory Hand, you are
Number 19.  Christine Bernhard, you are
20.

PROSPECTIVE JUROR BERNHARD:
Bernhard.  Bernhard.

THE COURT:  Okay.  Bernhard.
Jessie Ricketts, Number 21.  Christopher
Powers, you're number 22.  Scott Shelton,
you are Number 23.  Edward Cisko, you're

number 24.  Jerry Drury, you're number

25.  Edward Korb, you are number 26.

Richard Cross, you are Number 27.  Dejuan

Sheffield, you're number 28.  Did I say

that right?

PROSPECTIVE JURFOR SHEFFIELD:  Yes,

ma'am.

THE COURT:  Erika Kellogg, you're

number 29.  Amanda Decenso, number 30.

And did I say your name correct?

PROSPECTIVE JUROR DECENSO:  Yes.

THE COURT:  Okay.  Then so we now

have all the jurors.  Remember your own

number.  Okay.  Because at this time I

would like for you to stand so I can

administer the oath to you.  Prospective

jurors, you all stand up, please, and

raise your right hands.

(The prospective jurors sworn.)

THE COURT:  You may be seated.

Thank you.  I have a couple more

instructions to state, and then we will

move to the questioning.

So that you know what you're doing

here today, the State of Ohio and the

defendant are entitled to jurors who will
approach this case with open minds, and
agree to keep their minds open until a
verdict is reached.  Jurors must be as
free as humanly possible from bias,
prejudice and sympathy, and must not be
influenced by any preconceived ideas as
to the facts or the law.  You are each
undoubtedly qualified to serve as jurors.
There may be something, however, that
could disqualify you in this particular
case, and we will get into details in a
moment.

At this time the Court and counsel
will ask you questions.  These questions
are not designed to pry into your
personal affairs, but to discover if you
have any knowledge of this case, if you
have any preconceived opinion that you
cannot lay aside, or if you have had any
experience that may cause you to identify
yourself with either party.  If the
answer to a question asked by either the
attorneys or myself would cause any of
you embarrassment, you may raise your

hand and we will approach, let you come here at sidebar and you can answer that privately. And we will do so at the sidebar, that bench, and do a white noise machine so that nobody can hear the responses.

If you cannot hear the question asked, please indicate by raising your hand so that I may speak louder or more clearly, or so that the parties can speak louder.

The questions I'm going to ask will be directed to all of -- they are directed to those seated in the jury box as well as those seated in the back of the courtroom.

Whether you are in the jury box or the back of the courtroom, please raise your hand if you have an answer to any questions that are asked of you. Although I have a seating chart here we have already stated your name but we ask you to state your name for the purpose of the record. When you give an answer, if you would state your name to make sure

that you are the right person.  Sometimes
we hear a voice and we don't know where
it's coming from.  That's for the record,
also for a potential Court of Appeals or
transcripts to some other higher court.

Each prospective juror has the
right to request an in camera or private
hearing, and I already mentioned that.
In this regard, the Court is not required
to hold an in-camera hearing unless the
information that is contained in the
response to the question put to the
perspective juror is requested by any
person.  All right.

Now, the defendant in this case,
Ruben Jordan, has been charged with the
offenses of aggravated murder with
specification and also having a weapon
while under a disability.  The details of
this charge are the subject of our
inquiry in this trial, and we are not
going to give any facts yet at this time.
I believe the attorneys are going to
cover that in their questioning.  That
will come out during questioning and

during opening statements.

At this time, I tend not to ask a lot of questions of the jury because I believe the jury may feel slightly intimidated, or think they need to give a right answer because the Judge is asking the question, and we do want you to -- instead to feel very comfortable with what you're about to say what your answers would be and because lawyers tend to ask the same thing anyway.

So what I'm going to do now, I'm going to turn this over to my esteemed counsels, all four of them, and to have them commence with what we are going to call the voir dire process. You do understand that there are -- there is such a thing as peremptory challenges and that each side does have four peremptory challenges that they may exercise. What we do not want you to do is take that personally and feel like you have flunked something or failed as a person. In fact, you've probably seen a tape at the Jury Commission Office. And it's

1  because, again, there may be a tendency

2  to favor one side or the other, or they

3  feel for some reason that you are not as

4  unbiased or have sympathy or any reason,

5  but it's not going to be disclosed.  So,

6  you don't need to think or worry about

7  what the reason is, but you are

8  definitely qualified to serve on a jury,

9  and we will tell you where to go after

10  that.

11       There may be reasons why you may be

12  excused because for cause because you

13  indicated that you're unable to, no

14  matter what, you're unable to make a

15  decision in this particular case.  And

16  you can state that, and there is a

17  process for determining that also.

18       At this time, there may be also

19  from time to time where there might be

20  conferences here on the sidebar.  There

21  is a variety of legal reasons why that

22  may be happening.  Mainly because we

23  don't want something improper to be said

24  before the jury, because once something

25  is stated it's been stated.  It might be

1    an improper question.  It could be

2    something highly prejudicial, or the

3    wrong evidence.  There are right legal

4    reasons and he want you to be able to

5    evaluate the right evidence that you

6    should be hearing, however you may be

7    receiving in this case.

8            So I usually will turn on the white

9    noise machine and ask that you stand up

10    and talk among yourselves about anything

11    except this case.  Okay.

12            At this time, Mr. Prosecutor, you

13    may proceed.

14            MR. WHALEN:  Your Honor, could we

15    approach the bench for a moment --

16            THE COURT:  All right.

17            MR. WHALEN:  -- before we start.

18            THE COURT:  Okay.

19            (Unreported sidebar conference.)

20            THE COURT:  All right then.  We are

21    ready to proceed, and we have both

22    prosecutors and both defense attorneys

23    may be asking you questions, too.  And

24    they shouldn't be redundant, they're

25    going to try not to be, and at this time

1    you may start, Mr. Tieger.

2         MR. TIEGER:  Thank you, Judge.  As

3    everybody is told, my name is Seth

4    Tieger.  This is Megan Shanahan.  We are

5    going to be presenting the case for the

6    State of Ohio over the next few days.  I

7    don't recognize anybody here.  I don't

8    know if anybody recognizes me or Ms.

9    Shanahan.  No.

10         Do any of you know -- Joe Deters is

11   our boss, who's the elected prosecutor.

12   Do any of you know Mr. Deters or any

13   other prosecutor at all?  Your name, sir?

14         PROSPECTIVE JUROR HAND:  Greg Hand.

15         MR. TIEGER:  Mr. Hand, kind of the

16   way I think this is going to work is that

17   it's real hard to talk to you.

18         THE COURT:  Let me turn that -- no,

19   I'll just turn the volume down.

20         MR. TIEGER:  Thanks, Judge.

21         THE COURT:  There.

22         MR. TIEGER:  It's real hard to talk

23   to you folks, and then this group at one

24   time, so basically I think what we're

25   going to ask you to do, Mr. Hand, is I

1    appreciate you raising your hand, letting

2    us know, and if there is an answer to any

3    questions, if you can just raise your

4    hand and Ms. Shanahan and I will make

5    note of it.  And Mr. Whalen and

6    Ms. Williams will make a note of it and

7    then as this process goes, I think you'll

8    see whether it's later on today or will

9    come back.  Certainly if ever you will be

10   excused and certainly if you will stay

11   and then certain of you, in the order

12   that we talked about, starting with

13   Ms. Spencer, Mr. Burke and so forth will

14   be moved up into this panel.  And then as

15   you are -- we would already, we are doing

16   our homework, have a note of who raised

17   their hand and what it's about and

18   question you about that at that point.

19        Um, it looks like all of you are

20   first-day jurors, is that fair to say?

21        PROSPECTIVE JURORS:  Uh-huh.

22        MR. TIEGER:  And so none of you

23   would have really done a jury, this would

24   be your first one on your tour of duty.

25   It looks like some of you have sat on

juries in the past.  And when we start to
talk to you I get to ask you about that
at the time.  But the basic rule is
that -- and the reason this has taken a
little bit of time is that I don't know
if you remember filling out these
questionnaires.  When you do there is a
whole process in effect to where they
make copies of those questionnaires of
everybody, actually all the jurors and
then a copy is given to Ms. Shanahan and
myself.  A copy is given to Mr. Whalen
and Ms. Williams, and a copy is given to
Judge Allen.  So we took a few minutes to
review those questionnaires before we
talked to you so everybody would have a
copy of your questionnaires.

       As far as jury service, just real
briefly, I know it's a two-week process.
And just by way of scheduling, and Judge
Allen can correct me if I'm wrong here,
that I think normally we would start, the
Court has other cases on its dockets, a
lot of other cases, and those usually
take place in the morning as well, so

1    we'd probably be starting in the ten to

2    10:30 range every day, I think, and then

3    I think we'd normally end the day

4    probably around four or so.

5              THE COURT:  Not past five.

6              MR. TIEGER:  Sometime between the

7    four, 4:30 range.  And then there would

8    be a time for lunch.  And then during

9    that time, there probably would be a

10   couple ten to 15-minute breaks as well to

11   refresh yourself or just take a short

12   break.  Is everybody okay with that type

13   of schedule?

14             PROSPECTIVE JURORS:  Uh-huh.

15             MR. TIEGER:  And the way I'm kind

16   of understanding this is that normally

17   what we ask is that with this trial, as

18   you heard, it's an aggravated murder

19   trial.  So it's not going to be a short

20   trial, it will go into next week for

21   sure.  We are thinking it's going to be

22   over probably the middle -- towards the

23   end of next week.  I guess there is

24   always a very, very small chance it could

25   go into that third week.  Is everybody

1    okay if it does that?  Does anybody have

2    travel plans or any reason they couldn't

3    be here?  I guess, it would be Monday,

4    the 24th, or let's see, Mr. Burke.

5         PROSPECTIVE JUROR BURKE:  Yes.

6    Going in the third week would be a

7    problem for me with work.

8         MR. TIEGER:  Okay.  So you would

9    have to end your service by the 21st?

10        PROSPECTIVE JUROR BURKE:  I could

11   go to the Monday of the third week, but

12   not past that.

13        MR. TIEGER:  Okay.  And,

14   Ms. Williams, you raised your hand as

15   well?

16        PROSPECTIVE JUROR WILLIAMS:  I'm

17   not getting paid.

18        MR. TIEGER:  Okay.  That is a

19   hardship.  I mean, that's very important

20   to everybody really.  Can you tell me

21   about that a little bit?

22        PROSPECTIVE JUROR WILLIAMS:  The

23   job -- my job requires that you come to

24   jury duty but they don't pay you.

25        MR. TIEGER:  Okay.  So if it went

into extra time that would be a hardship
to you and your family?

PROSPECTIVE JUROR WILLIAMS:
Uh-huh.

MR. TIEGER:  Okay.  Mr. Fitzgerald?

PROSPECTIVE JUROR FITZGERALD:    I
have a business trip planned for the
third week.

MR. TIEGER:  And what day would
that be?

PROSPECTIVE JUROR FITZGERALD:  I
believe Wednesday or Thursday.

THE COURT:  We are going to ask you
to use your stage voice, if you don't
mind, in responding.  Not the inside
voice, but your stage voice.

MR. TIEGER:  Everybody back here
pretty much okay?  Again, we are -- this
is going to be over next week, but you
hate to promise that and if it doesn't
you don't deliver on it, so there is a
small chance it could go into that last
week.  I know we could talk about this a
little bit and everybody is always scared
of the snow.  And as I said, we are

probably going to stop around somewhere
between four and 4:30 today. And as a
result, we may not have the jury picked
today because of that, we really can't
start up again until all 30 of you are
present. And if there is a weather
emergency tomorrow and 28 of you make it
and two can't, we really can't do
anything.

So as a result, I think we are
going to maybe try to keep an eye on the
weather forecast the next couple hours.
But the plan is possibly to take tomorrow
off because it wouldn't be right to ask
you to come down. It's enough to ask you
to do what you're doing and sit on a
murder trial, but to ask you to come down
in the middle of a snow storm and then go
through this and then have all the
problems getting here and getting home,
we may take tomorrow off and ask you to
come back wednesday.

The other issue is that I think
there is a conflict that one of us has
Thursday morning. So on Thursday we

1    wouldn't start until probably 12 to 1:00

2    in the afternoon.  And then Monday of

3    next week is Martin Luther King Day where

4    the courthouse is closed.  So there are

5    definitely a few days that we are not

6    going to be in session.

7         Other than that, which is pretty

8    much, basically what we ask of jurors is

9    that we have everybody's full attention

10   on a case.  And by that, I always mean,

11   does anybody have a medical issue, a work

12   issue, a child issue or any kind of

13   family issue that would prevent them from

14   sitting as a juror on this case with the

15   schedule that we just talked about?

16        For instance, can everybody hear

17   okay, as Judge Allen talked about?

18   Because it's pretty frequent that you get

19   a juror with a hearing problem that

20   really can't make out what, more

21   importantly, the witnesses are saying.

22   Is everybody okay with hearing?

23        Can everybody sit for several hours

24   at a time?  I know there is a lot of

25   people with bad backs.  Let's see, Ms --

1       PROSPECTIVE JUROR KRIEG:  Krieg.

2       MR. TIEGER:  Krieg.  Do you have

3    a -- is it a --

4       PROSPECTIVE JUROR KRIEG:  I have a

5    couple of bad discs and spinal stenosis.

6       MR. TIEGER:  Okay.  And I know that

7    hard benches that we're so nice to let

8    people sit on for court are pretty

9    unforgiving, but when you get up here

10   they would be a lot more comfortable.

11   Would you be okay with that, sitting and

12   listening for a couple hours and there

13   would also be a probably ten to 15-minute

14   comfort break, or so to speak, and then

15   you could get back up, and that would be

16   our basic schedule other than an hour

17   lunch.

18       PROSPECTIVE JUROR KRIEG:  Probably.

19       MR. TIEGER:  Okay.  Thank you,

20   Ms. Krieg.

21       Does anybody have like a doctor's

22   appointment?  And I know it sounds

23   strange, but we do ask this because

24   sometimes a juror will be like, well, I

25   can't work Friday at all, I've got this

1    appointment.  But nobody has got any

2    planned doctor's appointments?

3        Does anybody have other than the

4    people that we just talked about, any

5    work issues where they have got a meeting

6    on a certain day at a certain time that

7    they cannot miss?

8        And in terms of meeting your kids

9    at the bus or a sick relative or somebody

10   that you have got to take care of, is

11   everybody okay with the schedule that we

12   just talked about?

13       Yes, sir?

14       PROSPECTIVE JUROR SHEFFIELD:  I

15   have a --

16       MR. TIEGER:  Can you tell us your

17   name?

18       PROSPECTIVE JUROR SHEFFIELD:  Djuan

19   Sheffield.

20       MR. TIEGER:  Okay.  Mr. Sheffield.

21       PROSPECTIVE JUROR SHEFFIELD:  I

22   have to take my grandfather to dialysis

23   on Mondays, Wednesdays and Fridays.

24       MR. TIEGER:  And what time does he

25   need to go to dialysis?

1　　　　　　PROSPECTIVE JUROR SHEFFIELD:  I

2　　think Monday is four, and then Tuesday

3　　it's 11 -- I mean Wednesday it's 11, and

4　　Friday it's four.

5　　　　　　MR. TIEGER:  Are you the only

6　　person that does that for your

7　　grandfather?

8　　　　　　PROSPECTIVE JUROR SHEFFIELD:  My

9　　sister, she can when my mom is at home,

10　　but then she just had a newborn so we

11　　would probably have to work something out

12　　when I get home.

13　　　　　　MR. TIEGER:  So it would be today

14　　at four?

15　　　　　　PROSPECTIVE JUROR SHEFFIELD:

16　　Uh-huh.

17　　　　　　MR. TIEGER:  You would have to be

18　　out of here by four to do that?

19　　　　　　PROSPECTIVE JUROR SHEFFIELD:  My

20　　mom gets off at three, so I would think

21　　that she can take him today.

22　　　　　　MR. TIEGER:  And then Wednesday at

23　　11?

24　　　　　　PROSPECTIVE JUROR SHEFFIELD:

25　　Wednesday at 11, and Friday at four.

1     MR. TIEGER:  I know Wednesday at 11

2  is gonna be a problem.  Let's see, where

3  are we?

4     THE COURT:  He's Number 28.

5     MR. TIEGER:  Okay.  Maybe we could

6  talk about that a little later,

7  Mr. Sheffield.  Thank you for bringing

8  that up.

9     PROSPECTIVE JUROR SHEFFIELD:  Thank

10  you.

11     MR. TIEGER:  Ma'am, can you state

12  your name?

13     PROSPECTIVE JUROR SPENCER:  Dorothy

14  Spencer.

15     MR. TIEGER:  Okay.  Ms. Spencer.

16     PROSPECTIVE JUROR SPENCER:  Did you

17  read my paper that I filled out?

18     MR. TIEGER:  I know I have.  Let me

19  go through it real fast.

20     PROSPECTIVE JUROR SPENCER:  Okay.

21     MR. TIEGER:  Yes.  Is there

22  anything specific about that with regard

23  to the scheduling that you would like to

24  talk about?  About something else?

25     PROSPECTIVE JUROR SPENCER:  Yes.

1     MR. TIEGER:  Okay.  We'll talk

2   about that later.

3         PROSPECTIVE JUROR SPENCER:  All

4   right.

5         MR. TIEGER:  Thank you.  Let's see,

6   Mr. Rozier.

7         PROSPECTIVE JUROR ROZIER:  Yes.  I

8   have to take my mother to the doctor

9   January 19.

10        THE COURT:  We can't -- can you

11  keep your December the --

12        MR. TIEGER:  November -- he said

13  January the 19th, which would be a week

14  from Wednesday.

15        PROSPECTIVE JUROR ROZIER:  Uh-huh.

16        MR. TIEGER:  At what time?

17        PROSPECTIVE JUROR ROZIER:  9:45.

18        MR. TIEGER:  In the morning?

19        PROSPECTIVE JUROR ROZIER:  Yes.

20        MR. TIEGER:  Okay.  Do you know how

21  long that appointment is going to take?

22        PROSPECTIVE JUROR ROZIER:  Going to

23  the clinic, it could take a couple, maybe

24  two or three hours.

25        MR. TIEGER:  So you would not be

available --

PROSPECTIVE JUROR ROZIER:  The
19th.

MR. TIEGER:  -- the 19th.  At least
the morning of the 19th.

PROSPECTIVE JUROR ROZIER:  Right.

