1               COURT OF COMMON PLEAS

2               HAMILTON COUNTY, OHIO

3                   - - -

4  STATE OF OHIO,             :

5            Plaintiff.    :

6  vs.                  :Case Number B1003262

7  RUBEN JORDAN,         :Appeal Number C1100833

8         Defendant.    :Volume II of X

9

10                   - - -

11          TRANSCRIPT OF PROCEEDINGS

12                   - - -

13  APPEARANCES:

14      Seth S. Tieger, Esq.
       Megan E. Shanahan, Esq.

15          On behalf of the State of Ohio.

16      William P. Whalen, Jr., Esq.
       Amy R. Williams, Esq.

17          On behalf of the Defendant.

18

19

20         BE IT REMEMBERED that upon the Jury

21  Trial of this cause, on January 12, 2011, before

22  the Honorable NADINE L. ALLEN, a judge of the

23  said court, the following proceedings were had,

24  to wit:

25

1      MORNING SESSION, January 12, 2011

2          THE COURT:  Court is in session.

3          (The jury entering the courtroom at

4      10:54 a.m.)

5          THE COURT:  Is everybody in the

6      room now?  All right.  You may all be

7      seated.  Before we get started, we do

8      have -- you may all be seated.  I just

9      want to make an announcement.  We do have

10     witnesses and some spectators here today,

11     and I just want to tell everybody that

12     cell phones are not allowed in the

13     courtroom.  Texting, picture taking, put

14     away any cell phones, any texting, any

15     picture taking immediately.  That applies

16     to everybody in the courtroom.

17          I think we are ready to continue

18     with our prospective jury, and three

19     persons are now -- two were excused for

20     cause, and I know the woman called this

21     morning, Connie (sic) Krieg.  She has

22     been excused for cause by the -- well,

23     the Court excused her based upon her

24     statement that she wasn't going to come

25     in today.  I assume there will not be an

```
 1        objection.  She has a bad health issue,
 2        also.
 3              MS. SHANAHAN:  Yes, Your Honor.
 4              THE COURT:  So we are ready to
 5        continue?
 6              MR. TIEGER:  Judge, I think Mr.
 7        Burck --
 8              THE COURT:  Mr. Tieger, for the
 9        record, I have a friend named Tieg.
10              MR. TIEGER:  That's okay.
11              THE COURT:  And it slipped in my
12        head.
13              MR. TIEGER:  Okay.  Mr. Burck and
14        Mr. Obst, Judge, I think there are two
15        open seats.  And my understanding is that
16        Mr. Obst would be in Seat Number 1 and
17        Mr. Burck would be in Seat Number 9.
18              THE COURT:  That is correct.  Would
19        Mr. Burck have a seat?  Mr. Burck, where
20        are you?  Okay.  You can step forward and
21        have a seat.  The first person excused
22        was Leon Rozier.  And you will be in Seat
23        Number 1, on the other side of that
24        pillar.
25              MR. TIEGER:  Judge, I think Ms.
```

1    Spencer went into --

2        THE COURT:  We already put in Ms.

3    Spencer.

4        MS. SHANAHAN:  Right.  And she had

5    went into Mr. Rozier's hot spot, and Mr.

6    Burck then would go into Mr. Smith's

7    spot, and then Mr. Obst would go into

8    Ms. Spencer's spot.  Is that correct,

9    Mr. Whalen?

10       MR. TIEGER:  That's the way I had

11   written it down.

12       THE COURT:  Mr. Burck, sit in

13   Number 13 then.  Number 13 is negotiated.

14       MR. TIEGER:  I think Mr. Burck

15   would be in Seat Number 9.

16       THE COURT:  There it is.  I see

17   that now.  Right.  Thank you for that

18   correction.

19       MR. TIEGER:  Sure, Judge.

20       THE COURT:  And Mr. Burck is in

21   Number 9.  And then the next person would

22   be Gary Obst, he would be in Number 1; is

23   that correct?

24       MR. TIEGER:  Yes.

25       THE COURT:  Mr. Obst would be in

Number 1?  And then Ms. Spencer -- Carol
Krieg was next, but she has been excused
also.

So Sherri Kemper, Number 17, would
you stand up, please.  You're going to be
seated.

MR. TIEGER:  Judge, I think we are
good now because there is an open seat
between Ms. Heintz and Ms. Bessey, but I
think they have -- they are really 10, 11
and 12.  They should be seated -- maybe
scoot over one, I think would that be
right?

MS. SHANAHAN:  Yes.

THE COURT:  Yes, scoot over one, if
you don't mind, so we can -- just for our
sake so we can keep our records clear.
So we have the 12.

Ms. Kemper, you can just have a
seat because -- you may be seated because
we are not to the point of even getting
to alternates yet.

So at this time, the attorneys have
the opportunity to question the three who
have been seated.

1    MR. TIEGER:  Thank you, Judge.

2    THE COURT:  The three who have been

3 seated.

4    MR. TIEGER:  Yes, Your Honor.

5    THE COURT:  Who have been seated.

6    MR. TIEGER:  Hello again,

7 everybody.  Hopefully, you all were in

8 agreement taking off yesterday on the

9 snow day.  It was maybe not as bad as

10 expected, but I know it snowed and snowed

11 and never stopped, so, hopefully, that

12 was a good day for you to get your

13 shoveling and all that done.  It would

14 have been a mess coming downtown.

15    Basically what today is going to

16 be, we're pretty much through jury

17 selection.  As the Court told you, each

18 side gets a chance -- a chance to excuse

19 four people.  We are getting close to

20 that point, when we finally get a jury.

21 And there is going to be several

22 alternates that are chosen.

23    The plan is going to be to go on a

24 view of the scene this afternoon around

25 two, and then my understanding is that

once that is complete, we would be done
for the day, and we would give opening
statements probably around noon or one
tomorrow.

So that's kind of the basic
schedule. We'll try to get a jury today
and go on a bus to the view and then
start with the actual testimony tomorrow
afternoon.

Mr. Obst, this kind of is going to
be a replay of Monday where myself, Mr.
Whalen, maybe Ms. Williams, will be
asking you some questions, and we are
just looking -- it's a little bit
different in that you folks, Mr. Burck
and Mr. Obst, were kind of in the back,
and we were primarily talking to the
people up here. And a lot of it is, did
you hear what we said? Is there anything
you would like to talk about? And we are
going to try not to repeat our questions
with you that we did with everybody else.
But, Mr. Obst, it looks like you're
retired from GE. What did you do for GE?

PROSPECTIVE JUROR OBST: Director

1     of International Corporation.

2          MR. TIEGER:  Okay.  Did that

3     involve a lot of travel?

4          PROSPECTIVE JUROR OBST:  Yes.

5          MR. TIEGER:  All over the world?

6          PROSPECTIVE JUROR OBST:  Primarily

7     --

8          MR. TIEGER:  Okay.

9          PROSPECTIVE JUROR OBST:  --

10    International.

11         MR. TIEGER:  How long have you been

12    retired?

13         MS. SHANAHAN:  She's having a hard

14    time hearing you.

15         PROSPECTIVE JUROR OBST:  A year and

16    nine months.

17         MR. TIEGER:  Did you start at GE

18    and work your way up to the level that

19    you were at?

20         PROSPECTIVE JUROR OBST:  Yes.

21         MR. TIEGER:  What type of work

22    would you have done when you talk about

23    the traveling and the supervisory

24    position that you have?

25         PROSPECTIVE JUROR OBST:  Primarily

1           negotiations, administering the

2           international joint ventures.

3                MR. TIEGER: Did you -- were you a

4           supervisor over people that worked for

5           you at all?

6                PROSPECTIVE JUROR OBST: Not in the

7           latest position, no.

8                MR. TIEGER: How about before that?

9                PROSPECTIVE JUROR OBST: Previously

10          , I was manager of international sources.

11               MR. TIEGER: And what would that

12          involve in terms of supervisory

13          capacities?

14              PROSPECTIVE JUROR OBST: Several

15          buyers and managers that work for me.

16              MR. TIEGER: Could you hire or

17          fire, that type of thing, or would it go

18          through a different chain of command?

19              PROSPECTIVE JUROR OBST: You would

20          make recommendations, those generally go

21          to human resources and I would not have

22          the authority to fire somebody at GE.

23              MR. TIEGER: And probably like the

24          government or something like that if

25          there is a lot of different levels?

1    PROSPECTIVE JUROR OBST:  We'd do

2    the appraisal, help people through the

3    process.

4    MR. TIEGER:  Okay.  What do you do

5    since you have been retired?

6    PROSPECTIVE JUROR OBST:  Primarily

7    volunteer work and keeping active in

8    sports and golf, tennis, biking,

9    volunteer with various tutoring, Great

10   Oaks, working with the church, lecturing

11   at the church.  GE Cell Phone Society,

12   volunteer organization, rebuilding

13   computers, the computers with Cincinnati

14   Computer Cooperative.

15   MR. TIEGER:  Okay.  So that sounds

16   like definitely a lot of things that

17   you're involved in since you have left,

18   and I'm sure you're keeping yourself

19   busy.  Anything that you would like to

20   tell us about that you heard Mr. Whalen

21   or myself talk about Monday that you

22   would like to comment at all?

23   PROSPECTIVE JUROR OBST:  No.

24   MR. TIEGER:  And, again, for you,

25   Mr. Burck, and really for everybody else,

```
 1          I hate to repeat all the questions
 2      that -- and I promise I won't do it, but
 3      anything that you think of that we talked
 4      about Kareem Gilbert, the killer of Mr.
 5      Austin testifying, the drug dealer, all
 6      those type of issues, you're okay with
 7      all those issues, Mr. Obst?
 8          PROSPECTIVE JUROR OBST:  Yes.
 9          MR. TIEGER:  Okay.  Mr. Burck, how
10      do you feel about all that?
11          PROSPECTIVE JUROR BURCK:  I'm fine
12      with it.
13          MR. TIEGER:  Okay.  You judge their
14      credibility based on what you see,
15      observe and the different tests or rules
16      that you have been figuring out somebody
17      is telling the truth?
18          PROSPECTIVE JUROR BURCK:  Yes, sir.
19      Yes, sir.
20          MR. TIEGER:   Mr. Burck, you're
21      with Kroger?
22          PROSPECTIVE JUROR BURCK:  Yes.
23          MR. TIEGER:  What do you do for
24      Kroger?
25          PROSPECTIVE JUROR BURCK:  At the
```

moment I manage the beer and wine
department in the store.

MR. TIEGER:  Okay.  Do you move
around between stores?

PROSPECTIVE JUROR BURCK:  Yeah.
I'm at one particular location right now.

MR. TIEGER:  How long have you been
at that location?

PROSPECTIVE JUROR BURCK:  Six years
in March.

MR. TIEGER:  Okay.  And it looks
like that you or your family has been the
victim of a burglary.

PROSPECTIVE JUROR BURCK:  Yes.

MR. TIEGER:  Can you tell me a
little bit about that?

PROSPECTIVE JUROR BURCK:  My wife
and I came home one night.  We are not
sure, we thought we might have -- as we
opened the back garage door, he might
have gone out the front door because the
garage door was open.  He broke the back
window on the back door and just, you
know, essentially very minor things.

MR. TIEGER:  Did the police

investigate?

PROSPECTIVE JUROR BURCK:  Yes.
North College Hill Police Department.

MR. TIEGER:  And did they come up
with any suspects?

PROSPECTIVE JUROR BURCK:  There was
kind of a string of burglaries going on
around at the time throughout the City
and we were thinking it was just that
individual.  We believe he was
apprehended.  You know, we are just
speculating that.

MR. TIEGER:  Are you satisfied with
the job they did?

PROSPECTIVE JUROR BURCK:
Absolutely.  Absolutely.

MR. TIEGER:  And you don't live in
that area of town anymore?

PROSPECTIVE JUROR BURCK:  No.  No,
sir.

MR. TIEGER:  Thank you, Mr. Burck,
Mr. Obst.  Pass for cause, Judge.

THE COURT:  Pass.  Did you say you
pass for cause?

MR. TIEGER:  Yes, Your Honor.

THE COURT: All right. Mr. Whalen,
Ms. Williams, you're going to do that
part?

MS. WILLIAMS: Yes.

THE COURT: Okay. You may proceed.

MS. WILLIAMS: Good morning,
everybody. Again, I'm not going to
repeat all the questions from yesterday.
I do just want to ask Mr. Obst and
Mr. Burck, I just want to make sure that
because Mr. Jordan does sit before you
today charged with this crime, that that
alone does not hold him guilty in your
mind, that you can accept that there is a
presumption of innocence here? And,
again, listen to all the facts and hold
the State to their burden to say that
they have to prove beyond a reasonable
doubt that just because he's charged, he
is not necessarily guilty. Can both of
you hold to that presumption?

PROSPECTIVE JUROR BURCK: Yes, yes.

PROSPECTIVE JUROR OBST: Yes.

MS. WILLIAMS: I notice, Mr. Obst,
that you said, as for police officers,

1    you said mostly good.  Is there a reason

2    that you say mostly, or you had any bad

3    experiences with police officers?

4         PROSPECTIVE JUROR OBST:  No.

5         MS. WILLIAMS:  Okay.  I see you're

6    on the NKU Advisory Board.  I notice you

7    had mentioned that.  What is the Advisory

8    Board at NKU?

9         PROSPECTIVE JUROR OBST:

10   International Business School there and

11   adviser position, help run selection of

12   the Dean, other type of roles and helping

13   curriculum, helping placement and those

14   type of activities.

15        MS. WILLIAMS:  So that's pretty

16   involved?

17        PROSPECTIVE JUROR OBST:  It's an

18   advisory job.

19        MS. WILLIAMS:  And, Mr. Burck, does

20   anything about you having been

21   burglarized, does that sway you one way?

22        PROSPECTIVE JUROR BURCK:  No.

23        THE COURT:  Is there anyone -- one

24   second.  Did somebody come into the room

25   with a cell phone in their possession?

Okay.  I saw some other witnesses, I'm
going to repeat that, put all cell phones
away.  There can be no texting, picture
taking of any kind.  Have nothing in the
hand, that is an electronic device.  All
right.  You may continue.

MS. WILLIAMS:  Okay.  Just one more
question, and I'll leave you alone.  Did
either of you see news stories or
anything related to this case?  I know we
discussed that a bit yesterday, so...

PROSPECTIVE JUROR BURCK:  Not that
I know of.

PROSPECTIVE JUROR OBST:  I don't
follow the case.

THE COURT:  Remember, keep your
voices up, stage voice, please.  I'm
talking louder than usual.  Okay.

MS. WILLIAMS:  No further
questions.

THE COURT:  You pass for cause?
All right.  At this time, since you both
pass for cause, as you know each side
does have the right to exercise
peremptory challenges, and I explained

1    what that means.  And this is now their

2    opportunity to do that.

3         The State will proceed first, and

4    we will seat -- that person will be

5    examined and we will replace that person

6    who will then be examined for cause.

7         MR. TIEGER:  Judge, can we approach

8    just briefly?

9         THE COURT:  Yes.

10        (The following transpired at

11   sidebar:)

12        MR. TIEGER:  Judge, it would be

13   Juror Number 4, Ms. Williams.

14        THE COURT:  Okay.  Kalisha

15   Williams.

16        MR. TIEGER:  Yeah.

17        THE COURT:  Okay.  And so we are

18   going to be replacing her with?

19        MR. TIEGER:  Whoever.

20        THE COURT:  Sherri Kemper.

21        MR. TIEGER:  Okay.

22        (Sidebar concluded.)

23        THE COURT:  This Court would like

24   to thank and excuse Juror Number 4,

25   Kalisha Williams.  And you are to be

1    released, go back to the jury room.

2    Thank you very much for your answers and

3    your service that you have given us this

4    morning, and you'll be replaced by Number

5    17, Sherri Kemper, who will take the

6    stand, please, in Number 4.

7        You may continue on challenge for

8    questioning of this juror.

9        (Prospective Juror Williams

10   excused.)