MR. TIEGER:  Maybe all day on the
19th depending on how it goes?

PROSPECTIVE JUROR ROZIER:  Right.

MR. TIEGER:  Okay.  Thank you,
Mr. Rozier.  It sounds like an auction,
you yawned, so I won't call on you,
Ms. Williams.

Now, Judge Allen kind of talked
about this a little bit, and there is
going to be a lot of questions from
myself and Mr. Whalen, Ms. Williams.  And
the purpose is to get a fair and
impartial jury.  And I know it sounds
like we're gonna kind of drum that into
you, that we're looking for a fair jury
to the State of Ohio, who Ms. Shanahan
and I represent, and also for Mr. Jordan
in this case.

So if there is anything in your

background or belief system that you
think would prevent or impair you from
being fair in this particular case, now
is the time to let us know because really
until you -- you really don't have a
speaking role in this trial so that you
need to tell us now no matter like how
insignificant you think it is.  Because
once you're chosen, and you're thinking
maybe I should have told them this or
that, it's really going to kind of be too
late.

So anything you think that we need
to know about you that will prevent you
from being fair?  Let's see, Mr. Smith?

PROSPECTIVE JUROR SMITH:  What if
you heard the case on the media?

MR. TIEGER:  Absolutely.  That was
my next question actually.  I was going
to tell you a little bit about the case.
I don't know whether any of you heard
about it.  It happened a while back.

PROSPECTIVE JUROR SMITH:  I did.

MR. TIEGER:  Let me read the
witness list first, and then I'll tell

you a little bit about the case just to
make sure it's the same one we're talking
about.  Do you recognize the name?

PROSPECTIVE JUROR SMITH:  Yes.

MR. TIEGER:  Mr. Jordan?

PROSPECTIVE JUROR SMITH:  I heard
about it this morning.

MR. TIEGER:  You heard about it on
the news this morning?

PROSPECTIVE JUROR SMITH:  Well, I
heard the past case and then I heard this
morning news.

MR. TIEGER:  So you follow the
news?

PROSPECTIVE JUROR SMITH:  Yes,
local events occurring.

MR. TIEGER:  Okay.  Let me just
read some of these witnesses off.  Police
Officer Rock.  These are all Cincinnati
Police.  Officer Avant, Ballman, Schare,
Sergeant Hunt.  There is a Victor Davis,
Jr., who's the victim's son.  Kenyada
Davis, who's the victim's daughter.  Dean
Shade, Police Officer Fusselman, Police
Officer Glindmeyer, Police Officer Luke,

1    Police Officer McGuffey; John Heile,

2    who's a ballistic expert at the coroner's

3    lab; Karen Looman and Gretel Stephens,

4    they are both doctors at the coroner's

5    office; Police Officer Odom; William

6    Harry, who's a serologist at the

7    coroner's office; there is a Kenneth

8    Heard, Kareem Gilbert, are potential

9    witnesses in this case.

10          And very briefly, does anybody

11   know any of those witnesses at all that I

12   just mentioned?

13          PROSPECTIVE JUROR WILLIAMS:  I

14   believe Police Officer Rock.

15          MR. TIEGER:  Rock.  Okay.

16   Ms. Williams, how do you know Mr. Rock?

17          PROSPECTIVE JUROR WILLIAMS:  He

18   patrols the neighborhood I live in.

19          MR. TIEGER:  What area of town is

20   that?

21          PROSPECTIVE JUROR WILLIAMS:  Fay

22   Apartments.

23          MR. TIEGER:  Is that up in -- he

24   was, I know, in District 1, but he's in

25   District 3 now.

1        PROSPECTIVE JUROR WILLIAMS:  Well,
2    I never see him.
3        MR. TIEGER:  Okay.  What do you
4    think of Officer Rock?
5        PROSPECTIVE JUROR WILLIAMS:  He's
6    fine with me.
7        MR. TIEGER:  Do you think he does a
8    good job?
9        PROSPECTIVE JUROR WILLIAMS:  Uh-huh.
10        MR. TIEGER:  Do you think he's fair
11    with the people that deserve to be
12    treated fair and maybe hard on the people
13    that don't deserve it?  Are you okay with
14    that?
15        PROSPECTIVE JUROR WILLIAMS:  Uh-huh.
16        MR. TIEGER:  Okay.  Thank you,
17    Ms. Williams.
18        PROSPECTIVE JUROR WILLIAMS:  Uh-huh.
19        MR. TIEGER:  Very briefly, just
20    like Mr. Smith, to make sure we are
21    talking about the same case.  On
22    October 16th of 2008, a 16-year-old by
23    the name of Kareem Gilbert shot and
24    killed a man by the name of Brian Austin
25    in a senseless street murder.  That's the

1    only way to describe it.  On Elder, near

2    the corner of Elder and Republic, the

3    Findlay Market area.

4         The only eyewitness was a guy by

5    the name of Victor Davis, who gave a

6    statement to the police identifying

7    Kareem Gilbert as the shooter.  Then

8    around two weeks later, on October 31st

9    of 2008, the allegation is that Ruben

10   Jordan, who's the father of Kareem

11   Gilbert -- Kareem Gilbert, if you

12   remember, is the shooter of Brian Austin.

13        The allegation is that the

14   defendant in that case, Kareem Gilbert,

15   his dad shot and killed Victor Davis,

16   basically right on the same corner, to

17   prevent his son from being convicted of

18   the murder of Mr. Austin.

19        Okay.  Mr. Smith, is this the case

20   that you heard about?

21        PROSPECTIVE JUROR SMITH:  It's the

22   same case but they said it a little

23   differently.

24        MR. TIEGER:  Okay.  That's one of

25   things that I know Judge Allen will tell

1    you, and even though there is no cameras

2    or reporters in here now, probably during

3    the trial, there will be cameras and

4    definitely Enquirer reporters reporting

5    on this case.  So she -- the Court will

6    tell you and order you not to read any

7    newspaper accounts of this or watch any

8    TV stories on this because a lot of times

9    the news really doesn't get it exactly

10   right.

11           The basic rule on publicity then is

12   that you have to disregard anything that

13   you may have heard about the case, and

14   base your decision -- what's gonna

15   happen, there will be witnesses sworn in.

16   They will sit in this chair and then tell

17   you what they know, if anything, about

18   the case, and then you'll base your

19   decision on their testimony and then any

20   exhibits that you would get to consider

21   taking in the juror room like photos,

22   documents, things like that.

23           In between the exhibits and the

24   testimony, you will decide whether Ms.

25   Shanahan and I proved our case, that he

did it, or we didn't prove our case.  But

it can't be based on what the media says.

Everybody good with that?

      Other than Mr. Smith, has anybody

else heard of this case other than what I

just said?  It's been a while since it

happened.  There hasn't been a lot in the

media recently on it.

      Okay.  Every case is unique and

this is no exception.  In a lot of cases

the identity of the defendant is known.

In that, let's say in a murder trial, the

issue is self-defense.  The person is

saying I did it but I had to do it

because I was gonna be killed, or like in

a date-rape case, the issue is she and I

had sex even though she says it's rape, I

say we had sex and she consented, so it's

really -- the person who had the sex,

it's not in dispute.  The dispute is

whether there was force or not or whether

there was consent.

      This is not that type of a case.

Because while everybody agrees that

Victor Davis was murdered, the issue is

1    the identity of the person who did it,

2    the issue in this case.  So it's not like

3    a self-defense or something.

4         Other cases rely on like eyewitness

5    identification.  Have any of you heard

6    that term?  Eyewitness ID, that type of

7    thing.  Where, let's say you work at a

8    bank or store, a robber comes in with a

9    gun, sticks it in your face and runs out

10   after they take your money.  And then the

11   eyewitness to the crime, whether it's the

12   bank teller or the store clerk says --

13   maybe looks at some photos or something

14   like that, and says that's the person

15   that did it.  Have any of you heard of

16   that type of case, an eyewitness

17   identification case?

18        Another type of case relies on what

19   we call physical evidence or scientific

20   evidence.  Does anybody here watch CSI,

21   Without a Trace or Criminal Minds?  If

22   you could raise your hand, anybody that

23   watches those?  I definitely watch those

24   a lot.  So Ion TV is on for like four or

25   five hours a night.  Did everybody --

most people, it looks like, watch those
shows.

And I don't think I have to tell
you that those shows are not -- there is
elements of realism, but there is a lot
of Hollywood in those.  Does everybody
understand that primarily that's for
entertainment?  Because you get a lot of
jurors that say, well, why didn't you do
it like Criminalist Stokes did it or
something like that.  Does everybody
understand the difference between those
TV shows and in the way things really
happen in court?  Everybody okay with
that?

This case is like a lot of cases
where it's a combination of eyewitness
identification and scientific evidence.
And it's also statements of the defendant
confessing to somebody else that he had
done it.  So it's kind of a mixture of a
lot of different types of cases.

And just talking about eyewitness
identification cases, would you all agree
with me that there is different types of

1   eyewitness ID cases, and one is it's a
2   stranger.  The store clerk, the bank
3   teller, a stranger walks in, you have
4   never seen that person before.  They come
5   in, they rob you, it's over in like 15
6   seconds, and you're asked to identify
7   somebody that you have never seen before.
8   But that can be difficult to do,
9   especially if time passes, you look at
10  some photos, that looks like him.  And,
11  you know, sometimes that does get a
12  little bit questionable.
13          The other type of eyewitness ID
14  case is somebody that commits a crime
15  that you know.  They're friends, family,
16  whatever they are, but a crime is
17  committed and you know that person.  You
18  knew them before the crime occurred, and
19  you're identifying somebody that you
20  know.  Does everybody agree that is a
21  different type of identification?
22          And if it's somebody you know,
23  would you agree that the danger is not
24  really misidentifying them.  What you
25  have to do is look at their credibility

or believability as to why -- why would
that person say that this other person
that they know committed a crime?  It's
obvious that they know who it is.  So
there is no danger, like you got the
wrong guy, but would you look at what's
their motive or why would they say that?

Ms. McKeehan, could you talk to me
a little bit about that?

PROSPECTIVE JUROR MCKEEHAN:  Why I
would look at the background, well, not
exactly the background, but what their
motive was for saying that because
sometimes people lie.

MR. TIEGER:  Okay.

PROSPECTIVE JUROR MCKEEHAN:  That's
-- I think we have all been in a
situation where we know someone is lying.

MR. TIEGER:  Okay.

PROSPECTIVE JUROR MCKEEHAN:  So
take into account why they are saying
what they are saying, what their
relationship is with the other person and
what they have to gain out of a yes or
no.

1     MR. TIEGER:  Okay.  And I don't

2  want it put you on the spot, but did you

3  have a specific incident in mind where

4  somebody said something about you or

5  somebody that you know?

6     PROSPECTIVE JUROR MCKEEHAN:  Yeah,

7  people say things about me all the time.

8     MR. TIEGER:  Okay.

9     PROSPECTIVE JUROR MCKEEHAN:  Yeah.

10     MR. TIEGER:  Well, what type of

11  thing would somebody say that you could

12  think of that to -- let us know that

13  people might have said that you did

14  something that you didn't do?

15     PROSPECTIVE JUROR MCKEEHAN:  Well,

16  I do dog rescue, and quite often someone

17  will say that I made a bad choice in

18  where I put a dog, or that I didn't vet

19  my dog properly or do something when I

20  know I did.  And it could be because they

21  didn't like the rescue, or they don't --

22  they have a different belief about dog

23  rescues than we do, or they have

24  different criteria of how they think the

25  dog should be vetted, and it could be

1  just totally wrong, that they are

2  mistaken.

3         MR. TIEGER:  Tell me about the dog

4  rescue.  What do you do?  It sounds like

5  all I do is watch TV, but I watch Animal

6  Planet and they have that on Animal

7  Planet.

8         PROSPECTIVE JUROR MCKEEHAN:  It's

9  my hobby.  I take dogs that are going to

10  be euthanized and we pull them out of

11  shelters and we get them ready for

12  adoption and then every weekend we have

13  an adoption event where we match the dogs

14  with potential homes.

15         MR. TIEGER:  Okay.  Ms. Shanahan is

16  starting to like you a lot because she

17  loves dogs, so I know that you just made

18  a friend in Megan.  But when you say

19  vetted wrong, what does that mean?

20         PROSPECTIVE JUROR MCKEEHAN:  Some

21  people vet their dogs to the t's.  I

22  mean, they get their teeth cleaned, and,

23  you know, we do basic shots and basic

24  vetting, but some people go beyond that.

25  You know, they do cosmetic on their dog.

1    They will do, like I said, dentals.  They

2    do all kinds of other grooming aspects to

3    the dog.  People have different ideas on

4    how far to go.

5          MR. TIEGER:  So somebody might say

6    that you did or didn't do something with

7    regard to a dog rescue that you knew that

8    you did everything that you should have

9    done and it was done correctly?

10         PROSPECTIVE JUROR MCKEEHAN:  Yes.

11   Yes.

12         MR. TIEGER:  Okay.  Does anybody

13   have any other thoughts on that?

14         Ms. Coffman, do you have any

15   thoughts on that at all?

16         PROSPECTIVE JUROR COFFMAN:  No, I

17   don't.  I agree with her.

18         MR. TIEGER:  Okay.  If somebody

19   came in and that person was known to the

20   person and said that that person did

21   something, you would look at it as

22   Ms. McKeehan said the --

23         PROSPECTIVE JUROR COFFMAN:  The

24   reason, why they would say that I would

25   probably -- before I would believe it, I

would look into the question why should I
believe it.

   THE COURT:  Speak up a little bit.

   PROSPECTIVE JUROR COFFMAN:  I would
look into the reason why they said the
person said that.

   MR. TIEGER:  Okay.  And in this
case -- sorry to put you all in a vacuum
here.  Kareem Gilbert, who is the -- I
think he's now probably 18 or so, but at
the time he was 16.  He's going to
testify against his own father in this
case.  And he was originally charged with
the murder of Mr. Austin and Mr. Davis,
and then prior to his trial Mr. Gilbert
told us, Ms. Shanahan, myself and the
Cincinnati Police, that, yes, I did shoot
and kill Mr. Austin, I did that.  But
that I did not shoot and kill Victor
Davis.  I was there but my father shot
and killed Mr. Davis.

   And in exchange for his cooperation
in this case, he pled guilty to being
responsible for the death of Mr. Austin,
and he received an 18-year prison

1    sentence, and that's an 18-year sentence
2    where you get no credit for good time or
3    lighter sentences or anything.  He has to
4    serve a full 18 years in the
5    penitentiary.  And in exchange for that,
6    his agreement with Ms. Shanahan and
7    myself and the Cincinnati Police was that
8    he testify truthfully in this case
9    against Mr. Jordan, Mr. Fitzgerald.  How
10   do you feel about that?
11        PROSPECTIVE JUROR FITZGERALD:  I
12   guess I don't have a -- I don't know how
13   to feel.
14        MR. TIEGER:  Okay.
15        PROSPECTIVE JUROR FITZGERALD:  The
16   whole thing makes me a little nervous, to
17   be honest with you.
18        MR. TIEGER:  Can you tell me why?
19        PROSPECTIVE JUROR FITZGERALD:  I've
20   never been in a courtroom.
21        MR. TIEGER:  Okay.  The whole
22   process you mean.  Okay.  And I think
23   everybody is super nervous because Ms.
24   Shanahan and I have been doing this for a
25   long time, and you're here, you know,

1     under the bright lights with the court

2     reporter and we're trying to go into, you

3     know, your feelings about things, and it

4     is kind of nerve-racking.  And we

5     apologize for that but there is a lot at

6     stake for not only Mr. Jordan but for the

7     family of Mr. Davis and the community in

8     general.

9          But in terms of the witness

10    cooperation, that he could have gotten

11    more time than the 18 years had he gone

12    to trial, in exchange for that sentence

13    and his truthful testimony, he's

14    testifying against his father.  Does

15    anybody think or can we talk about, you

16    know, because he could have gotten more

17    time, because there is this so-called

18    plea deal reached with him that they are

19    just not going to buy or believe what

20    he's going to say?

21          Ms. Binkley?

22          PROSPECTIVE JUROR BINKLEY:  Yeah, I

23    have no problem with that.  And like him,

24    this is all very intimidating right now,

25    but, no, I have no problem with that.

1    MR. TIEGER:  Okay.  Mr. Rozier?

2    PROSPECTIVE JUROR ROZIER:  None at

3    all.

4    MR. TIEGER:  Okay.  And,

5    Mr. Rozier, could you tell me what your

6    feelings on that were?  For instance,

7    when a co-defendant, so to speak, gets a

8    lessor sentence and agrees to testify,

9    obviously, he knows his father, so the

10   danger really isn't in misidentification.

11   It's of maybe does anybody --

12   PROSPECTIVE JUROR ROZIER:  Could be

13   that he's loyal to his father.

14   THE COURT:  Can you repeat that

15   louder.

16   PROSPECTIVE JUROR ROZIER:  I said

17   --

18   THE COURT:  And the reason -- wait

19   a minute.  The reason we are asking you

20   to repeat or get louder is because the

21   court reporter is faithfully recording

22   every syllable that she hears and that's

23   one of the reasons.

24   PROSPECTIVE JUROR ROZIER:  Okay.  I

25   just -- what I was saying basically was

1    he got to testify against his father,

2    right?  So by him testifying against his

3    father that would make his terms come up

4    lighter.

5         MR. TIEGER:  Well, right.  He's --

6    there is no turning back from the 18.

7    The 18 is the bottom line what he got for

8    what we say is telling the truth about

9    what actually happened.

10        PROSPECTIVE JUROR ROZIER:  But he

11   could be lying still.

12        MR. TIEGER:  And that's what I

13   wanted to ask you.  Does anybody feel

14   that because Ms. Shanahan and I made this

15   agreement with him that you're going to

16   have a hard time really believing him

17   because of the plea deal that was reached

18   between Ms. Shanahan, myself and

19   Mr. Gilbert?

20        PROSPECTIVE JUROR ROZIER:  I

21   wouldn't have a hard time believing it.

22        MR. TIEGER:  Okay.  But can you

23   elaborate on that a little bit?

24        PROSPECTIVE JUROR ROZIER:  Well,

25   pretty tough.

1    MR. TIEGER:  Well, what I'm saying

2    is he's going to -- whether it's late

3    this week or early next week, come in

4    here and sit in this chair and tell you

5    that I shot and killed a guy for

6    basically no reason.  And I was with my

7    dad when he shot and killed Victor Davis.