11       MR. TIEGER:  Hello, Ms. Kemper.

12       PROSPECTIVE JUROR KEMPER:  Hello.

13       MR. TIEGER:  Anything that you

14   would like to let us know about, any of

15   the answers or questions that you would

16   like to comment on at all?

17       PROSPECTIVE JUROR KEMPER:  The only

18   thing was on the --

19       THE COURT:  Ma'am, be sure to keep

20   your voice up, please.

21       PROSPECTIVE JUROR KEMPER:  Where it

22   asked if anyone, family had been a victim

23   of a crime.  My daughter was carjacked

24   when she was 17.

25       MR. TIEGER:  How old is she now?

PROSPECTIVE JUROR KEMPER:
Twenty-four.

MR. TIEGER:  Didn't happen here in
Cincinnati?

PROSPECTIVE JUROR KEMPER:  Yes.

MR. TIEGER:  What were the basic
facts of what happened?

PROSPECTIVE JUROR KEMPER:  She was
carjacked, her baby in the car and a guy
come up on her with a knife and tried to
get her to get in the car.  She refused,
she told him she wasn't getting in the
car.  She took the baby and he took the
car.  They found her car about four hours
later a few blocks down the street.

MR. TIEGER:  What part of town did
that happen in?

PROSPECTIVE JUROR KEMPER:  Elmwood.

MR. TIEGER:  Was this a total
stranger?

PROSPECTIVE JUROR KEMPER:  Yes.

MR. TIEGER:  Did Elmwood Police get
involved?

PROSPECTIVE JUROR KEMPER:  Yes.

MR. TIEGER:  Vanover, do you know

1    him at all?

2            PROSPECTIVE JUROR KEMPER:  No.

3            MR. TIEGER:  Just normal.

4            PROSPECTIVE JUROR KEMPER:  I don't

5    know any of them, the officers, but they

6    never caught anyone.  When they found the

7    car, the knife was underneath of it.  She

8    got it back like a few hours afterwards.

9            MR. TIEGER:  Do you know if she was

10   satisfied, or were you satisfied as her

11   mom with what the police did to try to

12   locate the person that had done that?

13           PROSPECTIVE JUROR KEMPER:  I guess.

14   I don't know that -- it was just so

15   random and so quick that they said it was

16   probably just a kid being -- well, he was

17   a teenager and we never heard any more

18   about it.

19           MR. TIEGER:  Okay.  And what did --

20   she is the one that is a teller now?

21           PROSPECTIVE JUROR KEMPER:  Yes.

22           MR. TIEGER:  Supervisor?

23           PROSPECTIVE JUROR KEMPER:  Uh-huh.

24           MR. TIEGER:  And you work at Lowes?

25           PROSPECTIVE JUROR KEMPER:  Yes.

1          MR. TIEGER:  How long you have been

2     at Lowes?

3          PROSPECTIVE JUROR KEMPER:  Just

4     since February of last year.

5          MR. TIEGER:  Okay.  What were you

6     doing before that?

7          PROSPECTIVE JUROR KEMPER:  Worked

8     in the office in North Side.

9          THE COURT:  Ma'am, remember, keep

10    your voice up, please.

11         PROSPECTIVE JUROR KEMPER:  I was --

12         MR. TIEGER:  I have the microphone,

13    it's easier, so it is harder to speak up.

14    It's a big room.

15         PROSPECTIVE JUROR KEMPER:  I was a

16    sales associate in a business down in

17    North Side.

18         MR. TIEGER:  What type of stuff

19    would you do at Lowes?

20         PROSPECTIVE JUROR KEMPER:  Customer

21    service desk.

22         MR. TIEGER:  Is that like return?

23         PROSPECTIVE JUROR KEMPER:  Yeah.

24         MR. TIEGER:  And different --

25         PROSPECTIVE JUROR KEMPER:  Yes.

1    MR. TIEGER:  So you would deal with

2    a lot of people on a day-to-day basis

3    with various issues, problems?

4        PROSPECTIVE JUROR KEMPER:  Yes.

5        MR. TIEGER:  Sometimes happy,

6    sometimes not so happy?

7        PROSPECTIVE JUROR KEMPER:  Yes.

8        MR. TIEGER:  Which Lowes do you

9    work at?

10        PROSPECTIVE JUROR KEMPER:

11   Springdale.

12        MR. TIEGER:  And it looks like you

13   also have prior jury service as well?

14        PROSPECTIVE JUROR KEMPER:  Yes.

15        MR. TIEGER:  Do you remember what

16   type of case that was?

17        PROSPECTIVE JUROR KEMPER:  It was a

18   possession, narcotics.

19        MR. TIEGER:  Did you deliberate in

20   that case?

21        PROSPECTIVE JUROR KEMPER:  Yes.

22        MR. TIEGER:  And reach a verdict?

23        PROSPECTIVE JUROR KEMPER:  Yes.

24        MR. TIEGER:  Thank you, Ms. Kemper.

25   Pass for cause, Judge.  Thank you.

1       THE COURT:  Ms. Williams or Mr.
2   Whalen?
3       MS. WILLIAMS:  Good morning,
4   Ms. Kemper.
5       PROSPECTIVE JUROR KEMPER:  Good
6   morning.
7       MR. WHALEN:  You said -- I'm sorry.
8   I might have missed it if he's -- you
9   said it was back in the '80s when you
10  served as a juror?
11      PROSPECTIVE JUROR KEMPER:  Yes.
12      MR. WHALEN:  What kind of case was
13  it?
14      PROSPECTIVE JUROR KEMPER:  Drug
15  possession.
16      MS. WILLIAMS:  And you guys were
17  able to come to a decision on that case?
18      PROSPECTIVE JUROR KEMPER:  Yes.
19      MS. WILLIAMS:  Okay.  And you lived
20  in Cincinnati your entire life, or --
21      PROSPECTIVE JUROR KEMPER:  Except
22  for a couple years I moved out to Brown
23  County.
24      MS. WILLIAMS:  Way out there, or so
25  I say.  And there is -- again, there is

1      nothing that you've heard asked that

2      would make you sway one way or another

3      before or against the defendant in this

4      matter?

5           PROSPECTIVE JUROR KEMPER:  No.

6           MS. WILLIAMS:  You would be able to

7      listen to all the evidence?

8           PROSPECTIVE JUROR KEMPER:  Yes.

9           MS. WILLIAMS:  No further

10     questions.

11          THE COURT:  You pass for cause.

12     Okay.  At this time would the defense

13     like to approach?

14          MR. WHALEN:  Yes, Your Honor.

15          THE COURT:  Approach the court.

16          (The following transpired at

17     sidebar:)

18          THE COURT:  Would you like to

19     exercise your first peremptory challenge?

20          MR. WHALEN:  Yes, Number ten.

21          THE COURT:  Thanks and excuse

22     Number ten.  Okay.  And she'll be

23     replaced by Sarah Lavelle.  Okay.  Thank

24     you.

25          (Sidebar concluded.)

1    THE COURT:  All right.  Court is
2    back in session.  And I would like to
3    thank and excuse Juror Number ten.  We
4    appreciate your participation.  You're
5    excused.  That would be Catherine Heintz,
6    you are thanked and excused, and thank
7    you for your participation, ma'am, and
8    your truthful, honest answers which have
9    lead to this exercise.  Will Sarah
10   Lavelle step forward, Number 18, and
11   would you have a seat there to replace
12   Ms. Heintz, Number ten.  Thank you.
13        (Prospective Juror Heintz excused.)
14        THE COURT:  And the next thing that
15   will happen is the attorneys are going to
16   question you for cause first.
17        MR. TIEGER:  Yes, Judge.  Hello
18   Ms. Lavelle.
19        PROSPECTIVE JUROR LAVELLE:  Hello.
20        MR. TIEGER:  Anything you would
21   like to let us know about yourself or
22   comment on any of the questions that we
23   asked?
24        PROSPECTIVE JUROR LAVELLE:  No.
25        MR. TIEGER:  Did you raise your

1    hand Monday at all on anything?

2         PROSPECTIVE JUROR LAVELLE:  I did.

3    I don't remember what it was now though.

4         MR. TIEGER:  Maybe about a victim

5    of a crime?

6         PROSPECTIVE JUROR LAVELLE:

7    Actually it was related to a police

8    officer.

9         MR. TIEGER:  Okay.  Okay.  And it

10   looks like your -- is it brother-in-law?

11        PROSPECTIVE JUROR LAVELLE:  Yes.

12        MR. TIEGER:  What department is he

13   with?

14        PROSPECTIVE JUROR LAVELLE:

15   Cincinnati.

16        MR. TIEGER:  What's his name?

17        PROSPECTIVE JUROR LAVELLE:  Kevin

18   Butler.

19        MR. TIEGER:  Do you know what

20   district or division he's in?

21        PROSPECTIVE JUROR LAVELLE:  I can't

22   remember right now.  The Pleasant Ridge

23   area.

24        MR. TIEGER:  Okay.  Okay.  And this

25   is a Cincinnati Police case, although it

did happen downtown so he would not be
involved.  The fact there is other
Cincinnati Police, is that -- do you
think you could be fair to Mr. Jordan?

        PROSPECTIVE JUROR LAVELLE:  Yes.

        MR. TIEGER:  And you're a teacher,
Ms. Lavelle --

        PROSPECTIVE JUROR LAVELLE:  Yes.

        MR. TIEGER:  -- at Oak Hills.  How
long have you been at Oak Hills?

        PROSPECTIVE JUROR LAVELLE:  About
15 years.

        MR. TIEGER:  And I know it's a
very, very large school.

        PROSPECTIVE JUROR LAVELLE:  It is.

        MR. TIEGER:  Is it the biggest in
Ohio or --

        PROSPECTIVE JUROR LAVELLE:  It was.
I don't think we still are.

        MR. TIEGER:  What type of things do
you do at Oaks Hills?  What do you teach?

        PROSPECTIVE JUROR LAVELLE:  I teach
ninth grade physical science, and ten
through 12 grade honors, physics.

        MR. TIEGER:  Okay.  I won't even

pretend to go into that.  Physical
science, is that like geology type of
things?

PROSPECTIVE JUROR LAVELLE:  Physics
and chemistry, kind of a combination, a
lot of different topics.

MR. TIEGER:  And did you say like
honors-type physics?

PROSPECTIVE JUROR LAVELLE:  Uh-huh.

MR. TIEGER:  So you get maybe
starting out in tenth grade and they
would maybe advance as they go to where
they're like in AP physics when they're
juniors or seniors?

PROSPECTIVE JUROR LAVELLE:  Uh-huh.

MR. TIEGER:  Is your background in
science?

PROSPECTIVE JUROR LAVELLE:  My
degree is in education, but physics is my
focus.

MR. TIEGER:  Did you -- has that
always been one of your focuses
throughout like college, that type of
thing?

PROSPECTIVE JUROR LAVELLE:  Uh-huh.

1    MR. TIEGER:  And it looks like the

2    NEA and Sierra Club are clubs that you

3    belong to?

4        PROSPECTIVE JUROR LAVELLE:  Uh-huh.

5        MR. TIEGER:  Tell me a little bit

6    about those.

7        PROSPECTIVE JUROR LAVELLE:  The NEA

8    is the teacher's union, and the Sierra

9    Club is an environmental organization.

10       MR. TIEGER:  Is that something you

11   participate in in terms of money or

12   causes, or would there be trips or things

13   like that that you're involved in?

14       PROSPECTIVE JUROR LAVELLE:  Mostly

15   donations.  I'm not really actively

16   involved.

17       MR. TIEGER:  Okay.  Thank you,

18   Ms. Lavelle.  Pass for cause, Judge.

19       THE COURT:  Thank you.  Counsel for

20   the defense?

21       MR. WHALEN:  Good morning.

22       PROSPECTIVE JUROR LAVELLE:  Good

23   morning.

24       MR. WHALEN:  Your husband is a

25   trainer at UC Health?

1    PROSPECTIVE JUROR LAVELLE:  Yes.

2    MR. WHALEN:  What type of training

3    does he do?

4    PROSPECTIVE JUROR LAVELLE:  He

5    trains new hires on policies of the

6    company as well as any computer classes

7    that they need to take.  And then people

8    that need to update their certifications

9    come in to do computer classes.

10    MR. WHALEN:  And how long has he

11    been doing that?

12    PROSPECTIVE JUROR LAVELLE:  Six

13    years.

14    MR. WHALEN:  Okay.  What'd he do

15    before that?

16    PROSPECTIVE JUROR LAVELLE:  He

17    worked at the Montessori Learning Center,

18    preschool.

19    MR. WHALEN:  Now, is it his brother

20    that's a police officer?

21    PROSPECTIVE JUROR LAVELLE:  Yes.

22    MR. WHALEN:  Okay.  You said it was

23    Kevin Butler?

24    PROSPECTIVE JUROR LAVELLE:  Yes.

25    THE COURT:  There have been a lot

1    of Butlers that have come through the

2    Cincinnati Police Department.  Is he part

3    of that family?

4         PROSPECTIVE JUROR LAVELLE:  I don't

5    know anyone else in the family that's an

6    officer.

7         MR. WHALEN:  Okay.  All right.  Do

8    you believe that police officers can lie?

9         PROSPECTIVE JUROR LAVELLE:  I

10   believe that anybody could lie.

11        MR. WHALEN:  Okay.  So whether it's

12   a police officer or not, you're not going

13   to give that person any more credibility

14   than you would any other witness or would

15   you?

16        PROSPECTIVE JUROR LAVELLE:  Um, I

17   think it's possible that they could lie.

18   It's hard for me to say whether I would

19   see them lying.  I guess I would see them

20   as more correct but not that they

21   couldn't be lying.

22        MR. WHALEN:  Okay.  Just a moment.

23   Pass for cause, Your Honor.

24        THE COURT:  Thank you very much.

25   And now we are going to approach again

1    for the discussion on the next peremptory

2    challenge.

3           (The following transpired at

4    sidebar:)

5           MR. TIEGER:  Judge, we would --

6    we're going to excuse Juror Number 18,

7    which would be Ms. Lavelle.

8           THE COURT:  Okay.

9           MR. TIEGER:  The one that just went

10   on.

11          THE COURT:  Okay.

12          MR. TIEGER:  It was a hot seat.

13          MR. WHALEN:  If we could have a

14   moment, we may be able to give you

15   another number now.

16          THE COURT:  Okay.  You want to do

17   that because Gregory Hand is coming up

18   next.  Would you like to tell me who

19   you're going to in the future?

20          MR. WHALEN:  We need to talk some

21   more.  I'm sorry.

22          THE COURT:  All right then, we'll

23   just proceed with this one.

24          (Sidebar concluded.)

25          THE COURT:  We're back on the

record, and now the Court would like to
thank and excuse Juror Number 18,
Ms. Lavelle.  Thank you very much for
your truthful answers and your
participation in today's proceedings, and
I hope you have the opportunity to serve
on another jury.

PROSPECTIVE JUROR LAVELLE:  Thank
you.

(Prospective Juror Lavelle
excused.)

THE COURT:  And I would like to ask
Mr. Gregory Hand, Number 19, to step
forward and have a seat in Number ten.
Thank you.  And you'll now be questioned
for cause by the State.

MR. TIEGER:  Hello, Mr. Hand.

PROSPECTIVE JUROR HAND:  Good
morning.

MR. TIEGER:  I think you had raised
your hand during the Monday session.

PROSPECTIVE JUROR HAND:  Yes, sir.

MR. TIEGER:  I forget whether we
talked or you got to let us know what
your thoughts were on a particular

1     question.

2          PROSPECTIVE JUROR HAND:  You asked

3     if anybody knew Prosecutor Deters.

4          MR. TIEGER:  Okay.  Do you know

5     Prosecutor Deters?

6          PROSPECTIVE JUROR HAND:  Yes.

7          MR. TIEGER:  Okay.  How do you know

8     him?

9          PROSPECTIVE JUROR HAND:  He was,

10    for nine years, a member of the Board of

11    Trustees at the University.  I'm the

12    director of Public Relations for the

13    University, so I worked pretty closely

14    with the Board.