8    Now he's going to be an admitted killer,

9    and he's an admitted killer that got an

10    18-year prison sentence.  Do any of you

11    think that, you know, God, this kid, I

12    mean he's killed a guy on the street.

13    Mr. Smith?

14    PROSPECTIVE JUROR SMITH:  Yeah, I

15    could look at him as a liar because he

16    might not like his father.

17    MR. TIEGER:  Okay.

18    PROSPECTIVE JUROR SMITH:  So that

19    could be an option in my mind right

20    there.

21    MR. TIEGER:  Yes, sir.  Would

22    you -- for instance, if myself or Ms.

23    Shanahan, Ms. Williams or Mr. Whalen

24    asked him, Mr. Gilbert, do you like your

25    dad?  Absolutely.  In fact, I told him

what I did.  We were close and he --
whatever he says, or he might say he
doesn't like him because of various
reasons.

I guess what I'm getting at, can
all of you treat Mr. Gilbert fairly while
looking at why he may say what he's
saying?  Would any of you discount him,
look, he's killed a guy for no reason?

PROSPECTIVE JUROR ROZIER:  I would,
because he killed somebody.

MR. TIEGER:  What?

PROSPECTIVE JUROR ROZIER:  Because
he committed murder already.  That means
he could lie about anybody because he
already killed someone.

MR. TIEGER:  And how would that --
so you would have -- it would be
difficult for you to really --

PROSPECTIVE JUROR ROZIER:  Believe
him at all because he is a murderer.

MR. TIEGER:  Okay.  And this is
kind of why we go through this
questioning because there is no right or
wrong answers.  Nobody is in any trouble

1    for this.  People are excused from jury

2    service for a variety of reasons every

3    day.  And if this is a type of case that

4    you can't be on, I'm sure there is

5    another type of case that you could, with

6    different witnesses and different facts.

7    So, that's why we ask this.

8         If you have got a -- I mean, he

9    said he did it.  He'll tell you that he

10   did it, so he is a killer.

11        PROSPECTIVE JUROR ROZIER:  He's a

12   killer but he's also a liar too because

13   he's a murderer.  It's just as simple as

14   that.  Why would you go out and murder

15   somebody innocently for no reason at all?

16   To me, you're a liar right off the top

17   because you're doing something stupid

18   anyway.

19        MR. TIEGER:  Would it be fair to

20   say then that would prevent or

21   substantially impair you from being a

22   fair juror in this case because he is a

23   very important witness in our case?

24        PROSPECTIVE JUROR ROZIER:  Yeah, I

25   will say that.  Yeah.

1          MR. TIEGER:  Okay.  Judge, I don't

2      know how you do the --

3          THE COURT:  Well, when both of you

4      are finished.  I mean, the defense might

5      want to rehabilitate him.  I don't know

6      whether you want --

7          MR. TIEGER:  I guess I would ask

8      that he be excused for cause.

9          THE COURT:  I'm gonna withhold

10     until all sides have a chance to question

11     him, but we will --

12         MR. TIEGER:  Okay.

13         THE COURT:  -- make that motion at

14     the right time.

15         MR. TIEGER:  I really appreciate

16     your honesty, Mr. Rozier, because that is

17     extremely important.  It's better that we

18     ask that now, because if we didn't know

19     what your thoughts were that -- basically

20     you could not give Mr. Gilbert a fair

21     hearing, right?

22         PROSPECTIVE JUROR ROZIER:  No,

23     because he a murderer.  I'm not going to

24     believe no murderers.

25         MR. TIEGER:  Gotcha.  Let's talk

1  about what Mr. Rozier said, because,

2  obviously, that's extremely important in

3  what we talked about.  Does anybody feel

4  like Mr. Rozier feels?  Mr. Smith?

5       PROSPECTIVE JUROR SMITH:  Well, not

6  just that he's a murderer, but to do

7  something senseless.  And then I have

8  seen a lot of guys who do stuff and just

9  they want to drag everybody down with

10  them, so I don't know if this guy is

11  going to be truthful.  He might be a good

12  liar.

13       MR. TIEGER:  Okay.

14       PROSPECTIVE JUROR SMITH:  It's kind

15  of hard -- it's kind of hard to walk in

16  and say, yeah, I'm looking at the guy

17  with a blank mind and I'm going to give

18  him a fair opportunity.  We already know

19  he's got these strikes against him

20  already.  So to be honest, you know, I

21  don't think I could look at him fairly.

22       MR. TIEGER:  Your personal views

23  would prevent or substantially impair you

24  from being fair in this particular case?

25       PROSPECTIVE JUROR SMITH:  Yes.

1          MR. TIEGER:  On that issue?

2          PROSPECTIVE JUROR SMITH:  Yes.

3          MR. TIEGER:  Thank you, Mr. Smith.

4    Does anybody else feel like that?

5    Anybody up here -- let's see,

6    Ms. McKinney, how do you feel about that?

7          PROSPECTIVE JUROR MCKINNEY:

8    Honestly, I feel differently because we

9    are here to hear -- we are here now to

10   hear different facts from both sides, and

11   honestly I don't know him, I don't know

12   what his past was or anything like that.

13   Well, I know he did kill someone, but we

14   are here to hear what he has to say, just

15   hear both sides, get the facts and then

16   make -- you know, make a judgment.  I

17   can't judge him on what he does.

18         MR. TIEGER:  Okay.  Thanks,

19   Ms. McKinney.

20         Ms. Heintz, could you talk to me a

21   little bit about that?

22         PROSPECTIVE JUROR HEINTZ:  I'm the

23   same.  I'm willing to sit here, listen

24   and take everything as it is.

25         MR. TIEGER:  Other than Mr. Smith

1    and Mr. Rozier, does everybody feel like

2    Ms. McKinney and Ms. Heintz pretty much?

3    Does anybody back here -- does anybody

4    have trouble going in with Mr. Gilbert's

5    testimony?

6         Let's see, Ms. Spencer.  Ms.

7    Spencer, did you feel like Mr. Rozier and

8    Mr. Smith?

9         PROSPECTIVE JUROR SPENCER:  It's

10   not that.  It's -- to be perfectly

11   honest, I have a son in prison.

12        MR. TIEGER:  Yes, ma'am.

13        PROSPECTIVE JUROR SPENCER:  And

14   it's like going through this all over

15   again.  And no matter what was said, I

16   will probably relate it to myself, you

17   know.

18        MR. TIEGER:  Yes, ma'am.

19        PROSPECTIVE JUROR SPENCER:  And it

20   will be hard.  I don't think I could

21   really be honest because I'm gonna put it

22   back to me and my son.

23        MR. TIEGER:  Thank you,

24   Ms. Spencer.  Basically, just to

25   elaborate a little bit, there is a lot of

1    Cincinnati street murders.  Is everybody
2    aware of that?  And do all of you know
3    it's very difficult to get witness
4    cooperation in these cases?  Has anybody
5    heard that?  Has anybody heard that there
6    is a fear of testifying, because no
7    matter what I tell somebody, don't worry,
8    you'll be safe, either they have to move
9    back in that neighborhood or they have
10   got people that live in that neighborhood
11   where the shooter is?  Does everybody
12   understand that?
13        As I said, Kareem Gilbert is not
14   the most articulate person in the world,
15   and I think I told you he is a dangerous
16   person that deserves to be locked up.
17   There is no question about that.  But
18   that at a certain point, do all of you
19   understand that myself, Ms. Shanahan and
20   the Cincinnati Police had a decision to
21   make.  When somebody comes to you and
22   says, hey, I did the first one but I
23   didn't do the second one, it was him, we
24   have to make a decision.  And we looked
25   at all the facts and circumstances of the

second case and we made a decision to do
the 18-year prison sentence.  And then we
made a decision that it was more
important for us to catch and pursue the
actual hands-on killer of Mr. Davis.  Is
everybody okay with that, with making
that kind of decision?

I think we have talked enough about
that.  The next thing I talked a little
bit about was that there is the
defendant, somebody is going to come in
here and tell you, Mr. Heard, that Mr.
Jordan confessed to him that he had done
it.  And Mr. Heard at the time was a drug
dealer.  Okay.  It's never going to end,
I know.  A lot of bomb shells.  But
anyway, he is a drug dealer.  He's going
to tell you back when this was going on
he was selling crack cocaine in Avondale
around the Burnet Avenue area.  And he's
going to come in here and tell you very
specifically that the defendant told him
that he killed Victor Davis to protect
his son.

Now, does anybody -- kind of like

what we talked about with Kareem Gilbert,
because somebody is a drug dealer -- in
fact, he's going to tell you that he was
Mr. Jordan's supplier, that, you know
what, he's a drug dealer, that's pretty
much it.  Like his credibility is shot
with me?

        Mr. Burke, how do you feel about
that?

        PROSPECTIVE JUROR BURKE:  You have
to -- I don't automatically
disconsider -- I mean, I don't approve of
drug dealing, but just because they are a
drug dealer doesn't necessarily mean they
are automatically a habitual liar.  I
would have to hear the whole facts,
everybody's story to see how things fit
and how people explain why they did the
things.  I can't just pick a class of
people out and say I don't believe
anything they say.

        MR. TIEGER:  Okay.  Ms. Bessey?

        PROSPECTIVE JUROR BESSEY:  I don't
see what would be in it for him to lie
because he said --

THE COURT: Ma'am, can you just keep your voice up, please?

PROSPECTIVE JUROR BESSEY: I don't think there is anything in it for him to lie.

MR. TIEGER: Okay. Mrs. Williams?

PROSPECTIVE JUROR WILLIAMS: How did you find out he was a drug dealer?

MR. TIEGER: Well, he --

PROSPECTIVE JUROR WILLIAMS: Is he trying to cover -- well, he claims he's trying to cover up what he did because he told you he was a drug dealer. But did he come forward and tell you that he did it, or did he get in trouble and now he's trying to say that, you know?

MR. TIEGER: He's trying to like get case consideration?

PROSPECTIVE JUROR WILLIAMS: Yeah.

MR. TIEGER: No, this is not one where there is any case consideration, so he just came forward?

PROSPECTIVE JUROR WILLIAMS: He came forward.

MR. TIEGER: Right.

1    PROSPECTIVE JUROR WILLIAMS:  All

2    right.

3    MR. TIEGER:  Okay.  Just because

4    you wouldn't discount that, because he's

5    a dealer he's not looking for anything

6    for saying this at all.  Nothing has been

7    promised him or told to him.  And you're

8    shaking your head.

9    PROSPECTIVE JUROR WILLIAMS:  Why

10   would he come forward?

11   MR. TIEGER:  Well, and I know it

12   sounds corny, but -- and, again,

13   sometimes people come forward because

14   they think it's the right thing to do.

15   PROSPECTIVE JUROR WILLIAMS:  A drug

16   dealer?

17   MR. TIEGER:  And, again -- right.

18   And that's why I wanted to ask you that

19   because I know, like Mr. Burke said, even

20   though he's admitting selling, you know,

21   he could be --

22   PROSPECTIVE JUROR WILLIAMS:  Right.

23   MR. TIEGER:  He thinks it's wrong

24   for somebody to say they did it and let

25   their son be the one that's in jail for

it.

PROSPECTIVE JUROR WILLIAMS:  Right.
But then he said he did it to protect his
son.  If his son is already a murderer,
why?

MR. TIEGER:  There's a difference
between one murder and two murders, I
guess.  I guess what the difference would
be --

PROSPECTIVE JUROR WILLIAMS:  Yes.

MR. TIEGER:  You're having some
trouble with that, I think.

PROSPECTIVE JUROR WILLIAMS:  Yes.

MR. TIEGER:  Okay.  Do you think
you could listen to him and treat him
fairly?

PROSPECTIVE JUROR WILLIAMS:  Yeah.

MR. TIEGER:  Okay.  Let's see,
Ms. Coffman, how do you feel about that?

PROSPECTIVE JUROR COFFMAN:  I would
like to hear it all.  I might have -- I
mean, I would like to hear it before I
decide one way or the other.  I have no
preconceived notion about him until I see
him.

1        MR. TIEGER:  Okay.  Ms. Binkley?

2        PROSPECTIVE JUROR BINKLEY:  That's

3    why I'm here, for all of you attorneys to

4    prove or disprove, and I would listen to

5    all of the facts.

6        MR. TIEGER:  Thank you,

7    Ms. Binkley.  Moving on, which I think we

8    have covered this enough.  I talked a

9    little bit about scientific or physical

10   evidence.  This case does have scientific

11   evidence, and it's something called DNA.

12   Has everybody heard of DNA?  Everybody?

13        And, basically, that's like a

14   biological fingerprint, and it's used for

15   a lot of reasons.  It could either point

16   to somebody that is guilty, it could

17   exonerate the innocent.  Would everybody

18   agree with that, that's their

19   understanding of it?  It's also used for

20   like paternal cases, like who the parents

21   are of a child, and it's used, I think in

22   medicine, for like diseases and try to do

23   research.  Does everybody accept DNA

24   evidence?  I know when it first started,

25   everybody is like, wow, DNA, like it's a

bunch of test tubes, like how can anybody
like really believe that? But I think
it's been around long enough to where
it's generally accepted. Does everybody
accept DNA as evidence if it's properly
presented? Everybody okay with that?

Now, I think Judge Allen told you
the defendant is charged with aggravated
murder. And basically what that means is
it's premeditated murder, is basically
what that means. But this is not a death
penalty case. So, the death penalty is
not one of the options. If the death
penalty were one of the options, this
would be a whole different jury
selection. There would be a hundred or
50 of you in here, all we would be
talking about is what your feelings are
on the death penalty, and basically with
those juries, once you find him guilty,
there is a second like mini-trial where
we ask for death and they ask for life
and then you decide which of the
penalties it is.

So that's absolutely not going to

happen.  It's not one of the options.
It's not a death penalty case.  And if
you find the defendant guilty, no one
will ask you what you think he -- what
punishment he should get.  So that cannot
even enter into your deliberations
because the law says that Judge Allen
gets to decide what the punishment is,
and you don't even have a voice or an
input into it.  Is everybody okay with
that?

PROSPECTIVE JURORS:  Yes.

MR. TIEGER:  Now, the case does
have police witnesses.  And in going
through your questionnaires, it looks
like some of you are friends with or
related to police.  The basic rule on
police is that you would treat them like
you would anybody else.  Now some people
love the police so much that when a
policeman walks up here they're
automatically going to believe a hundred
percent of what they say.

On the other hand, there is people
that hate police so much that they come

1  up here and they just -- they're not

2  buying it from the beginning.  The

3  correct response for those of you that

4  know or are related to police, they are

5  just like all of us anyway, and just like

6  I think a lot of you said, you would

7  listen to them, judge their credibility

8  and make your own decisions.

9       Is everybody okay with that?  Has

10  anybody ever had any bad dealings with

11  police at all?  Nobody.  Everybody is --

12       PROSPECTIVE JUROR SMITH:  Like

13  traffic stops or something, you know, but

14  nothing to where I was, you know --

15       MR. TIEGER:  Like covered up or

16  lied on or --

17       PROSPECTIVE JUROR SMITH:  No, not

18  on that one before, but it was really a

19  mistaken identity, so...

20       MR. TIEGER:  What happened there?

21       PROSPECTIVE JUROR SMITH:  A young

22  lady hit the back of my car, and I had

23  just came back here from California and I

24  had bought a brand new Trans Am.  And

25  when the girl hit me, I was out of the

1  car, like of all the cars you could hit,

2  and when the cop came up, he grabbed me

3  by the shoulder and slammed me on the

4  car.  So that was basically after the

5  girl told him he was grabbing on the

6  wrong person.  So that was about it right

7  there.

8       MR. TIEGER:  Okay.  Anybody else

9  have any bad dealings with police at all?

10       PROSPECTIVE JUROR ROZIER:  Just

11  racial profiling, stopped by them.

12       MR. TIEGER:  I'm sorry.  That

13  happens.

14       PROSPECTIVE JUROR ROZIER:  Too many

15  sheriffs in too many places.  And I'm

16  talking about less than two weeks ago I

17  was stopped midnight coming up Madison

18  Road on my way home.

19       MR. TIEGER:  There is no place for

20  that, and I apologize.

21       PROSPECTIVE JUROR ROZIER:  I said

22  dude, why are you stopping me?  He said I

23  had a clear license plate on my tag.  He

24  said my flashing tags should be covered

25  up with a clear plate.  I'm like they

1    sell them at the automobile place.

2         MR. TIEGER:  That should have no

3    role in any case, but it definitely does

4    not have a role in this case at all

5    whatsoever.  Has anybody, either

6    themselves or a friend or family member,

7    ever been the victim of a violent crime

8    or accused of a violent crime?

9         PROSPECTIVE JUROR ROZIER:  I have a

10   relative who went to jail.

11        MR. TIEGER:  Was that in Ohio?

12        PROSPECTIVE JUROR ROZIER:  Yes.

13        MR. TIEGER:  Mr. Rozier?

14        PROSPECTIVE JUROR ROZIER:  Yes, he

15   did 25 years.

16        MR. TIEGER:  When was that?

17        PROSPECTIVE JUROR ROZIER:  It was

18   the professor who got killed over at UC

19   off campus, someplace off campus at his

20   office.  He went in there and robbed him

21   and killed him.  That was back in 1977.

22        MR. TIEGER:  Okay.  Do you feel

23   that your relative was treated fairly in

24   that case?

25        PROSPECTIVE JUROR ROZIER:  Yeah.

MR. TIEGER:  Okay.

PROSPECTIVE JUROR WILLIAMS:  My children's father was a victim of a crime.

MR. TIEGER:  Ms. Williams, what type of victim was he?

PROSPECTIVE JUROR WILLIAMS:  He was murdered in Birmingham, Alabama at a nightclub.

MR. TIEGER:  How long ago did that happen?

PROSPECTIVE JUROR WILLIAMS:  In August of '06.

MR. TIEGER:  Was anybody ever caught?

PROSPECTIVE JUROR WILLIAMS:  No.

MR. TIEGER:  Do you feel that the police investigated that properly or did everything?

PROSPECTIVE JUROR WILLIAMS:  No, I never got into no details about it except Birmingham, Alabama.  So, no, I don't even talk about it with any of his relatives, nothing.

MR. TIEGER:  You're just not sure

1    what?