15         MR. TIEGER:  So you would be

16    involved in meetings, maybe social

17    events?

18         PROSPECTIVE JUROR HAND:  Not so

19    much social events, but in the planning

20    of every meeting, dealing with media at

21    the meetings, responses to the public and

22    the media about Board decisions.

23         MR. TIEGER:  Okay.  What was your

24    impression of Joe?  Did you get along

25    with him okay, thought he was fair,

1     honest, no bad thoughts at all?

2          PROSPECTIVE JUROR HAND:  I have no

3     bad thoughts.

4          MR. TIEGER:  Because he's Megan and

5     my boss.  What we need to know, if you

6     know him in a professional relationship,

7     we work for him, whether that would

8     influence you, whether you could be fair

9     to Mr. Jordan or not is basically what I

10    was getting at.

11         PROSPECTIVE JUROR HAND:  I don't

12    think it would affect my concept of

13    fairness.

14         MR. TIEGER:  Okay.  Tell me a

15    little bit about your job and what you

16    do.

17         PROSPECTIVE JUROR HAND:  As I

18    indicated, I'm director of Public

19    Relations for the University.  We work

20    with the media very closely and we get

21    involved in all of the communication

22    activities of the University.  In

23    particular, I'm generally on the bad news

24    side of things, so I get involved with

25    crises and emergencies and disturbances

1    of the various sorts.

2        MR. TIEGER:  Okay.  It looks like

3    in what your answer was on whether you

4    know any police officers, that you get

5    involved in criminal-type activities, I

6    know there was, for instance, some

7    robberies or people that were shot

8    recently at maybe in the Short Vine area

9    or different areas.  I know there is

10   warnings to the students to be careful of

11   a certain area or certain garage or --

12       PROSPECTIVE JUROR HAND:  I'm the

13   one who sends those communications to the

14   students and the faculty.

15       MR. TIEGER:  Okay.  And would that

16   mean meeting with the U.C. police

17   officers and they would maybe be alerting

18   you as to what's going on, and then you

19   would relate that on how you would

20   disseminate that to the general public?

21       PROSPECTIVE JUROR HAND:  Yes, there

22   is emergency response team avenues by a

23   member of the emergency response team.

24   We develop a variety of plans for various

25   contingencies at the University.  And

1   because of that, I am in the offices at

2   least quite a bit.

3         MR. TIEGER:  And just the next

4   question, just to get right to the bottom

5   line, is that, you know, Ms. Shanahan and

6   I are going to be arguing to you, along

7   with law enforcement, that Mr. Jordan did

8   what we say he did, shot and killed

9   Mr. Davis.  And we are going to be

10  working with law enforcement.  You work

11  with law enforcement on a daily basis, do

12  you think you would believe or side with

13  us more than you should to the detriment

14  of Mr. Jordan, or can you play it

15  straight down the middle?  Because if you

16  think you're going to side with us right

17  off the bat, then it's probably not right

18  that you're a juror.  But if you think

19  despite what you do or -- obviously

20  nobody can really keep your background

21  behind them, keep that here, but play it

22  fair and straight down the middle.

23        PROSPECTIVE JUROR HAND:  I don't

24  believe I carry a prejudice.

25        MR. WHALEN:  Okay.  You can be fair

to both sides?

      PROSPECTIVE JUROR HAND:  I think so.

      MR. WHALEN:  Also looks like you served on juries before.

      PROSPECTIVE JUROR HAND:  Yes, sir.

      MR. TIEGER:  And it looks like also you were sued?

      PROSPECTIVE JUROR HAND:  Yes.

      MR. TIEGER:  How long ago was that?

      PROSPECTIVE JUROR HAND:  Fifteen years ago.  That involved a criminal case at the University.  The professor was charged with selling grades to the students.  He was arrested and charged.  He was found innocent and sued myself and the police department for libel and slander.  And I was involved with the case for a little over a year until both the police and I were cleared of the accusations.

      MR. TIEGER:  Was that here in this courthouse?

      PROSPECTIVE JUROR HAND:  No.

      MR. TIEGER:  Federal court?

1    PROSPECTIVE JUROR HAND:  No, it's

2    Court of Claims.

3    MR. TIEGER:  Okay.  And I know you

4    must keep busy at UC because with that

5    big of a population there is a lot going

6    on.  I know I was involved in -- I don't

7    know if you remember Donald Little, the

8    basketball player, his case and various

9    rape cases I've had over the years that

10   have taken place on campus different

11   other cases, so there are -- those are

12   type of things that you know something

13   about.  We have never met I know.

14   PROSPECTIVE JUROR HAND:  No.

15   MR. TIEGER:  Okay.  And that it

16   looks like you or your family have been

17   the victim of a crime at some point?

18   PROSPECTIVE JUROR HAND:  Yes.

19   MR. TIEGER:  What type of crime was

20   that?

21   PROSPECTIVE JUROR HAND:  A few

22   years back my daughter was robbed at

23   gunpoint, at an ATM, she was with a

24   friend of hers and they were ordering

25   with money.

1        MR. TIEGER:  What part of town was

2    this?

3        PROSPECTIVE JUROR HAND:  Covedale.

4        MR. TIEGER:  Was anybody ever

5    caught?

6        PROSPECTIVE JUROR HAND:  Someone

7    was caught.  My daughter was never asked

8    to participate in any trials, so I'm not

9    sure what --

10        MR. TIEGER:  Was she hurt at all?

11        PROSPECTIVE JUROR HAND:  She was

12    not.

13        MR. TIEGER:  Thank you, Mr. Hand.

14    Pass for cause, Judge.

15        THE COURT:  All right.  You may

16    continue with cause, challenge for cause.

17    And, defense, Ms. Williams?

18        MS. WILLIAMS:  Yes.  Good morning,

19    Mr. Hand.  I see on your paper here, your

20    questionnaire, that you had said that you

21    have been a victim of a robbery, assault

22    and theft and burglary, or did -- all

23    those didn't all happen at the same time,

24    or were they all part of your daughter's

25    incident or --

1    PROSPECTIVE JUROR HAND:  No.  House
2  had been burglarized once.  I had a car
3  stolen.
4    MS. WILLIAMS:  I know recently
5  there has been a lot of news about crimes
6  going on around the University of
7  Cincinnati campus.  Has that made you
8  frightened for being at work or around
9  the campus at all?
10    PROSPECTIVE JUROR HAND:  Actually,
11  there has been a lot of discussion about
12  crime at the University.  The statistics
13  I have is crime in the neighborhood has
14  been decreasing, so, no, I have been
15  there a long time.
16    MS. WILLIAMS:  So the news stories
17  and everything about crime increasing in
18  the area in the media can blow things up,
19  obviously.  Those don't affect your
20  opinion as to this case or anything?
21    PROSPECTIVE JUROR HAND:  No, ma'am.
22    MS. WILLIAMS:  Just a moment.  No
23  further questions.  We'll pass for cause.
24    THE COURT:  You pass for cause?
25    MS. WILLIAMS:  Thank you.

```
 1              THE COURT:  Thank you very much.
 2    And now we'll move on.  By the way, there
 3    are -- each side does have four
 4    peremptory challenges, and we are moving
 5    to the third category of that, so would
 6    the attorneys approach?
 7              MR. WHALEN:  Could you give us a
 8    couple minutes?
 9              THE COURT:  Yes.  No, it is the
10    defense's.  Okay.
11              MR. WHALEN:  We are ready, Your
12    Honor.  Thank you.
13              THE COURT:  Counsel, approach
14    sidebar.
15              (The following transpired at
16    sidebar as follows:)
17              MR. WHALEN:  We are going to excuse
18    Mr. Gregory Hand.
19              THE COURT:  What?
20              MR. WHALEN:  Gregory Hand that they
21    just put in.
22              THE COURT:  Okay.  All right.  He's
23    Number 18 -- Number 19.  Okay.  Thank
24    you.
25              (Sidebar concluded.)
```

1    THE COURT:  Court is back in

2    session.  I would like at this time to

3    thank and excuse Number 19, Mr. Gregory

4    Hand.  Thank you very much for your

5    testimony and your answers today that you

6    forthrightly gave us, and we hope that

7    you have the opportunity to participate

8    in another jury.

9        PROSPECTIVE JUROR HAND:  Thank you,

10   Judge.

11       THE COURT:  Thank you very much.

12       (Prospective Juror Hand excused.)

13       THE COURT:  And I would like to ask

14   Christine Bernhard, Number 20, to please

15   step forward and have a seat in Number

16   ten.  It seems to be the hot seat today.

17       Counsel, you may both proceed

18   starting with the prosecution and

19   question for cause.

20       MR. TIEGER:  Thank you, Judge.  Ms.

21   Bernhard, Ms. Shanahan reminded me that

22   you raised your hand.  Okay.  Can you

23   tell me a little bit about that?

24       PROSPECTIVE JUROR BERNHARD:  It

25   was -- if I'm not stating the question

correctly it was:  Do you know somebody

who's been arrested?

      MR. TIEGER:  Okay.

      PROSPECTIVE JUROR BERNHARD:  Yeah,

my husband, before we were married.

      MR. TIEGER:  Okay.

      PROSPECTIVE JUROR BERNHARD:  For

DUI.

      MR. TIEGER:  Okay.  When was that?

Was that a while ago or --

      PROSPECTIVE JUROR BERNHARD:  It was

when we were still in college, so...

      MR. TIEGER:  Were you with him at

the time --

      PROSPECTIVE JUROR BERNHARD:  No.

      MR. TIEGER:  -- in the car?

      PROSPECTIVE JUROR BERNHARD:  No,

no.

      MR. TIEGER:  That's okay.  Did you

know what happened on the case in terms

of him going to trial or admitting that

he was --

      PROSPECTIVE JUROR BERNHARD:  He

just did no contest, I think.  Either

guilty or no contest.  I'm not really

1       sure.

2           MR. TIEGER:  He did the test, the

3       breath test?

4           PROSPECTIVE JUROR BERNHARD:  I'm

5       pretty sure he did the test.

6           MR. TIEGER:  And was over?

7           PROSPECTIVE JUROR BERNHARD:  Yeah.

8           MR. TIEGER:  Does he feel -- did

9       you feel that he was treated fairly by

10      the police or the Court?

11          PROSPECTIVE JUROR BERNHARD:  Yep.

12          MR. TIEGER:  And no further trouble

13      since then at all?

14          PROSPECTIVE JUROR BERNHARD:  No.

15          MR. TIEGER:  Okay.  Who do you work

16      for, Ms. Berhnard?

17          PROSPECTIVE JUROR BERNHARD:

18      Technically, Dell, Inc. or Dell

19      Computers.

20          MR. TIEGER:  Okay.  And what type

21      of things do you do for Dell?

22          PROSPECTIVE JUROR BERNHARD:  I'm

23      actually a consultant.  They just bought

24      the company that I used to work for.

25      It's not really the computer piece of it,

that kind of stuff, more business
solution, business practice with Dell.

MR. TIEGER:  Would a business come
to you for help with their system that
you would help them, or how does that
work?

PROSPECTIVE JUROR BERNHARD:  It
would be more that a company like Procter
& Gamble would say they want to implement
a PC software.  Then I would select a
vender to come there and help them with
what implementation process.  I'm just
using PG as an example.  And then that's
when myself and the rest of our team
would go in and help them design their
process and put in the system.

MR. TIEGER:  Would you actually go
to that other company then and help them?

PROSPECTIVE JUROR BERNHARD:  In
most cases, yes.

MR. TIEGER:  Set it this up,
allowing for a process, what would that
take necessarily to set up a SAP process?

PROSPECTIVE JUROR BERNHARD:
Anywhere from six months to 18 months

1    usually for first round implementation.

2         MR. TIEGER:  And were you trained

3    in a school, or is that something you

4    just picked up on?

5         PROSPECTIVE JUROR BERNHARD:  No,

6    it's something I just sort of picked up.

7    I graduated with marketing in finance and

8    went into what was Anderson Consults, so

9    just went to consulting.  I was trained

10   on that.

11        MR. TIEGER:  You had marked when

12   they asked you do you think you would be

13   a good juror, do you remember what you

14   put?

15        PROSPECTIVE JUROR BERNHARD:

16   Depends.

17        MR. TIEGER:  Okay.  Can you tell me

18   a little bit about that?

19        PROSPECTIVE JUROR BERNHARD:  Well,

20   it really just depends.  I just need to

21   take in a lot of information, and I'm

22   struggling with blaming people or, you

23   know, pointing fingers because I think

24   it's really -- you're an independent

25   person and you can kind of come up with

1    your own solutions.

2         MR. TIEGER:  Okay.

3         PROSPECTIVE JUROR BERNHARD:  I

4    guess, so I have a difficult time finding

5    people at fault with other people's

6    problems, you know what I mean?

7         MR. TIEGER:  Could you elaborate on

8    that a little bit?

9         PROSPECTIVE JUROR BERNHARD:  I

10   don't know.  I didn't say it very well.

11   I'm not explaining it very well.  But I

12   think I'm a good juror in so much as I

13   can take in a lot of information,

14   thoughtful, that type of deal.  But I

15   think also, you know, it just depends on

16   the character of the people, and they are

17   not taking responsibility for their piece

18   of it, I struggle with.

19        MR. TIEGER:  Okay.  If they were

20   blaming somebody else for what they did

21   themselves?

22        PROSPECTIVE JUROR BERNHARD:  Right,

23   for what they caused, yes, I struggle

24   with that.

25        MR. TIEGER:  You somewhat heard

1  myself and Mr. Whalen talk about the

2  facts of the case?

3  　　　PROSPECTIVE JUROR BERNHARD:

4  Uh-huh.

5  　　　MR. TIEGER:  What's kind of going

6  on.  In this case, I mean, you do have a

7  person, Kareem Gilbert, who's the son

8  that is going to be, in essence, saying I

9  did this, but he did this other thing, so

10  there is going to be somewhat of pointing

11  the finger at somebody else for doing

12  something, they're going to say they are

13  not even responsible for that second act.

14  　　　PROSPECTIVE JUROR BERNHARD:  Right.

15  　　　MR. TIEGER:  Is that the type of

16  thing that might work into your problem

17  area?

18  　　　PROSPECTIVE JUROR BERNHARD:

19  Problem area?

20  　　　MR. TIEGER:  Sorry to call it that.

21  　　　PROSPECTIVE JUROR BERNHARD:  That's

22  okay.  I don't think so.

23  　　　MR. TIEGER:  Okay.

24  　　　PROSPECTIVE JUROR BERNHARD:  I

25  think that's just explaining the facts as

1         that person knows it --

2            MR. TIEGER:  Okay.

3            PROSPECTIVE JUROR BERNHARD:  --

4         that's presenting it.

5            MR. TIEGER:  And it looks like you

6         have served as a juror before on a civil

7         case?

8            PROSPECTIVE JUROR BERNHARD:  I did.

9         A personal injury.  I believe it was a

10        drunk driver who passed in the accident,

11        passed way in the accident and the

12        plaintiff was suing the estate months

13        after.

14           MR. TIEGER:  Gotcha.  Wrongful

15        death?

16           PROSPECTIVE JUROR BERNHARD:  No,

17        no, the plaintiff -- am I getting it

18        wrong?  Somebody was suing the State, a

19        drunk driver.

20           MR. TIEGER:  Gotcha.  Gotcha.  For

21        what the drunk driver had done?

22           PROSPECTIVE JUROR BERNHARD:  Yeah.

23        But the man claimed that he had follow-up

24        back injury like earlier.

25           MR. TIEGER:  Okay.  Gotcha.  Okay.

Thanks, honestly, Ms. Bernard.  No, you
did fine.  Thank you.

THE COURT:  You pass for cause?

MR. TIEGER:  Yes, Your Honor.

THE COURT:  Okay.  Mr. Whalen,
you're going to proceed.

MR. WHALEN:  Ms. Bernard, I'm
curious to find out how somebody who's
born in New York goes to school at the
University of Dayton ends up in
Cincinnati, Ohio?

PROSPECTIVE JUROR BERNHARD:  Well,
it's interesting, they recruit evidently
in western New York, I guess.