2              PROSPECTIVE JUROR WILLIAMS:  No.

3              MR. TIEGER:  What happened by way

4    of trying to figure out who did it, and

5    you're going to have a family in here,

6    the Davis family who lost a husband or a

7    father, do you think you could be fair to

8    Mr. Jordan knowing that you have been

9    through the same thing as a victim?

10             PROSPECTIVE JUROR WILLIAMS:  Yeah.

11             MR. TIEGER:  Has anybody ever been

12   confronted with like a weapon, like a gun

13   or knife.  Ms. Binkley?

14             PROSPECTIVE JUROR BINKLEY:  Yes.  I

15   used to work at a restaurant as a manager

16   and I was held up for money, and he had

17   his hand in his pocket, so I don't know

18   if I was held up by a gun or a finger.

19             MR. TIEGER:  Yes, ma'am.  Now

20   that's pretty common.  Like a lot of

21   banks and so forth.

22             PROSPECTIVE JUROR BINKLEY:  Right.

23             MR. TIEGER:  You have to act like

24   it's a real gun.

25             PROSPECTIVE JUROR BINKLEY:  Yeah, I

1 did.

2   MR. TIEGER:  Did that person get

3 away?

4   PROSPECTIVE JUROR BINKLEY:  Yes.

5   MR. TIEGER:  Were they ever caught?

6   PROSPECTIVE JUROR BINKLEY:  No.

7   MR. TIEGER:  Did that person show

8 their face at all?

9   PROSPECTIVE JUROR BINKLEY:  They

10 had a hat on.  And to be quite honest

11 with you, I didn't even look at him at

12 all.  I was concerned with giving him the

13 money and I almost didn't even want to

14 look at him.

15   MR. TIEGER:  Okay.  Did anybody

16 ever ask you to identify the person that

17 did it?

18   PROSPECTIVE JUROR BINKLEY:  Oh,

19 yeah, they tried.  I had the police come

20 to my house and draw a drawing, you know,

21 but I had no idea what he looked like.

22   MR. TIEGER:  What part of town did

23 that happen in?

24   PROSPECTIVE JUROR BINKLEY:  On the

25 west side of town.

1    MR. TIEGER:  Okay.  How long ago
2  was that?
3    PROSPECTIVE JUROR BINKLEY:  Oh my
4  God.
5    MR. TIEGER:  It's been a while.
6    PROSPECTIVE JUROR BINKLEY:  It's
7  been a long while.
8    MR. TIEGER:  Okay.  And I think
9  Ms.  --
10   PROSPECTIVE JUROR MCKEEHAN:
11 McKeehan.
12   MR. TIEGER:  -- McKeehan.
13   PROSPECTIVE JUROR MCKEEHAN:  Yes.
14 18 years ago I was robbed on the L train
15 in Chicago.  I was the only one there, he
16 just stole a necklace, and that's it.  I
17 was like just take what you want, don't
18 hurt me, and he did, he jumped off at the
19 next exit and I made my way up to the
20 front of the cab and took a report.  They
21 never caught them.  I never heard
22 anything else.  I didn't really see him,
23 I really didn't want to look, because I
24 wanted him to leave me alone.
25   MR. TIEGER:  Yes, ma'am.  Sorry

again that happened.  Anybody else been
through something similar?  As you
noticed, I have used some graphic terms.
There is going to be explicit testimony
from some of the witnesses, but certainly
the coroner is going to be about the
cause of death.  And there is going to be
photos of victims showing their fatal
injuries.  Nobody enjoys looking at those
kind of pictures and hearing that type of
testimony, but it is part of the case.

Can everybody listen to that type
of testimony and look at those type of
graphic pictures in this case?  Everybody
okay with doing that?  I know some of you
are probably like this, because I know I
am, I'm like a very curious person.  You
want to now the answer to everything.
You want to know why things happen.  You
want to kind of get to the bottom of it.

And Judge Allen touched on this
when she first spoke to you, that there
are rules of evidence that apply in this
case and that there may be some questions
that Ms. Shanahan and I have.  We may

object, Mr. Whalen and Ms. Williams may

object to certain things, and those are

things you can consider.  You're maybe

wanting to know like what's the answer,

why weren't they allowed to say it, or

there may be some things that Ms.

Shanahan, myself, Mr. Whalen and

Ms. Williams forget to ask or don't ask

that you might want to know.  There may

be legal reasons that we are not allowed

to ask it so we don't ask it.

But what  I'm kind of getting at in

a long-winded way, saying that you're not

going to be permitted to raise your hand

and ask any questions of the witness or

anything like that.  You're basically

stuck with whatever the evidence is that

comes out in the courtroom.  Can

everybody accept that?  Because there are

going to be things that you don't know

about the case that you wish you did, but

you're going to have to be making a

decision anyway.  Is everybody good with

that?

In this case, like every other

1    case, every case I have ever done, is

2    that there are going to be

3    inconsistencies in this case.  Whatever

4    they may be, things are going -- are any

5    of you like scientific or chemists or

6    engineers, accountants, anything like

7    that?

8         PROSPECTIVE JUROR MCKEEHAN:  Not an

9    accountant but I work in accounting.

10        MR. TIEGER:  Okay.  A lot of times

11   things have to add up exactly between

12   column B and column A or else it just

13   doesn't work.  In this case there are

14   going to be things that don't exactly

15   match up.  Is everybody okay with that,

16   or is everybody going to be expecting

17   perfection in our presentation?  When

18   you're dealing with human credibility,

19   human frailty, especially things that

20   happened a number of years ago, memories

21   are going to be different.  There are

22   going to be things that are a little bit

23   different.  Is everybody okay with that?

24   Does everybody understand?

25        There's what we call the standard

of proof which means that Ms. Shanahan
and I have to prove to you that Ruben
Jordan is guilty of this crime, and we
have to show you that by what's called
beyond a reasonable doubt. And that's
the standard of proof, we call it.
That's used in every case in the State of
Ohio from like the most minor traffic
case, like a speeding trial, running a
red light, shoplifting, any kind of case
like that, all the way up to like rape
and murder. It's the same exact words
that Judge Allen will read you out of a
book that is used in every case in the
State of Ohio, and that's called beyond a
reasonable doubt. Can all of you accept
that definition? Because sometimes on TV
you hear the word like a shadow of a
doubt. Have any of you heard that word?
But it's called beyond a reasonable
doubt.

Can everybody follow that rule? I
won't tell you what it is, the Court will
tell you. Can you follow the law as the
Court gives it to you on that?

The other thing that Ms. Shanahan
and I are going to ask you to do is pass
judgment on Mr. Jordan.  And by that I
mean we are going to ask you to decide
whether he actually killed Mr. Davis or
not.  And the reason I bring it up is
that a long time ago I had a case, I
don't think it was a murder case, I can't
really remember, but it was kind of a
long trial we went through.  The 12 of
you go back in the jury room, okay, let's
start.  One of the jurors turns their
chair around, it's not up to me, it's up
to God.  I'm not going to sign a guilty.
I'm not going to sign a not guilty.  It's
not my place to decide whether he did it
or not.

Well, that's an extreme example.
It really is true.  And because of that,
we had to, a couple months later, pick a
new jury, have everyone testify again,
and go through the same thing.  So ever
since then I have asked that question.
Can all of you, when the time comes, do
any of you have a religious or moral

1   belief that would prevent you from

2   passing judgment on another person?

3   Nobody does?

4        And by that I mean if Ms. Shanahan

5   and I have proven our case to you, can

6   all of you sign a guilty verdict saying

7   that Mr. Jordan did this crime?  Can

8   everybody do that?

9        On the other hand, if I haven't

10  proven my case, can all of you sign a not

11  guilty verdict?  One or the other?  Okay.

12       Has anybody, either yourself or a

13  family member or friend, ever been

14  involved in the criminal justice system

15  either as a victim or a witness?  No.

16  How about the opposite where either

17  yourself or a friend or family member has

18  ever been accused or charged with a

19  crime?  And by that I mean like, well,

20  let's see, like domestic violence or OVI,

21  DUI, disorderly conduct, theft, anything

22  like that, you, yourself, family member,

23  Ms. McKinney?

24       PROSPECTIVE JUROR MCKEEHAN:  My

25  uncle, he was found guilty of domestic

1    violence.

2         MR. TIEGER:  Who was the victim in

3    that?

4         PROSPECTIVE JUROR MCKINNEY:  His

5    wife.

6         MR. TIEGER:  And that would be your

7    aunt?

8         PROSPECTIVE JUROR MCKINNEY:

9    Uh-huh.

10        MR. TIEGER:  She had said -- did he

11   admit that he did it or did he deny it?

12        PROSPECTIVE JUROR MCKINNEY:  I

13   believe he denied it, but he got found

14   guilty.

15        MR. TIEGER:  So your aunt said it

16   happened?

17        PROSPECTIVE JUROR MCKINNEY:  Uh-huh.

18        MR. TIEGER:  She said that he

19   abused her, hit her.  He said he didn't

20   do it but somebody decided that she was

21   telling the truth?

22        PROSPECTIVE JUROR MCKINNEY:  I

23   believe she had bruises.  There was

24   evidence to prove that he did do it.

25        MR. TIEGER:  How long ago was that?

1          PROSPECTIVE JUROR MCKINNEY:  About

2     three months ago.

3          MR. TIEGER:  Okay.

4          PROSPECTIVE JUROR MCKINNEY:  About

5     six months ago.  I take that back.

6          MR. TIEGER:  Are you close to your

7     aunt and uncle?

8          PROSPECTIVE JUROR MCKINNEY:  No.

9     Well, I talk to them occasionally at

10     holidays and stuff like that.

11          MR. TIEGER:  And did you feel that

12     the court system treated her and him

13     fairly in that case?

14          PROSPECTIVE JUROR MCKINNEY:  Uh-huh.

15          MR. TIEGER:  You're okay with the

16     result?

17          PROSPECTIVE JUROR MCKINNEY:  Uh-huh.

18          MR. TIEGER:  Even though he denied

19     it, there was sufficient proof to say

20     that he did it?

21          PROSPECTIVE JUROR MCKINNEY:  (Nods

22     affirmatively.)

23          MR. TIEGER:  Ms. Williams?

24          PROSPECTIVE JUROR WILLIAMS:  I was

25     charged with DUI in '09.

1   MR. TIEGER:  And what happened on

2   that?

3   PROSPECTIVE JUROR WILLIAMS:  I was

4   drinking and driving and I caused an

5   accident.

6   MR. TIEGER:  And did you take a

7   test?

8   PROSPECTIVE JUROR WILLIAMS:  Uh-huh.

9   MR. TIEGER:  Breath test?

10  PROSPECTIVE JUROR WILLIAMS:  No,

11  they drew blood.

12  MR. TIEGER:  They drew blood.  Were

13  you hurt?

14  PROSPECTIVE JUROR WILLIAMS:  No.

15  No one was hurt, but I was charged with

16  DUI.

17  MR. TIEGER:  Did blood results come

18  back and say that you were like over the

19  --

20  PROSPECTIVE JUROR WILLIAMS:  One

21  point over.

22  MR. TIEGER:  Okay.  Did you enter a

23  guilty plea or no contest plea?

24  PROSPECTIVE JUROR WILLIAMS:  No

25  contest.

1    MR. TIEGER:  Do you feel that you

2    were treated fairly by the police?

3    PROSPECTIVE JUROR WILLIAMS:  Yes.

4    MR. TIEGER:  That you really

5    probably shouldn't have been driving?

6    PROSPECTIVE JUROR WILLIAMS:  Uh-huh.

7    MR. TIEGER:  Was that in Cincinnati

8    or was that --

9    PROSPECTIVE JUROR WILLIAMS:  It was

10   in Cincinnati.

11   MR. TIEGER:  What part of town was

12   that in?

13   PROSPECTIVE JUROR WILLIAMS:  On

14   Reading Road.

15   MR. TIEGER:  And where on Reading

16   Road?

17   PROSPECTIVE JUROR WILLIAMS:

18   Vernon's Place, I think it was.

19   MR. TIEGER:  Like Avondale?

20   PROSPECTIVE JUROR WILLIAMS:  By the

21   hospital.

22   MR. TIEGER:  Okay.

23   PROSPECTIVE JUROR WILLIAMS:  Uh-huh.

24   MR. TIEGER:  The place where this

25   happened in like the Findlay Market area,

1   is anybody familiar with that area?

2   Anything about that that would cause you

3   to be fair or unfair one way or another

4   in this case?  And there are a few people

5   back here that I think raised their

6   hands.  Maybe if you can just tell me

7   your names real fast.

8        PROSPECTIVE JUROR LAVELLE:  Sarah

9   Lavelle.

10        MR. TIEGER:  Lavelle.  Okay.

11        PROSPECTIVE JUROR BERNHARD:

12   Christine Bernhard.

13        MR. TIEGER:  Bernhard.

14   Ms. Spencer, is it?

15        PROSPECTIVE JUROR SPENCER:  Yes.

16        PROSPECTIVE JUROR KEMPER:  Sherri

17   Kemper.

18        MR. TIEGER:  Kemper.  Ms. Decenso.

19   I'm just going to go through your

20   questionnaires.  Mr. Rozier, I think we

21   talked a lot, so I'm going to skip over

22   you.

23        Ms. McKinney, you're a pharmacy

24   tech?

25        PROSPECTIVE JUROR MCKINNEY:  Uh-huh.

1    MR. TIEGER:  How long have you

2    been -- is that at Mercy Hospital?

3        PROSPECTIVE JUROR MCKINNEY:  Yes.

4        MR. TIEGER:  And how long have you

5    been with Mercy?

6        PROSPECTIVE JUROR MCKINNEY:  Since

7    April, about ten, 11 months.

8        MR. TIEGER:  When did you get

9    through school?

10        PROSPECTIVE JUROR MCKINNEY:  I did

11    not.

12        MR. TIEGER:  Okay.  You're still --

13    it looks like you have two years, okay,

14    two years of college.

15        PROSPECTIVE JUROR MCKINNEY:  But it

16    was for education, it was not for

17    pharmacy.

18        MR. TIEGER:  Okay.  And then you

19    got out of Cincinnati State?

20        PROSPECTIVE JUROR MCKINNEY:  Uh-huh.

21        MR. TIEGER:  And do you like what

22    you are doing in pharmacy?

23        PROSPECTIVE JUROR MCKINNEY:  Yes.

24        MR. TIEGER:  Is that something you

25    plan on continuing on for a lengthy

1    period of time?

2           PROSPECTIVE JUROR MCKINNEY:  Yes.

3           MR. TIEGER:  Where is Mercy

4    Hospital, the one you work at?

5           PROSPECTIVE JUROR MCKINNEY:  In Mt.

6    Airy.

7           MR. TIEGER:  What type of things

8    would you do as a pharmacy tech?

9           PROSPECTIVE JUROR MCKINNEY:  Data

10    entry, accounting, filling prescriptions,

11    mailing out prescriptions, ordering

12    medication as a manager.

13           MR. TIEGER:  And you would work

14    with a pharmacist?

15           PROSPECTIVE JUROR MCKINNEY:  Yes.

16           MR. TIEGER:  And you said you're an

17    open-minded person?

18           PROSPECTIVE JUROR MCKINNEY:  Yes.

19           MR. TIEGER:  What do you mean by

20    that?

21           PROSPECTIVE JUROR MCKINNEY:  Well,

22    I guess I'm not close-minded.  I take

23    everything in and then I don't like make

24    a decision on basically anything.  I

25    can't just make one decision off just one

1    thing.

2          MR. TIEGER:  Okay.  Thank you,

3    Ms. McKinney.  Let's see,

4    Ms. Messerschmitt?

5          PROSPECTIVE JUROR MESSERSCHMITT:

6    Yes.

7          MR. TIEGER:  Tell me a little bit

8    about yourself.

9          PROSPECTIVE JUROR MESSERSCHMITT:

10   I'm 53.  I have three children who are

11   adults now.

12         MR. TIEGER:  Are you a homemaker,

13   is that fair to say?

14         PROSPECTIVE JUROR MESSERSCHMITT:  I

15   was let go of my job in March.

16         MR. TIEGER:  What did you do when

17   you were working?

18         PROSPECTIVE JUROR MESSERSCHMITT:  I

19   was a senior administrative assistant for

20   a clinical research organization.

21         MR. TIEGER:  What type of research

22   did you do?

23         PROSPECTIVE JUROR MESSERSCHMITT:

24   It's where drugs are being invented and

25   we would take it from phase I to phase IV

1    to FDA approval.  We would be the one to

2    do the studies and see if the drug was

3    appropriately working for that

4    indication.

5         MR. TIEGER:  And how long had you

6    been at that company?

7         PROSPECTIVE JUROR MESSERSCHMITT:  I

8    was at that company for three years and

9    another one before that about nine years.

10        MR. TIEGER:  Okay.  And is this

11   because just of the economy or was it

12   downsizing or whatever, what happened?

13        PROSPECTIVE JUROR MESSERSCHMITT:

14   It was because of the economy and I

15   worked from home for them, and they were

16   located globally, and it's kind of hard

17   to support VPs and that from your HOME

18   when they're in different states.

19        MR. TIEGER:  Okay.  It sounds like

20   you didn't have a lot of bad feelings or

21   was it kind of a tough breakup?

22        PROSPECTIVE JUROR MESSERSCHMITT:

23   No.  The person who wanted me to go to

24   this company, she's the one that let me

25   go, and we are still friends, and it was

1    just something that had to be done.

2         MR. TIEGER:  Okay.  Are you looking

3    for something else or you enjoying your

4    time off?

5         PROSPECTIVE JUROR MESSERSCHMITT:  I

6    have a granddaughter so I have been

7    enjoying my time, but I have been looking

8    for something, you have to go to work to

9    make bills, meet them.

10        MR. TIEGER:  And it looks like you

11   have prior jury service.

12        PROSPECTIVE JUROR MESSERSCHMITT:

13   Yeah, it was back in, I guess my daughter

14   was about four or five.  She's 26 now, so

15   back in late '90s or early '90s,

16   somewhere around there.

17        MR. TIEGER:  Do you remember what

18   type of case it was?

19        PROSPECTIVE JUROR MESSERSCHMITT:

20   It was a case where a gentleman had

21   stolen something from Kmart, and it was

22   found on him outside the store doors.

23        MR. TIEGER:  Like a shoplifting?

24        PROSPECTIVE JUROR MESSERSCHMITT:

25   Yeah, like it was a camera or radio --

1    alarm clock, in fact, I think it was.