MR. WHALEN:  I was worried your
parents were gypsies or something.

PROSPECTIVE JUROR BERNHARD:  No,
that would have been fun though, just
Catholic.

MR. WHALEN:  That's not fun, I can
tell you.  You talked about your husband,
and let me -- not just a DUI, but if your
husband is charged with a crime, would
you be one of the kind of jurors that you
would want to sit in on this case if he's

1    being tried for it?

2              PROSPECTIVE JUROR BERNHARD:  Yes.

3              MR. WHALEN:  You indicate that

4    you're very positive toward police

5    officers.  Can you tell me what you mean

6    by very positive?

7              PROSPECTIVE JUROR BERNHARD:  I

8    think I answered that.  Yes, I'm very

9    positive towards police officers,

10   generally speaking.  I think it's amazing

11   that somebody would dedicate their lives

12   to that.  I think that's a really noble

13   career path.

14             MR. WHALEN:  And do you think these

15   noble people can lie?

16             PROSPECTIVE JUROR BERNHARD:  I do.

17   I think anybody can lie.

18             MR. WHALEN:  All right.  So if a

19   police officer comes in here to testify,

20   he's not raised to a particular higher

21   level than any other witness when he

22   comes in?

23             PROSPECTIVE JUROR BERNHARD:  I

24   think by the nature of his business and

25   by the nature of who he or she, you know

what they dedicate their lives to, I
think they get a little bit of a benefit
of the doubt.  But I think it would also,
you know -- I would have to take in what
they are saying and understand where they
are coming from and how I feel about
that.

MR. WHALEN:  So if this young lady
seated here comes in and tells you
something is black, the police officer
walks in and says it's white, you're
going to lean toward what the police
officer said than what this woman said?

PROSPECTIVE JUROR BERNHARD:  I
probably would.  Yes, I would.

MR. WHALEN:  Believe me, I
appreciate your honesty and the
struggling that you have done with your
answers.  I mean, clearly you think
through what you're doing.  Next time you
won't answer so well.

PROSPECTIVE JUROR BERNHARD:  No,
no.

MR. WHALEN:  Okay.

THE COURT:  You pass for cause?

1      MR. WHALEN:  Just a second.

2      THE COURT:  All right.

3      MR. WHALEN:  Pass for cause, Your

4  Honor.

5      THE COURT:  Well, thank you.  And

6  now, approach one other time.

7      MR. TIEGER:  Can I just have a

8  minute, Judge, also?

9      THE COURT:  Yes.

10     MR. TIEGER:  Thanks.

11     (The following transpired at

12  sidebar as follows:)

13     MR. WHALEN:  We want to remove the

14  court reporter.

15     MR. TIEGER:  I object, Judge.  We

16  are going to excuse Mr. Bernhard.

17     THE COURT:  Okay.  He is on the hot

18  seat.

19     MS. WILLIAMS:  What number is that?

20     MR. TIEGER:  The one we just did.

21  Number ten, I indicated.

22     (Sidebar concluded.)

23     THE COURT:  All right.  Court is

24  back in session, and we are going to

25  thank and excuse juror -- Ms. Bernhard.

1    Thank you very much for your attendance

2    and appearance and answers today.  I do

3    hope you found this rewarding and are

4    able to serve on a jury.

5         PROSPECTIVE JUROR BERNHARD:  Thank

6    you.

7         (Prospective Juror Bernhard

8    excused.)

9         THE COURT:  And also Juror Number

10   21, Jessie Ricketts, please come forward

11   and sit in the hot seat, Number ten.  You

12   may be seated.  Now the questions for

13   cause.

14        MR. TIEGER:  Hello, Ms. Ricketts.

15        PROSPECTIVE JUROR RICKETTS:  Hi.

16        MR. TIEGER:  Um, anything you would

17   like to let us know about yourself or any

18   of your answers?

19        PROSPECTIVE JUROR RICKETTS:  Yeah,

20   I think I filled out that form a little

21   too fast.  I didn't fill out any

22   information about people in my family

23   that has been arrested before.

24        MR. TIEGER:  Okay.

25        PROSPECTIVE JUROR RICKETTS:  When I

was six years old, my dad spent a year in
the federal penitentiary for falsifying
documents.  He owned a coal mine.  And
then I think my sister has also been
arrested for a DUI, but my mom won't tell
us exactly.

MR. TIEGER:  Okay.

PROSPECTIVE JUROR RICKETTS:  She's
hiding it from us.

MR. TIEGER:  This wasn't -- that's
just something that's kind of secret
between your mom and your sister?

PROSPECTIVE JUROR RICKETTS:  Yeah.

MR. TIEGER:  Okay.  And your dad's
situation, was that -- let's see, it
looks like you're from West Virgina.  Was
that in West Virgina?

PROSPECTIVE JUROR RICKETTS:  Yes.

MR. TIEGER:  Do you remember much
about that?  You said you were six?

PROSPECTIVE JUROR RICKETTS:  I
mean, at the time I was just told he
stole a car because that's the only way I
was, obviously, going to be able to
understand it.  But as I have gotten

older and read documents, I just know
that he owned a coal mine.  I think it
was about trying to get the coal mine
open and all of the safety regulations.
So he just lied about -- I'm not sure
about what, got people to sign documents
that weren't legitimate.  I also think he
was tied into investors that were kind of
bigger people, somehow he was tied into
other investors that he knew to be kind
of doing illegal things as well, and so
my dad was not just dealing with very
legitimate people and got tied into all
that and went to jail.

          MR. TIEGER:  Okay.  So he was gone
for a short period of time when you were
a child?

          PROSPECTIVE JUROR RICKETTS:  Yes.

          MR. TIEGER:  Came back and never
really talked about it.  I'm sure since
you have been grown up, have you had a
chance to talk to him about what had
happened?

          PROSPECTIVE JUROR RICKETTS:  No.

          MR. TIEGER:  Does he know that you

know what he went to jail for?

PROSPECTIVE JUROR RICKETTS:  Yeah.
Yeah.

MR. TIEGER:  Okay.  Are you okay
with how well that went?  I mean, I know
we all love our families, and you know,
without getting too deep into it, but I
mean our mothers and fathers are,
especially when they're that young, I
mean, they can do no wrong and then all
the sudden he's in jail.

PROSPECTIVE JUROR RICKETTS:  Yeah.
I mean, I kind of accept my dad for the
person that he is and it hasn't really, I
don't think, affected me, the jail part
has never really affected me much.

MR. TIEGER:  Do you feel that he
was treated fairly and that he
acknowledged that he got involved with
the wrong group of people and did things
that he shouldn't have done?

PROSPECTIVE JUROR RICKETTS:  Yes.

MR. TIEGER:  And he paid a price
for it?

PROSPECTIVE JUROR RICKETTS:  Yes.

1          MR. TIEGER:  Moving on from that.

2      You went to Xavier?

3          PROSPECTIVE JUROR RICKETTS:

4      Uh-huh.

5          MR. TIEGER:  And then Landor

6      Associates, what type of company is that?

7          PROSPECTIVE JUROR RICKETTS:  It's a

8      branding and design agency.  We work --

9      P&G is our biggest client here in

10     Cincinnati.

11         MR. TIEGER:  How long have you been

12     with them?

13         PROSPECTIVE JUROR RICKETTS:  Seven

14     years.

15         MR. TIEGER:  What type of things do

16     you do for them?

17         PROSPECTIVE JUROR RICKETTS:  I am a

18     senior line manager, so I work directly

19     with our clients at mostly P&G and come

20     back and talk to our design team about

21     how to mostly develop packaging design

22     for them.

23         MR. TIEGER:  Okay.  So Crest or --

24         PROSPECTIVE JUROR RICKETTS:  Bingo.

25         MR. TIEGER:  Any of that, the box?

```
1          PROSPECTIVE JUROR RICKETTS:  Yeah.
2    General defining elements.
3          MR. TIEGER:  The color?
4          PROSPECTIVE JUROR RICKETTS:
5    Exactly.
6          MR. TIEGER:  Okay.  I know there is
7    a lot of time spent on that.  It looks
8    simple, but I know there is a lot of
9    studies and things like that.
10         PROSPECTIVE JUROR RICKETTS:  Uh-huh.
11         MR. TIEGER:  Okay.  So you enjoy
12   what you do?
13         PROSPECTIVE JUROR RICKETTS:  Yeah.
14         MR. TIEGER:  And when you were
15   asked whether you would be a good juror,
16   you put that you weren't sure?
17         PROSPECTIVE JUROR RICKETTS:  Just I
18   have never done it before, so until I got
19   in here and understood the process and
20   learned any information, I just didn't
21   feel like I could answer that question.
22         MR. TIEGER:  How about now, you
23   kind of been through a couple days of
24   this.
25         PROSPECTIVE JUROR RICKETTS:  I feel
```

1    like I could be a good juror.

2        MR. TIEGER:  Okay.  Thank you,

3    Ms. Ricketts.  Pass for cause, Judge.

4        THE COURT:  All right.  Thank you.

5        MR. WHALEN:  Your maiden name

6    wasn't Goddy, was it?

7        PROSPECTIVE JUROR RICKETTS:  No.

8        MR. WHALEN:  Okay.  You say here

9    the police officers are here to protect

10   us.  And I don't think anybody is going

11   to disagree with that, but if a police

12   officer comes in and testifies, are you

13   going to automatically believe what they

14   say?

15       PROSPECTIVE JUROR RICKETTS:  No.

16       MR. WHALEN:  You will judge them

17   like all the other witnesses?

18       PROSPECTIVE JUROR RICKETTS:  Yes.

19       MR. WHALEN:  You have been in here

20   now and you're sure that you could be a

21   fair and impartial juror?

22       PROSPECTIVE JUROR RICKETTS:  Yes.

23       MR. WHALEN:  And when you go back

24   with the other jurors to make a decision,

25   you're going to put aside all of the

pictures that you saw and the
gruesomeness of the crime and family
members that have gone through a terrible
time, and reach a verdict that's based
solely upon the evidence and the law?

PROSPECTIVE JUROR RICKETTS:  Yes.

MR. WHALEN:  You have no problem
with that?

PROSPECTIVE JUROR RICKETTS:  No
problem.

MR. WHALEN:  Okay.  May I have a
moment, Your Honor?

THE COURT:  Yes.

MR. WHALEN:  Pass for cause, Your
Honor.

THE COURT:  All right.  And I want
the attorneys to approach now, please,
again.

(The following transpired at
sidebar as follows:)

MR. WHALEN:  We are going to get
rid of Number 7.

THE COURT:  Number 7.  Okay.
Excuse Number 7.  All right.

MR. WHALEN:  And let me -- how many

have we used?

THE COURT:  This is your third.
You have -- this is your third.  Each of
you have one left.

MR. TIEGER:  Okay.

(Sidebar concluded.)

THE COURT:  You may all be seated
please.  We would like to thank and
excuse Juror Number 7, and she is to be
replaced by Number 22, Christopher
Powers.  I want to thank Ms. Binkley.  I
want to thank you for your participation
today.  I hope it's been a rewarding
experience, and also hope you have the
opportunity to serve on a jury.

PROSPECTIVE JUROR BINKLEY:  Thank
you.

THE COURT:  Okay.

(Prospective Juror Binkley
excused.)

THE COURT:  And at this time, yes,
have a seat there and now we will
continue with the challenge or
questioning for cause.

MR. TIEGER:  We are getting close,

1    I promise.  It shouldn't be that much

2    longer.

3         Mr. Powers, again, I know this is

4    getting a little bit redundant, but

5    anything that you would like to let us

6    know about yourself or any of the

7    questions we asked, any comments you

8    would like to make on that?

9         PROSPECTIVE JUROR POWERS:  No, sir.

10        MR. TIEGER:  You're fine with

11   everything that myself, Mr. Whalen,

12   Ms. Williams have talked about?

13        PROSPECTIVE JUROR POWERS:  Yes,

14   sir.

15        MR. TIEGER:  And based on all the

16   information that you have, do you think

17   you could be a fair juror to both sides?

18        PROSPECTIVE JUROR POWERS:  Yes,

19   sir.

20        MR. TIEGER:  You're at U.C?

21        PROSPECTIVE JUROR POWERS:  Yes,

22   sir.  Raymond Walters College, branch

23   campus, Blue Ash.

24        MR. TIEGER:  And I know Mr. Burck

25   also works for UC and Mr. Hand, I forgot

1    to ask him also, now that he's not a

2    juror any more, but works for UC.  Do you

3    and Mr. Burck know each other at all?

4         PROSPECTIVE JUROR POWERS:  No, sir.

5         MR. TIEGER:  Okay.  And I know UC

6    is a very large institution.  What do you

7    do for UC?

8         PROSPECTIVE JUROR POWERS:  I'm

9    director of enrollment services.  I'm

10   over admission, financial aid and

11   registration.

12        MR. TIEGER:  And how long have you

13   been out at Raymond Walters?

14        PROSPECTIVE JUROR POWERS:  Six

15   years.

16        MR. TIEGER:  I know that's gotten

17   to be a very, very popular place to go

18   and very large campus.

19        PROSPECTIVE JUROR POWERS:  Yes,

20   sir.  Over 5,000 students.

21        MR. TIEGER:  When you started, how

22   big was it?

23        PROSPECTIVE JUROR POWERS:  Probably

24   4200.

25        MR. TIEGER:  Okay.  And then I know

years and years before that it was even a
lot smaller.

PROSPECTIVE JUROR POWERS:  Sure,
3500 maybe.

MR. TIEGER:  And what you said with
admissions and what else?

PROSPECTIVE JUROR POWERS:
Admissions, financial aid and
registration.

MR. TIEGER:  Okay.  And what type
of things would you do on a daily basis
then?

PROSPECTIVE JUROR POWERS:  As a
director, I supervise a team of 13 people
in those areas and help students whenever
necessary with anything to do with
financial aid, admission or registration.
We are kind of a one-stop center, so
students come to us first.

MR. TIEGER:  What got you
interested in working for the university?

PROSPECTIVE JUROR POWERS:  My own
undergrad experience at Berea College in
Kentucky, enjoyed helping students, and I
have been in the career a little over ten

years and started at Hanover College.

        MR. TIEGER:  And then you got a lot
of kids at Raymond Walters, also, a lot
of kids that move down on the main
campus?

        PROSPECTIVE JUROR POWERS:  Main
campus, yes, sir.

        MR. TIEGER:  Do you help with that
as well?

        PROSPECTIVE JUROR POWERS:  Yes,
sir.

        MR. TIEGER:  And that goes credit
for credit, I think?

        PROSPECTIVE JUROR POWERS:  Depends
if they stay within the same major, yes,
sir.

        MR. TIEGER:  Okay.  And it looks
like you also had some jury service a few
years ago.

        PROSPECTIVE JUROR POWERS:  Yes,
sir.

        MR. TIEGER:  Do you remember what
type of case that was?

        PROSPECTIVE JUROR POWERS:  I
believe one was a breaking and entering

1    and the other was a DUI case.

2         MR. TIEGER:  And you deliberated on

3    those?

4         PROSPECTIVE JUROR POWERS:  Yes,

5    sir.

6         MR. TIEGER:  Thank you, Mr. Powers.

7    Pass for cause, Judge.  Thank you.

8         THE COURT:  Thank you.  Defense may

9    continue.

10        MR. WHALEN:  Mr. Powers, I may have

11   missed it.  You may have been asked this

12   already, but you served on a jury in

13   2007?

14        PROSPECTIVE JUROR POWERS:  Yes,

15   sir.  I believe it was about that time.

16        MR. WHALEN:  And what kind of jury

17   was it?

18        PROSPECTIVE JUROR POWERS:  What

19   kind of case was it, sir?

20        MR. WHALEN:  Yes.

21        PROSPECTIVE JUROR POWERS:  One was

22   breaking and entering and the other was

23   DUI.

24        MR. WHALEN:  And did you reach a

25   verdict in both of those?