2        MR. TIEGER:  Good memory.

3        PROSPECTIVE JUROR MESSERSCHMITT:

4    Thank you.

5        MR. TIEGER:  And were you able to

6    deliberate with other jurors and reach a

7    verdict in that case?

8        PROSPECTIVE JUROR MESSERSCHMITT:

9    Yes, we were.

10        MR. TIEGER:  Thank you,

11    Ms. Messerschmitt.

12        PROSPECTIVE JUROR MESSERSCHMITT:

13    Uh-huh.

14        MR. TIEGER:  I see, Ms. Williams,

15    it's Barrington of Oakley.  Where is

16    that?

17        PROSPECTIVE JUROR WILLIAMS:  It's

18    assisted living, like a nursing home.  I

19    work in the cafeteria.

20        MR. TIEGER:  How long have you been

21    with Barrington?

22        PROSPECTIVE JUROR WILLIAMS:  Well,

23    I have been doing dietary for about ten

24    years, but I have been there since last

25    year in June.

1    MR. TIEGER:  What type of things do
2    you do as a dietary aide?
3    PROSPECTIVE JUROR WILLIAMS:  Like
4    prepare the food.  I clean.
5    MR. TIEGER:  Okay.  How many
6    people?  Is it for elderly people?
7    PROSPECTIVE JUROR WILLIAMS:  Uh-huh.
8    MR. TIEGER:  Okay.  You said is it
9    assisted living?
10   PROSPECTIVE JUROR WILLIAMS:  Uh-huh.
11   MR. TIEGER:  So they can kind of
12   get along on their own?
13   PROSPECTIVE JUROR WILLIAMS:  Uh-huh.
14   MR. TIEGER:  Do you enjoy that?
15   Yeah, you do?
16   PROSPECTIVE JUROR WILLIAMS:  Oh, I
17   love it.
18   MR. TIEGER:  Okay.  Thank you,
19   Ms. Williams.
20   PROSPECTIVE JUROR WILLIAMS:  Uh-huh.
21   MR. TIEGER:  Let's see,
22   Ms. McKeehan?
23   PROSPECTIVE JUROR MCKEEHAN:  Yes.
24   MR. TIEGER:  Let's see, an
25   administrator.

1    PROSPECTIVE JUROR MCKEEHAN:  I work

2    for Greenebaum Doll & McDonald law firm.

3    MR. TIEGER:  What is a billing

4    administrator?

5    PROSPECTIVE JUROR MCKEEHAN:  I take

6    care of all the billing for the

7    Cincinnati and Lexington offices.  I send

8    out the billed clients as I contact

9    insurance companies and handle any

10   problems they would have with their

11   bills.

12   MR. TIEGER:  What kind of law firm

13   is that?

14   PROSPECTIVE JUROR MCKEEHAN:  Well,

15   they used to be estate planning.  They do

16   patents and trademark, very little

17   litigation and no criminal law at all.

18   MR. TIEGER:  Were are they located?

19   PROSPECTIVE JUROR MCKEEHAN:  We are

20   right downtown here in Cincinnati.  We

21   have some offices in Lexington,

22   Louisville, Nashville, several other

23   offices.

24   MR. TIEGER:  So somebody would do

25   work -- somebody would do work for a

1   client, you would be responsible for

2   getting the bill to that client?

3           PROSPECTIVE JUROR MCKEEHAN:  That's

4   correct.

5           MR. TIEGER:  And then do you follow

6   through and make sure it's paid?

7           PROSPECTIVE JUROR MCKEEHAN:  No.

8   No.

9           MR. TIEGER:  That's somebody else?

10          PROSPECTIVE JUROR MCKEEHAN:

11  Someone else does that.  I will answer

12  questions about the billing.  And if

13  there is problems, I'll contact the

14  attorney and try to work it out.

15          MR. TIEGER:  Okay.  How long have

16  you been doing that for?

17          PROSPECTIVE JUROR MCKEEHAN:

18  Sixteen years.

19          MR. TIEGER:  Okay.  And then how

20  long have you been doing the animal

21  rescue?

22          PROSPECTIVE JUROR MCKEEHAN:  About

23  two years.

24          MR. TIEGER:  Okay.  What got you

25  into that?

1    PROSPECTIVE JUROR MCKEEHAN:  I saw
2    on Craig's list said West Union needed
3    assistance, their pound did, and so I
4    took up a collection in my office.  And
5    one of the attorneys at my office, at the
6    time, she was into animal rescue, and she
7    asked me to take a trip out there and see
8    if it was really as bad as they said it
9    was, and so I did.  And I came back and I
10   said it really is that bad, and so it got
11   me into rescue.
12        MR. TIEGER:  Okay.  Thank you, Ms.
13   McKeehan.
14        PROSPECTIVE JUROR MCKEEHAN:  Sure.
15        MR. TIEGER:  Let's see,
16   Mr. Fitzgerald.  You're with Fidelity
17   Investments?
18        PROSPECTIVE JUROR FITZGERALD:
19   Correct.
20        MR. TIEGER:  A managing director.
21   What type of things would you do as a
22   managing director?
23        PROSPECTIVE JUROR FITZGERALD:  I
24   manage corporate 401 plans for 27
25   companies, Wisconsin, Michigan and

1    Minnesota, out in Nebraska.

2         MR. TIEGER:  How long have you been

3    with Fidelity?

4         PROSPECTIVE JUROR FITZGERALD:

5    Eighteen years.

6         MR. TIEGER:  And I'm assuming you

7    start -- you had to work yourself up?

8         PROSPECTIVE JUROR FITZGERALD:

9    Correct.

10        MR. TIEGER:  Are you a supervisor

11   of anybody at Fidelity?

12        PROSPECTIVE JUROR FITZGERALD:  No,

13   sir.

14        MR. TIEGER:  Somebody that you

15   would report to somebody else?

16        PROSPECTIVE JUROR FITZGERALD:

17   Correct.

18        MR. TIEGER:  And you are given kind

19   of free reign to do what you think is

20   right on particular accounts?

21        PROSPECTIVE JUROR FITZGERALD:  To

22   an extent.  I mean it's got to be legal.

23        MR. TIEGER:  Right.  Details, you

24   know.  Is that in Kenwood or where is

25   that located?

1          PROSPECTIVE JUROR FITZGERALD:

2  Covington, Kentucky.

3          MR. TIEGER:  How big of a company

4  do you have?

5          PROSPECTIVE JUROR FITZGERALD:

6  44,000 people.

7          MR. TIEGER:  Wow.  Okay.  And how

8  many in Covington?

9          PROSPECTIVE JUROR FITZGERALD:  A

10  little bit less than 4,000.

11          MR. TIEGER:  I didn't realize it

12  was so large.  Where are you?  Do you

13  have your own building over there?

14          PROSPECTIVE JUROR FITZGERALD:

15  Yeah, we own about 275 acres out there.

16  We own four building.

17          MR. TIEGER:  And what part of

18  Kentucky?  Covington you said?

19          PROSPECTIVE JUROR FITZGERALD:  It's

20  southern Covington.  I think it's like

21  Latonia, just right outside Latonia.

22          MR. TIEGER:  Okay.  Okay.  Thank

23  you, Mr. Fitzgerald.

24          Let's see, Miss Binkley.

25          PROSPECTIVE JUROR BINKLEY:  Yeah.

1    MR. TIEGER:  It looks like you're

2  at Merrill Lynch.

3    PROSPECTIVE JUROR BINKLEY:  Yes, I

4  am.

5    MR. TIEGER:  Is that a competitor

6  to Fidelity?

7    PROSPECTIVE JUROR BINKLEY:  Yes, it

8  is, that's why I left Fidelity.

9    MR. TIEGER:  None of you knew each

10  other before this at all?  Do you know

11  each other at all?  All complete

12  strangers.  Okay.  How long have you been

13  with Merrill Lynch?

14    PROSPECTIVE JUROR BINKLEY:  Eleven

15  years.

16    MR. TIEGER:  And it looks like

17  you -- what do you do for Merrill Lynch?

18    PROSPECTIVE JUROR BINKLEY:  I'm

19  called a client associate.  I work with a

20  group of four brokers and four

21  assistants.  So we take care of all the

22  paperwork and the clients and opening new

23  accounts and transferring assets from one

24  company to another, and issuing checks

25  and taking care of their Visa problems

1        and --

2             MR. TIEGER:  How did you get from

3        like social work to Merrill Lynch?

4             PROSPECTIVE JUROR BINKLEY:  It's

5        very similar.  You're just dealing with a

6        different social class of people.

7             MR. TIEGER:  Okay.  Did you ever --

8        were you ever a social worker?

9             PROSPECTIVE JUROR BINKLEY:  I

10       worked for about five years for the

11       Hamilton County Welfare Department.

12            MR. TIEGER:  Okay.  And now it's

13       called Jobs & Family services.

14            PROSPECTIVE JUROR BINKLEY:  I guess

15       that's what they call it.

16            MR. TIEGER:  Were you up in the

17       Alms & Doepke Building at the time?

18            PROSPECTIVE JUROR BINKLEY:  No,

19       Sycamore, what is it Seventh and

20       Sycamore?

21            MR. TIEGER:  I think I know where

22       you mean.

23            PROSPECTIVE JUROR BINKLEY:  Yeah.

24       That's where we were.  It's been many

25       years ago.

1    MR. TIEGER:  What did you do for

2    them?

3    PROSPECTIVE JUROR BINKLEY:  I was

4    the caseworker.

5    MR. TIEGER:  How did you like that?

6    PROSPECTIVE JUROR BINKLEY:  I liked

7    it to a certain extent.  It got to the

8    point -- it got to be kind of stressful

9    so I decided it was time to get out and

10   do something else.

11   MR. TIEGER:  And it looks like

12   you're happy with the decision you have

13   made?

14   PROSPECTIVE JUROR MCKEEHAN:  Yes.

15   MR. TIEGER:  Okay.  And it looks

16   like you also have prior jury service?

17   PROSPECTIVE JUROR BINKLEY:  Yeah,

18   about 12 years ago.

19   MR. TIEGER:  Do you remember what

20   type of case that was?

21   PROSPECTIVE JUROR BINKLEY:  No, I

22   don't.  I know you asked somebody else,

23   and I was trying to remember what it was

24   but I can't remember.  It was a one-day

25   affair.

1    MR. TIEGER:  And I don't mean to

2    pry too much, but on your questionnaire,

3    when they asked whether you thought you

4    would be a good juror, do you remember

5    what your answer was?

6    PROSPECTIVE JUROR BINKLEY:  No, I

7    don't.

8    MR. TIEGER:  Okay.  I think you

9    said you weren't sure.  I think you are a

10    little bit anxious.

11    PROSPECTIVE JUROR BINKLEY:  Yeah.

12    I had -- this whole thing is rather

13    intimidating and, you know, a little bit

14    of the anxiety, but I'm doing fine.

15    MR. TIEGER:  Okay.  After having

16    kind of heard the Judge and myself, and I

17    know Mr. Whalen and Ms. Williams are

18    going to talk to you as well, do you

19    think it's something that you're going to

20    be able to do?

21    PROSPECTIVE JUROR BINKLEY:  Yeah.

22    MR. TIEGER:  Okay.  Thank you, Ms.

23    Binkley.  Let's see, Ms. Coffman.

24    PROSPECTIVE JUROR COFFMAN:  Yeah.

25    MR. TIEGER:  It looks like you're

retired, ma'am?

PROSPECTIVE JUROR COFFMAN:  Yes.

MR. TIEGER:  And what did you do
before you were retied?

PROSPECTIVE JUROR COFFMAN:  Well,
years ago I was a home economist in
Columbus, Ohio, and then I took off for a
while and then I worked for Talbots doing
all their window displays for 25 years,
and now I'm retired.

MR. TIEGER:  And a home economist
now?

PROSPECTIVE JUROR COFFMAN:  Home
economist.

MR. TIEGER:  What is that?

PROSPECTIVE JUROR COFFMAN:  They
don't even have them any more.  I worked
out of Columbus, at a gas company and we
would teach women how to use their gas
appliances.  We went to their home and
showed them what to do, and it's just a
whole other way of life years ago.

MR. TIEGER:  Who did you work for?

PROSPECTIVE JUROR COFFMAN:
Columbia Gas of Ohio.

1          MR. TIEGER:  So if you bought a --

2          PROSPECTIVE JUROR COFFMAN:

3    Anything.

4          MR. TIEGER:  -- gas --

5          PROSPECTIVE JUROR COFFMAN:  Not

6    furnaces, but just stoves.  Well then

7    they had gas washers and dryers, I'm not

8    sure.  They had gas appliances, just go

9    out and then we managed phones and told

10   woman how to cook and they would call and

11   tell them how to fix a turkey and have

12   the box in front of us, read what to do.

13   I never cooked in my life but read that

14   book, saved my life.  It was a great job.

15         MR. TIEGER:  I'm glad you said it

16   that way because you could probably never

17   teach men how to do that anyway.

18         PROSPECTIVE JUROR COFFMAN:  My

19   husband cooks every night so --

20         MR. TIEGER:  How long did you do

21   that for?

22         PROSPECTIVE JUROR COFFMAN:  Gas

23   company, I don't know, five, six years.

24         MR. TIEGER:  I know they teach that

25   in high school a little bit, the home ec

1    and all that, but that's a little bit

2    different than what you do.

3         PROSPECTIVE JUROR COFFMAN:  I don't

4    know if they stop -- almost like they

5    stopped doing that now.  Maybe they're

6    starting up again.

7         MR. TIEGER:  I think pretty much

8    now when you buy, it's like they won't

9    even help you to the door.

10        PROSPECTIVE JUROR COFFMAN:  You're

11   on your own.  We had company cars.  We

12   were all called the same name.  We went

13   all over Ohio judging contests of all

14   kind.  It was a great job right out of

15   college.

16        MR. TIEGER:  And then Talbots you

17   worked for, where was that?

18        PROSPECTIVE JUROR COFFMAN:  Hyde

19   Park, Kenwood, downtown.  Wherever there

20   was a Talbots store I went and did all

21   the window displays.

22        MR. TIEGER:  I gotcha.  Wherever,

23   you worked on the displays for the

24   stores?

25        PROSPECTIVE JUROR COFFMAN:  Yes.

1          MR. TIEGER:  Like a window?

2          PROSPECTIVE JUROR COFFMAN:

3   Mannequins.  All the mannequins, dressing

4   all the mannequins, dressing anything

5   inside the store, doing any displays in

6   any store.

7          MR. TIEGER:  How many Talbot stores

8   are there still in Cincinnati?

9          PROSPECTIVE JUROR COFFMAN:  Well,

10   just in proper, three, but now they are

11   out everywhere.

12          MR. TIEGER:  Okay.  How long have

13   you been retired?

14          PROSPECTIVE JUROR COFFMAN:  2004,

15   maybe five.

16          MR. TIEGER:  How are you spending

17   your time?

18          PROSPECTIVE JUROR COFFMAN:  Well, I

19   stopped to take care of my father who was

20   in his 90s.  And since he'd taken care of

21   me I thought well, I'll take care of him.

22   And then he passed away in 2005.  So now

23   I just do volunteer work, Historical

24   Society type of work, Mary Elders in

25   Mariemont, Elder Home Garden, whatever

1       anybody needs I do for free.

2               MR. TIEGER:  And your husband is

3       a -- or was a counselor at St. X?

4               PROSPECTIVE JUROR COFFMAN:  He

5       still is.

6               MR. TIEGER:  What type of

7       counseling does he do?

8               PROSPECTIVE JUROR COFFMAN:  He gets

9       the boys into college.

10              MR. TIEGER:  Okay.  Guidance

11      counselor?

12              PROSPECTIVE JUROR COFFMAN:  Yes.

13              MR. TIEGER:  Does he ever deal with

14      discipline?

15              PROSPECTIVE JUROR COFFMAN:  Yes, he

16      has to.

17              MR. TIEGER:  Because I know there

18      was the boy that fell off the balcony

19      down in Florida, you know, I know that.

20      I'm sure a lot of students were extremely

21      upset about that, so he deals with the

22      kids about things like that?

23              PROSPECTIVE JUROR COFFMAN:  Yes.

24              MR. TIEGER:  Okay.  Thank you,

25      Ms. Coffman.

1          Let's see, Mr. Smith, you're at

2      Duke.

3          PROSPECTIVE JUROR SMITH:  Yes.

4          MR. TIEGER:  What do you do for

5      Duke?

6          PROSPECTIVE JUROR SMITH:  I'm a

7      civil engineer stationary.

8          MR. TIEGER:  When they asked you

9      are you related to a friend or policeman,

10     what are your feelings, you had put that

11     you don't trust.

12         PROSPECTIVE JUROR SMITH:  No.

13         MR. TIEGER:  Okay.  Maybe, no

14     trust.  You trust police but you don't

15     know any.  Okay.  Gotcha.

16         PROSPECTIVE JUROR SMITH:  I usually

17     let them go their way and I go my way.

18         MR. TIEGER:  Gotcha.  When you

19     asked him whether you thought you would

20     be a good juror, you had put I don't

21     know, I do not like to judge.

22         PROSPECTIVE JUROR SMITH:  No, I

23     don't.  Like you, I would like really try

24     to say a person is a certain type of

25     person or until they prove themselves to

1    be that.

2         MR. TIEGER:  Okay.

3         PROSPECTIVE JUROR SMITH:  That's

4    what I meant by that.  I don't just see a

5    person, say, oh, that guy is a bad cop.

6    You have to do things to make me.

7         MR. TIEGER:  Gotcha.

8         PROSPECTIVE JUROR SMITH:  Saying

9    what you are.

10        MR. TIEGER:  Thank you, Mr. Smith.

11   Let's see, Ms. Heintz.  Let's see, you're

12   in sales?

13        PROSPECTIVE JUROR HEINTZ:  Yeah,

14   I'm actually also in security, but I'm in

15   --

16        MR. TIEGER:  And where do you work,

17   a department store?

18        PROSPECTIVE JUROR HEINTZ:  I do

19   actually work at three different stores.

20        MR. TIEGER:  Okay.

21        PROSPECTIVE JUROR HEINTZ:  I work

22   in Clifton, I work in Eastgate -- well,

23   actually I only have those two right now.

24        MR. TIEGER:  Are they the same

25   store or different store?

1   PROSPECTIVE JUROR HEINTZ:

2   Different stores.

3   MR. TIEGER:  What stores do you

4   work at?