1   PROSPECTIVE JUROR POWERS:  Yes,
2   sir, if I remember correctly.
3   MR. WHALEN:  And did you have any
4   difficulty sitting and talking with the
5   other jurors and debating back and forth
6   and making the decision?
7   PROSPECTIVE JUROR POWERS:  No, sir.
8   MR. WHALEN:  Okay.  You've heard
9   the question that I've asked about the
10  police officers, you put here they are
11  public servants to the community.
12  PROSPECTIVE JUROR POWERS:  Yes,
13  sir.
14  MR. WHALEN:  Would you believe a
15  police officer more than you would
16  anybody else that comes into this room?
17  PROSPECTIVE JUROR POWERS:  No, sir.
18  MR. WHALEN:  So you would judge
19  them the same as you would everybody
20  else?
21  PROSPECTIVE JUROR POWERS:  Yes,
22  sir.
23  MR. WHALEN:  Pass for cause, Your
24  Honor.
25  THE COURT:  Thank you, Counsel.

1    MR. TIEGER:  Judge, we need just a

2    minute.

3    THE COURT:  I'm going to turn on

4    the machine here.  Would you like to

5    stand up?  Jurors, you can do that.  Can

6    you approach?

7    (The following transpired at

8    sidebar as follows:)

9    THE COURT:  This is your last one.

10    MR. TIEGER:  Yeah.  Judge, we are

11    going to excuse Number 5, Ms. McKeehan.

12    THE COURT:  Okay.  All right.

13    Replace by Shelton, Number 23.

14    MR. TIEGER:  Yes.

15    THE COURT:  Okay.

16    (Sidebar concluded.)

17    THE COURT:  You may all be seated.

18    And at this time we are going to thank

19    and excuse Number 5, Ms. Carmen McKeehan.

20    And Ms. McKeehan, thank you for your

21    participation today.

22    PROSPECTIVE JUROR MCKEEHAN:  Thank

23    you.

24    THE COURT:  We hope you found this

25    a rewarding experience.  And I do hope

1    you have an opportunity to serve on a

2    jury.

3         PROSPECTIVE JUROR MCKEEHAN:  Thanks.

4         THE COURT:  You may go to the jury

5    commission.  And would Mr. 23, Scott

6    Shelton, you are next.  This will

7    continue on with -- when he's seated.

8    And you may now continue with questioning

9    for cause.

10        MR. TIEGER:  Thank you, Judge.

11   Hello, Mr. Shelton.

12        PROSPECTIVE JUROR SHELTON:  Hello.

13        MR. TIEGER:  Again, you can

14   probably anticipate what I'm going to

15   ask.  Anything you would like to comment

16   on?

17        PROSPECTIVE JUROR SHELTON:  No,

18   sir.

19        MR. TIEGER:  Okay.  Based on

20   everything I have said, and Mr. Whalen,

21   Ms. Williams, do you think you could sit

22   with everybody else here on this panel,

23   be a fair juror?

24        PROSPECTIVE JUROR SHELTON:  I think

25   so, yes.

1          MR. TIEGER:  Nothing in your

2    background or any of the things we talked

3    about that would give you any concerns or

4    prevent you from doing the right thing?

5          PROSPECTIVE JUROR SHELTON:  No.

6          MR. TIEGER:  You're with, is it

7    Cognis?

8          PROSPECTIVE JUROR SHELTON:  Cognis

9    Corporation.  It's a chemical company

10   here in town.  Recently, it was acquired

11   by BASF, so there is some transition

12   stuff going on at work now, so...

13         THE COURT:  What did you say?  You

14   are with?  You have been what, please?

15         PROSPECTIVE JUROR SHELTON:  Cognis

16   Corporation is where I work.  We were

17   recently acquired.

18         THE COURT:  Okay.  Acquired by

19   BASF?

20         PROSPECTIVE JUROR SHELTON:  Yes.

21         MR. TIEGER:  What type of company

22   is BASF?

23         PROSPECTIVE JUROR SHELTON:  It's

24   the largest chemical company in the

25   world.

1    MR. TIEGER:  So I guess it's not a

2    bad thing to get acquired by them.

3    PROSPECTIVE JUROR SHELTON:  Well,

4    for the people here in Cincinnati it

5    could be a bad thing.  Job eliminations

6    and whatnot.

7    MR. TIEGER:  And when did you get

8    taken over by BASF?

9    PROSPECTIVE JUROR SHELTON:  It was

10   last month, the transition period will go

11   through this year.

12   MR. TIEGER:  What type of things do

13   you do at that company?  Logistics?

14   PROSPECTIVE JUROR SHELTON:  I do

15   logistics, so, you know, coordinating

16   trucks and railcars and material from

17   customers to our plants and visa-versa.

18   Just making sure the products are at the

19   right place at the right time.

20   MR. TIEGER:  And so you would be --

21   they're volatile type of things,

22   dangerous maybe type of things?

23   PROSPECTIVE JUROR SHELTON:  Yes,

24   hazardous materials.

25   MR. TIEGER:  And you're there to

1    make sure that it all gets where it is

2    and the right way, the right time and all

3    that?

4            PROSPECTIVE JUROR SHELTON:  At the

5    right cost.

6            THE COURT:  Right cost.

7            MR. TIEGER:  Do you supervise

8    anybody, or do you work with the team at

9    all?

10           PROSPECTIVE JUROR SHELTON:  We have

11   a team of distribution department in

12   Cincinnati, so I don't personally

13   supervise anybody.

14           MR. TIEGER:  Do you enjoy working?

15           PROSPECTIVE JUROR SHELTON:  Yes.

16           MR. TIEGER:  And none of the

17   other -- you have never sat on a jury at

18   all?

19           PROSPECTIVE JUROR SHELTON:  No.

20           MR. TIEGER:  Victim of a crime?

21           PROSPECTIVE JUROR SHELTON:  No.

22           MR. TIEGER:  Thankfully, I guess

23   that hasn't affected you at all.  Okay.

24   Thank you, Mr. Shelton.  Pass for cause,

25   Judge.

THE COURT: All right. You may
continue. Defense?

MS. WILLIAMS: Good morning,
Mr. Shelton. I see you came from
Tennessee.

PROSPECTIVE JUROR SHELTON: Yes.

MS. WILLIAMS: Looks like three
years ago.

PROSPECTIVE JUROR SHELTON: Yes.

MS. WILLIAMS: I also see you got a
Beckley. I assume that's a son.

PROSPECTIVE JUROR SHELTON: That's
a daughter.

MS. WILLIAMS: I'm sorry. I kind
of like that name. When you moved up
here three years ago, I see your daughter
is three, was that when she was born or
for a job?

PROSPECTIVE JUROR SHELTON: Shortly
after, to be closer to family up here in
Cincinnati.

MS. WILLIAMS: Okay. And help out?

PROSPECTIVE JUROR SHELTON: Yes.

MS. WILLIAMS: Again, I notice when
you put: Did you think you would be a

good juror?  You kind of had a question about whether or not you would make a good juror, and you now think that you would make a good juror.  You would be fair, you said.

PROSPECTIVE JUROR SHELTON:  I think so.

MS. WILLIAMS:  Okay.  I see you're married to Julia.  What does she do for a living?

PROSPECTIVE JUROR SHELTON:  She was a school teacher, but now she's a stay-at-home mother.

MS. WILLIAMS:  Okay.  What school did she teach at?

PROSPECTIVE JUROR SHELTON:  Back in Memphis.

MS. WILLIAMS:  So she didn't teach here locally or anything?  No further questions.  Pass for cause.

THE COURT:  Thank you very much. And, Counsel, you want a moment before you exercise the last peremptory challenge on that side?  On each side actually.  No, that's not correct.  It

will be the third one of the defendant.

(The following transpired at sidebar as follows:)

THE COURT:  Okay.

MR. WHALEN:  Number 7.  Mr. Powers. Number 7.

THE COURT:  Okay.  All right. Thank you.  And that's your fourth.

MR. TIEGER:  We are done.

THE COURT:  You're done.

MR. TIEGER:  Alternates.  Judge, as far as the alternates, Judge, we have assuming --

THE COURT:  Okay.  We also have to replace Mr. Sheffield, because he said --

MR. TIEGER:  He's gone.

THE COURT:  We already let him go.

MR. TIEGER:  He left.  We bumped him Monday.

THE COURT:  Okay.  I did have "for cause" written here.  Okay.  So he's already gone.

MR. TIEGER:  So we would have one, two, three, four.  We would have five jurors left.

THE COURT:  Uh-huh.

MR. TIEGER:  And if you want to
keep three alternates, we each have two
bumps which is going to be a problem.

THE COURT:  Yeah, if you use them.

MR. TIEGER:  Because we only have
one.

THE COURT:  Then we got to start
over, or can bring --

MR. WHALEN:  Seth and I discussed
that, we don't want to start over.

MR. TIEGER:  No.

THE COURT:  Have one exercise if
you -- that's up to you to exercise one
each.

MR. TIEGER:  I mean --

MR. WHALEN:  I have got a question.
We are going to pick Prospective Juror
Number A and Number B, if he uses A as a
peremptory, does he have to use A or can
he use it for B also?

THE COURT:  Either one.

MR. TIEGER:  My understanding that
A and B -- A or B.  But then if I bump A,
B would move up to A spot.  C would bump

to B.  One would move up.  So, for
instance, C would not go into A's spot.

MR. WHALEN:  Okay.

THE COURT:  It just stays there.
So if you bump B, A remains.

MR. TIEGER:  A remains.  But if I
bump A, C would -- B would move up and C
would move to B, I think.  What are your
thoughts on how many -- just if we have
to change that spot, one is two, three,
four, five.

MS. WILLIAMS:  So three would give
us two bumps.  One bump.

MR. TIEGER:  Two bumps each, I
guess, depending if we all take them.

THE COURT:  If you can do one and
he can do one and still have enough
people left.

MS. SHANAHAN:  We'll still have
enough left.

MR. TIEGER:  Yeah.

MR. WHALEN:  Unless somebody goes
for cause.

MR. TIEGER:  If we bring three up
and nobody bumps anybody, and those

```
 1          are -- we each bump one, I think we are
 2          good.  But if we start bumping two, then
 3          it's going to be a problem.
 4               THE COURT:  We can't do that,
 5          right, so just --
 6               MR. TIEGER:  So just go with two
 7          alternates.
 8               MR. WHALEN:  One alternate each.
 9          What they are saying, still go with three
10          alternates, only get one bump.  Is that
11          what you're saying?
12               MS. SHANAHAN:  Only get one bump,
13          Bill.
14               THE COURT:  You agree?
15               MR. TIEGER:  Is that what we are
16          talking about?  I didn't catch that.
17               THE COURT:  One.
18               MS. WILLIAMS:  I think we are
19          talking we would receive one alternate,
20          like if someone gets sick or doesn't come
21          in, weather.
22               THE COURT:  Each of you would
23          exercise one preemptory challenge for the
24          alternate each.
25               MR. TIEGER:  Is that what you said,
```

Bill?

MS. SHANAHAN:  And still end up with three names.  We will still have three alternates.

MR. WHALEN:  You're saying bring up three alternates and we each only get one bump.

THE COURT:  Yes.

MS. SHANAHAN:  Correct.  Which is not the norm.  Normally we would each get two.

MR. WHALEN:  We can do that.

MS. SHANAHAN:  We can do that or have to start over.

THE COURT:  Yeah, we are going to bring up three alternates at the same time and you guys make your choice.  One each.

MR. WHALEN:  Can I think about that for a minute?

MR. TIEGER:  Sure.

THE COURT:  Okay.  How long is a minute, because I don't want to, because otherwise --

MR. TIEGER:  Maybe review the names

1    and decide in a minute.  I know I would

2    like to look.

3         THE COURT:  We are going to take a

4    little recess.  So after you do your --

5    you're going to do that now and we'll

6    take a recess.  You're going to exercise

7    your challenge and we'll take a recess,

8    let them leave and have ten minutes.

9         MR. TIEGER:  We have to fully

10   examine.

11        MR. WHALEN:  You got voir dire.

12        MR. TIEGER:  Unless it's for cause.

13   Why don't we do it, then take a break?

14        THE COURT:  Exercise your fourth,

15   take a break.

16        MR. TIEGER:  Yeah.

17        (Sidebar concluded.)

18        THE COURT:  At this time we are

19   back in session, and the Court would like

20   to thank and excuse Mr. Powers, Juror

21   Number -- seated in Number 7.  Thank you,

22   sir, for your participation.  I hope you

23   do have an opportunity to serve and I

24   hope this was a rewarding experience so

25   far.

PROSPECTIVE JUROR POWERS:  Yes,
ma'am.  Thank you.

(Prospective Juror Powers excused.)

THE COURT:  And I would like to ask
for Jerry Drury -- Edward Cisko, Number
24, Mr. Edward Cisko, please come forward
and have a seat in Number 7.

I hear a cell phone that shouldn't
be in the room or on at all.  So whoever
that is, you cannot have a cell phone on
or in use in this courtroom.

All right.  You may continue for
cause of Mr. Cisko.

MR. TIEGER:  Okay.  Hello, Mr.
Cisko.

PROSPECTIVE JUROR CISKO:  Hello.

MR. TIEGER:  Unless you tell us you
can't be fair, everybody has excused
everybody they can, so, basically, do you
think you can be a fair juror in this
case?

PROSPECTIVE JUROR CISKO:  Yes, I
can.

MR. TIEGER:  Is there anything that
anybody has talked about that would cause

1  you to think you couldn't be fair to Ms.

2  Shanahan or myself or Mr. Jordan?

3        PROSPECTIVE JUROR CISKO:  No, there

4  is not.

5        MR. TIEGER:  And all the facts that

6  we have talked about, you're okay with

7  everything that has been discussed?

8        PROSPECTIVE JUROR CISKO:  Yes.

9        MR. TIEGER:  Okay.  Thank you,

10  Mr. Cisko.  Pass for cause, Judge.

11        THE COURT:  Mr. Whalen?

12        MS. WILLIAMS:  I see -- Mr. Cisko,

13  I see that you're a landscape foreman.

14        PROSPECTIVE JUROR CISKO:  Yes,

15  that's correct.

16        MS. WILLIAMS:  What does that

17  entail?

18        PROSPECTIVE JUROR CISKO:  Once a

19  salesman sells a job to the customer, I

20  get it from there and set it up.

21        MS. WILLIAMS:  So you actually go

22  out and do the planning and everything?

23        PROSPECTIVE JUROR CISKO:  Yes.  A

24  crew does, yes.

25        MS. WILLIAMS:  That sounds

1    interesting.  And your wife is retired?

2          PROSPECTIVE JUROR CISKO:  Yes, she

3    is.

4          MS. WILLIAMS:  You listed that your

5    father is retired.  Does he live with you

6    or --

7          PROSPECTIVE JUROR CISKO:  No, he

8    doesn't, no.

9          MS. WILLIAMS:  Okay.  And you have

10   lived in Hamilton County your entire

11   life?

12         PROSPECTIVE JUROR CISKO:  That's

13   correct, Judge.

14         MS. WILLIAMS:  Okay.  No further

15   questions.  We pass for cause, Your

16   Honor.

17         THE COURT:  Thank you very much.

18   We now pass for cause.  At this time we

19   are going to take a brief recess while

20   the parties do talk about the

21   alternatives who will be placed.

22         So at this time I'm going to allow

23   you to get up and leave the courtroom,

24   and remember the admonitions that you

25   cannot discuss this case among

1    yourselves.  Do not form an opinion on

2    this matter.  Do not permit anyone to

3    discuss it with you or in your presence.

4    And I'll remind you of these instructions

5    again at each recess, but you may rise

6    for the jury.  We are going to take about

7    a ten-minute break.

8            (The jury leaving the courtroom at

9    12:17 p.m.)

10           THE COURT:  Counsel, just for a

11   point of procedure.  They're going to be

12   getting a view before they have heard all

13   my instructions, because giving

14   instructions is going to take ten to 15

15   minutes, so they won't have a lunch is

16   what I'm kind of getting around to.