5   PROSPECTIVE JUROR HEINTZ:  PacSun

6   and Pangaea.

7   MR. TIEGER:  Okay.  I know PacSun.

8   And what's the other one?

9   PROSPECTIVE JUROR HEINTZ:  It used

10  to be a hippy store.  It's right next to

11  the Esquire.

12  MR. TIEGER:  Gotcha.  On Ludlow?

13  PROSPECTIVE JUROR HEINTZ:  Uh-huh.

14  MR. TIEGER:  Sitwell's, is that

15  still the coffee shop or whatever?

16  PROSPECTIVE JUROR HEINTZ:  I don't

17  really go there.

18  MR. TIEGER:  Stay away from there?

19  PROSPECTIVE JUROR HEINTZ:  No, they

20  actually opened the coffee shop across

21  the street and they call themselves The

22  Light.

23  MR. TIEGER:  So you go to The

24  Light.  And what do you do for the

25  stores?

1          PROSPECTIVE JUROR HEINTZ:  I'm an

2    opener/closer.  I make the deposits.  I

3    work alone.  I do all the sales, all the

4    windows, all kind of stuff.

5          MR. TIEGER:  Okay.  And you say --

6    did you say something about security?

7          PROSPECTIVE JUROR HEINTZ:  Yeah, I

8    work at pretty much all the local vendors

9    and I do incident reporting.

10         MR. TIEGER:  Okay.  Do you mean

11   like if a band came to town you would

12   work?  When you say "security," what do

13   you mean?

14         PROSPECTIVE JUROR HEINTZ:  Yeah.

15   Like -- should I say where I work?

16         MR. TIEGER:  Sure.

17         PROSPECTIVE JUROR HEINTZ:  River

18   Bend, US Bank arena, the Madison, the

19   Taft Music Hall.

20         MR. TIEGER:  Okay.  And what type

21   of things would you do in security?

22         PROSPECTIVE JUROR HEINTZ:  During

23   the day I actually take care of SAP

24   (phonetic), but in the evening I take

25   care of intoxicated ladies.  I take care

of the women for the most part or I calm
down situations or I write up reports for
the police or things like that.

MR. TIEGER:  All right.  Would you
ever have to testify at all or go to
court on anybody?

PROSPECTIVE JUROR HEINTZ:  I don't
because I'm not involved, but the people
I write the reports for, they do.

MR. TIEGER:  What type of things
would you get involved in?  Would you
ever get involved with people with
weapons or --

PROSPECTIVE JUROR HEINTZ:  No
weapons thus far.  It's mainly just drugs
or alcohol or, you know, fights or things
like that.

MR. TIEGER:  Okay.  How do you like
that compared to working at a store?

PROSPECTIVE JUROR HEINTZ:  I like
that because it's a lot of fun.  I mean,
it's fun because it's busy, it's quick
and I work with a lot of paramedics.

MR. TIEGER:  Okay.  And your
degree, it looks like you have a degree

1       in psychology?

2           PROSPECTIVE JUROR HEINTZ:  I have

3       one last class.

4           MR. TIEGER:  You have one more to

5       do.  Okay.  And it looks like there was a

6       lawsuit that you or somebody in your

7       family was involved, with a malpractice

8       case?

9           PROSPECTIVE JUROR HEINTZ:  My dad

10      used to own an efficiency and they got

11      their reports but never told them.  And

12      he's a musician with the CSO so his hands

13      went numb so he did that.

14          MR. TIEGER:  Okay.  Is that still

15      going on?

16          PROSPECTIVE JUROR HEINTZ:  No,

17      that's done, it's over.  It was in like

18      2001 or something.

19          MR. TIEGER:  Was he satisfied with

20      the results or not?

21          PROSPECTIVE JUROR HEINTZ:  Yes.

22          MR. TIEGER:  Okay.  Thank you,

23      Ms. Heintz.

24          Let's see, Ms. Bessey.

25          PROSPECTIVE JUROR BESSEY:  Contact

1   for Internal Revenue Service.

2          MR. TIEGER:  How long have you been

3   at IRS?

4          PROSPECTIVE JUROR BESSEY:  Five

5   years.

6          MR. TIEGER:  And you have over in,

7   is that Covington?

8          PROSPECTIVE JUROR BESSEY:

9   Covington.

10          MR. TIEGER:  What type things do

11   you do over there?

12          PROSPECTIVE JUROR BESSEY:  I

13   provide my toll free number for wage

14   investment.  Small business owners call

15   me about their tax accounts, majority of

16   the time I'm on the phone.

17          MR. TIEGER:  Okay.  And it looks

18   like you have prior service, maybe on a

19   civil case?

20          PROSPECTIVE JUROR BESSEY:  Yes.

21          MR. TIEGER:  And it looks like

22   you're talking about the victim of a

23   crime?

24          PROSPECTIVE JUROR BESSEY:  My

25   daughter.

1      MR. TIEGER:  Tell me a little bit

2  about that.

3      PROSPECTIVE JUROR BESSEY:  She

4  lives up by Standard, a club very close

5  to here, on the dance floor, and there

6  was an altercation and she got hit in the

7  head with a full bottle of beer and was

8  injured.

9      MR. TIEGER:  Was anybody ever

10  prosecuted?

11      PROSPECTIVE JUROR BESSEY:  No, no.

12      MR. TIEGER:  Nobody could say where

13  it came from or anything?

14      PROSPECTIVE JUROR BESSEY:  No, no.

15      MR. TIEGER:  Did the police get

16  involved?

17      PROSPECTIVE JUROR BESSEY:  There

18  was not a police report filed, however

19  Victim of Crimes communicated with her

20  and she just wanted --

21      MR. TIEGER:  Is she okay now?

22      PROSPECTIVE JUROR BESSEY:  She's

23  fine.

24      MR. TIEGER:  Thank you, Ms. Bessey.

25      Mr. Burke, you work for UC?

1    PROSPECTIVE JUROR BURKE:  Yes.

2         MR. TIEGER:  What do you do for UC?

3         PROSPECTIVE JUROR BURKE:  I'm a

4    manager of support services which is part

5    of communications.  Earlier you asked if

6    we knew anybody in our impaneled group.

7    I mentioned Mr. Hand and I have met and

8    spoke a few times as we both work for the

9    same communication division at UC.

10        MR. TIEGER:  Okay.  Mr. Hand, the

11   gentleman -- gotcha.  Thank you.  So you

12   went to UC and now you work for UC.  I

13   guess you like UC.

14        PROSPECTIVE JUROR BURKE:  Well, I

15   got a Bachelor's.  I was working on a

16   Master's, had to drop out of that

17   program.  A friend of mine worked at UC,

18   they had a job opening, I thought I would

19   work there a few years and I have been

20   there 26.

21        MR. TIEGER:  Okay.  And is the

22   field that you work in, it's not what

23   your degree is in?

24        PROSPECTIVE JUROR BURKE:  Not even

25   close.

1    MR. TIEGER:  You were going for

2    your Master's in biology?

3        PROSPECTIVE JUROR BURKE:  Yes.

4        MR. TIEGER:  And then --

5        PROSPECTIVE JUROR BURKE:  Now I'm

6    more pretty much a business manager.

7        MR. TIEGER:  Okay.  What type of

8    stuff do you get involved in at UC?

9    What's your -- is it fundraising?

10       PROSPECTIVE JUROR BURKE:  No.

11       MR. TIEGER:  Or is it building

12   facilities.

13       PROSPECTIVE JUROR BURKE:  The

14   support services is like a -- it's

15   duplicating art design, photo and video.

16   We are a production department.  And I

17   coordinate the billing and the ordering

18   of supplies, and that's why the last, you

19   know, going into the third week of trial

20   would be impossible for me, because

21   that's the time that I have to get all

22   the billing together for the month.

23       MR. TIEGER:  Okay.

24       PROSPECTIVE JUROR BURKE:  And close

25   out the month.

1    MR. TIEGER:  And it looks like you

2    have some prior jury service as well?

3    PROSPECTIVE JUROR BURKE:  Yes, I

4    served on one before, about ten plus

5    years ago.  It was a criminal case,

6    breaking and entering.

7    MR. TIEGER:  Did you reach a

8    verdict in that?

9    PROSPECTIVE JUROR BURKE:  Yes.

10    MR. TIEGER:  Folks, I'll basically

11    stick with you guys, and then I'll talk

12    to you guys as you start coming up here,

13    that would probably be later on today or

14    Wednesday.  So thank you folks for

15    answering all my question.  Judge, I

16    would pass for cause.

17    THE COURT:  You passing for cause

18    still?

19    MR. TIEGER:  Actually, other than

20    the two.

21    THE COURT:  And I'm going to hold

22    off on that because I'm going to question

23    them.  And then I want -- Ms. Shanahan,

24    do you have questions you want to ask

25    this panel?

MS. SHANAHAN:  No, not that panel.
Thank you.

THE COURT:  So now for the
defendant, would you like to proceed with
voir dire, Mr. Whalen?

MR. WHALEN:  Thank you, Your Honor.
As we indicated before, my name is Bill
Whalen.  Amy Williams is my co-counsel
and we represent Mr. Ruben Jordan.  I
have got a number of questions.  Some of
them are going to be directed to an
individual and some of them might be a
little pointed.  And if that occurs, I'm
not trying to pick on you.  If I don't
ask you any questions, I'm not ignoring
you, so don't feel that I don't want to
talk to you.  It's just that your
questionnaire or your answers didn't
bring any issues up.

The potential witnesses we have is
Leshuande Ramsey, Deshaunta Ramsey,
Ronnel Ramsey, Wooster Osbury, Ron Seay
and Anthony Jordan.  Does anybody here
know any of those names?  I'm sorry, it's
Ernest Seay.

1          Some of the things that I'm going

2     to talk with you about Mr. Tieger talked

3     with you, I'm going to, at least, I hope,

4     a little different area.  Is it

5     Ms. Williams?

6          PROSPECTIVE JUROR WILLIAMS:  Uh-huh.

7          MR. WHALEN:  Okay.  You indicated

8     that you know Officer Rock, I think.

9          PROSPECTIVE JUROR WILLIAMS:  Rock.

10          MR. WHALEN:  Rock.  Okay.  And he

11     worked the Fay Apartments for a number of

12     years?

13          PROSPECTIVE JUROR WILLIAMS:

14     Uh-huh.

15          MR. WHALEN:  And you got to know

16     him?

17          PROSPECTIVE JUROR WILLIAMS:  No, I

18     didn't get to know him personally, I just

19     see him cruising my neighborhood.

20          MR. WHALEN:  Okay.  Do you believe

21     that he could lie?

22          PROSPECTIVE JUROR WILLIAMS:  Yes.

23          MR. WHALEN:  Okay.  Get on the

24     stand and raise his hand to tell the

25     truth and then lie?

1    PROSPECTIVE JUROR WILLIAMS:  Yes.

2         MR. WHALEN:  Okay.  So because

3    somebody is wearing a uniform and

4    carrying a badge and gun doesn't mean

5    that they are absolutely believable at

6    that time; am I correct?

7         PROSPECTIVE JUROR WILLIAMS:  Uh-huh.

8         MR. WHALEN:  Okay.  Does anybody

9    believe that because an officer comes up

10   with a uniform on and badge, raises his

11   right hand and gets on the stand to

12   testify that you automatically are going

13   to believe that person?  And you believe

14   that people -- somebody else mentioned

15   it, and I didn't catch it, said that

16   people come in and lie all the time.  So

17   that because somebody took an oath

18   doesn't mean they are automatically

19   telling you the truth, am I correct?

20        PROSPECTIVE JUROR WILLIAMS:  But

21   what he's doing his job as far as

22   patrolling the neighborhood and doing

23   what I have seen him do, I feel like he's

24   doing his job.

25        MR. WHALEN:  Okay.  And you feel

1    safer because he's up there?

2         PROSPECTIVE JUROR WILLIAMS:  Yes.

3         MR. WHALEN:  Oh, okay.  Mr. Rozier,

4    you talked about the fact that you can't

5    believe an admitted killer if he comes in

6    to the courtroom --

7         PROSPECTIVE JUROR ROZIER:  Right.

8         MR. WHALEN:  -- and testifies, am I

9    correct?

10        PROSPECTIVE JUROR ROZIER:  Yeah.

11        MR. WHALEN:  Okay.  The Judge is

12   going to tell you, I believe is going to

13   tell you that you are the sole judge of

14   the witnesses.  In other words, one side

15   puts the witness on, the other side

16   cross-examines them, and then at the end

17   of the case you all go back and make a

18   judgment.  And you have to decide whether

19   you believe, disbelieve all or part of

20   what that witness testified.

21        And there is all kinds of things

22   that are going to come into play on that.

23   How a person sits, how they talk, how

24   they explain things, how accurate they

25   seem to you.  And if Mr. Rozier -- I

1    mean, if the murderer comes in and says

2    I'm a murderer but he seems very

3    believable to you, he's very sympathetic,

4    he cries, are you going to take those

5    things into consideration?

6         PROSPECTIVE JUROR ROZIER:  It could

7    be fake tears.

8         MR. WHALEN:  Well, I agree with

9    you, but usually you can tell if somebody

10   is faking tears or not.  I mean, you have

11   been around long enough to know when

12   people come and tell you a story, you

13   know whether you believe it or not?

14        PROSPECTIVE JUROR ROZIER:  Nine

15   times out of ten I'm not believing them.

16        MR. WHALEN:  Okay.  Well, all I'm

17   saying is will you wait if he gets on the

18   stand?

19        PROSPECTIVE JUROR ROZIER:  I won't

20   believe him period, simple as that at all

21   because he's a murderer, just as simple

22   as that.  I won't believe them at all.

23        MR. WHALEN:  And if the Judge tells

24   you that you're to hold your judgment and

25   to listen to what they have got to say

1    first, you're not going to follow her

2    instructions?

3          PROSPECTIVE JUROR ROZIER:  I would

4    follow the instructions, but I still

5    wouldn't believe them.

6          MR. WHALEN:  Okay.  There are a lot

7    of things that come into play on what a

8    person testifies to, and I believe this

9    young man is going to come in and tell

10    you that his father killed somebody and

11    he saw his father do that.  I'm also

12    going to tell you, I believe the evidence

13    is going to show, that he was charged

14    with it, that Kareem was charged with

15    this murder that we are hearing today and

16    then turned around and agreed to testify

17    against his father and they dropped the

18    charge.

19          I believe you're also going to find

20    out that if he doesn't come in and do it

21    now, then they're going to charge him.

22    And when they say tell the truth, the

23    prosecutor has already told him he's got

24    to tell the truth, but he's told the

25    truth is that the father did it.  Now

whether or not his father did it or not
is something you all have to decide.

But there is little nuances to each
one of these witnesses that are going to
come in.  And with this type of a case,
the witnesses that you get aren't from
some of the better neighborhoods.  And
they talked about this occurred around
Findlay Market.  Does everybody
understand that Findlay Market is
Over-the-Rhine?  Everybody knows that?
Okay.

Somebody is going to come in, one
or more people are going to come in and
tell you that my client committed this
murder.  I believe when the Judge gives
you the instructions, she's going to tell
you that he's cloaked with a cloak of
innocence.  And at this point in time
he's presumed innocent, and unless the
State proves beyond a reasonable doubt
that he committed this murder, your
verdict has to be not guilty.  Does
anybody have a problem with that?
Everybody can accept that?

One of the other things that, along
with the innocence, Mr. Jordan can take
the stand or not take the stand.  He can
testify in his own defense.  Whether he
does or doesn't is up to his attorneys.
We are going to advise him whether he
should testify or not.  And if he doesn't
testify, the Judge, I believe, is going
to tell you you can use that for making a
judgment on whether he's innocent or
guilty.

Does anybody have a problem with
that or is somebody here going to say,
Mr. Jordan, I want you to stand up and
tell us what happened out there.  And if
he doesn't, you're going to say, well,
you're guilty.  Can you all follow the
law as the Judge gives it to you?

Mr. Smith, you talked about you saw
something on the news about this case?

PROSPECTIVE JUROR SMITH:  Yes, I
have, in the past.

MR. WHALEN:  And you have heard
details about the case.  Would you agree
with me that it would be very unfair to

1    find Mr. Jordan either guilty or not

2    guilty based upon what you saw in the

3    news?

4        PROSPECTIVE JUROR SMITH:  Could you

5    repeat that again?

6        MR. WHALEN:  Sure.  Whatever you

7    heard on the news.

8        PROSPECTIVE JUROR SMITH:  Yes.

9        MR. WHALEN:  Do you think that that

10   is fair to convict or acquit him based

11   upon what you heard on the news?

12       PROSPECTIVE JUROR SMITH:  Well, so

13   far what I heard --

14       MR. WHALEN:  I don't want you to

15   tell me what you heard.

16       PROSPECTIVE JUROR SMITH:  Okay.

17   Yes or no?

18       MR. WHALEN:  Yes.

19       PROSPECTIVE JUROR SMITH:  I would

20   say yeah, I could probably be unfair.

21       MR. WHALEN:  You could be what?

22       PROSPECTIVE JUROR SMITH:  Unfair.

23       MR. WHALEN:  Unfair.

24       PROSPECTIVE JUROR SMITH:  Because

25   of a lot of stuff I heard, you know, kind

1       of make things look like he done it.

2           MR. WHALEN:  But the people you

3       heard from didn't see it, didn't

4       participate, investigate it.

5           PROSPECTIVE JUROR SMITH:  Well, I

6       mean you want me to elaborate on what I

7       heard?

8           MR. WHALEN:  No, sir, I do not want

9       you to elaborate on what you heard.

10          PROSPECTIVE JUROR SMITH:  But the

11      point is they kind of made it like his

12      son had accused him and like he was

13      guilty.

14          MR. WHALEN:  Well, there is no

15      doubt.

16          PROSPECTIVE JUROR SMITH:  That's

17      the way I'm saying -- that's the way I

18      heard it appeared.

19          MR. WHALEN:  The son accused him,

20      there is no doubt about that.  He made a

21      deal with the prosecutors and the police

22      and said my dad did it.  Okay.