17           MS. SHANAHAN:  I mean, the bus is

18   paid for, Judge.  I mean, if we --

19           THE COURT:  I don't have to give

20   instructions.  I can just tell them what

21   they're getting ready to do without the

22   rest of the jury instructions.  Separate

23   them.  And so I was just asking if you

24   mind if I separate the jury -- if I just

25   read to them what is getting ready to

1  happen for the jury view.  I'll do all

2  the rest of it tomorrow, the instructions

3  and opening statements.

4       MR. TIEGER:  That sounds -- the

5  preliminary instructions, Judge, you were

6  talking about?

7       THE COURT:  Yeah, the preliminary

8  instructions.  They have heard some of

9  that already.

10       MS. SHANAHAN:  I guess I

11  misunderstood what you meant.

12       THE COURT:  If you think it's all

13  right to skip that, I'll go right into

14  what a jury view is.

15       MR. TIEGER:  Sure.

16       THE COURT:  Okay.  Lunch recess,

17  jury view and then they're excused for

18  the day.

19       MR. TIEGER:  When Bill gets back,

20  go through.

21       THE COURT:  Ms. Williams, can we

22  interrupt you for just one second?

23  Remember where you were, please.

24       MS. WILLIAMS:  Yes.

25       THE COURT:  Because of timing, I

would like to -- do you object if I give
the preliminary instructions tomorrow
instead of now, because if I do it now
it's another 20 minutes.  I am going to
tell them -- I will give the instruction
on what the jury view is, and then
they're going to go to lunch, and they're
going to come back for the jury view and
then that's going to be it for the day.

        MS. WILLIAMS:  That's fine.

        THE COURT:  Yeah.  Okay.  Is the
defendant going to attend the jury view?
No, he waived that right yesterday; is
that correct?

        MR. TIEGER:  He waived that
yesterday, Judge.  Judge, I have got no
problem with the jury -- if your excused
basically from the bus instead of coming
back up and gathering in the courtroom,
there is no reason.

        THE COURT:  Yes, they are excused
from the bus.  I was getting ready to say
I don't want them to come back up here.
Once they get off the bus, just tell them
what they do in terms of being excused

1     for the day.  I don't think they go to

2     the Jury Commissioner.  They are my jury

3     now, just go home.

4          MR. TIEGER:  Right.  And I think

5     they report to your jury room.

6          THE COURT:  They do need to know

7     what time we're starting tomorrow.  I'll

8     make it 10:00 again.  Is that all right?

9          MR. TIEGER:  Judge, I think Ms.

10    Shanahan has a trial.

11         THE COURT:  When are you starting

12    tomorrow, at what time?

13         MS. SHANAHAN:  9:00 a.m.

14         THE COURT:  When would you like

15    to -- I want to tell the jury when they

16    need to come in here.

17         MS. SHANAHAN:  Yes, ma'am.  Let me

18    call Judge Kubicki and ask what time they

19    think we can get our bench trial

20    underway.

21         MR. TIEGER:  And, Judge, maybe

22    if -- going back to today, if the Court

23    would give them their admonishments maybe

24    prior to the jury view and that way they

25    will know for the day.

1      THE COURT:  I just gave it to them

2  again.  You want the whole page read?

3      MR. TIEGER:  No, no.  I think just

4  to say remind you.

5      THE COURT:  Yes, which I did just

6  now, but I will do it again.

7      MR. TIEGER:  Yeah.

8      THE COURT:  Okay.  And we are going

9  to tell them -- I have several things to

10  tell them because they need to know what

11  time to report.  They get to sleep in.

12      MR. TIEGER:  I guess they would

13  need to know that we're not gonna cut

14  them loose for lunch tomorrow.  They're

15  going to have to come in and be fed and

16  be ready to start.

17      THE COURT:  Right.

18      MS. SHANAHAN:  Judge, I believe if

19  we said 1:00, that would be very safe, if

20  that's acceptable with the Court.  They

21  are not answering but I know that his

22  docket moves pretty quick.

23      THE COURT:  I was thinking one,

24  noon, and they can just wait until one,

25  you know, because you might get done

```
1        early.  Do you think one is more likely
2        to be --
3                MR. TIEGER:  Or we can say 12:30.
4                THE COURT:  All right.  We'll say
5        12:30.  How about that?
6                MR. TIEGER:  I know about the time
7        we order the defendant and they have to
8        be together as a group, then we have to
9        order him and so it does take a process,
10       yes.
11               THE COURT:  So by 1:00 we can
12       actually have testimony going on.
13               MS. SHANAHAN:  Yes, ma'am.
14               THE COURT:  Get a nice four hours
15       in, three or four hours in.
16               MR. TIEGER:  Yes.
17               THE COURT:  Did we waive the right
18       for the defendant to attend the jury
19       view?
20               Counsel, have you decided -- you
21       waive it?
22               MS. WILLIAMS:  Yes.
23               THE COURT:  Okay.  You have -- are
24       the attorneys going to attend the jury
25       view, or are you just going to give
```

1    instructions?  You're going with them?

2         MS. SHANAHAN:  Yes, ma'am.

3         THE COURT:  And you're going with

4    them?

5         MR. WHALEN:  Yes.

6         THE COURT:  Okay.  Then, so you

7    have decided what you're going to --

8    because once I bring them in, they're

9    going to be going to lunch and meeting at

10   the bus, wherever you tell them to meet.

11        MR. BRENNER:  Okay.  They'll be

12   excused and come back.

13        THE COURT:  Are you going to have

14   something in writing about what you want

15   them to observe to tell?

16        MR. TIEGER:  We will get that to

17   Mr. Brenner before the view.

18        THE COURT:  All right then, I'm

19   not --

20        MR. TIEGER:  Judge, maybe it would

21   be easier if -- I don't know how Mr.

22   Brenner planned it, to have the jury

23   return here a few minutes till two, and

24   then Mr. Brenner could walk them as a

25   group to the bus instead of meeting in

1    the lobby.

2         MR. BRENNER:  I think that would be

3    easiest that way.  I don't know all the

4    faces yet.

5         THE COURT:  You want them in here?

6    Okay.  That's fine.  Ready to bring in

7    the jury?

8         MR. WHALEN:  Yes.

9         THE COURT:  Are the alternates --

10   here's what we're doing, Scott, we are

11   going to do something different.  We are

12   only bringing in the alternatives --

13   alternates.  Here they are.  I'm going to

14   put a check by their name.  Everybody

15   else has recess.

16        MR. BRENNER:  So they are the last

17   five names on there.

18        (The prospective alternates

19   entering the courtroom at 12:34 p.m.)

20        MR. BRENNER:  All rise for the

21   jury.

22        THE COURT:  We are now in the

23   process of selecting three alternates and

24   all of you are going to be questioned and

25   each side will have one challenge to

1    remove a juror, and State may proceed.

2         MR. TIEGER:  Thank you, Judge.  We

3    are, as I said, very close to getting to

4    the end of this, and then finally the

5    trial will begin.  And basically the 12

6    people that are going to be on the jury

7    have already been chosen.  And you, if

8    you're chosen, would be what's called

9    alternates.  Have you heard of that

10   before?

11        Basically what that means is that

12   if one of the member of the panel, for

13   whatever reasons, gets called away, gets

14   the flu, can't attend any more, you would

15   be plugged in for them and you would be a

16   regular juror and deliberate at that

17   point.

18        So what we would be asking you to

19   do is, you would have to -- it's a hard

20   job, because probably what happens is you

21   listen to all the testimony, you have to

22   be extremely attentive and act as if, you

23   know, you are going to be a juror.

24   Probably what usually happens is that at

25   the end of the trial, all the jurors have

1    been here and are ready and the Judge

2    will simply say thank you for your time,

3    you're excused.  It can be frustrating, I

4    know, because at the end of that period

5    of time, I'm sure you would be ready to

6    deliberate.  But knowing all that, can

7    all of sit in an alternate's role?

8           PROSPECTIVE ALTERNATES:  Yes.

9           MR. TIEGER:  Is anybody -- I can

10    kind of do this as a group between

11    myself, Mr. Whalen, Ms. Williams.  There

12    have been a lot of issues talked about, a

13    lot of things brought up, would anybody

14    like to discuss any of that?  Any reason

15    that they would like to comment on

16    anything?  The nature of the case, the

17    type of testimony, the fact that it's a

18    homicide, that type of thing, the nature

19    of the people that are going to testify,

20    is everybody okay with that?

21           PROSPECTIVE ALTERNATES:  Yes.

22           MR. TIEGER:  Okay.  Good with that.

23    Mr. Drury?

24           PROSPECTIVE ALTERNATE DRURY:  Yes.

25           MR. TIEGER:  You're in graphic art?

1    PROSPECTIVE ALTERNATE DRURY:  Yes,
2    I am.
3    MR. TIEGER:  And what type of thing
4    do you do?
5    PROSPECTIVE ALTERNATE DRURY:  I'm
6    really quite along the same line of
7    business with Mr. Ricketts.  I have been
8    a PPM, I build art, I retouch, adjust
9    color.  A PPM is a production manager who
10   basically facilitaes between P&G, Landor,
11   studio and printer to build technical
12   information correct, just to get it all
13   correct and through the pipeline.  But I
14   also do color correction and retouch
15   images to make them look bright to
16   everyone who goes out and buys the
17   product.
18   MR. TIEGER:  Would there be a
19   certain -- which products do you work
20   with, or would people come to your
21   company to design certain things whether
22   it be like Wendy's, do you do like food?
23   PROSPECTIVE ALTERNATE DRURY:  Mostly
24    Procter & Gamble.
25   MR. TIEGER:  Okay.  So it's

1    whatever, Charmin.

2         PROSPECTIVE ALTERNATE DRURY:

3    Charmin, Bounty, Tide, all the proper

4    name appliances.

5         MR. TIEGER:  I'm sure that's enough

6    to keep you busy.

7         PROSPECTIVE ALTERNATE DRURY:  Yes,

8    it is.

9         MR. TIEGER:  And how long have you

10   been doing that for?

11        PROSPECTIVE ALTERNATE DRURY:  I

12   have been doing that for 30 years.

13        MR. TIEGER:  And it looks like that

14   you or your, is it wife, was a victim of

15   a robbery?

16        PROSPECTIVE ALTERNATE DRURY:  Yes,

17   prior to our marriage.  Her daughter had

18   a party when she was at work.  She worked

19   an evening shift and it was the people

20   that her daughter had invited to the

21   party, took some of her belongings.

22        MR. TIEGER:  Okay.  There was no

23   weapon involved, correct?

24        PROSPECTIVE ALTERNATE DRURY:  No.

25        MR. TIEGER:  And you kind of went

1  through the same type of thing, but it

2  never went to court around 20 years ago?

3          PROSPECTIVE ALTERNATE DRURY:  Yeah.

4  It was in Butler County.  And basically

5  they seated us, and we were seated for

6  maybe half an hour, 45 minutes, and then

7  the prosecuting attorney came out and

8  told us that we had done our job, that

9  just the defendant seeing our presence

10 made a decision to go ahead and bargain,

11 so he didn't have to go to court.

12         MR. TIEGER:  Okay.  And it looks

13 like you have been in Hamilton County a

14 couple years.  You came from Butler

15 County?

16         PROSPECTIVE ALTERNATE DRURY:  Yes.

17         MR. TIEGER:  What made you move?

18         PROSPECTIVE ALTERNATE DRURY:  Tired

19 of the commute.  I work downtown, so get

20 a little closer.

21         MR. TIEGER:  Okay.  Are you glad

22 you did it?

23         PROSPECTIVE ALTERNATE DRURY:  Oh,

24 yes.

25         MR. TIEGER:  It's hard to move

1    after being in one place so long.

2         PROSPECTIVE ALTERNATE DRURY:  Yeah.

3    But that ten-minute drive is so much

4    better than an hour.

5         MR. TIEGER:  Yes.  Yes.  Okay.

6    Thank you, Mr. Drury.

7         PROSPECTIVE ALTERNATE DRURY:  You're

8     welcome.

9         MR. TIEGER:  Mr. Korb?

10        PROSPECTIVE ALTERNATE KORB:  Yes.

11        MR. TIEGER:  I see you're retired?

12        PROSPECTIVE ALTERNATE KORB:  Yes.

13        MR. TIEGER:  What did you do before

14   you were retired?

15        PROSPECTIVE ALTERNATE KORB:  Well,

16   I worked with my father and brother in a

17   small injection enrollment company.  Just

18   the three us really.  We were injection

19   molding and running plastic parts,

20   plastic.

21        MR. TIEGER:  Are your -- is it your

22   brother and your --

23        PROSPECTIVE ALTERNATE KORB:  My

24   father.

25        MR. TIEGER:  Are they both still

1   involved in that company?

2   PROSPECTIVE ALTERNATE KORB:  No.

3   My father has left, and actually I left.

4   My brother is down there, and I just

5   simply do sort of the bookkeeping and

6   occasionally run some parts.

7   MR. TIEGER:  What is the name of

8   your company?

9   PROSPECTIVE ALTERNATE KORB:

10  Cincinnati Mold.

11  MR. TIEGER:  Where is that located?

12  PROSPECTIVE ALTERNATE KORB:  Down

13  off Stille Drive off River Road.

14  MR. TIEGER:  And what type of

15  products would you make, where would they

16  go once you make them?  Would they be for

17  machines?

18  PROSPECTIVE ALTERNATE KORB:  Well,

19  people -- whatever somebody needs made

20  out of plastic, we approach to design and

21  manufacture that product.

22  MR. TIEGER:  A specialized part to

23  fit in a certain product?

24  PROSPECTIVE ALTERNATE KORB:  Yes,

25  right.

MR. TIEGER:  Okay.  Your degree is in English?

PROSPECTIVE ALTERNATE KORB:  Yes.

MR. TIEGER:  That was something that you enjoyed back in college and still do.  Do you still read or do things like that?

PROSPECTIVE ALTERNATE KORB:  Well, I read a lot, but my English degree never did anything for me.

MR. TIEGER:  Okay.  And so you're still involved in the family company to a degree now even though you're retired officially?

PROSPECTIVE ALTERNATE KORB:  Yes.

MR. TIEGER:  And it was marked on the form:  Do you think you would be a good juror?  I think you put a question mark.

PROSPECTIVE ALTERNATE KORB:  Right. I assume every citizen would be.  I guess I don't have qualifications.

MR. TIEGER:  And now having been through this, do you think you would be?

PROSPECTIVE ALTERNATE KORB:  Sure.

 1          MR. TIEGER:  Do you have a family,
 2     Mr. Korb?
 3          PROSPECTIVE ALTERNATE KORB:  I have
 4     a wife and daughter.
 5          MR. TIEGER:  Because, again, that
 6     wasn't on here, and I apologize for
 7     prying about that.
 8          PROSPECTIVE ALTERNATE KORB:  Okay.
 9          MR. TIEGER:  Are they here locally,
10     too?
11          PROSPECTIVE ALTERNATE KORB:  Yes.
12          MR. TIEGER:  Okay.  Does your wife
13     work or is she retired?
14          PROSPECTIVE ALTERNATE KORB:  She's
15     retired.
16          MR. TIEGER:  Okay.  But she worked
17     for the company as well?
18          PROSPECTIVE ALTERNATE KORB:  No,
19     she didn't.  She was a teacher for a
20     number of years.
21          MR. TIEGER:  Thank you, Mr. Korb.
22          Mr. Cross, you're with the Parks.
23     And what do you do for the Parks?
24          PROSPECTIVE ALTERNATE CROSS:
25     Operation supervisor.

1          MR. TIEGER:  And that's for the

2     City?

3          PROSPECTIVE ALTERNATE CROSS:  Yes.

4     It's city.

5          MR. TIEGER:  What type of things

6     would you -- would that be like Burnet

7     Woods?

8          PROSPECTIVE ALTERNATE CROSS:  Yes.

9          MR. TIEGER:  Eden Park, or any of

10    the local parks?

11         PROSPECTIVE ALTERNATE CROSS:  I

12    supervise the west district which is Mt.

13    Airy.

14         MR. TIEGER:  Okay.  Do you guys get

15    involved in the like planning between

16    like the Boulevards, like on Central

17    Parkway, the tall grasses, that type of

18    thing?