23          PROSPECTIVE JUROR SMITH:  Yep.

24          MR. WHALEN:  But what I'm saying is

25      whether he did it or not is up to this

```
 1          jury to decide that, not up to the news
 2          media.
 3               PROSPECTIVE JUROR SMITH:  Yeah.
 4               MR. WHALEN:  So you agree with me
 5          that you can't always believe what you
 6          hear in the news media?
 7               PROSPECTIVE JUROR SMITH:  Well, by
 8          his statement, yeah, I know you can.
 9               MR. WHALEN:  Okay.
10               PROSPECTIVE JUROR SMITH:  Because
11          they said that he -- that he had -- that
12          once he admitted that his father did it
13          that case was shut down and boom,
14          straight onto him.
15               MR. WHALEN:  There is no doubt
16          about that.  The son said my dad did it
17          and they went after dad.
18               PROSPECTIVE JUROR SMITH:  That made
19          me assume right then and there that he
20          might have been guilty.
21               MR. WHALEN:  Well, do you agree
22          with me that they have to prove beyond a
23          reasonable doubt.
24               PROSPECTIVE JUROR SMITH:  Yeah.
25          Yeah.
```

1          MR. WHALEN:  Okay.  And whatever

2     you heard, once you go back with the rest

3     of the jurors and make a decision, you're

4     going to put out of your mind what you

5     heard on the news or are you going to

6     bring that in with you?

7          PROSPECTIVE JUROR SMITH:  Well,

8     based on what I heard in the courtroom.

9          MR. WHALEN:  Okay.  And you're

10    going to ignore what you heard on the

11    news?

12         PROSPECTIVE JUROR SMITH:  Yes.

13         MR. WHALEN:  Okay.  One of the

14    other legal concepts that we are dealing

15    with, and Mr. Tieger talked with you

16    about some of them, we filed a notice of

17    alibi.  And I know a lot of people have

18    heard that on different TV shows, but

19    basically a notice of alibi says it

20    wasn't me, I was somewhere else, and they

21    bring in witnesses to say where they are

22    at at that time.  Does that concept of an

23    alibi bother anybody?  Do they feel like

24    it's an unfair or improper defense?

25         Ms. Williams, the look on your face

1    is scaring me.

2         PROSPECTIVE JUROR WILLIAMS:  You

3    scaring me.

4         MR. WHALEN:  You feel that that's

5    not a proper defense?

6         PROSPECTIVE JUROR WILLIAMS:  Yeah,

7    I feel like it is.

8         MR. WHALEN:  Okay.  And if we

9    present that, you'll listen to it?

10        PROSPECTIVE JUROR WILLIAMS:  Uh-huh.

11        MR. WHALEN:  Okay.  And we have got

12   a burden of proof with that, and the

13   Judge will tell you what it is.  And if

14   we don't meet that, then you don't

15   believe it.

16        PROSPECTIVE JUROR WILLIAMS:  Right.

17        MR. WHALEN:  Okay.  Ms. McKeehan,

18   you indicated in your examination by the

19   prosecutor that people lie.  You

20   understand that?

21        PROSPECTIVE JUROR MCKEEHAN:  Yes.

22        MR. WHALEN:  They do all the time.

23   They have done it about you, and so when

24   you listen to a case like this,

25   especially with the consequences that are

1    involved, you understand that you're

2    going to have to weigh that testimony

3    that you have and the evidence that you

4    have and judge whether or not it's

5    truthful and whether it's enough to prove

6    to you that Mr. Jordan committed this

7    crime and prove to you beyond a

8    reasonable doubt?

9         PROSPECTIVE JUROR MCKEEHAN:  Yes.

10         MR. WHALEN:  Okay.  And if they

11    were talking about DNA, would you agree

12    with me that if there was a burglary

13    here, and one of the Judge's lamps were

14    stolen and it was found down the hall and

15    they found my fingerprints on it, it

16    doesn't necessarily mean that I took it?

17         PROSPECTIVE JUROR MCKEEHAN:  That's

18    right.

19         MR. WHALEN:  Okay.  Ms. Binkley,

20    I'm going to pick on you for a while.

21         PROSPECTIVE JUROR BINKLEY:  Great.

22         MR. WHALEN:  You indicated in one

23    of your answers that you're fair minded

24    and you're going to listen to all the

25    evidence.

1    PROSPECTIVE JUROR BINKLEY:  Yes.

2         MR. WHALEN:  And the attorneys have

3    to prove things to you?

4         PROSPECTIVE JUROR BINKLEY:  Yes.

5         MR. WHALEN:  Okay.  By the law, the

6    Judge is going to tell you we don't have

7    to prove anything to you for Mr. Jordan.

8    We can sit there and not do anything

9    throughout this whole trial.  And when

10   it's over with, the Judge says, you know,

11   you have to go back and make a decision

12   and we do not have to put any evidence

13   on.  You understand we don't have to

14   prove anything unless we put an alibi on,

15   we have to prove that, but beyond that we

16   don't have to prove anything.  And if we

17   sit there throughout that trial and don't

18   do anything, do you feel that the

19   prosecutor proved their case?

20        PROSPECTIVE JUROR BINKLEY:  Yes,

21   it's up to the prosecutor to convince me.

22        MR. WHALEN:  Okay.  Beyond a

23   reasonable doubt.

24        PROSPECTIVE JUROR BINKLEY:  Beyond

25   a reasonable doubt?

1    MR. WHALEN:  And you have no

2    problems with that?

3    PROSPECTIVE JUROR BINKLEY:  Yeah.

4    The burden is on them.

5    MR. WHALEN:  Okay.  Mr. Fitzgerald,

6    you said something about making in your

7    job that things have to come out exact,

8    the figures, am I correct?

9    PROSPECTIVE JUROR FITZGERALD:  No.

10   Well, I think the question was I have

11   liberty to do what I want with my

12   clients.

13   MR. WHALEN:  No.  No.

14   PROSPECTIVE JUROR FITZGERALD:  I

15   don't actually do -- I'm not an

16   accountant so I don't have that big

17   issue.

18   MR. WHALEN:  But your books have to

19   balance?

20   PROSPECTIVE JUROR FITZGERALD:

21   Sure.

22   MR. WHALEN:  And things have to

23   equal out?

24   PROSPECTIVE JUROR FITZGERALD:  Sure.

25   MR. WHALEN:  Okay.  Things aren't

that exact all the time.  In criminal

law, things don't always come out the

way -- just the way that they should.

And can you, and I'm assuming you're

going to have to step out of your

experience and step into a totally

different experience and weigh the

evidence and have the prosecutor prove it

to you beyond a reasonable doubt.

Now nobody is going to tell you

that that's .10 or .95.  It's a decision

based upon the Judge's explanation to you

about what beyond a reasonable doubt is.

So can you put aside, if need be, any

experiences you have in balancing the

books and understanding that numbers have

to come out?

PROSPECTIVE JUROR FITZGERALD:  Yes.

MR. WHALEN:  Okay.  The prosecutor

talked to you about things that you're

going to see, photographs you're going to

see, the coroner's photograph, a person

on a slab.  You're going to see a person

dead on the street, and it's not a pretty

scene, and it has to evoke emotions.  I

don't care who you are. You see those
kind of things, you see sympathy for the
person that died, for the family that is
involved, and what this person may or may
not have suffered, but it doesn't mean
that Mr. Jordan did that.

     And the other thing is the Judge is
going to tell you in her instructions
when you go back to that jury room, you
put aside all passion and prejudice that
you may have and you reach a decision
based solely upon the evidence in this
case. Is there anybody here that cannot
do that? Okay. No matter what the
prosecutor tells you, no matter what the
defense tells you, when you get back into
that jury room, the decision is made by
you, and based upon the evidence and the
instructions on the law from the Judge.
That's it. Do you have any problems with
that?

     I believe that the Judge is going
to give all of you notebooks so that you
can take notes during the trial. And
she's also going to tell you how you can

1    and cannot use those notes.  Will you

2    listen to what she tells you and follow

3    her instructions?

4          PROSPECTIVE JURORS:  Yes.

5          MR. WHALEN:  MS. McKinney, you have

6    been doing what you have been doing since

7    April?

8          PROSPECTIVE JUROR MCKINNEY:  No, I

9    have been in pharmacy for about ten years

10    but at Mercy.

11          MR. WHALEN:  Oh, okay.  How did you

12    get into that field?

13          PROSPECTIVE JUROR MCKINNEY:  It was

14    a job I had in high school, part-time job

15    when I turned 18.

16          MR. WHALEN:  Something you liked

17    doing?

18          PROSPECTIVE JUROR MCKINNEY:  Uh-huh.

19          MR. WHALEN:  Thank you.

20    Ms. Messerschmitt?

21          PROSPECTIVE JUROR MESSERSCHMITT:

22    Yes.

23          MR. WHALEN:  I'm not sure I

24    understand what it is that you do.  Can

25    you explain that to me again?

1    PROSPECTIVE JUROR MESSERSCHMITT:

2    Right now I'm unemployed.

3         MR. WHALEN:  I'm sorry.  What you

4    did do?

5         PROSPECTIVE JUROR MESSERSCHMITT:

6    Oh, I was a senior administrative

7    assistant.  I worked for a pharmaceutical

8    research organization, and what I did is

9    I supported senior vice-presidents,

10   vice-presidents sales teams who would go

11   out and do presentations to

12   pharmaceutical companies.  Those are the

13   kind of things I did, answered the phone,

14   filing, expense reports, travel, that

15   kind of stuff.

16        MR. WHALEN:  I didn't understand

17   your words about support.  What does the

18   support involve?

19        PROSPECTIVE JUROR MESSERSCHMITT:

20   Support means that I have 20 people that

21   I'm in charge of making sure their

22   calendar is up-to-date, that their

23   expenses are up-to-date, that their

24   travel arrangements were correct.  Make

25   sure they are meeting, that they get to

1    the meeting, those kinds of things, just

2    to make their daily jobs run smoother.

3            MR. WHALEN:  It looks like most of

4    your family is involved with the

5    automotive industry.

6            PROSPECTIVE JUROR MESSERSCHMITT:

7    My husband, yes.

8            MR. WHALEN:  And your son is a

9    truck driver?

10           PROSPECTIVE JUROR MESSERSCHMITT:

11   Yeah, they distribute or deliver Arizona

12   Tea, Red Bull that buy distributing.

13           MR. WHALEN:  Were you the one that

14   had the uncle who was convicted of

15   domestic violence?

16           PROSPECTIVE JUROR MESSERSCHMITT:

17   No, sir.

18           MR. WHALEN:  Who was that?

19           PROSPECTIVE JUROR MCKINNEY:  I was.

20           MR. WHALEN:  Okay.  I'm sorry.

21   Ms. McKinney, right?

22           PROSPECTIVE JUROR MCKINNEY:  Uh-huh.

23           MR. WHALEN:  And it appeared that

24   that case was one that was involved in a

25   trial.  In other words, they brought

1   witnesses in and testified?

2          PROSPECTIVE JUROR MCKINNEY:  I

3   think she just -- wife showed up and

4   testified.

5          MR. WHALEN:  Okay.

6          PROSPECTIVE JUROR MCKINNEY:  I

7   don't know all the specifics of the case,

8   but I know he had to do time for it.

9          MR. WHALEN:  Okay.  And what state

10  was that in?

11         PROSPECTIVE JUROR MCKINNEY:  In

12  Cincinnati.

13         MR. WHALEN:  Okay.  Ms. Williams,

14  how long have you been working where

15  you're at now at Barrington?

16         PROSPECTIVE JUROR WILLIAMS:  Since

17  June.

18         MR. WHALEN:  June of --

19         PROSPECTIVE JUROR WILLIAMS:  '09.

20         MR. WHALEN:  -- of 2010?

21         PROSPECTIVE JUROR WILLIAMS:  I keep

22  saying '09, 2010.

23         MR. WHALEN:  What did you do before

24  that?

25         PROSPECTIVE JUROR WILLIAMS:  I

1  worked at the convention center over in

2  Kentucky.  I'm a chef so I do the cooking

3  at the nursing home too.

4       MR. WHALEN:  Okay.  Do you work

5  somewhere else besides Barrington now?

6       PROSPECTIVE JUROR WILLIAMS:  No.

7       MR. WHALEN:  Okay.  Thank you.

8  Ms. McKeehan?

9       PROSPECTIVE JUROR MCKEEHAN:  Yes,

10 sir.

11      MR. WHALEN:  You were robbed on the

12 L train in Chicago.  Would you say it was

13 about six years ago?

14      PROSPECTIVE JUROR MCKEEHAN:  More

15 like 16 years ago.

16      MR. WHALEN:  Oh, 16 years ago.

17      PROSPECTIVE JUROR MCKEEHAN:  A long

18 time ago.

19      MR. WHALEN:  Was there anything in

20 that experience that you feel that you

21 would bring to this trial?

22      PROSPECTIVE JUROR MCKEEHAN:  I

23 don't think so.  I mean, it was pretty --

24 it's pretty stupid of me to be on a car

25 all by myself at that time, that part of

1     Chicago that I was in.  Just stupid thing

2     I guess.

3          MR. WHALEN:  Well, this is kind of

4     on the side, but didn't anybody from the

5     train system say anything to you?

6          PROSPECTIVE JUROR MCKEEHAN:  It

7     happens all the time, I shouldn't have

8     been in the car by myself which I said

9     okay, well --

10         MR. WHALEN:  Well, I don't know

11    that much about Chicago but I had

12    occasion with another attorney who rides

13    on the L and the train stopped at a

14    location and the conductor came back and

15    said we hope you enjoyed your ride but

16    from this point on we can't guarantee

17    your safety.  And needless to say, we got

18    off.  But I thought it was very nice of

19    them to come back and tell us that, you

20    know, beyond this point it's not very

21    safe.  So I just wondered whether or not

22    they were still doing that.  But I think

23    it may have been more than 16 years ago.

24         PROSPECTIVE JUROR MCKEEHAN:  I do

25    ride that ride very often, obviously, or

1    I would not want to be in there.

2         MR. WHALEN:  Mr. Fitzgerald, one of

3    the organizations you belong to is the

4    Police Cadets of America?

5         PROSPECTIVE JUROR FITZGERALD:

6    Correct.

7         MR. WHALEN:  I would guess that

8    that's because of your son?

9         PROSPECTIVE JUROR FITZGERALD:

10   Correct.

11        MR. WHALEN:  How long have you been

12   doing that?

13        PROSPECTIVE JUROR FITZGERALD:

14   About seven, eight years.

15        MR. WHALEN:  Your wife works with

16   human resources for Fifth Third?

17        PROSPECTIVE JUROR FITZGERALD:

18   Right.

19        MR. WHALEN:  And how long has she

20   been doing that?

21        PROSPECTIVE JUROR FITZGERALD:  Five

22   or six years.  She did the same thing for

23   Fidelity.

24        MR. WHALEN:  Thank you.

25   Ms. Binkley, I've already talked to you

1  once.  We've relieved some of your

2  anxiety?

3      PROSPECTIVE JUROR FITZGERALD:  Yes,

4  you have.  Yes, I seem to be doing well.

5      MR. WHALEN:  The fact that you were

6  robbed at gunpoint, do you feel that that

7  would carry over into Mr. Jordan's trial?

8      PROSPECTIVE JUROR BINKLEY:  It's

9  been more than 30 years ago.

10      MR. WHALEN:  Okay.

11      PROSPECTIVE JUROR BINKLEY:  Yeah.

12      MR. WHALEN:  You were two years old

13  at the time that happened?

14      PROSPECTIVE JUROR BINKLEY:  Two

15  years old.  You got it.

16      MR. WHALEN:  You have a son that's

17  a laborer.  Who does he work for?

18      PROSPECTIVE JUROR BINKLEY:  Well,

19  what he does, and I can't remember the

20  name of the company he works for, but he

21  maintenances x-ray machines.

22      MR. WHALEN:  Okay.

23      PROSPECTIVE JUROR BINKLEY:  Yeah.

24      MR. WHALEN:  You've had a matter

25  yourself that was in the court system?

1    PROSPECTIVE JUROR BINKLEY:  I've

2    had what?

3    MR. WHALEN:  A case in the court

4    system.  It says here you were divorced.

5    PROSPECTIVE JUROR BINKLEY:  Yeah, I

6    was going to say, what is that?  Yeah,

7    I'm divorced.  I have been divorced for,

8    oh my God, more years than I was ever

9    married.

10   MR. WHALEN:  Okay.  Is there

11   anything about being in the court system

12   that put a bad taste in your mouth?

13   PROSPECTIVE JUROR BINKLEY:  No.

14   MR. WHALEN:  Okay.  So attorneys

15   didn't offend you or the Court didn't

16   offend you?

17   PROSPECTIVE JUROR BINKLEY:  That

18   was all a good thing.

19   MR. WHALEN:  Thank you.

20   Ms. Coffman, it sounds like you've had a

21   number of different jobs and you were

22   years ago, in 1982, on a jury in Clermont

23   County?

24   PROSPECTIVE JUROR COFFMAN:  They

25   excused me, so I never --

1  MR. WHALEN: So you didn't sit?

2  PROSPECTIVE JUROR COFFMAN: No.

3  MR. WHALEN: Okay. I have to ask

4  you the list of clubs or organizations

5  you belong to, and this first one is this

6  TTT?

7  PROSPECTIVE JUROR COFFMAN: Yes,

8  it's an organization of women and we

9  work the whole year to send

10  underprivileged girls to camp and we stay

11  with these girls for a year in hopes some

12  day that maybe they will join us or we

13  can make some huge difference in their

14  life.

15  MR. WHALEN: And how long have you

16  been doing that?

17  PROSPECTIVE JUROR COFFMAN: Three

18  years now.

19  MR. WHALEN: And I'm getting the

20  impression you enjoy doing that?

21  PROSPECTIVE JUROR BINKLEY: It's

22  very rewarding, yes.

23  MR. WHALEN: Good. And what is

24  TPHS?

25  PROSPECTIVE JUROR COFFMAN: Terrace

1  Park Historical Society.

2      MR. WHALEN:  Okay.  You have a

3  child, whether it's a son or daughter,

4  who's a teacher in Dallas?

5      PROSPECTIVE JUROR COFFMAN:

6  Daughter in Dallas.

7      MR. WHALEN:  Is she married?

8      PROSPECTIVE JUROR COFFMAN:  No.

9      MR. WHALEN:  Okay.  Thank you.

10  Mr. Smith, you and I have talked already

11  so I won't pick on you again.

12      Ms. Heintz, you've had -- as a

13  result of what you do, I get the

14  impression you have a lot of contact with

15  police officers and firemen, am I

16  correct?

17      PROSPECTIVE JUROR HEINTZ:  Not so

18  much police or paramedics.

19      MR. WHALEN:  Okay.  But police are

20  not called periodically?