19         PROSPECTIVE ALTERNATE CROSS:  Yeah.

20         MR. TIEGER:  I know down in

21    Eggleston there is a lot, down Central

22    Parkway there is a lot.

23         PROSPECTIVE ALTERNATE CROSS:  (Nods

24    affirmatively.)

25         MR. TIEGER:  Daffodils all over.

1    Is that the type of stuff that you do?

2         PROSPECTIVE ALTERNATE CROSS:  I'm

3    not out there planting anymore.  I think

4    I helped assist them, but I'm pretty much

5    making sure the equipment works and get

6    the people and equipment involved.

7         THE COURT:  Can you keep your voice

8    you sir, please?

9         PROSPECTIVE ALTERNATE CROSS:  Sure.

10        THE COURT:  Stage voice.  There is

11   lots of stages there.

12        MR. TIEGER:  How many people do you

13   work with?

14        PROSPECTIVE ALTERNATE CROSS:  I

15   have nine under me.  I mean, our district

16   has probably got -- we have 19 in our

17   district.  There is three districts.

18        MR. TIEGER:  Okay.  And how long

19   have you been with the City?

20        PROSPECTIVE ALTERNATE CROSS:

21   Almost 21.

22        MR. TIEGER:  And there's a lot in

23   the news about the City these days.  Are

24   you involved at all in any of the

25   politics or anything like that?

1    PROSPECTIVE ALTERNATE CROSS:  No,

2 unh-unh.

3    MR. TIEGER:  Just let them fight it

4 down at City Hall?

5    PROSPECTIVE ALTERNATE CROSS:  We've

6 got a good director, and he's, you know,

7 we're -- we have all got our jobs at

8 least this year.  We heard that at least.

9 We don't know what we're merging with, so

10 there is going to be some changes but

11 yeah.

12    MR. TIEGER:  That's got to be tough

13 to go through every December.

14    PROSPECTIVE ALTERNATE CROSS:  Yeah.

15    MR. TIEGER:  Late December and all

16 the sudden you hear in the news that none

17 of that is figured out yet.

18    PROSPECTIVE ALTERNATE CROSS:  Yeah.

19 They want managed competition.  It's been

20 a good job.  I enjoy my work.

21    MR. TIEGER:  And it looks like you

22 have some prior jury service in 2005.

23    PROSPECTIVE ALTERNATE CROSS:  I was

24 trying to think if it was 2005.  Yeah, I

25 was picked for a jury for a case -- it

was a criminal case.  It was back when UC
students were involved with the horse.  I
remember when Art Long and Danny Fortson
hit the police horse.

MR. TIEGER:  And that was what you
were --

PROSPECTIVE ALTERNATE CROSS:  Judge
Burlew was the defense attorney.

MR. TIEGER:  Okay.

PROSPECTIVE ALTERNATE CROSS:  Ken
Lawson, yeah.

MR. TIEGER:  Interesting, I'm sure.

PROSPECTIVE ALTERNATE CROSS:  Oh,
yeah.

MR. TIEGER:  Okay.  Thank you,
Mr. Cross.  Ms. Kellogg?

PROSPECTIVE JUROR KELLOGG:  Yes.

MR. TIEGER:  You're at US Bank?

PROSPECTIVE JUROR KELLOGG:  That is
correct.

MR. TIEGER:  What do you do for US
Bank?

PROSPECTIVE JUROR KELLOGG:
Personal banker.

MR. TIEGER:  What does that mean?

1    PROSPECTIVE JUROR KELLOGG:

2    Personal banker means that you manage the

3    customer's account.

4        MR. WHALEN:  Ma'am, keep your voice

5    up, please.

6        PROSPECTIVE JUROR KELLOGG:  I

7    apologize.  Credit lines, checking

8    accounts, and basically applications is

9    what I do.

10        MR. TIEGER:  Do you work in a

11   branch?

12        PROSPECTIVE JUROR KELLOGG:  No, I

13   actually work at the call center.

14        MR. TIEGER:  I'm sorry?

15        PROSPECTIVE JUROR KELLOGG:  I take

16   inbound calls, so I guess a call center.

17        MR. TIEGER:  Is that out on Red

18   Bank Road there?

19        PROSPECTIVE JUROR KELLOGG:  Yes.

20        MR. TIEGER:  That big building?

21        PROSPECTIVE JUROR KELLOGG:  Yes,

22   sir.

23        MR. TIEGER:  How long have you been

24   with US Bank?

25        PROSPECTIVE JUROR KELLOGG:  I have

1   been with US Bank probably about eight

2   months now.

3        MR. TIEGER:  Okay.  What did you do

4   before that?

5        PROSPECTIVE JUROR KELLOGG:  I

6   actually worked for Avon Products, which

7   I did the same thing, service customers,

8   inbound calls.

9        MR. TIEGER:  You had marked that, I

10  guess, a member of your family has been

11  charged with a weapon possession?

12       PROSPECTIVE JUROR KELLOGG:  Yes,

13  sir.

14       MR. TIEGER:  Who is that?

15       PROSPECTIVE JUROR KELLOGG:  His

16  name is Rasheed Mohammed.  It's a

17  situation -- I'm not sure about the year,

18  maybe about '06 or '07.  It was a

19  situation at a gas station where someone

20  had came up behind his vehicle and

21  basically tried to attack him, and he had

22  possession.  However, I didn't follow the

23  trial so I don't exactly know the

24  situation --

25       MR. TIEGER:  Okay.  And is

1    Mr. Mohammed a friend or relative of

2    yours?

3         PROSPECTIVE JUROR KELLOGG:  He's my

4    cousin.

5         MR. TIEGER:  Okay.  And then he was

6    at a gas station, somebody accosted him?

7         PROSPECTIVE JUROR KELLOGG:  Yes,

8    sir.

9         MR. TIEGER:  He had a weapon in his

10   possession that he wasn't supposed to

11   have?

12        PROSPECTIVE JUROR KELLOGG:  Yes,

13   sir.

14        MR. TIEGER:  And then he got

15   charged with having that weapon which

16   wouldn't have happened but for somebody

17   attacking him first?

18        PROSPECTIVE JUROR KELLOGG:  Yes,

19   sir.

20        MR. TIEGER:  And do you know what

21   happened to him?

22        PROSPECTIVE JUROR KELLOGG:  No, I

23   didn't follow it because I didn't really

24   get into that.  I didn't really care, to

25   be honest.

1    MR. TIEGER:  Do you know if he was

2    convicted or not?

3    PROSPECTIVE JUROR KELLOGG:  No,

4    he's not serving any time or anything.

5    MR. TIEGER:  Do you know if he

6    might be on probation?

7    PROSPECTIVE JUROR KELLOGG:  To my

8    understanding, I'm not really sure.  As I

9    said, I didn't really follow it, I just

10   know that it was a situation he put

11   himself in.  It was unnecessary.

12   MR. TIEGER:  In what way?  What do

13   you mean?

14   PROSPECTIVE JUROR KELLOGG:  Meaning

15   if he didn't have possession or anything

16   like that, then he wouldn't have to worry

17   about having to go to jail, or having to,

18   you know, basically go through any type

19   of trial, so I don't feel, you know, any

20   way about it.

21   MR. TIEGER:  So your thoughts were

22   that if he wouldn't have had the gun in

23   the first place, none of this would have

24   happened?

25   PROSPECTIVE JUROR KELLOGG:  Right.

1    If he wouldn't have had the gun, then it

2    wouldn't have happened.  But by having

3    the gun, I can see where you try to

4    defend yourself, but I just think the

5    whole scene stuff was unnecessary.

6         MR. TIEGER:  Okay.  And then it

7    happened how long ago?  A number of years

8    ago?

9         PROSPECTIVE JUROR KELLOGG:  I

10   believe '06 or '07.

11        MR. TIEGER:  So he's not really

12   close?

13        PROSPECTIVE JUROR KELLOGG:  No.  I

14   mean, he's my first cousin, but you have

15   distant cousins that you don't talk to,

16   and he's one of them.

17        MR. TIEGER:  Okay.  Thank you,

18   Ms. Kellogg.  Let's see, Mr. Decenso.

19        PROSPECTIVE ALTERNATE DECENSO:  Yes.

20        MR. TIEGER:  Let's see, you are

21   with the Cincinnati Convention Business

22   Bureau?

23        PROSPECTIVE ALTERNATE DECENSO:  Yes.

24        MR. TIEGER:  What type of things do

25   you do for them?

PROSPECTIVE ALTERNATE DECENSO:  I'm
an intern so I'm only part-time staff
because I'm finishing school at UC.  So
right now what I'm involved with is
mostly research, to support the sales
staff.  I might do some like low-level
accounts, small meetings just to get the
experience, the sales experience.

MR. TIEGER:  And UC is in
session -- you're going to UC?

PROSPECTIVE ALTERNATE DECENSO:
Yeah.

MR. TIEGER:  And they're in session
and you're missing classes unless you go
to night school?

PROSPECTIVE ALTERNATE DECENSO:  I'm
not really missing classes this quarter,
I'm just doing my Capstone, and it's a
project that we work on, so we do
meetings outside of class time, so class
doesn't actually meet.

MR. TIEGER:  Okay.  Is there a
program that you're in?  Is it called
hospitality management?  Is that your --

PROSPECTIVE ALTERNATE DECENSO:

1    That's my degree program.

2         MR. TIEGER:  Okay.  And when are

3    you due to graduate?

4         PROSPECTIVE ALTERNATE DECENSO:

5    June.

6         MR. TIEGER:  Is it a four-year

7    program or is it a --

8         PROSPECTIVE ALTERNATE DECENSO:  It's

9    a five-year program.  They just changed

10   it because we switched over to the

11   culture business, so I think it's now

12   four years and a quarter.  I'll complete

13   it in four years because I had some

14   credits in high school from the College

15   of Charleston.

16        MR. TIEGER:  Okay.  So no problem

17   worrying about missing classes at all?

18        PROSPECTIVE ALTERNATE DECENSO:

19   Unless this lasts a couple of months.

20        MR. TIEGER:  No.  This is not a

21   California or LA trial at all.  You don't

22   have to worry about that.  The

23   misdemeanor, OVI, was that you?

24        PROSPECTIVE ALTERNATE DECENSO:  Yes.

25        MR. TIEGER:  Tell me a little bit

1  about that.

2  PROSPECTIVE ALTERNATE DECENSO:  The

3  stop was about a year ago and I pled no

4  contest.

5  MR. TIEGER:  Who stopped you?

6  PROSPECTIVE ALTERNATE DECENSO:

7  Trooper Pavin (phonetic) maybe.

8  MR. TIEGER:  Was it in the county

9  somewhere or in the City?

10  PROSPECTIVE ALTERNATE DECENSO:

11  City.  So, yeah, I had my -- I didn't go

12  to trial.

13  MR. TIEGER:  Did you take a test?

14  Were you over the .08?

15  PROSPECTIVE ALTERNATE DECENSO:  No.

16  MR. TIEGER:  No accident?

17  PROSPECTIVE ALTERNATE DECENSO:  No.

18  MR. TIEGER:  Did they treat you

19  fairly?

20  PROSPECTIVE ALTERNATE DECENSO:

21  Uh-huh.

22  MR. TIEGER:  And you pled out.  Are

23  you done with probation or are you still

24  on?

25  PROSPECTIVE ALTERNATE DECENSO:  I'm

```
 1        not reporting, but I think my probation
 2        goes through April, so yes.
 3             MR. TIEGER:  And then do you feel
 4        that you were treated fairly by the
 5        justice system?
 6             PROSPECTIVE ALTERNATE DECENSO:  Yes.
 7             MR. TIEGER:  You were drunk and you
 8        were driving drunk and it shouldn't have
 9        been, pretty much?
10             PROSPECTIVE ALTERNATE DECENSO:
11        Yeah.
12             MR. TIEGER:  Okay.  Thanks,
13        Ms. Decenso.
14             Judge, I would pass for cause on
15        all five.
16             THE COURT:  Thank you.
17             MS. WILLIAMS:  Good morning,
18        everyone.
19             PROSPECTIVE ALTERNATES:  Good
20        morning.
21             MS. WILLIAMS:  Gosh, I guess it's
22        afternoon now.  Again, just to clarify,
23        none of you have any problem from any of
24        the questions you've heard throughout
25        Monday and today, correct?
```

PROSPECTIVE ALTERNATES:  No.

MS. WILLIAMS:  I'll start with you,
Mr. Drury.  Am I pronouncing that
correctly?

PROSPECTIVE ALTERNATE DRURY:
That's correct.

MS. WILLIAMS:  All right.  On this
charge that you served as a juror 20
years ago, what type of charge was that?

PROSPECTIVE ALTERNATE DRURY:  I do
not even know or remember.  I was seated
as -- we sat there for a half hour, 45
minutes and told it was over.  I didn't
know what the case was about.

MS. WILLIAMS:  It was probably
criminal though.  You're saying the
person saw you?

PROSPECTIVE ALTERNATE DRURY:  Had
the person seated in the office with the
door open is what the prosecuting
attorney told us and they could see.

MS. WILLIAMS:  So you didn't hear
any evidence?

PROSPECTIVE ALTERNATE DRURY:  Not
at all.

1    MS. WILLIAMS:  You mentioned, and I

2    see on your form here, that you and your

3    wife work together?

4         PROSPECTIVE ALTERNATE DRURY:  Yes.

5         MR. WHALEN:  Are you here in the

6    same company too?

7         PROSPECTIVE ALTERNATE DRURY:  Same

8    company.

9         MS. WILLIAMS:  Is that how you met?

10        PROSPECTIVE ALTERNATE DRURY:  Yes,

11   it is.

12        MS. WILLIAMS:  I hear that happens.

13   And, Mr. Korb, you said that you worked

14   with your brother and father at

15   Cincinnati Mold?

16        PROSPECTIVE ALTERNATE KORB:  Yes,

17   uh-huh.

18        MS. WILLIAMS:  Is that a company

19   you just started?

20        PROSPECTIVE ALTERNATE KORB:  Well,

21   they started it about 60 years ago.  I

22   previously had worked at Cincinnati

23   Milicron for 29 and a half years.

24        MS. WILLIAMS:  That's good.

25   Probably a little more freedom working up

1    there, brother and father.

2         PROSPECTIVE ALTERNATE KORB:  A lot

3    more, yes.

4         MS. WILLIAMS:  How old is your

5    daughter?

6         PROSPECTIVE ALTERNATE KORB:  She's

7    40.

8         MS. WILLIAMS:  You have grandkids?

9         PROSPECTIVE ALTERNATE KORB:  No, I

10   don't.

11        MS. WILLIAMS:  You said you do like

12   to read a lot, just not really magazines.

13   What kind of stuff do you read?

14        PROSPECTIVE ALTERNATE KORB:

15   Everything.

16        THE COURT:  Keep your voice up,

17   please, a little bit.

18        PROSPECTIVE ALTERNATE KORB:   I'm

19   Currently reading Karen Armstrong's

20   Battle for God, and I love history,

21   science, psychology.

22        MS. WILLIAMS:  Okay.  And,

23   Mr. Cross, you said you have been with

24   the City for 21 years?

25        PROSPECTIVE ALTERNATE CROSS:

1    Uh-huh.

2         MS. WILLIAMS:  In the west

3    district.  I'm sure you said that

4    included Mt. Airy, and what else is in

5    that area?

6         PROSPECTIVE ALTERNATE CROSS:  The

7    art district.  Mt. Echo Park, Saylor

8    Park.

9         MS. WILLIAMS:  Okay.  I know a

10   little bit about it.  And you said now

11   you just more do equipment.  Are you a

12   supervisor now?

13        PROSPECTIVE ALTERNATE CROSS:  Yeah.

14        MS. WILLIAMS:  Okay.  I see you've

15   got two kids that are college age.  Are

16   they in college?  What college do they go

17   to?

18        PROSPECTIVE ALTERNATE CROSS:  My

19   daughter is at NKU and my son is at

20   Cincinnati State.

21        MS. WILLIAMS:  And on this chart

22   you said it was back in 2005 that you

23   served as a juror?