21      PROSPECTIVE JUROR HEINTZ:  They are

22  outside of the gate.

23      MR. WHALEN:  And do you have to

24  ever give them reports about what you

25  saw?

1    PROSPECTIVE JUROR HEINTZ:  I'm more
2    responsible for staff.  I mean I really
3    don't have friends with the staff.  If
4    someone is involved in a fight, I get
5    their report and then I take that to our
6    records, but the staff will get the
7    reports separately to the police.
8        MR. WHALEN:  Okay.
9        PROSPECTIVE JUROR HEINTZ:  I don't
10   write anything for the police.
11       MR. WHALEN:  So you -- and none of
12   the names of police officers that were
13   read don't do anything for you?
14       PROSPECTIVE JUROR HEINTZ:  No, only
15   name I know of is the Lloyd, Sheriff
16   Lloyd.
17       MR. WHALEN:  Okay.  And do you
18   believe that police officers
19   automatically tell the truth when they
20   come in the courtroom and raise their
21   hand?
22       PROSPECTIVE JUROR HEINTZ:  I hope
23   so.  It would depend on their character.
24       MR. WHALEN:  You would do what?
25       PROSPECTIVE JUROR HEINTZ:  Depend

1    on their character.

2        MR. WHALEN:  Well, you're not going

3    to know their character when they come

4    in.  If a police officer comes in and

5    raises his right hand and swears to tell

6    the truth, are you going to believe that

7    he's telling the truth?

8        PROSPECTIVE JUROR HEINTZ:  I think

9    so, yes.

10       MR. WHALEN:  You have a brother

11   who's an attorney?

12       PROSPECTIVE JUROR HEINTZ:  He does

13   property with buildings.

14       MR. WHALEN:  So he doesn't go into

15   courtrooms?

16       PROSPECTIVE JUROR HEINTZ:  No, he

17   doesn't.

18       MR. WHALEN:  Thank you.

19   Ms. Bessey?

20       PROSPECTIVE JUROR BESSEY:  Yes.

21       MR. WHALEN:  How long have you

22   worked for the IRS?

23       PROSPECTIVE JUROR BESSEY:  Five

24   years.

25       MR. WHALEN:  When you say you had a

1    great respect for the law, can you tell

2    me what you mean by that?

3            PROSPECTIVE JUROR BESSEY:  Well, to

4    have in society no right from wrong.

5            MR. WHALEN:  I'm sorry?

6            PROSPECTIVE JUROR BESSEY:  I do

7    have great respect for them for that

8    reason.  Not necessarily --

9            MR. WHALEN:  Do you ever think they

10   make mistakes?

11           PROSPECTIVE JUROR BESSEY:  Yes.

12           MR. WHALEN:  Do you think they ever

13   lie?

14           PROSPECTIVE JUROR BESSEY:  Yes.

15           MR. WHALEN:  Please?

16           PROSPECTIVE JUROR BESSEY:  Yes.

17           MR. WHALEN:  Will you hold the

18   prosecutors to their burden that the

19   Court is going to tell you that they

20   have?

21           PROSPECTIVE JUROR BESSEY:  Yes.

22           MR. WHALEN:  And if they don't do

23   that, Mr. Jordan can get up and walk out

24   of the courtroom with you all, get on the

25   elevator and go home?

1      PROSPECTIVE JUROR BESSEY:  Yes.

2          MR. WHALEN:  And this doesn't

3      brother you.  Okay.  Mr. Burke, you

4      indicated on your questionnaire that you

5      are separated?

6          PROSPECTIVE JUROR BURKE:  Yes.

7          MR. WHALEN:  There is a divorce

8      pending?

9          PROSPECTIVE JUROR BURKE:  Possibly.

10      We haven't worked that out.

11          MR. WHALEN:  Okay.  And how long

12      have you been separated?

13          PROSPECTIVE JUROR BURKE:  A little

14      over two years.

15          MR. WHALEN:  And you sat some years

16      ago on a criminal case?

17          PROSPECTIVE JUROR BURKE:  Yes.

18          MR. WHALEN:  And you don't remember

19      what it was?

20          PROSPECTIVE JUROR BURKE:  Breaking

21      and entering.

22          MR. WHALEN:  Okay.  And there isn't

23      anything about that that you would carry

24      into this case?

25          PROSPECTIVE JUROR BURKE:  No,

nothing, just the experience of having
done it once before, but --

MR. WHALEN:  But there wasn't a bad
experience sitting down with 11 other
people and trying to hash out a decision?

PROSPECTIVE JUROR BURKE:  Not
really.

MR. WHALEN:  And not a bad
experience with the Judge or jurors,
attorneys involved?

PROSPECTIVE JUROR BURKE:  No.

MR. WHALEN:  One of the things that
the Court is going to tell you, I
believe, is that 12 of you are going to
go back and make a decision on this case.
And you have to reach unanimous decisions
and it can't be ten to 12 or nine to
three.  It has to be all.  It has to be
unanimous.  Can each of you sit down with
the rest of the jurors and give or take,
listen to what they got to say, express
your opinion and believe that you can
come to a unanimous decision?  Is there
anybody here who feels they cannot do
that?

On the other side, if you're in there with the other jurors, and the vote is 11 to one and you're the one that says what the other 11 doesn't say, and you firmly believe that you're right, can you stick by your guns no matter how many other people disagree with you?  Do you have a problem with that?

Mr. Fitzgerald?

PROSPECTIVE JUROR FITZGERALD:  Yes. Yes, I do.

MR. WHALEN:  And to what way?

PROSPECTIVE JUROR FITZGERALD:  I could probably convince otherwise in my mind that --

MR. WHALEN:  And if they don't convince you?

PROSPECTIVE JUROR FITZGERALD: Well, they don't convince me, I'll stick to what I think.

MR. WHALEN:  Okay.  Can I have a moment, Your Honor?

THE COURT:  Yes.

MR. WHALEN:  I have no other questions, Your Honor, and I'll pass for

1    cause.

2         THE COURT:  I'm going to ask Mr.

3    Leon Rozier, that -- are there any

4    circumstances under which you would be

5    able to say that you could render a

6    decision in this case, sir?  Are you

7    really conveying to the Court that you

8    find you're just not going to be able to

9    believe the prosecution's case because of

10   the main witness and you just can't get

11   past that?

12        PROSPECTIVE JUROR ROZIER:  I can't

13   get past that.

14        THE COURT:  Okay.  Then anything

15   you want -- I'm inclined to grant the

16   motion to excuse him for cause.  He's

17   honestly relayed that information.  So

18   you are excused for cause.

19        (Prospective Juror Rozier excused

20   for cause.)

21        THE COURT:  And we are going to

22   seat number -- in number 1's place will

23   be seated Dorothy Spencer.  But we're

24   first going to take a break.  I think

25   everybody would like to have that.

1    MR. TIEGER:  Judge, I think

2    Mr. Smith was the same, had the same, I

3    think, viewpoints.

4    THE COURT:  Well, Mr. Smith, let me

5    do that with you because I began to hear

6    things from you as you were questioned.

7    Do you also feel that you are unable, no

8    matter what the circumstances are, or

9    what the Court's instructions are, that

10   you would find that you could not believe

11   anything no matter what you heard from

12   the stand?

13   PROSPECTIVE JUROR SMITH:  I would

14   have more of a leaning towards not

15   believing him.

16   THE COURT:  And more of a leaning,

17   and you can't get past that today?

18   PROSPECTIVE JUROR SMITH:  Not

19   really.

20   THE COURT:  Okay.  So even though

21   you have gone through a voir dire

22   process, you essentially feel that you

23   are unable to render any verdict in all

24   if the State -- you cannot find a guilty

25   finding if the State's case relies upon a

murderer or testimony from drug dealers?

PROSPECTIVE JUROR SMITH:  Yeah, I
don't tend to believe that, you know, the
character is kind of shady to me.

THE COURT:  All right.  Then that
being the case, I'm going to excuse both
of you.  Number one and Mr. Michael Smith
who is Number nine, and we are going to
take a break, and we'll come back and
seat the other jurors.  We are going to
break for ten minutes until 3:35.

(The jury leaving the courtroom at
3:25 p.m.)

THE COURT:  Counsels, we are going
to come back at quarter to four.  I guess
you want to go through the process to
seating these last two and adjourn for
the day?

MR. TIEGER:  That sounds good,
Judge.  Ms. Spencer has issues too.  We
are not going to get through jury
selection.

THE COURT:  No, no, we are not
going to get through that, but we'll
work, continue it until tomorrow.  I

1     don't know if you want to --

2         MR. TIEGER:  Tomorrow, I don't

3     know, I haven't seen the latest weather.

4         MR. WHALEN:  I can go through and

5     look at the status.

6         THE COURT:  We'll decide whether we

7     are going to break for now or try to get

8     to the last two.  Of course, that could

9     go on and on.

10         MR. TIEGER:  It does.

11         THE COURT:  I mean for cause, get

12     past the cause part and do the

13     peremptories, and --

14         MR. TIEGER:  You're right, Judge.

15     The next one is another problem.

16         (Recess.)

17         THE COURT:  Counsel, I think you're

18     going to make a motion for cause on

19     Ms. Spencer?

20         MR. TIEGER:  Yes.

21         THE COURT:  And are you going to

22     object to that?

23         MR. WHALEN:  Which one is this now?

24         THE COURT:  The lady who said her

25     son is in jail and prison will relate

```
1        back to her.
2              MR. WHALEN:  No.
3              THE COURT:  You're not going to
4        object to that?
5              MR. WHALEN:  No.
6              THE COURT:  So we can just let her
7        go.  Well, let's bring them in and we
8        are -- you want to question the other
9        two, Mr. Burke and Mr. Obst, today or
10       start that tomorrow?
11             MR. TIEGER:  Judge, we are not
12       going to get a heck of a lot more done
13       today.
14             THE COURT:  No, we are not.
15             MR. TIEGER:  I would probably be
16       better just to stop for the day, and then
17       start -- tomorrow is the alleged snow
18       day, Judge.  And I think what
19       Ms. Shanahan and I were talking about
20       that probably everybody could get here,
21       but if you only have one or two --
22             THE COURT:  Yeah, I'm keeping up
23       with the snow day thing because going
24       home or coming in, either way with five
25       or six inches is not a good thing.
```

1          MR. TIEGER:  You're going to have

2     somebody scared --

3          THE COURT:  Or won't come.

4          MR. TIEGER:  Yeah.  So if we have

5     26 hear and one or two missing, we are

6     not going to be able to do anything.  I

7     think it's better to call off tomorrow.

8          THE COURT:  Why don't we call

9     Ms. Spencer in as though she's having a

10    private sidebar.

11         MR. WHALEN:  Could I address two

12    others issues?

13         THE COURT:  I'll have the jury come

14    in and do the admonishment.

15         MR. WHALEN:  One, I don't think you

16    gave this instruction, but when I went

17    into the restroom Mr. Fitzgerald was in

18    there.  I would like for you to tell them

19    that the attorneys aren't going to talk

20    to them, and --

21         THE COURT:  I'm going to go through

22    the whole thing, full admonishment

23    because we are going to adjourn for the

24    day.

25         MR. WHALEN:  The second thing is

Mr. Jordan is right here right now.  I
want him to tell the Court he's going to
waive his presence whenever we do the
view of the scene.

THE DEFENDANT:  Yes, I will.

THE COURT:  So the record here --
we are back on record.  State vs. Ruben
Jordan, and not yet -- not yet we'll come
and get you, sir -- Mr. Jordan, do you
want him to stay or can he just stay
there, counsel.

MR. WHALEN:  I have told him that
he has a right to go to the view of the
scene, but I would like for him to waive
that.  He's indicated he's going to
follow my instructions and he's going to
waive his presence at the view of the
scene.

THE COURT:  All right.  That is so
noted.

MR. WHALEN:  Okay.  Thank you.

THE COURT:  At this time, bring the
jury in so I can give them -- to let
Ms. Spencer be released, and then we are
going to adjourn for the day, and we'll

1     deal with the rest of the jurors

2     tomorrow.

3          (The jury entering the courtroom at

4     3:44 p.m.)

5          THE COURT:  All right.  You may all

6     be seated.  Whenever you get seated.  And

7     back on the record on State vs. Ruben

8     Jordan.  We have already discussed the

9     matter of Ms. Dorothy Spencer.  The

10    State, would you like to make a motion?

11         MR. TIEGER:  Judge, I have got no

12    trouble if she's excused for cause in

13    this case based on what she said before.

14         THE COURT:  Do you object, from the

15    defense?

16         MR. WHALEN:  No, Your Honor.

17         THE COURT:  Ms. Spencer, we are

18    going to thank and excuse you for cause.

19    You are released from jury service in

20    this case, and you are to report to

21    whatever she tells you to do, so go back

22    to the jury commission office.  Thank

23    you.

24         And for everyone else, we are going

25    to -- we have decided that we are going

1  to continue the juror voir dire on

2  Wednesday morning at 10:00 a.m.  There is

3  to be expected five or six inches of

4  snow, and it will be basically cleared up

5  by Wednesday morning.

6        So with that in mind, there is

7  something we get called the admonition,

8  and this is very important to you to

9  understand, and that is that you have to

10  remain fair and attentive throughout the

11  trial and throughout this jury process.

12  Do not discuss this case among yourselves

13  until it is finally submitted to you, or

14  to even -- and also you cannot discuss it

15  among yourselves or with anyone else.  Do

16  not permit anyone to discuss it with you

17  or in your presence; other jurors, the

18  party, the witnesses, the attorney, the

19  bailiff, anyone including myself.  Do not

20  form or express any opinion on the case

21  until it is finally submitted to you.

22        Perhaps more difficult to

23  understand is that you may not discuss

24  this case among yourselves until

25  submitted to you, because you're gonna

spend a lot of time by yourselves during recesses and at lunches, so you have to resist that urge to talk. You will receive the opening statements and then the evidence, and then the arguments of counsel and then the law, the instructions of the law from me and in that order.

So it would be unfair for you to discuss the case among yourselves before you receive everything necessary for your deliberations. You must explain this rule to your family and friends since this matter is expected to continue more than one day or even more than one week.

Do not talk with the attorneys, the parties or the witnesses during the trial. Likewise, the participants in the trial must not talk with you. If anyone should attempt to discuss the case with you, please immediately report to either the bailiff -- report the incident either to the bailiff or to my law clerk, Scott Brenner.

You may not investigate or attempt

to obtain additional information on this
case outside of the courtroom.  It's
highly improper for any one of you to do
this.  So that means you are instructed
not to read, view or listen to any report
in the newspaper, the radio or the
television on the subject of this trial.
And that would include going -- now we
have to include very, very extensive jury
instructions about not going on the
Internet and Facebook and You-Tube, and
there is so many new devices showing up,
Google.  I think you understand that you
are not to use the electronic information
in any way to affect this trial or to
obtain additional information.

        And as this trials goes on you'll
be getting coroner reports and scientific
evidence, and we don't want you to start
investigating what all that is about
because you're gonna receive everything
that both sides feel is necessary for you
to make a decision and this Court feels
is necessary for you to make a decision.
If we think you need to know something

beyond what is given, you'll also receive that.

So you have to decide this case only upon the evidence received in the courtroom, that would be from the witness stand and exhibits. And if the parties stipulate, that means that they agree that something is a fact, that this exhibit or this piece of paper, you don't have to question this piece of paper because we both agree that it's a fact, it's true, and we'll tell you when that has happened.

If you should acquire information from an outside source, you must not report it to other jurors and you must disregard it in your deliberations. But you should tell the Court, because if you get a phone call from someone, newspaper reporters or somebody connected to this case, you are to report that to the Court.

To be fair, I have to caution you now that you may be questioned later by the Court to find out if you did read or

1    view or listen to any report concerning

2    this trial contrary to my instructions.

3    And when your duty is completed, of

4    course you may discuss the case and your

5    experiences as a juror, but you are not

6    required to do so.  You don't have to.

7    So until that moment you must follow

8    carefully these instructions and control

9    your natural desire to discuss the case

10   except when it's finally submitted to you

11   by the Court.

12       If during the trial you have a

13   personal problem, you may explain that

14   matter to the bailiff and they will

15   report that to me and we'll decide how we

16   should deal with that.  Every effort will

17   be made to accommodate you and we will be

18   taking frequent breaks as mentioned.

19       There is some instructions that say

20   I should repeat this every time we take a

21   recess unless you listen carefully.

22   Anybody need to hear it again?  Do you

23   think you got this very well understood?

24   So you need to understand that this

25   applies to every recess that we take,

1   every break and during lunch and
2   especially overnight.  And so I'll remind
3   you briefly each time we take a recess.
4   Other than that, they do apply to your
5   conduct throughout the trial.  Thank you
6   very much and we are adjourned.
7           MR. TIEGER:  Judge, one other
8   thing.
9           THE COURT:  Yes.
10          MR. TIEGER:  Juror Number 28,
11  Mr. Sheffield, I know he had noted before
12  that his grandfather I think is in
13  dialysis.
14          THE COURT:  Yes.
15          MR. TIEGER:  Wednesday mornings at
16  11.
17          THE COURT:  That is correct.
18  Mr. Sheffield, are you here still?
19          PROSPECTIVE JUROR SHEFFIELD:  Yes.
20          THE COURT:  Then he's excused for
21  cause based if -- he cannot be here
22  Wednesday and participate.
23          MR. WHALEN:  I think he should,
24  Your Honor.
25          THE COURT:  Sir, you are thanked

1   and excused for cause --

2        PROSPECTIVE JUROR SHEFFIELD:  Thank

3   you.

4        THE COURT:  -- sir, because of

5   that.  I believe that -- let's see.  Is

6   there anyone else whose hand went up

7   saying they are not available for the

8   rest of the week and next week?  I don't

9   recall anybody else.

10       MR. TIEGER:  Judge, do you want

11  them to report to the Jury Commissioner

12  then at 10:00?

13       THE COURT:  Yes, because we don't

14  have enough room for them.  We'll come

15  and get you at the right time.  There is

16  more space and magazines up there, and

17  comfort.  So we'll come and get you, and

18  you are to report Wednesday at 10:00 a.m.

19  I have a morning docket so if they were

20  to come in at ten, avoid the rush hour

21  and we will -- go to the Jury

22  Commissioner at 10:00 a.m.  Thank very

23  much so far.

24       (The jury leaving the courtroom at

25  3:50 p.m.)

1              (Proceedings continued in progress

2        until January 12, 2011.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25