24        PROSPECTIVE ALTERNATE CROSS:  I

25   wish I could be exactly sure.  It's been

between five and eight years ago.

MS. WILLIAMS: Do you know if that
was a misdemeanor or a felony charge?

PROSPECTIVE ALTERNATE CROSS:
Striking a police officer. I think
that's what they considered that horse
they hit.

MS. WILLIAMS: Okay. Now, when it
has as many people involved, you would
think I would remember that part. I was
in law school at the time.

PROSPECTIVE ALTERNATE CROSS: Yes.

MS. WILLIAMS: I don't remember
much. You have a close friend that's in
law enforcement and you wrote yes, or
relative.

PROSPECTIVE ALTERNATE CROSS: Yeah,
I have several friends in the police,
Cincinnati Police.

MS. WILLIAMS: In the Cincinnati
Police, or in --

PROSPECTIVE ALTERNATE CROSS: Just
because I'm -- well, my office is right
across the parking lot from the park
police, so I just come in contact with a

1    lot of those guys on a daily basis.  And

2    I just have friends in the sheriff's

3    department.

4            THE COURT:  Can you hear?

5    Remember, keep your voices up so she can

6    hear.

7            PROSPECTIVE ALTERNATE CROSS:  Yeah.

8            MS. WILLIAMS:  You deal with the

9    police then on a daily basis?

10           PROSPECTIVE ALTERNATE CROSS:  Not

11   every day, but, you know, I have to

12   report abandoned vehicles, just different

13   things.

14           MS. WILLIAMS:  Do you do that to

15   the park police, or to the individual in

16   Cincinnati Police Departments?

17           PROSPECTIVE ALTERNATE CROSS:  Park

18   police.  Well, yeah, District 5,

19   sometimes we put calls in for dead

20   animals.  Different agencies, whether

21   it's highway or all of them.

22           MS. WILLIAMS:  Okay.  So the people

23   you know, they're friends.  Do you have

24   any relatives that are police officers?

25           PROSPECTIVE ALTERNATE CROSS:  Um,

1    no.

2           MS. WILLIAMS:  Okay.  Does your

3    friendship with these police officers,

4    does that sway you one way or another as

5    to whether a police officer would be

6    telling the truth?  Are you more inclined

7    to believe police officers?

8           PROSPECTIVE ALTERNATE CROSS:  Not

9    necessarily.

10          MS. WILLIAMS:  Okay.  So you

11   believe that police officers can lie, can

12   make mistakes?

13          PROSPECTIVE ALTERNATE CROSS:  Yeah.

14          MS. WILLIAMS:  I'm gonna bother

15   you, Ms. Kellogg.  You said you have some

16   college.  Are you still in college?

17          PROSPECTIVE JUROR KELLOGG:

18   Actually --

19          THE COURT:  Ma'am, keep your voice

20   up, please.

21          PROSPECTIVE JUROR KELLOGG:  I'm

22   enrolling back into college currently.

23          MS. WILLIAMS:  What are you going

24   to be studying?

25          PROSPECTIVE JUROR KELLOGG:  Right

```
1        now I'm on the verge of pursuing
2        cosmetology.  Then after that, I'm going
3        to get my RN and then my Master's.
4             MS. WILLIAMS:  Okay.  So you can
5        hope to be a nurse one day.
6             PROSPECTIVE JUROR KELLOGG:  Uh-huh.
7             MS. WILLIAMS:  I see that you have
8        one child, a one-year old.
9             PROSPECTIVE JUROR KELLOGG:  Yes.
10            MS. WILLIAMS:  And that you're a
11       single mother.
12            PROSPECTIVE JUROR KELLOGG:  Yes.
13            MS. WILLIAMS:  What does your child
14       do while you're -- I'm sorry, while
15       you're at work, daycare or family?
16            PROSPECTIVE JUROR KELLOGG:  Daycare.
17            MS. WILLIAMS:  Daycare.  And, Ms.
18       Decenso, I'm sorry, you are not missing
19       classes.  Is it kind of like an online
20       course, or --
21            PROSPECTIVE ALTERNATE DECENSO:  No,
22       it's the only course that I'm involved in
23       this quarter at UC.  So for this set of
24       ten weeks, I'm just taking my senior
25       project which is more of like
```

1    independent.

2         MS. WILLIAMS:  Kind of outside of

3    classwork?

4         PROSPECTIVE ALTERNATE DECENSO:  Yes.

5         MS. WILLIAMS:  Okay.  I understand.

6    I did a couple of those myself.  Okay.

7    And you're not married, have no children

8    or anything?

9         PROSPECTIVE ALTERNATE DECENSO:  No.

10         MS. WILLIAMS:  Okay.  I'll just put

11    this -- and I have asked you, and I'll

12    just put it to all of you, all of you

13    seem to have either positive or neutral

14    feelings towards police officers.  Does

15    that incline you to believe police

16    officers more than others, or that they

17    can't make mistakes?  Are all of you

18    willing to listen to the evidence and

19    determine, like he said, the credibility?

20         PROSPECTIVE JUROR KELLOGG:  Most

21    definitely.

22         PROSPECTIVE ALTERNATE CROSS:  Sure.

23         PROSPECTIVE ALTERNATE DRURY:  Yes.

24         PROSPECTIVE ALTERNATES:  Yes.

25         MS. WILLIAMS:  No further

1      questions.
2            THE COURT:  You pass for cause?
3      All right.  Would you like to discuss
4      your first peremptory challenge?
5            MR. TIEGER:  Could I have just a
6      second, Judge?
7            THE COURT:  Okay.  I'm gonna turn
8      on the white noise machine.  You all can
9      talk among yourselves.
10           MR. TIEGER:  We are ready, Jude.
11           THE COURT:  You ready.  All right,
12     Counsel.  If you would like to approach.
13           (The following transpired at
14     sidebar as follows:)
15           THE COURT:  Do you mind?  What I
16     would like to do is, can we just announce
17     both of them at the same time and move
18     on?
19           MR. TIEGER:  We are going to waive.
20           THE COURT:  You're going to waive?
21           MR. TIEGER:  We are.
22           MS. WILLIAMS:  Yeah, that's fine.
23           THE COURT:  Uh-huh.
24           MS. WILLIAMS:  You're waiving?
25           THE COURT:  Would you like --

1        MS. WILLIAMS:  We are going to

2   knock off Richard Cross.

3        THE COURT:  What?

4        MS. WILLIAMS:  Richard Cross.  So

5   this will leave four.

6        MS. SHANAHAN:  The last one goes

7   away.

8        THE COURT:  That would leave Drury,

9   Korb and Kellogg; is that correct?

10        MR. TIEGER:  Drury, Korb and

11   Kellogg.

12        THE COURT:  And going to excuse Mr.

13   Cross.  All right.  Thank you very much.

14        (Sidebar concluded.)

15        THE COURT:  Okay.  At this time,

16   thank you very much for your attention,

17   we are going to thank and excuse Number

18   27, Mr. Cross.  Our thanks.  And thank

19   you for participating, and we hope that

20   you have the experience of serving on a

21   jury.  You have done a very good job

22   today in your civic duty.

23        And that also excuses Ms. Amanda

24   Decenso, because we have -- you're the

25   last in line, that's the reason for you.

1    You are thanked and excused also.

2         PROSPECTIVE ALTERNATE DECENSO:

3    Thank you.

4         THE COURT:  I want to admonish both

5    of you, since you have heard this portion

6    of this experience, you cannot discuss

7    your -- what your verdict would be or

8    discuss it among yourselves.  Thank you.

9    You are excused.

10        (Prospective Alternates Cross and

11   Decenso excused.)

12        THE COURT:  And would all three of

13   you come out, because we have to

14   rearrange a few people.

15        The remaining jurors are Jerry

16   Drury, Number 25; Ed Korb, Number 26; and

17   Amanda Decenso, Number 30.

18        MR. TIEGER:  Edward Korb and Erika

19   Kellogg would be --

20        THE COURT:  Pardon.  I can't see

21   very well.  What happened?  Erika.

22   Number 29, Erika Kellogg.  Let me put my

23   glasses back on.  All right.  You three

24   need to step out of the jury box for the

25   moment until we get everybody seated, and

1    I have to give all of you some new

2    instructions.  So we are now ready to

3    bring in the jury.

4        Okay.  You may as well -- you can

5    kind of stand right there for a second.

6    You will need to have a seat, because as

7    soon as we get everybody seated, we are

8    going to bring in the jury.  You can just

9    sort of stand right there.  Thank you.

10    We are kind of rushing, because I would

11    like you to have a decent lunchtime,

12    lunch hour.

13        (The jury joining the alternates at

14    1:03 p.m.)

15        MR. BRENNER:  Mr. Drury, if you can

16    have a seat here.  Mr. Korb, you can have

17    a seat here.  And Ms. Kellogg, I have got

18    this special chair here for you.

19        THE COURT:  You may all be seated.

20    We are now at the point where we are

21    going to be going to lunch in a moment.

22    But before we recess for lunch, I want to

23    explain to you what will be happening

24    next.  You're going to have a jury view

25    today, which means that you will be taken

to the scene involved in this case.  You
will remain together under the
supervision of the bailiff, Scott
Brenner, my assistant bailiff, Scott
Brenner today until you are excused by
him.  And that means today after the jury
view you are going to be excused for the
day and you're not going to be returning
here.

Counsel and the parties may
accompany you, but they may not discuss
this case or demonstrate anything
relating to it.  So they will not be
pointing to something or making comments
about what you're observing.

The bailiff may call to your
attention objects requested by counsel,
and you won't know whether it's the
prosecution or the defense.  They will
just be pointing out objects for you to
look at.

What you observe outside this
courtroom is not to be considered as
evidence, and that's because the scene
may have changed slightly since the

incident.  The evidence of the physical
appearance of the scene must come to you
from the witness stand, so you will also
hear testimony about that.

The purpose of this jury view and
of your visit is to help you understand
the evidence as it is presented in the
courtroom.  Thank you very much for that.

The defendant is not attending the
jury view.  He has waived his right to do
that, but both the prosecution -- both
prosecutors and both defense attorneys
are going to accompany you on this.  At
this time, we are going to be recessing
for lunch.

At 1:55, I want you to be back in
this courtroom so that you can be
transported to the bus that will take you
to the scene.  But before we go, I'm
going to repeat part of our recess
instruction.  That is, do not discuss the
case among yourselves or with anyone
else.  Do not permit anyone to discuss it
with you or in your presence.  It is your
duty not to form or express an opinion on

this case until it is finally submitted
to you.

　　　　And the whole instructions I gave
you yesterday do apply to this case until
we are -- until a verdict is announced in
court.

　　　　At this time, after you do your
jury view today, if you come back from
lunch in this room about 12:50-55, you
will go to the jury view and you will be
recessed for the day.  So tomorrow is
Thursday, the 13th, and you will not have
to be back in the Jury Commissioner until
12:30.  So, again, you get to have a nice
late morning, and come back at 12:30
and --

　　　　MR. TIEGER:  Judge, can we approach
just briefly?

　　　　THE COURT:  Anything else?
Apparently, there is one more thing.

　　　　(Unreported sidebar conference.)

　　　　THE COURT:  And there is one very
important function that we must do right
now, and that is to stand up to take your
oath as jurors.  We have selected a jury

today, therefore, if you will raise your

right hands to be sworn.

(The jurors and alternates sworn.)

THE COURT:  You may swear or

affirm.  And we are now excused for lunch

until 12:55 -- until 1:55.

(The jury leaving the courtroom at

1:06 p.m.)

THE COURT:  One more thing,

Counsel.  They are excused.  Thank you.

When they come back, I'm going to reissue

the oath, because I left out a few things

I needed to say.  I'll just repeat it.

So is there anything else before we

actually have that lunch recess from you

guys except for the observations you

would like to point out?

MR. TIEGER:  Judge, when you

re-administer the oath, are you going to

do that?

THE COURT:  I'm going to

re-administer the oath.

MR. TIEGER:  On the record, do you

need us here, or because I know he --

THE COURT:  You can waive your

1    presence if you would like to.  I'm going

2    to re-administer the oath, and I'm going

3    to say:  Do you swear or affirm that you

4    will diligently inquire into and

5    carefully deliberate all matters brought

6    before you -- before this Court, in the

7    matter involving the State of Ohio and

8    the defendant, and will you do this to

9    the best of your skill and ability, and

10   without bias and prejudice?  That's what

11   I am going to say to them.  You may be

12   present if you would like to, or you may

13   waive your presence.  It will be on the

14   record.  Whatever is stated, it will be

15   on the record.

16        MR. TIEGER:  Ms. Shanahan and I are

17   happy to be here, but if the defendant

18   wants to waive, we just wouldn't show and

19   the defense, so I'm good either way.

20        THE COURT:  You guys want to waive

21   it?

22        THE DEFENDANT:  I'll waive.

23        THE COURT:  I'm going to say that

24   oath I just said to you on the record

25   with the court reporter.

THE DEFENDANT:  I'll waive it.

THE COURT:  Okay.  Thank you.  And
then are you guys going to write your
things -- the things you want them to
observe on paper?

MR. TIEGER:  We are going to do it
right now, Judge.  We'll maybe meet a few
minutes earlier.

THE COURT:  You can do that at
12:55 when you get back.

MR. TIEGER:  Sure.

(Luncheon recess.)

THE COURT:  Let the jury in.  For
the record, on the matter of State vs.
Ruben Jordan, this includes the
information of both of your statements of
what you want them to observe?

MS. SHANAHAN:  Yes, Your Honor.

THE COURT:  Mr. Whalen approved it.

MS. SHANAHAN:  He just said as long
as they notice the area of Victor Davis's
apartment, which is 1804 Republic, that's
all he asked to be on there.

THE COURT:  Okay.  And he didn't
object to the other part, so that's for

1    the record, and this will go to the

2    bailiff.

3            (The jury entering the courtroom at

4    2:02 p.m.)

5            THE COURT:  Hello, jurors.  Would

6    you just remain standing?  Did you have a

7    nice lunch, by the way?  Did you have

8    enough time?

9            JURORS:  Yes.

10           THE COURT:  I need to also repeat

11   the oath because I left out a couple of

12   magic, very necessary words, so if you'll

13   raise your right hands to be sworn again

14   as jurors.

15           Do you swear or affirm that you

16   will diligently inquire into and

17   carefully deliberate all matters between

18   the State of Ohio and Ruben Jordan, and

19   do you affirm and swear that you will do

20   this to the best of your skill and

21   ability and without prejudice or bias so

22   help you God, or you do this as you shall

23   answer under the pains and penalties of

24   perjury?  You may say I do.

25           JURORS:  I do.

1    THE COURT:  Thank you.  You are now

2    going to be taken -- the next stop will

3    be taking -- my bailiff will take you to

4    the bus.  You will view the scene and

5    then you'll be released for the day, and

6    I will see you tomorrow at 12:30.  Thank

7    you.

8    JURORS:  Thank you.

9    THE COURT:  And please note, I'm

10   handing the instructions from the counsel

11   as to what they want them to observe.

12   A JUROR:  Your Honor, do we meet in

13   the jury room?

14   THE COURT:  Meet in -- you can meet

15   here, this jury room.  Now that you're

16   chosen, you are assigned to this court

17   from now on.

18   A JUROR:  12:30?

19   THE COURT:  Yes.  And you can leave

20   some property, we can lock it, et cetera.

21   A JUROR:  Thank you.

22   MR. BRENNER:  After the jury view,

23   you'll be dismissed.  The bus will bring

24   you back here.  Is there anything you

25   want to get out of the jury room or out

1          of the Jury Commissioner room you left

2          there?

3                    A JUROR:  Our coats.

4                    MR. BRENNER:  Why don't we swing by

5          there and pick that stuff up and I'll

6          meet you in the hallway.

7                    THE COURT:  Have a good evening.

8                    (The jury leaving the courtroom at

9          2:05 p.m.)

10                    (Proceedings continued in progress

11          until January 13, 2011.)