1          COURT OF COMMON PLEAS

2          HAMILTON COUNTY, OHIO

3                - - -

4    STATE OF OHIO,           :

5              Plaintiff.     :

6    vs.                      :Case Number B1003262

7    RUBEN JORDAN,            :Appeal Number C1100833

8          Defendant.    :Volume III of X

9

10                 - -

11          TRANSCRIPT OF PROCEEDINGS

12                - - -

13   APPEARANCES:

14        Seth S. Tieger, Esq.
          Megan E. Shanahan, Esq.
15             On behalf of the State of Ohio.

16        William P. Whalen, Jr., Esq.
          Amy R. Williams, Esq.
17             On behalf of the Defendant.

18

19

20          BE IT REMEMBERED that upon the Jury

21   Trial of this cause, on January 13, 2011, before

22   the Honorable NADINE L. ALLEN, a judge of the

23   said court, the following proceedings were had,

24   to wit:

25

OFFICER BRENDON ROCK
        Direct Examination ...........Page 338, Line 6
        Cross-Examination ...........Page 348, Line 24
        Redirect Examination .........Page 352, Line 16

DETECTIVE RON AVANT
        Direct Examination ...........Page 353, Line 23
        Cross-Examination ...........Page 362, Line 15

DETECTIVE KURT BALLMAN
        Direct Examination ...........Page 365, Line 5
        Cross-Examination ...........Page 389, Line 9

SERGEANT JEFFREY HUNT
        Direct Examination ...........Page 394, Line 23
        Cross-Examination ...........Page 402, Line 18

VICTOR DAVIS, JR.
        Direct Examination ...........Page 404, Line 6
        Cross-Examination ...........Page 417, Line 13

AFTERNOON SESSION, January 13, 2011

THE COURT:  Good afternoon, everyone.  I think we are ready for the jury to come in, and we'll be able to start.

MR. WHALEN:  No, Your Honor, defendant is not here.

THE COURT:  And the defendant, we do need him, too.  All right.  You guys, I'm hearing now that the defendant was not brought over today at all.  He's in the Justice Center and they're going to have to get him dressed out, meaning he has a right to change clothes and shower.  What does that mean?

DEPUTY:  If you want him in street clothes.

THE COURT:  They want him in --

MR. WHALEN:  Yes.

THE COURT:  As the defendant.

DEPUTY:  Then it will probably take 45 minutes maybe.

THE COURT:  Okay.  Wow.  All right.

DEPUTY:  I'll get him sent over.

THE COURT:  We might as well take a

1  break until 1:30, and it won't take 45

2  minutes.

3      MR. TIEGER:  Judge, I know

4  everybody's done it.  It just seems to

5  happen all the time, so...

6      THE COURT:  It just happens.

7      (Pause in proceedings.)

8      (The jury entering the courtroom at

9  1:35 p.m.)

10      THE COURT:  You may be seated.

11  Good afternoon, ladies and gentlemen of

12  the jury.  I thank you for coming back

13  today again, being timely and prompt

14  today.  We are going to resume today.

15  And what we are going to have next your

16  jury instructions.  Preliminary so that

17  you can listen to this evidence and be

18  able to follow and understand what is

19  happening in this procedure, because many

20  of you are in your first week and some of

21  you are strange to juror service.

22      And following that, we will have

23  opening statements of counsel and the

24  State will then begin to present some of

25  its evidence today.  That's what we will

be doing today.

So, I'm going to again explain some of the procedures here today. Jury service may be strange to some of you so a short explanation is in order. Those who participate in a trial must do so in accordance with established rules. That is true of the witnesses, the lawyers and the judge, and it is equally true of your part as jurors.

The lawyers present evidence according to the rules. The Judge enforces the rules and determines what evidence may be admitted. You will be the sole judges of the facts, the credibility of the witnesses and the weight to be given to the testimony.

Later, the Court will instruct you regarding the law and you will apply the law to the facts. It is your sworn duty to accept the law as given to you by the Court. The procedure for the trial is a as follows: First counsel outline what they expect their evidence will be. These opening statements are not

1  evidence.  They are a preview of the
2  claims of each party designed to help you
3  follow the evidence as it is presented.
4  Then the State offers its evidence.  The
5  defendant may, but need not, offer
6  evidence.  If the defendant presents
7  evidence, the State may put on what is
8  called rebuttal evidence.
9       The trial concludes with the
10 arguments of counsel, the instructions of
11 law by the Court and thereafter you
12 deliberate on your verdict.  The State of
13 Ohio has the burden of proof, and the
14 defendant is presumed innocent until and
15 unless his guilt is established by proof
16 beyond a reasonable doubt.
17      The defendant must be acquitted or
18 found not guilty unless the State of Ohio
19 produces evidence which convinces you
20 beyond a reasonable doubt of each and
21 every essential element of the offense
22 charged in this case.  I have used the
23 words "reasonable doubt".  And at this
24 time I will define reasonable doubt.
25      Reasonable doubt is present when

after you have carefully considered and
compared all the evidence, you cannot say
you are firmly convinced of the truth of
the charge.  Reasonable doubt is a doubt
based on common sense and logic and
reason.  Reasonable doubt is not mere
possible doubt because everything
relating to human affairs or depending on
moral evidence is open to some possible
or imaginary doubt.

Proof beyond a reasonable doubt is
proof of such character that an ordinary
person would be willing to rely upon it
and act on it in the most important of
his or her own affairs.

If I say his or hers or forget,
they are interchangeable.  His means
hers, et cetera, today and throughout
this trial.  As jurors, you will
determine the facts in this case based on
the credibility of the witnesses and the
weight to be given to this evidence.

To weigh the evidence, you must
consider the credibility of all the
witnesses.  And to do this you will apply

the tests of truthfulness which you apply
in your own daily lives.  And many of you
might be thinking I didn't know I had
tests I applied, but whether you realize
it or not, when someone is telling you
about an incident that you did not
observe and did not see, you are
evaluating that evidence, that story,
that version based upon your internal
tests.

And later on, I will give you an
example of what those tests may be which
you may use, but you are not required to
use them.  You may use your own tests
that is the kind of authority and
province that the jury does have to weigh
the credibility and to determine facts in
this case because many of the facts are
in dispute and that's why we are here.

You are not required to believe the
testimony of any witness simply because
it is given under oath.  You may believe
the testimony -- you may believe or you
may disbelieve all or any part of the
testimony of any witness who testifies.

So you may believe half the sentence and not the rest, or a portion and not all of it. So you're not -- it's not an all or nothing situation for you as jurors. It is within your province to determine what testimony to believe and what testimony you do not want to believe.

The Court will permit note taking by the jurors. And the taking of notes may distract you from the evidence. I will allow that, but I'm going to tell you how it shall be done. The Court will permit those jurors who desire to take notes during the trial to do so. No juror is required to takes note. The taking of note is entirely a matter of personal choice.

The fact that the note taken by a juror supports that juror's recollection in no way makes that juror's memory more reliable than that of the other jurors who do not take notes. Do not let the taking of notes divert your attention from what's being said or is happening in the courtroom during the trial.

1  Some persons believe that taking

2  notes is not helpful because it may

3  distract the person's attention and

4  interfere with hearing all the evidence.

5  All notes are confidential and for the

6  consideration of the jury only.  So I

7  will not review them, the bailiff, the

8  parties and the litigants, the court

9  reporter and the attorneys will not be

10  reviewing them.  Each note-taker will

11  leave that note with the bailiff during

12  all recesses and until deliberations

13  begin.

14  At that time you will be allowed to

15  take your notes to the jury room.  All

16  notes will be returned to the bailiff for

17  destruction at the time that the jury is

18  discharged.

19  So at the conclusion of these

20  instructions, I want to ask you to raise

21  your hands for those who would like to

22  take notes.

23  The Court will permit jurors to

24  propose questions for the Court to ask of

25  the witnesses.  If you have a question,

wait until the end of questioning of the
witness by the attorneys. When the
questioning is finished, I will ask if
you have any questions, which we may or
may not answer that question because it
is the function, obligation and duty of
the prosecution and the defense to put on
before you the evidence that you need to
be considering. So you may be asking a
question which I will not allow any party
to ask.

So for that reason, I may be
denying that question and it may not be
asked. And I will be asking counsel how
they feel about that particular question
unless you object now.

MR. TIEGER: Could we approach,
Judge?

THE COURT: Okay. We didn't
discuss this before this began, so we'll
talk about it now.

(Unreported sidebar conference.)

THE COURT: All right. And both
sides have requested, and I agree with
that, because this is a serious matter

1   and they have spent a considerable amount

2   of time in preparation, we are not going

3   to allow the jurors to ask questions

4   today.  You may ask questions at the end

5   about evidence you heard when the jury is

6   deliberating.  The jury may ask a

7   question during deliberation at the

8   conclusion of the case.

9        It is important that you remain

10   fair and attentive throughout the trial.

11   Do not discuss this case among yourselves

12   or with anyone else.  Do not permit

13   anyone to discuss it with you or in your

14   presence.  Do not form or express an

15   opinion on this case until it is finally

16   submitted to you.  More difficult to

17   understand is that you may not discuss

18   this case among yourselves until it is

19   finally submitted to you.  You will

20   receive the opening statements this

21   morning -- this afternoon, some evidence.

22   Later on, you'll hear more evidence that

23   will take us into next week.

24        The arguments will follow and the

25   law, in this order.  It would be unfair

for you discuss the case among yourselves
before you receive everything necessary
for your deliberations, and you must
continue to explain this rule to your
family and friends.

Since this matter is expected to
continue more than one day, do not talk
with the attorneys, the participants or
the witnesses during the trial, and
likewise the participants in the trial
must not talk with you.

If anyone should attempt to discuss
the case with you, please immediately
report the incident to the bailiff.  You
may not investigate or attempt to obtain
additional information on this case
outside the courtroom.  It is highly
improper for any one of you to attempt to
do this.  There was a jury view, and you
did observe some matters which were
pointed out to you, and so that means you
are not permitted to go back and get any
further additional information on this
case outside of the courtroom.

You are instructed not to read,

view or listen to any report in the
newspaper, radio or television on the
subject of this trial.  Do not permit
anyone to read or comment upon news
reports to you or in your presence.  News
reporters are in the trial throughout
this trial, but they are -- their
impressions are incomplete and at times
inaccurate, and this is standard jury
instructions.  You must consider and
decide this case only upon the evidence
received in the courtroom.  If you should
acquire information from an outside
source, you must report it to the other
jurors, and you must disregard it in your
deliberations.

In addition, you should report the
outside source of information to the
bailiff or to the Court at the first
opportunity.  To be fair, I caution you
now you may be questioned later by the
Court to find out if you did read or view
or listen to any report concerning this
trial.

When your juror duty is completed,

of course you are released from this
obligation to remain silent or to not
have any comments or not to read or
investigate or speak on this matter.

If during the trial you have a
personal problem, please explain it to
the bailiff and we will resolve that
matter before we commence again with the
trial.  At this time we are ready to
commence with the case in chief of the
prosecution.  Is the prosecution ready
for opening statements?

MS. SHANAHAN:  We are, Your Honor.

THE COURT:  Okay.  At this time,
would you raise your hand for those who
would like to take notes.  Everybody want
to take notes?  Those who do not want to
take notes?  There is one hand.  So
everybody but -- there are two who do not
want to take notes.

Number 12, Michael Burck and David
Burck.  The Burcks, non-brothers, do not
wish to take notes.

ALTERNATE JUROR KORB:  No.  I do.

THE COURT:  You do.  You are my

1    alternate.

2          ALTERNATE JUROR KORB:  Yes.

3          THE COURT:  You're Mr. Korb, the

4    alternate juror.  Okay.  Thank you.

5          Ms. Shanahan, everybody has

6    received their notes and papers.  All

7    right.  You may commence.

8          MS. SHANAHAN:  Thank you, Your

9    Honor.  Good afternoon, ladies and

10   gentlemen.  On behalf of the State and

11   the defense, I would like to thank you

12   for your time and attention in this

13   important matter.  It's very important

14   that you do pay attention throughout the

15   course of this trial so that both the

16   State and the defense get a fair shake.

17          Ladies and gentlemen, what brought

18   us here today is the filing of an

19   indictment.  It's the document that lets

20   the defendant know what he's being

21   charged with.  For that reason, I'm going

22   to read to you the indictment.

23          In the matter of the State of Ohio

24   against Ruben Jordan, Case B1003262, in

25   the Court of Common Pleas, Hamilton

County, Ohio, Grand Jury term 2010, the Grand Jurors of the County of Hamilton in the name and by the authority of the State of Ohio upon their oaths do find and present that Ruben Jordan on or about the 31st day of October, in the year 2008, in Hamilton County, Ohio, did purposely and with prior calculation and design cause the death of Victor Davis, in violation of Section 2903.01(A) of the Ohio Revised Code, and against the peace and dignity of the State of Ohio.

Specification 1 to Count 1, the Grand Jurors further find and specify the said Ruben Jordan did have on or about his person or under his control a firearm while committing the offense of aggravated murder, and displayed the firearm, brandished the firearm, indicated that he possessed the firearm, or he used it to facilitate the offense alleged in Count 1.

Count 2, the Grand Jurors of the County of Hamilton, in the name and by the authority of the State of Ohio, upon

their oaths do find and present that
Ruben Jordan on or about the 31st day of
October, in the year 2008 in Hamilton
County, Ohio, did knowingly acquire or
have or carried or used a firearm or
dangerous ordnance, to wit:  A firearm.

And at the time the defendant knew
he was under indictment for or had been
convicted of an illegal -- excuse me, an
offense involving the illegal possession
of, sale of, use of, administration of,
distribution or trafficking in any drug
of abuse, to wit:  Possession of drugs in
Hamilton County, Ohio, Court of Common
Pleas, Case B0309177 on February 6, 2004;
preparation of marijuana for sale in
Hamilton County Court of Common Pleas,
Case B00068990, December 14th, 2000; the
illegal processing of drug documents in
Hamilton County, Ohio, Court of Common
Pleas, Case B8955998 on October 17th,
1995; and aggravated trafficking in drugs
in Hamilton County, Ohio, Court of Common
Pleas, Case B0929170 on March 19th, 1993;
drug abuse in Hamilton County, Ohio,

1    Court of Common Pleas, Case Number

2    B911528 on May 1st, 1991, and at the time

3    the defendant had not been relieved from

4    such a disability pursuant to Section

5    2923.14 of the Ohio Revised Code, in

6    violation of Section 2923.13(A)(3) Ohio

7    Revised Code, and against the peace and

8    dignity of the State of Ohio.

9         Ladies and gentlemen, on

10   October 16th, 2008, just after 1:00 a.m.

11   in the morning at 20 West Elder Street,

12   Kareem Gilbert murdered Brian Austin.

13        The evidence will show that Kareem

14   Gilbert -- excuse me, that Brian Austin

15   and Victor Davis had gone out that

16   evening and picked up some Subway

17   sandwiches.  They returned to the area

18   there at 20 West Elder, sat down to eat.

19   Kareem Gilbert, who was known to both

20   Victor Davis and Brian Austin, approached

21   and started to mess with Brian Austin,

22   kept trying to put his hands in Brian's

23   pockets.  He was playing around.  They

24   were horsing around.

25        But gradually this horsing around

became serious because Brian kept saying
stop it, quit it, get lost.  And Kareem
wouldn't back off and he kept coming at
Brian.  And finally Brian, frustrated,
took his Subway sandwich and smacked
Kareem in the head with it, food went
down the front of Kareem's white t-shirt.
It was a meatball sandwich.  There was
spaghetti sauce all over him and he was
mad.  He turned, he walked towards the
vacant lot at the corner of Republic and
Elder removing the white t-shirt and
discarding it and going around the
corner.

The evidence will show the next
thing that happened is Kareem Gilbert
came back yielding a large handgun, held
it up to Brian Austin and fired, but the
gun didn't go off, there was a click.
Brian Austin was there saying, is this
for real, is this for real?  And Victor
Davis is awe, man, Lil Red, don't do
this.  Lil Red is known as Kareem
Gilbert.  Kareem Gilbert is known as Lil
Red.

But Kareem pulled the safety off the gun, fired multiple more shots as Brian ran, killing him there at 20 West Elder. He came to rest right at 19 West Elder. Victor Davis ran from the scene but he circled around quickly and was watching his friend, who was lying there bleeding, die and he called 911.

Kareem Gilbert knew that Victor Davis knew that he had killed Brian Austin. And within a few days things went downhill for Victor Davis. Victor lived with his sister right there in the same building where Kareem Gilbert lived with his mother, where his brother would be around. Everybody knew each other, but everybody knew how the streets worked. And Victor Davis knew that he had to get out of there if he was going to be safe. But his sister didn't want to leave her apartment, and Victor Davis wasn't going to leave his sister down there, so Victor wouldn't leave.

And he, essentially, became a sitting duck. What happened in the

following days was the police were on the
search for Kareem Gilbert.  Ultimately,
Victor Davis was seen that night at the
scene having a heated discussion with
Shawn Gilbert, and the police thought
that odd, and then somebody came and
said, hey, that guy, that Victor Davis,
he was with Brian when he was killed.

So the police took Victor Davis
from the scene, took him down to homicide
and questioned him.  But Victor said, I
don't know who the guy was, I have seen
him in the neighborhood, he just came up
and shot him.  He just came up and shot
Brian.

Ultimately, within two days,
Victor's conscience told him what he
needed to do even though he's for the
streets and he knew that he was a sitting
duck.  And he called his friend, Ron
Avant, Detective Ron Avant, who he had
gone to high school with and just
happened to run into a few months before.
And he said, Ron, I know who did it.  I
wasn't totally forthright with the police

1   the night of the murder, but I know who

2   killed Brian and I need to tell them.

3         So on October 18th, Victor Davis

4   went back to homicide and he told the

5   whole story.  He told the whole story

6   about Kareem Gilbert.  He told the whole

7   story about how he lives there and how he

8   was afraid.  And how he knew that

9   something was going to happen and this

10  needed to stop.  This was ridiculous.

11        Unfortunately, because Victor did

12  not want to leave his sister behind,

13  Victor stayed in that area.  The police

14  are out looking for Kareem.  They went to

15  Kareem's mother's house, she said she

16  didn't know where he was.  Kareem was in

17  the wind.

18        The police went to his father's

19  house.  He said he had been here but he

20  left about a week ago, and he had been

21  staying there for about a week prior to

22  that.  His father's Ruben Jordan.  His

23  father is that man.  And he said Kareem

24  was here with me, he was here, he stayed

25  for a week, but I went to get my son an

attorney because he had murdered somebody, and when I came back he was gone, I don't know where he is.

October 31st, Halloween night, approximately 11:30 at night Victor Davis came home. He parked his car on the west side of Republic Street. He got out of his car and he never even made it to the breezeway door because Ruben Jordan walked up, unsuspecting, unarmed Victor Davis is there, and Ruben Jordan guns him down and leaves him lying in the gutter. And that's where he died on October 31st at approximately 11:30 at night.

Victor was alone but people were watching. And there were people in the area who saw a bald man standing over Victor Davis's body. There were people in the area that saw what happened. It was logical however for the police to look at Kareem, certainly there was a motive. Everybody knew Kareem killed Brian Austin, and Victor Davis was the only eyewitness to that murder, and Victor Davis talked to the cops. And

everybody knows what happens when you
talk to the police and you're an
eyewitness.  So everybody assumed it was
Kareem Gilbert.  And Kareem was still on
the run.

Ultimately, Kareem was caught on
December 31st of 2008, almost two
months -- exactly two months to the date
after Victor's murder, and he was charged
with both Brian Austin's murder and
Victor Davis's murder because there
seemed to be plenty of proof that he
would be the logical person.  Ultimately
his t-shirt that was left there at the
scene came back with his DNA, spaghetti
sauce down the front.  It was logical he
killed the one eyewitness to that murder.
However, in early 2009, evidentiary
things started to come to light and they
weren't adding up.

Ladies and gentlemen, the testimony
and the evidence will show that at the
crime scene for Davis's murder, the
killer left something behind.  He spit a
rather large amount of phlegm.  And when

the police arrived on the scene, within
three minutes, within three minutes the
police were on Davis's murder scene.  You
will hear their testimony that it appears
to be fresh spittle on the ground.  There
was still bubbles in it so they collected
it as evidence.  We sent it to the lab
and, ultimately, it's not Kareem
Gilbert's.  That's a problem.  It's fresh
spit five feet from Davis's body and it's
not Kareem Gilbert's.

The case becomes delayed.  There is
a change of attorneys.  There is multiple
motions.  The case against Kareem is
delayed.  Change of attorneys, we have
motions, case is set for trial.  And then
in early 2010, prior to Kareem Gilbert
going to trial for the murder of Brian
Austin and Victor Davis, there is a
break.  That spit was hit on a DNA.  It
was put in a database and DNA came back
showing that we now know who contributed
to that spit, whose spit it is.  It's
Ruben Jordan's.  That fresh spit that was
found five feet from Davis's body was

Ruben Jordan's.  And everybody kind of
stopped and went huh.

And slowly, ladies and gentlemen,
the tables began to turn.  While the spit
was being tested by our local lab for
confirmation, Ruben Jordan appeared on
the news.  And there is a man named
Kenneth Heard, and Kenneth Heard knows
Ruben Jordan.

Ladies and gentlemen, you'll hear
his testimony.  Kenneth Heard was Ruben
Jordan's drug dealer.  That was through
2008 and 2009.  But in April of 2009,
while Kareem Gilbert is sitting in the
Hamilton County Justice Center awaiting
trial for the murder of Brian Austin and
Victor Davis, Kenneth Heard had been shot
and decided it was time to leave town.
He left town, is trying to turn his life
around.

And he talked to a police officer
here, and he said I have information on a
murder.  I have information on a murder.
But he didn't know Ruben Jordan's real
name.  When he told the police officer,

that actually happened in early in 2009,
he didn't know his name.  So he tells the
police officer it's a murder of a guy,
very vague.  And the police officer says
you have got to give me more, how am I
supposed -- their is a million unsolved
murders, how am I supposed to do this?
Kenneth Heard goes on his way, moves out
of town.

Ultimately, when Ruben Jordan
appears on the news, Kenneth Heard says
that's him, that's the guy that I was
dealing drugs to.  And he calls up the
detective and says now let me tell you
what this guy Ruben Jordan, who I didn't
know his real name, what he told me, what
Ruben Jordan told Kenneth Heard in early
2009, is his son is awaiting trial for
the murder of Victor Davis, I'm the one
did it.  Ruben Jordan told him, I'm
nervous, I'm worried my son is sitting in
jail for something that I did.  I
committed that murder.

And Kenneth Heard said, why would
you do that, why would you let your son

go down?  He said, well, but I had to do
it, I had to protect my son.  This Victor
Davis was going to testify against my
son, so I killed him, I had to.  And
Kenneth Heard persisted about why, why
would you let him go down for that?  And
that is the end of the exchange.

This all starts to come to light
now in early 2010.  Kenneth Heard had
tried to tell the police in '09 but he
just didn't have a name.  But now we have
a name and we have fresh spit from the
scene, and it's all pointing to Ruben
Jordan.

Still the case went all the way to
the day of trial before everything was
put together against Kareem Gilbert.  And
there we are ready to go, it's go time
and Kareem Gilbert is going to go down
for the murder of Victor Davis even
though his father committed that murder.
And it was at that point that Kareem
himself said, hold on, hold on a minute,
my dad has been telling me to just go to
trial, this is going to get taken care

of, but I'm not going down for two
murders.  I did one, I murdered Brian
Austin.  And that's the first time he
admitted that.  But he said I murdered
Brian Austin but I didn't murder Victor
Davis, my father did.

And, ladies and gentlemen, here we
are.  Everything was done properly
throughout every point in this case.  It
just so happened it took a while for all
the ducks to line up and, unfortunately,
there was one sitting duck that went down
all over somebody getting smacked with a
Subway sandwich.

Ladies and gentlemen, this is how
this case unfolded.  This is the evidence
that is going to be presented to you.
You are going to hear testimony and
receive actual evidence.  The State is
confident when you hear the whole story,
the entire story from beginning to end,
that you will return guilty verdicts
against Ruben Jordan for the murder of
Victor Davis.  Thank you.

THE COURT:  Thank you.

MR. WHALEN: Good afternoon. The facts in this case will make it a great mystery novel, but it doesn't make for a very good criminal trial. What the prosecutor just laid out for you on many points we agree with them and we're probably not going to object or even cross-examine some of the witnesses. But the rest of the problem is that it doesn't make any sense, and it certainly doesn't prove that my client killed anybody.

Kareem Gilbert lived down on the streets where we went on the view yesterday at 804. He lived with his mother and with his mother's boyfriend by the name of Johnny Terry. Johnny Terry has dreadlocks.

On October 16th of '08, Kareem killed Brian Austin down on Republic Street where you were yesterday. As a result of a dispute that he had with Victor Davis, he knew who the killer was, told the police who it was and they began looking for Kareem. Not only did he tell

them who it was, but he told his family
Kareem was going to kill me and he began
to lay the clothes out he wanted for his
funeral.  He told his family how he
wanted his funeral conducted because he
knew he was a dead man.

On Halloween, October 31st, Kareem
came up to Victor and shot and killed him
on the street.  Now, the witnesses are
going to tell you that no one actually
saw it, but they heard the shots.  The
one witness you are going to hear from
today looked out his window and he told
the police that it was that Gilbert kid
that did it.  They tell you that they
found fresh spit on the scene, and they
did.  And they told you that the lab
tests are going to show that it belonged
to Ruben Jordan, it did.  We are not
going to argue that point.

What they didn't tell you is that
Ruben Jordan has grandchildren living in
a building, and it was Halloween and he
had been down there that night for
Halloween with his grandchildren, not

knowing what his son was doing down
there.

Shawn has a brother -- I mean
Kareem has a brother Shawn.  And
throughout the police investigation, they
were told that Kareem did it and they
were told that Kareem and his brother did
it.  And they had that information
throughout this whole thing.  But the
prosecutor told you about coming down to
the last minute, it did.  They had this
Mr. Heard that came up and says that
Ruben told him that he did it.  You're
going to find out that Mr. Heard doesn't
even really know who Ruben is.  You're
going to find out in his statement also
he doesn't have his name right, he
doesn't have his identity.  He told him
that Ruben is a man in his early 20s.  He
has no idea who Ruben Jordan is.

And they had that information and
they have the spit.  They ran off the
crimes that my client has gone to prison
for in the past, and we are not going to
hide that from you.  They had his DNA.

when you go in prison, they take your DNA. And they took his DNA and they had DNA, and it took two years for them to decide that it belonged to Ruben Jordan.

And then not only it took two years, they have got Mr. Heard, they have got the spittle and they're going to trial, and they have got the witnesses that were from -- that have testified or had given them statements, and yet they are at the day of trying Kareem Gilbert for the murder of Victor Davis. This is the State saying we got the killer, we are going to trial and we are going to convict him. And then the killer turns around and says, oh, wait a minute, it wasn't me, I didn't do that, my daddy did it.

Now all the sudden this admitted killer is all the sudden believable and he's saying it was my daddy that did it. And the State decided, well, we got the wrong man. And they made a deal. They dropped the murder of Victor Davis against Kareem. He goes free of that

1    until he doesn't come in here and tell

2    you my daddy did it.  And that's the

3    proof that they're going to tell you

4    rises to beyond a reasonable doubt.  And

5    I'm going to tell you it doesn't.  And I

6    believe your duty is to return a verdict

7    of not guilty.  Thank you.

8         THE COURT:  Anything further in

9    opening statements?

10         MS. SHANAHAN:  No, Your Honor.

11   Thank you.

12         THE COURT:  All right.  You're

13   going to call your first witness, sir.

14         MR. TIEGER:  Police Officer Rock.

15         THE COURT:  Would you like to swear

16   all them, do a separation individually?

17         MR. TIEGER:  Judge, I don't think

18   any witnesses are here, but we would ask

19   for a separation.

20         MR. WHALEN:  We agree.

21         THE COURT:  Are there -- are there

22   persons in this room who will be

23   testifying in the future?  You don't have

24   any of your potential witnesses.  Okay.

25   Then bring in the officer, and I will

```
 1            also make a ruling on that.
 2                 MR. TIEGER:  Police Officer Rock.
 3                 THE COURT:  While he's coming, if
 4            there is anybody in the courtroom who has
 5            a cell phone, it must be turned off.  You
 6            cannot text, cannot use either way.  And
 7            if it is seen, it will be seized, so put
 8            it -- turn it off, please, and keep it
 9            out of range and do not use it.
10                 Officer, would you please raise
11            your right hand to be sworn?
12                 OFFICER BRENDON ROCK,
13    having been first duly sworn, was examined and
14    testified as follows:
15                 THE COURT:  There is also a
16            separation of witnesses also.  Anyone who
17            will be testifying, all witnesses
18            separated and must step out in the
19            hallway will be called in individually
20            and you cannot discuss your testimony.  I
21            see two more people came in.  Would all
22            attorneys turn around and tell me any of
23            these parties will be witnesses?
24            Additional people come in?
25                 Mr. Whalen?
```

1          MR. TIEGER:  No, Your Honor.  No.

2          THE COURT:  Did the defense look

3      there?  Just witnesses.  Just spectators.

4          MR. TIEGER:  Victor Davis's family.

5          THE COURT:  All right.  Okay.

6              DIRECT EXAMINATION

7  BY MR. TIEGER:

8      Q.    Good afternoon.  Can you pull that

9  mike towards you, Officer.  Please tell us your

10 name and spell your last name.

11     A.    Officer Brendon Rock, R-O-C-K.

12     Q.    What's your occupation?

13     A.    Police officer for the City of

14 Cincinnati.

15     Q.    How long have you been a Cincinnati

16 police officer?

17     A.    About a decade, sir.

18     Q.    I'm going to direct your attention

19 to October of 2008, what area of town were you

20 working in at that point?

21     A.    Over-the-Rhine.

22     Q.    And we heard in jury voir dire one

23 of the jurors who's no longer a juror said she

24 recognized your name from the Fay Apartments or

25 District 3 area.  Since October of 2008, have

1   you changed districts?

2       A.    Yes, sir.

3       Q.    And Over-the-Rhine, what district

4   is that in?

5       A.    That's District 1.

6       Q.    And how is that basically divided

7   up?  There is different districts that

8   Cincinnati Police are assigned to?

9       A.    Correct.  There are five districts

10   in the City.  District 1 includes

11   Over-the-Rhine, West End, Mt. Adams and

12   downtown.

13       Q.    And how about the district you are

14   in now, District 3?

15       A.    That's the west side of town,

16   Westwood, Price Hill, Saylor Park.

17       Q.    I'm going to direct your attention,

18   Officer Rock, to 10/16 of 2008, early in the

19   morning of that day, around 1:05 in the morning,

20   were you on duty at that time?

21       A.    Yes, sir.

22       Q.    And were you in uniform in a marked

23   police car?

24       A.    Yes, I was.

25       Q.    Were you on routine patrol?

1          A.      Yes.

2          Q.      What is routine patrol?

3          A.      Just patrolling in the vehicle

4     looking for crime, anything like that.

5          Q.      And were you called to an area at

6     or about 22 West Elder?

7          A.      Yes, sir.

8          Q.      And could you describe what a radio

9     run or a dispatch is, Officer Rock?

10         A.      In this instance I believe someone

11    heard a gun fire or saw some sort of

12    disturbance, they called 911.  I recall taking

13    that call and sent that to a dispatcher who then

14    calls us on the radio and advises us to respond

15    to the location.  That's what happened that

16    night.

17         Q.      And how does a dispatcher advise

18    you to respond to a certain area?

19         A.      They give you the location and a

20    description of what is going on there, what the

21    caller told the call taker.

22         Q.      And how did you hear that?

23         A.      Over our radio.

24         Q.      And do you have a radio on today?

25         A.      Not right now, sir, no.

Q.    Where is that normally kept?

A.    The mouth piece is up on the collar area and radio itself is down on the belt.

Q.    And when you heard that, to go to that area, how long did it take you to get to that area?

A.    I was not far at all.  I mean, I think I was actually in the area before the dispatcher finished advising me to head to the area.

Q.    How long would it have taken you to get to the call at the Elder and Republic Street corner, so to speak?

A.    I mean from where I was when the initial run came out, ten, 15 seconds.

Q.    And could you describe to the jury what you saw when you got to that area?

A.    I was driving, I believe, would have been kind of east on Elder towards Vine Street from Republic or Race Street.  As I drove up the street, I saw several individuals out, one of whom appeared to be staggering somewhat through the street.  This individual reached the south side of Elder Street and collapsed.  I saw several people milling about him in the general

 1  area.
 2              As other police officers began to
 3  show up I started to try and push everyone back
 4  to create room for fire personnel and secure the
 5  crime scene.
 6          Q.    So, what you're -- what I'm
 7  understanding is that you saw an individual
 8  stumble, and then that individual fall.
 9          A.    That's correct.
10          Q.    And was that individual going from
11  one side of -- from Elder Street to the other
12  side of Elder Street?
13          A.    The general direction seems to be
14  from the north side of the street to the south
15  side of the street.
16          Q.    And did you -- you saw some other
17  individuals in the area?
18          A.    Yes, sir.
19          Q.    Was there an individual in that
20  area that you later knew or became known to be a
21  gentleman by the name of Victor Davis?
22          A.    Yes, sir.
23          Q.    And where did you see that
24  individual, Officer Rock?
25          A.    He was one of the subjects I saw

1  right beside the victim after the victim fell to

2  the ground.  And while I didn't know his name or

3  anything, as I took note of his general

4  appearance, observed him to be moments later

5  engaged in a heated conversation with another

6  subject, and then we came across him yet one

7  more time that night.

8          Q.    Was there anything distinctive

9  about Victor Davis?

10         A.    He was a larger man and had a full

11  set of dreadlocks.

12         Q.    Okay.  So is he somebody that you

13 would recognize or he was a distinctive looking

14 individual?

15         A.    Yes, sir.

16         Q.    And you said he was in some type of

17 conversation, or how would you describe -- did

18 you see him with somebody else right there at

19 the scene officially?

20         A.    The first time I took note of him

21 he was there where the victim fell, and I

22 couldn't say that he was speaking with anyone in

23 particular.

24         Q.    Okay.

25         A.    Moments later I saw him talking to

another individual, or more to the point that

individual, I think, was talking to him in a

very animated manner.

        Q.    Okay.  What happened next then at

the scene, Officer Rock?  You have got somebody

stumbling and falling.  Were people upset?

        A.    Yes.

        Q.    And what did you determine

happened or how did you determine what had

happened?

        A.    Based on the radio run that I had

received about shots fired and whatnot, and

seeing this individual fall to the ground, I

assumed that he had most likely been shot.

        Q.    Okay.  And did you look at or

approach the body at all?

        A.    Not really.  Seconds after I got

there, two other officers showed up.  I believe

one or both of those officers went more to the

body like I did.  Like I said, I kind of headed

in the east and secured the crime scene area.

        Q.    And why is it important to secure a

crime scene?

        A.    Physical evidence on the scene can

be removed or destroyed or altered.  It's

1  important to, again, let -- with an incident

2  like this, people want to congregate around the

3  body.  But once the fire personnel get there,

4  they need space to work, so it's kind of a case

5  when you show up, it's important to kind of stop

6  that as soon as possible.

7      Q.    So if there is potential evidence,

8  shell casings, physical evidence, that that

9  would be -- the integrity of that is preserved?

10     A.    Yes, sir.

11     Q.    And did you try to do that to the

12 best of your ability in terms of setting up a

13 perimeter or crime scene tape?

14     A.    Yes, sir.

15     Q.    And what is a perimeter or crime

16 scene tape?

17     A.    Well, we use the yellow crime scene

18 tape.  It establishes a perimeter, a wall inside

19 which we don't want pedestrians or even officers

20 or firefighters who aren't needed to enter and

21 leave.  It's in this area that whatever evidence

22 there is we want to keep that there and keep it

23 as it is until the experts come to deal with it.

24     Q.    And why is fire called in in a

25 situation like that, Officer Rock?

1          A.      They are the medical personnel who
2     respond to situations like this.
3          Q.      And is that one of the things that
4     either on a shooting they respond or you notify
5     fire right away to show up because somebody is
6     in urgent need of their care?
7          A.      Yes.
8          Q.      Did they respond to the scene?
9          A.      Yes, they did.
10         Q.      Did they get there quick?
11         A.      Yes.
12         Q.      Do you know if they had attended to
13    the body that had stumbled and fallen which
14    later turned out to be the body of Brian Austin?
15         A.      They did.
16         Q.      Were they able to do anything to
17    save his life?
18         A.      Not really, no.
19         Q.      He was basically dead there on the
20    street?
21         A.      That's correct.
22         Q.      Did homicide then come to the
23    scene?
24         A.      Yes, sir.
25         Q.      What happened next then at the

1  scene in terms of -- you had mentioned to the

2  jury, Officer Rock, that you had seen Mr. Davis

3  again and this other individual that he was in

4  an animated conversation with?

5      A.    Yes, sir.  After the crime scene

6  had kind of been established, the crime scene

7  tape was up, I was standing on one side of the

8  scene and there were several individuals

9  becoming very loud, somewhat disorderly.  That's

10  not too unusual for a situation like this.  But

11  one individual in particular stood out, he was

12  quite disorderly.

13          At one point I actually placed him

14  in handcuffs and threatened to arrest him and

15  remove him from the scene if he couldn't control

16  himself.  This was the individual I had seen

17  earlier engaged in the conversation with

18  Mr. Davis.

19      Q.    And did you determine that

20  individual's name?

21      A.    Yes, I did, I wrote it down.  It

22  was Shawn Gilbert.

23      Q.    Was there anybody else at the scene

24  engaged in this animated or angry conversation

25  either with you or other officers?

1          A.     The conversation between
2    Mr. Gilbert and Mr. Davis was just those two.
3    But once I had to deal with Mr. Gilbert later
4    on, his mother was out there along with several
5    neighbors, extended family members.
6          Q.     At that point then, Officer Rock,
7    after you say you handcuffed Shawn Gilbert?
8          A.     Yes, sir.
9          Q.     And eventually let him go, you did
10   not arrest him?
11         A.     That's correct.  He calmed down and
12   promised to control himself and he was not
13   arrested.
14         Q.     Did you let homicide then take over
15   the scene?
16         A.     Yes, sir.
17         Q.     Did that basically end your
18   involvement in this case?
19         A.     For the most part, yes, sir.
20              MR. TIEGER:  Okay.  Just one
21         moment, Judge.  Nothing further, Judge.
22         Thank you.
23              THE COURT:  Thank you.
24                  CROSS-EXAMINATION
25   BY MR. WHALEN:

1      Q.     Officer Rock, you determined that

2 there was an individual that your police

3 department was looking for as a result of the

4 shooting, am I correct?

5      A.     I wouldn't say that I determined

6 that.  I would say the police department

7 determined that.

8      Q.     So you weren't involved in that at

9 all?

10      A.     I was certainly not the lead

11 investigator on this.

12      Q.     I didn't ask you that.  I just

13 asked you if you became aware that they were

14 looking for an individual for that shooting?

15      A.     Yes, sir.

16      Q.     And it was Kareem Gilbert?

17      A.     Yes, sir.

18      Q.     Okay.  And the person that was

19 disorderly at the scene was by the name of Shawn

20 Gilbert?

21      A.     That's correct.

22      Q.     Do you know that he was Kareem's

23 brother?

24      A.     At the time I did not.

25      Q.     Okay.  Did you release that

1  information to your investigators later?

2       A.     Yes, sir.

3       Q.     When Shawn Gilbert was upset and

4  being disorderly, what was he saying?

5       A.     I can't recall exactly.  It's just

6  kind of the standard, he's upset that this took

7  place in his neighborhood.  Nothing too

8  particular.

9       Q.     So he was all worked up because

10 somebody had dared to have a shooting in his

11 neighborhood?

12      A.     Right outside where he lived, yes,

13 sir.

14      Q.     Okay.  And when he became so

15 disorderly that you arrested him, put him in

16 cuffs, was he saying anything to you?

17      A.     Not really.

18      Q.     He didn't have any conversation

19 with you?

20      A.     I wouldn't say we had a

21 conversation.  I told him several times to quiet

22 down or he would be arrested.  Eventually he did

23 listen to me and he did calm down.

24      Q.     This man is at the scene of a

25 crime, he's all worked up, he's disorderly, and

1    when you put him in cuffs he doesn't have any

2    conversation with you.  When you tell him calm

3    down, what does he say?

4            A.    I wouldn't say he said okay, I

5    will, or anything like that, he just eventually

6    did calm down.

7            Q.    But, again, you had no

8    conversations with him?

9            A.    That's correct.

10           Q.    He didn't tell you other than that

11   there had been a killing in his neighborhood

12   that he was upset about anything else?

13           A.    No, sir.

14           Q.    Now, the person that you saw him

15   having a heated discussion with was Victor

16   Davis?

17           A.    That's correct.

18           Q.    And Victor Davis was with

19   Mr. Austin that was killed?

20           A.    Yes.

21           Q.    And did you take any special notes

22   of that fact?

23           A.    That information was also passed on

24   to the homicide investigators later.

25           Q.    And did you learn why Mr. Gilbert

1    and Mr. Davis were having a heated discussion?

2        A.    I believe in speaking with the

3    other investigators they presented me with their

4    theory, but I, myself, did not uncover the

5    reason for this, no.

6        Q.    Did it have anything to do with

7    Kareem Gilbert?

8        A.    Did the conversation that those two

9    were having?

10       Q.    That was relayed to you, yes.

11       A.    I believe that was their theory,

12   yes.

13            MR. WHALEN:  I have nothing else,

14       Your Honor.

15                REDIRECT EXAMINATION

16   BY MR. TIEGER:

17       Q.    Officer Rock, these aren't marked

18   with an exhibit number yet, but I'm going to

19   show you, and we will mark these at some point,

20   but these photos, the one of the larger man in

21   dreadlocks laying dead in the street and closer

22   up of his face, is that the individual you

23   identified as Victor Davis that you saw on the

24   scene of the Austin murder?

25       A.    Yes, sir.

1      MR. TIEGER:  No further questions,

2   Judge.

3      THE COURT:  Thank you, Officer.

4   You may step down.  Thank you for your

5   testimony.  Is he released or do you want

6   him to remain?

7      MR. TIEGER:  He can be released.

8      THE COURT:  Officer, you are

9   released.

10      THE WITNESS:  Thank you.

11      THE COURT:  Thank you.

12      (Witness excused.)

13      THE COURT:  Next witness?

14      MS. SHANAHAN:  State will call

15   Detective Avant.

16      THE COURT:  Officer, step up and

17   I'll swear you in.  Up to the podium.

18   Raise your right hand.

19         DETECTIVE RON AVANT,

20   having been first duly sworn, was examined and

21   testified as follows:

22      MS. SHANAHAN:  Please have a seat.

23         DIRECT EXAMINATION

24   BY MS. SHANAHAN:

25      Q.    Detective, please state and spell

1  your last name for the record.

2       A.    My name is Ron Avant.  A-V, as in

3  Victor, A-N-T.

4       Q.    And how are you employed?

5       A.    I'm employed with the City of

6  Cincinnati Police Department assigned to CIS.

7  I'm a polygraph examiner.

8       Q.    Okay.  How long have you been with

9  the City of Cincinnati Police Department?

10      A.    Twenty-four years now.

11      Q.    And how long have you been assigned

12 to the CIS Division?

13      A.    Eleven years.

14      Q.    And what does CIS stand for?

15      A.    Criminal Investigation Section.

16      Q.    Okay.  Have you been a polygraph

17 examiner that entire time?

18      A.    Yes, sir.

19      Q.    The full 11 years?

20      A.    Yes.

21      Q.    What type of training, if any, did

22 you receive to do that type of a job?

23      A.    We were sent down to Atlanta,

24 Georgia where we learned how to do not just

25 polygraph itself, but we have learned a little

1    bit of psychology, physiology, pretty much those

2    two subjects and combine them all together.  We

3    learn how to do interrogations and interviews as

4    well.

5         Q.    Are you required to do sort of like

6    continuing education --

7         A.    Yes.

8         Q.    -- to maintain your certificate?

9         A.    Yes, we are.

10         Q.    Okay.  And what is required of you?

11         A.    Every two years we go and attend

12    classes, different states throughout the United

13    States, and we would receive a certificate

14    saying that we completed a certain amount of

15    hours of training.

16         Q.    And you have maintained your

17    certificate to be a polygraph examiner?

18         A.    Yes, through the American Polygraph

19    Association.

20         Q.    Okay.  And currently are you

21    working with CPD as a polygraph examiner?

22         A.    Yes.

23         Q.    Was that the same job that you were

24    holding back in October of 2008 through 2009?

25         A.    Yes, I was.

```
 1          Q.    Okay.  Do you know a person by the
 2    name of Victor Davis?
 3          A.    Yes, I do.  He's a friend of mine.
 4          Q.    Okay.  How was it that you know he
 5    had -- how did you become friends?
 6          A.    Victor and I went to Woodward High
 7    School together from 1980 to 1984.  We were
 8    classmates.
 9          Q.    And did you maintain any contact
10    with Victor after he graduated high school?
11          A.    Actually, no.  Victor had left and
12    went to the military and I hadn't seen him in
13    years.
14          Q.    Okay.  When was -- prior to his
15    death, when was the most recent time that you
16    saw Victor or the first time that you saw Victor
17    prior to his death?
18          A.    It was the early part of October.
19          Q.    Okay.  And where was it that you
20    saw him?
21          A.    We were at Golden Coral.  I know it
22    was good to see him.
23          Q.    Did you speak to him at that time?
24          A.    Sure did.  We spoke, talked for a
25    long time.
```

1      Q.    Did you exchange information at

2   that time?

3      A.    Yes, I gave him my cell number and

4   he gave me his cell number.

5      Q.    Okay.  I'm going to show you what's

6   not yet marked but photographs that have been

7   referenced.

8          MR. WHALEN:  Your Honor, so we

9      don't end up having a mix-up, have you

10     got them marked now?

11         MS. SHANAHAN:  Yes.  Yes.  Well,

12     they are not marked yet because we want

13     them as a series.  It's just easier.

14         THE COURT:  They will be marked?

15         MS. SHANAHAN:  They will be marked.

16         THE COURT:  Do you want them marked

17     now?

18         MR. WHALEN:  I would.

19         THE COURT:  They'd rather not mark

20     them now.

21         MR. WHALEN:  I understand that,

22     but --

23         MS. SHANAHAN:  That's fine.  It's

24     not a problem.  I was just trying to keep

25     all the photographs together, Judge.

1    THE COURT:  So that will be State's

2    Exhibit?

3    MS. SHANAHAN:  One and two.  Thank

4    you, Judge.

5    (State's Exhibit Numbers 1 and 2

6    marked for identification.)

7    Q.    I'm sorry.  I'm showing you what's

8    now been marked as State's Exhibits 1 and 2.

9    Are you familiar with the person that is

10   depicted in those photographs?

11   A.    Yes, I am.

12   Q.    And would you please tell the Court

13   and ladies and gentlemen of the jury who that

14   is?

15   A.    That's my friend Victor Davis.

16   Q.    Okay.  Detective Avant, when is the

17   next time you heard from Victor after speaking

18   to him at the Golden Coral?

19   A.    Victor called me October 18th.

20   Q.    And when he called you, did you

21   talk to him, or did he leave you a message?

22   A.    I talked to him.

23   Q.    And what did he say, if anything?

24   A.    He had told me about a homicide

25   that he had witnessed.  And he had stated that

he had went down to CIS the night it happened,
but he had told the investigator he didn't know
what happened.  And he thought about it, and he
wanted to talk to the investigators about it
because a friend of his was killed, and he
wanted to do his part and be a witness and talk
to the investigator to let him know the truth of
what happened.

     Q.    This was on October 18th?

     A.    Yes, ma'am.

     Q.    They called and told you this?

     A.    Yes.

     Q.    Ultimately, were you able to
determine who the murder was and who it was
assigned to?

     A.    Right.  It turned out it was --
yeah, I talked to CIS.  I called them up right
away and I gave his number to the investigators
so they can call him and talk to him and get the
information.

     Q.    Okay.  And do you know whether or
not Victor Davis went and spoke with Detective
Schare and Ballman?

     A.    Yes, he did.

     Q.    Okay.  When was the next time that

1    you spoke with Victor Davis?

2        A.    Well, Victor had called me pretty

3    much afterwards, we had spoke back and forth.

4    And then he started calling me about people, the

5    family members are starting to threaten him

6    because they found out that he had spoke with

7    the investigators.

8        Q.    So when you say that there were

9    calls back and forth, there were multiple times

10   between the 18th and his death that you spoke to

11   Victor?

12       A.    Right.  Yes, I did.

13       Q.    And each of those times -- on each

14   of those times did he express concern about the

15   threats that he was receiving?

16       A.    Not immediately at first.  But as

17   time went on, a couple days later, yes, he

18   started talking about the threats that he was

19   starting to receive from Kareem's mother and

20   other family members, because --

21       Q.    From his mother and who else?  I'm

22   sorry.

23       A.    Other family members.

24       Q.    Okay.  Okay.  Did you talk to

25   Victor Davis on October 31st?

1        A.      Yes, I did.

2        Q.      And what did that conversation

3  entail?

4        A.      Well, he was still talking about

5  the threats, and I had told him he needs to

6  leave from downtown because I could hear the

7  fear in his voice.  He said that it's getting

8  hot and he was very afraid, and I told him he

9  needed to leave.

10        Q.      Was Victor Davis a proud man,

11  Detective Avant?

12        A.      He was.  He was.

13        Q.      He served in the military; is that

14  correct?

15        A.      He served in the military.  He was

16  a very good guy, very good friend of mine.

17        Q.      Had he fallen on rough times at

18  this point?

19        A.      You know, I don't know.  I knew he

20  grew his hair longer, because Victor was always

21  a clean-cut guy in high school.  But I

22  understand when you get out of the military you

23  want to be a civilian, you want to grow your

24  hair, and that's what he did.

25        Q.      Okay.  Who was he staying with, if

1  you know, down in this area?

2       A.    I believe he was staying with his

3  sister at the time.

4       Q.    Did he talk to you at all about his

5  sister or her willingness to go along with him

6  and get out of downtown?

7       A.    No, I don't think she wanted to

8  leave, but I told him that he needed to leave

9  because the danger was -- the threats were

10 towards him.

11            MS. SHANAHAN:  Okay.  One moment,

12       please.  Thank you, Detective.  Nothing

13       further at this time, Your Honor.

14            THE WITNESS:  Okay.

15                CROSS-EXAMINATION

16 BY MR. WHALEN:

17       Q.    Officer Avant, do you own any real

18 estate down in Cincinnati?

19       A.    I did.  I owned the two-family

20 rental in Avondale on Hearne Avenue.

21       Q.    Do you still own it?

22       A.    No, I sold it.

23       Q.    Was a woman by the name of

24 Leshuande Ramsey ever a client of yours?

25       A.    Yes.

1        Q.    And how did you know her?

2        A.    Just as a landlord/tenant.

3        Q.    Okay.  And did a gentleman seated

4 at counsel table here, do you know him?

5        A.    Yes, he actually was the boyfriend

6 of my tenant.

7        Q.    Okay.  And at any time did you and

8 Leshuande Ramsey get in a dispute?

9        A.    No.  Just typical landlord/tenant

10 discussions about rent, payment of rent, but

11 nothing -- nothing -- never did anything legal.

12 I never filed any eviction papers because she

13 said she was going to try to leave, and I was

14 being very lenient with her in allowing her --

15 to give her time to move.

16        Q.    And did you tell her that you were

17 going to make her and her fiance's life a living

18 hell?

19        A.    Oh no.

20        Q.    Never said that?

21        A.    Never said that.

22        MR. WHALEN:  Okay.  I have nothing

23        else, Your Honor.

24        THE COURT:  Anything else from this

25        witness?

1          MS. SHANAHAN:  No, Your Honor.

2    Thank you.

3          THE COURT:  Thank you, Officer.

4    You may step down.  Thank you for your

5    testimony.  And is this detective

6    released?  Do you want this officer to

7    remain?

8          MR. TIEGER:  He's free to leave,

9    Judge.

10          THE COURT:  Officer, you're

11    released.  Thank you for your testimony.

12          THE WITNESS:  Thank you ma'am.

13          (Witness excused.)

14          MR. WHALEN:  Your Honor, could we

15    approach the bench for a minute?

16          THE COURT:  Yes.

17          (Unreported sidebar conference.)

18          THE COURT:  Bring in the third

19    witness.

20          MR. TIEGER:  Shall I call the next

21    witness, Judge?  Detective Ballman.

22    Judge, he's down at the end of the hall.

23    Let me grab him real fast.

24          THE COURT:  Officer, will you step

25    forward and raise your right hand, be

1        sworn please?

2                DETECTIVE KURT BALLMAN,

3    having been first duly sworn, was examined and

4    testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. TIEGER:

7        Q.    Good afternoon, sir.

8        A.    Good afternoon, sir.

9        Q.    Could you please tell us your name

10   and spell your last name?

11       A.    Detective Kurt Ballman, K-U-R-T,

12   B-A-L-L-M-A-N.

13       Q.    What's your occupation?

14       A.    I'm a police officer with the City

15   of Cincinnati assigned to the Homicide Unit.

16       Q.    How long have you been a Cincinnati

17   police officer?

18       A.    Approximately 20 years.

19       Q.    And what did you start out doing as

20   a Cincinnati police officer?

21       A.    Same as every other officer, start

22   out on patrol.  Well, recruit at the academy.

23   Once you graduate, you're a patrol officer.

24       Q.    How long have you been in homicide?

25       A.    Eight years.

1  Q.   Okay.   What are the basic duties of

2  a homicide officer?

3  A.   We investigate homicides, suicides,

4  baby deaths, kidnaps, police interventions, in

5  general, death investigations.

6  Q.   And, specifically, do you go to

7  scenes?

8  A.   Yes.

9  Q.   And are you where the evidence is

10 collected at scenes as well?

11 A.   Yes.

12 Q.   And do you try to solve a murder?

13 A.   Yes.

14 Q.   So to speak, if you have got an

15 individual that is dead at the scene and nobody

16 is around, you try to figure out who did it?

17 A.   Yes.

18 Q.   Do you work with the coroner's lab

19 as well?

20 A.   Yes, we work with the coroner's

21 office.

22 Q.   Do you try to develop witnesses?

23 A.   Yes.

24 Q.   And do you work with witnesses over

25 the course of an investigation and try to secure

1    their appearance and make sure they're present

2    for court?

3         A.    Yes.

4         Q.    Is there a general problem, if

5    you're aware, Detective Ballman, with locating,

6    finding and keeping witnesses involved in these

7    type of homicide cases?

8         A.    Yes, there is.

9         Q.    Could you describe that for the

10   jury.

11        A.    We -- my office, we call it witness

12   management.  Quite frequently, it's difficult to

13   get people to come forward to have them tell the

14   truth.  Generally, there is a fear out there on

15   the streets, they say, to testify in homicide

16   cases.  Once you do have a witness that is

17   cooperative, he or she may come in to all kinds

18   of or meet with all kinds of resistance out in

19   their neighborhoods.

20              One of the most horrible things,

21   apparently, to be these days is a snitch.  So

22   there is a lot of pressure not to be a snitch.

23   So even from people that may not -- may or may

24   not have anything to do with the case, this

25   person may feel some social pressure not to

1    snitch, not to tell.  They get kind of branded.

2            Often we have to move witnesses

3    because they are receiving threats, or they have

4    fear of retaliation.  So it gets kind of

5    difficult to keep them in the loop after they

6    have assisted us in a case.

7            Q.    And in a community like

8    Over-the-Rhine that I know is primarily a lot of

9    good people, but there are several very

10   dangerous people down there.

11           A.    There is several dangerous elements

12   in that neighborhood.

13           Q.    When an individual identifies

14   himself as a witness, you and I and everybody

15   goes home.  That witness usually has to remain

16   in the community with that person, either

17   themselves or their family?

18           A.    Their family, their friends, gang

19   members, whoever, and those are the people that

20   are usually, as we say, stepping on them.

21           Q.    And did you respond to a homicide

22   in the early morning hours of 10/16 of '08?

23           A.    Yes, sir.

24           Q.    And my understanding is that the

25   homicide occurred shortly after one in the

morning.  Do you know how long it took you to
get to the scene?

A.     About 20 to 25 minutes.  Once we
were there, I think approximately at 1:25.

Q.     Who did you respond to?

A.     My partner at the time, Detective
Jeff Schare.

Q.     And were you and Detective Schare
the lead investigators on what turned out to be
the Brian Austin homicide?

A.     Yes, we were.

Q.     What did you do first at the scene?
I want you to describe for the jury for us.

A.     We arrived, we parked our car near
Vine at Elder, walked down to the scene and was
met with some of the initial responding
officers, the uniformed guys, they were there
with some of our sergeants and criminalists.

        Once they arrived, we initially
walked through noticing physical evidence in the
crime scene area.  Also the victim's body across
the street was still present at the scene and
just generally took notes on the scene and the
victim.

Q.     Why doesn't -- why is it important,

1    Detective Ballman, for a homicide investigator,

2    for you to go to a criminal scene instead of

3    just looking at photos later on?

4             A.    It's kind of an organic process.

5    You're actually -- humans see it three

6    dimension.  You actually are on this scene and

7    it kind of brands your memory a little bit

8    better that you're there, your seeing the shell

9    casings lie, you're seeing where the body is,

10   you're seeing blood spatter.  So it's just --

11   pictures doesn't always give you the best or

12   truest experience.

13            Q.    Okay.

14            A.    You can document with them, but --

15            Q.    Okay.  And did you see the body of

16   Brian Austin there at the scene?

17            A.    Yes, I did.

18            Q.    And then a homicide, where fire has

19   done everything they can to save an individual's

20   life, is the body left then on the scene, at the

21   scene in the condition that it's in at the time

22   that the police would respond?

23            A.    Not always left in the condition.

24   Sometimes fire will move the body in attempts to

25   rescue them or render a -- and I think that was

1  the case in this situation.  The way we found

2  the body on his back was after fire had worked

3  on him because he was originally, I'm told,

4  found on his left side.

5      Q.    Other than maybe trying to put pads

6  on him or do something to save his life at the

7  scene, cut his shirt open or something like

8  that, the general area would be the same?

9      A.    Yes, sir.

10     Q.    And then that's documented for

11 homicide and photos are taken and so forth?

12     A.    Yes, sir.

13     Q.    Did you see any civilian people

14 hanging around or in the area?

15     A.    There was quite a bit of civilian

16 people coming down.  We had a little bit of a

17 crowd gathering towards Vine Street at Elder.

18     Q.    And did somebody catch your eye at

19 the scene, Detective Ballman?

20     A.    Originally, after I had viewed the

21 scene, taken my preliminary notes, I was walking

22 back toward the area of Vine Street just to

23 interview persons in the group or crowd.  We had

24 information that there was a woman wearing a

25 tye-dyed shirt and flower pants that may have

1    seen the incident, and I was attempting to

2    locate her at the time.

3         Q.    And what, if anything, unusual did

4    you see when?

5         A.    I did find the woman.  She was very

6    uncooperative.  She was absolutely kind of upset

7    that she talked to a police officer in front of

8    the crowd, like I was singling her out.

9         Q.    Did you ever see anybody that you

10   felt was in a confrontation with another

11   individual?

12        A.    Yes, I did.  There was a young man

13   I also attempted to talk to along the side of

14   the building, on the north side, and he didn't

15   want to speak to me either.

16              As I crossed the street to speak to

17   the other side on the south side of the group

18   where I believe the woman was, she didn't want

19   to talk.  I was heading back down to go on the

20   scene when across the radio an officer reported

21   that he had a subject that might be involved in

22   the incident, or was a witness to the incident,

23   and they were up by the bank or the credit union

24   which was on Vine Street right at the top of

25   Elder where Elder dead ends.

1          So I walked down there and two

2    individuals, one Victor Davis and another one

3    was identified as Shawn Gilbert.

4          Q.    And did you know Victor Davis

5    before this, Detective Ballman?

6          A.    No, I did not.

7          Q.    Was he a larger man with

8    dreadlocks?

9          A.    Yes.

10         Q.    And did you know Shawn Gilbert

11   before this at all?

12         A.    No.

13         Q.    What drew your attention to Mr.

14   Gilbert and Mr. Davis?

15         A.    I believe Mr. Gilbert was trying to

16   influence Mr. Davis to not cooperate with the

17   police.  So I had, just to kind of intimidate

18   him, I had the officer get his information, and

19   then I had Mr. Davis placed in the police car

20   and asked that he be transported to CIS.

21         Q.    In your training, background and

22   experience, Detective Ballman, what made you --

23   what lead you to the opinion that you just told

24   the jury, that Shawn Gilbert was trying to

25   influence or intimidate Mr. Davis?

1       A.    It's not uncommon at our scenes to

2   have somebody who doesn't necessarily have to be

3   involved, but he's just generally there working

4   as kind of a cooler, and that's what I kind of

5   felt at the time he was doing is just kind of,

6   you know, don't snitch, you know, keep your

7   mouth shut, just kind of intimidating him.

8            I didn't know at that particular

9   moment what any of their connection was, what

10  was going on, other than the fact that the

11  officer reporting that Mr. Davis was a possible

12  witness or involved in the incident.

13      Q.    And in relation to where the body

14  was, it was on Elder Street, is that correct,

15  Detective Ballman?

16      A.    Yes, it was in front of 19 Elder

17  Street on the outside.

18      Q.    And where would the body of Brian

19  Austin be in relationship to the corner of

20  Republic and Elder?

21      A.     Probably half a block, if that,

22  from the corner of Republic and Elder.  The

23  corner of Republic and Elder would have been

24  east of the body.

25      Q.    Across the street and a little bit

further up?

   A.    Yes.

   Q.    And did you get Shawn Gilbert's
name then, Detective Ballman?

   A.    Yeah, I just -- I just got it in
passing.

   Q.    And Victor Davis was put in a
uniform police officer's car?

   A.    And transported to CIS.

   Q.    And did you eventually speak to
Victor Davis at your headquarters downtown?

   A.    Yes, we did.

   Q.    And could you describe the
interview process for the jury of Mr. Davis?

   A.    We brought him in and interviewed
him.  Generally asked him if he needs any water
or anything to eat, things like that, try to
make him as comfortable as possible.  And then
we began to talk to him about what his
involvement may or may not have been in the
incident.

   Q.    And did he give a statement to you
about what he saw?

   A.    Yes, he did.  He said that he had
been there with the victim, Brian Austin, that

1  an individual had come around the corner, placed

2  a gun to Brian's head, pulled the trigger.  It

3  didn't go off when he came around the corner, he

4  said something to the effect of, you know,

5  you're going to have to give me something, and

6  then he says the gun didn't work, Mr. Davis then

7  says he takes off fleeing.

8         The individual put the gun into

9  action, shoots Brian in the chest and then

10  continues to chase him across the street firing

11  at him.  As he's fleeing from the north side to

12  the south side of the street, Victor Davis says

13  he looped around, ran around a car, ran towards

14  Vine Street, looped around and came back to

15  where Brian had fallen and they had called 911.

16      Q.    Did Mr. Davis indicate to you,

17  Detective Ballman, that prior to the shooting

18  there was some interplay between Mr. Austin and

19  the shooter that involved Mr. Austin hitting or

20  striking the shooter with a meatball sub?

21      A.    Actually, that was in the next

22  interview.  He just kind of -- we kind of

23  started hitting him on who the guy was, we felt

24  like he might know who the shooter was, and he

25  was a little bit misleading at first.  He was

telling us he was a young guy, under 25.  And he
could describe the gun, and the gun was in his
right hand, but he was really being kind of
evasive that evening, and we kind of felt like
he was intimidated and wasn't going to kind of
tell us everything.

     Q.    Did you feel that he really knew
the identity of the shooter of Mr. Austin?

     A.    Yes, we did.

     Q.    But he indicated that he didn't
know who it was at all?

     A.    Yes, he described him as a young
guy.

     Q.    But did not know him?

     A.    He said he might be able to
identify him later.

     Q.    Okay.  He was at that point the
only known eyewitness to the death of Mr.
Austin.  Nobody else came forward at all; is
that correct?

     A.    That's correct.

     Q.    And during the whole course of your
investigation of all the people at the scene,
hanging out that morning, present there, upset,
basically all the hangers on, nobody ever came

1  forward to say they saw one thing other than

2  Mr. Davis?

3         A.    That is correct.

4         Q.    And when he told you, Mr. Davis,

5  that your feeling that he was reluctant or

6  didn't really want to say what happened, was

7  that unusual, if at all?

8         A.    No.  It occurs several -- quite

9  frequently in homicide cases.

10        Q.    Why it is not unusual, Detective

11 Ballman?

12        A.    Just people are frightened or

13 intimidated and they don't want to be the one

14 that has to put the finger on a murderer, and

15 they don't went to have to come to court, and

16 they don't want to have to be branded a snitch

17 or all kinds of reasons.

18        Q.    And did you give Mr. Davis your

19 business card, Detective Ballman?

20        A.    Yes, I did.

21        Q.    And that has your name, you are

22 homicide and your phone number?

23        A.    Yes, sir.

24        Q.    And between the 16th of October,

25 which would be the date Mr. Austin was murdered,

1  and the next day or two, was information

2  developed that Kareem Gilbert or Little Red was

3  the shooter?

4      A.    Yes.

5      Q.    And was a photo spread put together

6  with Kareem Gilbert in this photo spread?

7      A.    Yes, my partner, Jeff Schare,

8  contacted the Hamilton County Juvenile Court

9  System and they constructed a photo lineup for

10  us.

11      Q.    And at some point did you and

12  Detective Schare receive a call about Victor

13  Davis on 10/18 of '08?

14      A.    Yes.  Ron Avant is a detective that

15  works as a polygrapher in our office, and he

16  called Detective Schare and said he was a high

17  school friend of Victor Davis, and that Victor

18  Davis had contacted him and told him that he

19  didn't tell the police the complete truth, and

20  that Ron had talked to him, and that he wanted

21  to come back in and tell us what had happened.

22      Q.    So moving then to just a couple

23  days later, on October 18th, did you have

24  another interview with Mr. Davis?

25      A.    Mr. Davis came in that afternoon

1  sometime after 4:00, I believe, and we

2  re-interviewed him.

3      Q.    And during that second interview of

4  Mr. Davis, Victor Davis, did he indicate to you

5  that he knew who the shooter of his friend was?

6      A.    Yes, he did.

7      Q.    And who did he say it was?

8      A.    Well, we kind of generally went

9  through the incident.  At that point Detective

10  Schare read him the witness -- the thing we read

11  for photo lineups, and he went through the

12  lineup and he picked out Number 1 and said that

13  was Little Red, the person that had murdered or

14  shot Brian Austin.

15      Q.    And Little Red, the person he

16  picked out, did that turn out to be Kareem

17  Gilbert?

18      A.    That was the photo of Kareem

19  Gilbert.

20      Q.    Did he just know him by Little Red?

21      A.    Yeah, pretty much so because that's

22  how he referred to him, but it turns out that

23  they were very well acquainted.  They are next

24  door neighbors.  They basically -- Mr. Davis's

25  sister stayed in the apartment building, same

1  apartment building or nearby apartment building

2  as Mr. Davis's sister who he was staying with.

3      Q.    Are you familiar with where this

4  apartment building is, Detective Ballman?

5      A.    At the corner of Republic and

6  Elder.

7      Q.    What's the -- we went on a jury

8  view a couple days ago, actually yesterday I

9  guess, and we viewed a couple spots on Elder

10 Street, and then we just walked around the

11 corner, there is a vacant lot and there is an

12 apartment building, I believe, 1802, 1804?

13     A.    1802 is across street from the --

14     Q.    Is that where Mr. Davis lived?

15     A.    Yes.

16     Q.    Is that the same building or area

17 that Kareem Gilbert and Kareem Gilbert's mother

18 lived at?

19     A.    Yes.

20     Q.    And also Davis's sister?

21     A.    Yes.

22     Q.    So the suspect that he named in the

23 Austin shooting stayed in the same building as

24 the witness?

25     A.    Yes.

1          Q.      What did you do next at the scene,

2    Detective Ballman?

3          A.      At the scene?

4          Q.      I'm sorry.  After you identified

5    Mr. Gilbert, Kareem, Little Red as the shooter,

6    were murder warrants put out for Kareem Gilbert?

7          A.      Yes.

8          Q.      And that would be on or about

9    October 18th of 2008?

10         A.      Yes.  My partner conferred with the

11   prosecutor's office, and once we had done that

12   we went ahead signed the murder warrants based

13   on Mr. Davis's identification.

14         Q.      After October 18th, did you or

15   other detectives or other people try to look for

16   Kareem Gilbert to try to arrest him for the

17   murder of Brian Austin?

18         A.      Yes.

19         Q.      And what were the results of that

20   search?

21         A.      SOFAST was sent out, that's a kind

22   of a fugitive apprehension team.  They had tried

23   to locate him several times at his mother's.

24   It's at 1802 Republic, a couple times at his

25   father's address on Hearne.  We received rumors

that he had gone to New York to be with an
uncle, basically the family shipped him out of
state, which later turned out not to be true.
And I believe he was essentially picked up at a
relative's address somewhere on the west side of
town.

Q.    And then he was eventually caught
on December 31st of 2008?

A.    Yes, sir.

Q.    And during this time, my
understanding, Detective Ballman, that a white
t-shirt was located at the crime scene?

A.    Yes.  And that became very
significant in the case.  We collected as part
of the crime scene at the time it had pizza
sauce or spaghetti sauce or some sort of red
sauce on the shirt.

Q.    Yeah, that's relevant, because I
interrupted before when I was talking about
Davis's interview about what had preceded the
shooting.

A.    Once Victor Davis had identified
Kareem as the shooter, he went into more detail
on what happened that evening.  He and Brian
Austin had hooked up maybe around 12:30 that

night.  They had driven over to Subway in lower
Fairmount that's part of a BP Station, bought
some food and drink and come back to Elder
Street to just sit and talk in front of the
store and eat their sandwiches and drink their
drinks.

Mr. Davis told us that Little Red
appeared and began to harass Brian Austin,
putting his hands into his neck or something.
And at that time Brian Austin had pushed Little
Red and hit him upside the head with his
meatball or his hoagy sandwich.

At that point Little Red left the
scene momentarily and returned with a black
handgun, put it up to Brian Austin's head.  He
told us Brian Austin made some statement that
basically don't do this.  He pulled the trigger,
it clicked, he worked the action again, put the
gun back into action and fired and shot Brian in
the chest.

At that time Mr. Austin, according
to Mr. Davis's statement picks up -- it's before
he's running across the street as Mr. Gilbert is
repeatedly firing at him.  Mr. Davis says he
runs behind a Cadillac Escalade or larger

1  vehicle like a Cadillac SUV and flees toward

2  Vine Street, but then the story is the same, he

3  returns to aide Brian and he calls 911.

4        Q.    And going back to the crime scene,

5  did it turn out later on in the investigation

6  that this t-shirt was collected and DNA was done

7  and it was Kareem Gilbert's DNA on a white

8  t-shirt that was lifted at the scene?

9        A.    Yes.

10       Q.    And that t-shirt also had red

11 sauce, that would be consistent with a sub that

12 was being used at the time?

13       A.    Yes.

14       Q.    Now, as far as Victor Davis, did

15 you become aware between October 18th of 2008

16 and the date of his death, October 31st, that

17 anything was done to try to help him get away

18 from that area?

19       A.    Yes.  When he came in on the second

20 interview on the 18th, he was very emphatic that

21 his and his sister needed some sort of

22 protection.  We assured him -- unfortunately, we

23 were working nights at the time, and that is a

24 little bit of a handicap for us, because a lot

25 of our facilitators, a lot of our, you know,

1    like our victim advocate works during the

2    daytime, so we have a little bit of a delay in

3    how we can get in touch with them.

4                But we assured Victor Davis that we

5    would get in touch with our victim's advocate

6    and try to have him and his sister moved from

7    that location to a more safe location.

8        Q.    And do you know if your victim

9    advocate ever met with Mr. Davis?

10       A.    No.  At one point he kind of

11   refused to be moved at that point which was a

12   little bit strange.

13       Q.    Do you know why he refused to be

14   moved?

15       A.    I do not, but he was emphatic

16   taking his sister, protecting her, so I think

17   that was his motivation at the time.  He was

18   afraid that if he left, or if he didn't stay at

19   the residence on Elder, or excuse me on

20   Republic, that they, Kareem's family or Kareem,

21   may try to get to him through his sister.

22       Q.    Were you involved at all in the

23   investigation in the death of Victor Davis,

24   Detective Ballman?

25       A.    Just peripherally because it was

involved with my Brian Austin case.  Victor
Davis again was my eyewitness.

Q.    And Detective Luke and Detective
McGuffey were the primary investigators at
Victor Davis's homicide.

A.    Yes.

Q.    And are you aware that when the
body of Victor Davis was found in the street
right in front of his apartment building, your
card was on his body?

A.    Yes.

MR. TIEGER:  Just one moment,
Judge.  No further questions, Judge.

MR. WHALEN:  Judge, can we approach
at sidebar for a moment?

(Unreported sidebar conference.)

THE COURT:  We are going to take a
comfort break for all of us.  And so,
ladies and gentlemen of the jury, you
must remember the admonitions I gave you
not to begin to discuss this case.  You
have heard that several times now, and
you may break.  And if you do believe you
do have to come back at three, you need
to be back in your seats at 3:15.  It is

now 3:00.  3:15 in your seat.  And Scott
needs to collect the notes, please.  We
have to figure out a system for all that.
Can you put your juror number on there?
Do you all know your numbers?  Scott can
help you identify yourself by number.

Number 1 is Greg Obst, Number 2 is
Lena McKinney, 3, Beverly Messerschmitt,
4 is Sherri Kemper, 5 is Scott Shelton, 6
is Brian Fitzgerald, 7 is Edward Cisko,
8 -- wait a minute.  I'm not sure if that
name was correct.  Edward Cisko.  Eight
Sally Coffman, 9 David Burck, 10 Jessie
Ricketts, 11 Christine Bessey, 12 Michael
Burke and alternate one is Gary Drury.
Alternate two Edward Korb and alternate
three, Erika Kellogg.

So remember your number and put
that on the note taking and we are
excused.  Officer, you are also excused.

THE WITNESS:  Thank you, ma'am.

THE COURT:  And come back, it looks
like now 3:20.

(The Jury leaving the courtroom at
3:05 p.m.)

1           (Recess.)

2           (The jury entering the courtroom at

3      3:25 p.m.)

4           THE COURT:  All right.  You may be

5      seated, and I believe we are ready for

6      cross.  Counsel, you ready?

7           MS. WILLIAMS:  Yes.

8           THE COURT:  Cross?

9               CROSS-EXAMINATION

10  BY MS. WILLIAMS:

11      Q.   Detective Ballman, you said that

12  you had heard of a heated discussion between Mr.

13  Davis and another individual from officers that

14  had been on the scene?

15      A.   When I arrived up there, the

16  officer had called that he had somebody

17  involved.  When I got up there, it appeared that

18  Mr. Davis was being intimidated by the other

19  individual known as Shawn Gilbert.

20      Q.   Okay.  You actually saw this then

21  yourself?

22      A.   Yes.

23      Q.   Okay.  And at that time did he know

24  of Shawn Gilbert as Kareem Gilbert's brother?

25      A.   Didn't even have the name Kareem

1    Gilbert.  Didn't have any idea of what Shawn

2    Gilbert's connection was to this incident.

3          Q.    Okay.  When did you learn that

4    information?

5          A.    The following day when we received

6    a tip that Kareem Gilbert was our shooter, and

7    at that point the name Gilbert that I had spoke

8    to was Shawn Gilbert at the scene was now

9    relevant.

10          Q.    Okay.  Did anybody ever look for

11    Shawn Gilbert after that -- after you had

12    learned he was related to Kareem?

13          A.    Yes.

14          Q.    Was he interviewed?

15          A.    Yes.

16          Q.    Or questioned?

17          A.    Yes, he was.

18          Q.    And did he identify anyone as part

19    of that crime?

20          A.    He denied being involved, any of

21    his family members being involved and/or being

22    involved in Davis's homicide.

23          Q.    When you interviewed Mr. Davis on

24    October 16, 2008, you had stated that he was

25    fearful for his life, correct?

1          A.     He was nervous, he was worried
2   about being brought down to the station, yes, he
3   was fearful.
4          Q.     Did he make any statements to you
5   about having been homeless?
6          A.     Yes.
7          Q.     What did he mean when -- or what
8   statements did he make?
9          A.     He just told us -- when we asked
10  for his address, he told us he was homeless.
11         Q.     And he wasn't homeless at this
12  time, you're meaning from a prior time, correct?
13         A.     At the time I took that as he was
14  stating he was homeless at that time.
15         Q.     Did he make a statement to you, "I
16  should have stayed homeless"?
17         A.     I don't recall, ma'am.
18         Q.     I can show you the transcript if
19  that would refresh your memory.
20         A.     That would be fine.
21         Q.     Line ten, if you could just read
22  that out loud what Mr. Davis stated?
23         A.     Starting at Line ten?
24         Q.     Yes.
25         A.     Do I need to read the predecessor

1  or just --

2       Q.    You can just read what they say?

3       A.    It says I should have -- I should

4  have stayed homeless.

5       Q.    Do you know what he meant by that?

6       A.    No.

7       Q.    Okay.  Detective, you stated that

8  you had interviewed Kareem Gilbert on

9  December 31st --

10       A.    Yes.

11       Q.    -- of 2008.  When you were

12  interviewing him, did he ever state whether he

13  owned or had ever used a firearm?

14       A.    I don't recall, ma'am.

15       Q.    Okay.  Again, I'll refresh your

16  memory here.  If you could read that out loud.

17       A.    Starting line 20, or --

18       Q.    I believe it's 21.

19       A.    Okay.  He says:  I sell crack, but

20  I ain't never thought about doing that and

21  killing nobody, Bro.  I just put this on my

22  life, Bro.  I ain't about trying to come in,

23  come on, man.  It's somebody's life, man.  Is

24  that what you needed read?

25       Q.    Yes, that one and also Line 21

right here.

    A.    Okay.  It says:  Oh, you're all clowning, Bro.  I ain't never touched a gun.

    Q.    Thank you.  And, again, Detective, who made those statements?

    A.    Kareem Gilbert.

    Q.    So Mr. Gilbert said I ain't never touched a gun, correct?

    A.    According to the transcripts, yes, ma'am.

    Q.    And he stated I sell crack, but I ain't never thought of killing nobody?

    A.    Yes, ma'am.

    Q.    But then you are aware he later confessed to that murder, correct?

    A.    Yes.

    Q.    And is now serving time?

    A.    Yes.

    Q.    So he was not truthful when he was speaking to you?

    A.    No, the first interview he completely denied involvement.

    MS. WILLIAMS:  No further questions.  Thank you.

    THE COURT:  Anything else from the

1          prosecution?

2                    MR. TIEGER:  No, Your Honor.

3                    THE COURT:  Thank you, Officer.

4          You may step down also.

5                    THE WITNESS:  Thank you, ma'am.

6                    THE COURT:  Counsel, you want mim

7          to remain?

8                    MR. TIEGER:  No, Judge.

9                    THE COURT:  I said counsels, you

10         want him to remain?

11                   MR. WHALEN:  No, we do not.

12                   THE COURT:  Okay.  Thank you.

13         Officer, you are released.

14                   (Witness excused.)

15                   MS. SHANAHAN:  The State will call

16         Sergeant Jeffrey Hunt.

17                   THE COURT:  Officer, please stand

18         and raise your right hand to be sworn.

19                   SERGEANT JEFFREY HUNT,

20    having been first duly sworn, was examined and

21    testified as follows:

22                   THE COURT:  Have a seat there.

23                     DIRECT EXAMINATION

24    BY MS. SHANAHAN:

25         Q.    Detective, please state your name

1　and spell your last name for the record.

2　　　　A.　　My name is Jeff Hunt.  Last name

3　spelled H-U-N-T.

4　　　　Q.　　And I apologize.  It's Sergeant

5　Hunt, correct?

6　　　　A.　　It is.

7　　　　Q.　　Okay.  Sergeant, how are you

8　employed?

9　　　　A.　　I'm employed by the Cincinnati

10　Police Department, and I'm presently assigned to

11　the Southern Ohio Fugitive Apprehension Strike

12　Team.

13　　　　Q.　　How long have you been with the

14　Cincinnati Police Department?

15　　　　A.　　Thirty years.

16　　　　Q.　　During that time you have basically

17　held pretty much every position that there is in

18　the police department up to being in the SOFAST

19　Unit?

20　　　　A.　　I've had a varied career, yes,

21　ma'am.

22　　　　Q.　　How long have you been with SOFAST?

23　　　　A.　　Since its inception, which was in

24　May of '06.

25　　　　Q.　　And when I'm referencing SOFAST,

1  that's what the common lingo is for the Southern

2  Ohio Fugitive Task Force, correct?

3      A.    Yes, it is.

4      Q.    And what exactly do you do?

5      A.    It's a multi-task force with the

6  United States Marshall service, basically we go

7  out and look for wanted fugitives.

8      Q.    Okay.

9      A.    Focusing on those most violent

10 felonies, first, second and third degree.

11     Q.    Okay.  Were you called upon by the

12 Cincinnati Police Department to locate a Kareem

13 Gilbert in late 2008?

14     A.    Yes, I was.

15     Q.    Okay.  Tell us about your

16 involvement in this case, please.

17     A.    I was contacted by our Homicide

18 Unit who indicated there was signed warrants on

19 Kareem Gilbert for murder and asked us to start

20 looking for him.

21     Q.    Okay.  Did they provide you a

22 description of Kareem and photographs of him?

23     A.    They did.

24     Q.    Okay.

25     A.    Yes.

1          Q.     What did you first do to go search

2    for Kareem Gilbert?

3          A.     Well, we started our own background

4    investigation, tried to find addresses, verified

5    addresses of family members, that kind of thing,

6    and we focused on his family's residence down on

7    Republic Street.

8          Q.     Is that the common protocol in a

9    situation like this where you're dealing with a

10   juvenile and you need to find where they might

11   be?

12         A.     Yes.  We focus mostly on felonies,

13   that's our best contact for younger persons,

14   juveniles especially.

15         Q.     Okay.  So what did you first do

16   with this case then?

17         A.     We went to the family residence at

18   I believe it's 1806 Republic Street and went up

19   and knocked on the door and asked if we could

20   come inside and spoke to Kareem's mother and

21   other family members.

22         Q.     Okay.  Did you let them know why

23   you were looking for Kareem?

24         A.     We did.

25         Q.     Okay.  What is it that you told

1  them, the reason?

2      A.    I spoke to his mother, his

3  stepfather was also there.  We told them that he

4  were looking for him for a homicide.

5      Q.    Okay.  And was Kareem present at

6  the home at that time?

7      A.    He was not.

8      Q.    Were they able to give you any

9  information about where he might be?

10      A.    No.

11      Q.    Were they willing to give you any

12  information about where he might be?

13      A.    They provided us with no useful

14  information.  They indicated that he had been

15  staying there and they had not seen him for some

16  time and really had no idea where he would go,

17  close friends, girlfriends, other family

18  members.

19      Q.    They did not know any of that

20  information?

21      A.    They did not.

22      Q.    Okay.  What did you do then?

23      A.    Well, the information we kept

24  receiving was that it was focused down in that

25  area.  We continued to check the addresses we

1    had, we tried to locate a father's address, at

2    that time it was Concord, and found out that was

3    a bad address.

4            The CrimeStopper tips that came in

5    indicated that Kareem was down in the Republic

6    area constantly and basically all -- the only

7    thing we could do is continue to check that

8    area, drive around the area as frequently as

9    possible.  And we went back to the family

10   address on several different occasions.

11       Q.    Okay.  And you did regularly patrol

12   that area looking for Kareem?

13       A.    We did.

14       Q.    And when you went back to the

15   family address, the 1806 address on Republic,

16   did you locate anything on those other

17   occasions?

18       A.    No.  On several different times we

19   went in, they allowed us to go in and search the

20   residence.  One time we found it completely

21   unlocked and open and nobody home.  One time I

22   saw his mother walking in the neighborhood.  We

23   tried to do surveillance on her, and then she

24   came back around the block and I spoke with her

25   for about 20 minutes.

Q.   Okay.   Ultimately were you able

ever to locate the father of Kareem Gilbert?

A.   Yes.

Q.   And who is that person?

A.   Ruben Jordan.

Q.   Do you see that person in the

courtroom?

A.   Yes, it's the gentleman sitting at

defense table in the brownish striped shirt.

MS. SHANAHAN:  Your Honor, may the

record reflect identification of the

defendant?

THE COURT:  Stipulated, Counsel.

MR. WHALEN:  We'll stipulate that,

Your Honor.

THE COURT:  All right.  Thank you.

Q.   Detective, what happened when you

located Ruben Jordan?

A.   We went up and talked to Mr.

Jordan.  He allowed us in the residence.  He

allowed us to go and search for Kareem.  Kareem

was not home.  We had some conversations.  Mr.

Jordan told me that Kareem had, in fact, been

staying there for a little while and that Kareem

was frightened, and they were trying to work out

1  an arrangement for an attorney, and Mr. Jordan

2  left to go get an attorney.  While he was gone,

3  Kareem left and he had no idea where he went.

4      Q.    Okay.  Ultimately, did you receive

5  information about Kareem's activities down

6  around Republic Street around his mother's home?

7      A.    Yes.

8      Q.    Okay.  And what did you do with

9  that information?

10      A.    Obtained some information from a

11  confidential source that indicated they had

12  regularly met with Kareem to purchase narcotics

13  from him.  I believe it was heroin.  They said

14  Kareem was his regular heroin supplier.

15      Q.    Uh-huh.

16      A.    He described the location that he

17  would always meet Kareem at.  He had a phone

18  number for Kareem.  We tried to do some

19  background on the information on the phone

20  number on that subject.  Finally we were able to

21  set up a controlled meeting to purchase some

22  drugs.

23      Q.    And were you able to apprehend

24  Kareem at that time?

25      A.    We did.  On December 31st, the

1   source arranged a meeting with Kareem on Beekman

2   Street and was able to provide us with a

3   description of what he was wearing.  Had

4   numerous officers in the area to stop Kareem as

5   he's walking down the sidewalk.

6       Q.    And this was December 31st of 2008?

7       A.    Yes, it was.

8       Q.    Okay.  Backing up to your contact

9   with the defendant, Ruben Jordan, did he know

10  what his son was charged with?

11      A.    Yes.

12      Q.    Okay.

13      A.    Because he said he was going to try

14  to get him an attorney, and he knew it was for a

15  homicide.

16          MR. TIEGER:  Okay.  Thank you.

17      Nothing further.

18                CROSS-EXAMINATION

19  BY MR. WHALEN:

20      Q.    Officer, when you talked to Mr.

21  Jordan, he told you he was trying to get his son

22  an attorney.  Did he also tell you that with the

23  attorney they hoped to turn his son in?

24      A.    Yes.

25          MR. WHALEN:  Okay.  I have nothing

1     else.

2          THE COURT:  Thank you, Officer.

3     Anything further?

4          MS. SHANAHAN:  No, ma'am.

5          (Witness excused.)

6          MS. SHANAHAN:  Would you like me --

7     I didn't know the time constraints.

8          THE COURT:  If you can, if you want

9     him to stay, he has to stay.  Released,

10    he may be released.

11         MR. TIEGER:  It's fine that he's

12    released, Judge, we have another witness

13    in the hallway.

14         MR. WHALEN:  We have no objection.

15         THE COURT:  All right.  Thank you,

16    Officer.  You are released.  Thank you

17    for your testimony.

18         (Witness excused.)

19         MR. TIEGER:  State will call Victor

20    Davis, Jr.

21         THE COURT:  All right.  Sir, please

22    step forward and raise your right hand to

23    be sworn.

24          VICTOR DAVIS, JR.,

25  having been first duly sworn, was examined and

testified as follows:

        THE COURT:  Have seat in this chair
and turn it around to kind of face the
front.

        THE WITNESS:  Okay.

        DIRECT EXAMINATION

BY MS. SHANAHAN:

    Q.    Sir, would you please state your
name for the record?

    A.    Victor Warren Davis, Jr.

    Q.    Okay.  And, Mr. Davis, do you know
a person by the name of Ruben Jordan?

    A.    Yes.

    Q.    How do you know him?

    A.    From the neighborhood, and I used
to talk to his daughter-in-law.

    Q.    Okay.

    A.    His stepdaughter.

    Q.    His stepdaughter.  I'm going to ask
you to take that microphone and just pull it
over towards you.  It moves around and stuff.
Okay.  Just it's hard in this room for everybody
to hear.

        THE COURT:  I can turn the volume
up a little bit.

1          MS. SHANAHAN:  Thank you, Your

2     Honor.

3          Q.    Sir, it sounds like a silly

4     question, but are you related to the victim,

5     Victor Davis, Sr. in this case?

6          A.    Yes, ma'am, that was my father.

7          Q.    Okay.  And how old are you?

8          A.    About 22.

9          Q.    And do you have any siblings, any

10    brothers or sister?

11         A.    Yes, I do.

12         Q.    How many?

13         A.    Two brothers and two sisters.

14         Q.    Okay.  And are you in regular

15    contact with your brothers and sisters?

16         A.    Yes, ma'am.

17         Q.    Do they live here in town?

18         A.    Yes, ma'am.

19         Q.    Okay.  And how about your mom?

20         A.    I talk to her every day.

21         Q.    Every day.  Okay.  Were you living

22    with your mother, or were you living on your

23    own?

24         A.    With my mother, back and forth.

25         Q.    Back and forth.  Okay.  Now, what

 1   about your dad?  Tell us a little bit about him.
 2   What kind of man was he?
 3        A.    A very humble man, and he gave his
 4   last to the neighborhood.  He would like bend
 5   over backwards for everybody, more than he do
 6   his kid.
 7        Q.    When you say "the neighborhood,"
 8   what did he consider his neighborhood?
 9        A.    The downtown Avondale area, like
10   wherever he lay his head at, people is welcome.
11        Q.    Did he spend some time in the
12   military?
13        A.    Yes, he did.
14        Q.    What branch of the military?
15        A.    The Army.
16        Q.    Okay.  And do you know about how
17   long he was there?
18        A.    No, I don't.
19        Q.    Okay.  Do you know if he fought in
20   any wars?
21        A.    Desert Storm.
22        Q.    Okay.  Was he also in Panama?
23        A.    Panama?
24        Q.    Do you know?
25        A.    I don't know.

1    Q.    Okay.  Did your father talk to you

2  about those traumatic issues that he had after

3  the war?

4    A.    Yes.

5    Q.    Okay.  Tell us a little bit about

6  that.

7    A.    He was just telling me like he

8  would wake up some nights in a cold sweat, just

9  have awful memories and just thinking about

10  things he went through.

11    Q.    And yet dealing with all of that he

12  was still a constance presence in the community

13  of helping people out?

14    A.    Yes.

15    Q.    Okay.  And did you ever have any

16  contact with him?  Did you ever have regular

17  contact with your dad?

18    A.    Yes, ma'am.

19    Q.    How often do you think you talked

20  to him?

21    A.    Every day.  I'm a junior.

22    Q.    You're his junior?

23    A.    Every day.

24    Q.    Did he have a cell phone or a home

25  phone or --

1          A.    Cell phone, house phone.  I'm

2     making contact with my father.

3          Q.    Okay.  Did you see each other a

4     lot, spend time together?

5          A.    Yes, ma'am.

6          Q.    Okay.  How about with your sisters

7     and brothers and mom, did they have contact with

8     your dad pretty regularly?

9          A.    Yes, my dad would make sure he see

10    his kids.  Like he would go to the limit to see

11    his kids.

12         Q.    Okay.  Now, did you learn that your

13    father was the witness to a murder?

14         A.    Yes, I did.  He called me the same

15    exact night.

16         Q.    He called you the night it happened

17    and told you?

18         A.    Yes, ma'am.

19         Q.    What did he tell you?

20         A.    He told me exactly what happened,

21    exactly who did it.  He sent me pictures and

22    everything and told me if don't nobody else in

23    the family know him, I do, because I spend more

24    time down there with him.

25         Q.    Meaning you spend more time down

1  there with him?

2      A.    Yes.

3      Q.    So you knew the people that he was

4  telling you about?

5      A.    Yes.

6      Q.    And who were those people?

7      A.    Kareem, they call him Little Red,

8  and Shawn, his brother Shawn, and a couple other

9  people.

10      Q.    Okay.  And the picture that he had

11  sent you, did you recognize those people from

12  the neighborhood?

13      A.    Immediately.  Immediately.

14      Q.    Immediately.  Okay.  Was your

15  father nervous about the fact that he knew who

16  these people were that did this?  He knew who

17  Kareem was?

18      A.    He was nervous because they was too

19  close to him.

20      Q.    Okay.

21      A.    But he knew it was coming.  He knew

22  it.  He knew it.

23      Q.    What do you mean?

24      A.    Like, he made a joke to me one

25  time, and I told him like, don't be mad if I'm

1    dead by the end of the week like.

2        Q.    Okay.  He had accepted this?

3        A.    (Nods affirmatively.)

4        Q.    And I know that this is difficult,

5    and you're nodding your head yes, but the court

6    reporter is taking everything down, so take your

7    time, but try to work with us here.

8            THE COURT:  In other words, you'll

9        have to make a verbal, if you can.

10           THE WITNESS:  Yes, ma'am.

11           THE COURT:  You can say yes or no?

12           THE WITNESS:  Yes.

13           THE COURT:  Rather than just nod

14       your head, if you can verbalize that too.

15           THE WITNESS:  Yes, ma'am.

16       Q.    Did your father tell you that he

17   was in danger down there?

18       A.    Several times.  Several times.

19       Q.    Several times.

20       A.    He had called me right after the

21   murder and told me what had happened, and called

22   me, I think it was like a Wednesday, and told me

23   they had came, had seen him outside and had said

24   a few words to him and that he really ain't feel

25   comfortable.

1       Q.    Okay.  So he knew these people were

2 right in his neighborhood and that he had to see

3 them?

4       A.    They were actually right next door.

5       Q.    Right next door to where he lived?

6       A.    Yes.

7       Q.    Who did he live there with?

8       A.    My aunt.

9       Q.    Okay.  Is that his sister, your

10 dad's sister?

11       A.    His sister and my little cousin,

12 and my little cousin's father.

13       Q.    Okay.  Victor, how long have you

14 known Ruben Jordan?

15       A.    For about a year and a half before

16 it happened.

17       Q.    A year and a half before your

18 father's murder?

19       A.    About two years.

20       Q.    How did you know him?

21       A.    From Avondale and from him running

22 around doing drugs and everything like.

23       Q.    Okay.

24       A.    And I knew him from -- I had knew

25 his stepdaughter.

```
 1          Q.    You hung out with her?
 2          A.    We actually used to kick it for a
 3   little bit.
 4          Q.    Uh-huh.
 5          A.    And like Ruben was a cool guy at
 6   first.  Like he would see me, if he needed
 7   something it come out of my pocket if I got it.
 8   If he ask me for a couple dollars, I got a
 9   dollar or so for you.
10          Q.    Okay.  So you had a decent
11   relationship with Ruben?
12          A.    Uh-huh.  I spoke to him every time
13   I seen him, because I seen him a lot, and he
14   know I talked to his daughter.  He knew it.
15          Q.    Okay.  Another question.  Do you
16   see that person that we are referring to as
17   Ruben Jordan in the courtroom?
18          A.    Right there.
19          Q.    Okay.  What was your relationship
20   like with Ruben Jordan when your father was
21   murdered?
22          A.    After that, it was no more
23   relationship.  I seen him, he keep moving, he
24   wouldn't speak for real, wouldn't say a word
25   other than right before my father got killed, we
```

1  actually had a conversation.

2  　　　　Q.　　Okay.

3  　　　　A.　　After that, this guy wouldn't say

4  nothing to me.  He kept moving every time he

5  seen me.

6  　　　　Q.　　Okay.

7  　　　　A.　　And he was so I'm sorry, I'm sorry.

8  　　　　Q.　　Well, slow down a minute there.

9  Where was it that you were when he was saying

10 I'm sorry, I'm sorry?

11 　　　　A.　　When he first seen me in the

12 courtroom, because we had came down here to

13 court a couple times before he actually came,

14 and we seen him down here, he basically broke

15 down to me, telling me how sorry he is and that

16 he didn't know that was my father.

17 　　　　Q.　　Did he ask you why you were down

18 here in the courthouse?

19 　　　　A.　　Yes, he did.

20 　　　　Q.　　Okay.  And what did you tell him

21 when he asked you?

22 　　　　A.　　Somebody killed my father, I'm here

23 for my father murder case.

24 　　　　Q.　　And what was his immediate reaction

25 when you told him that?

1      A.    Basically on my shoulder, like I'm

2  sorry, man, I can't tell you no other way, I'm

3  sorry.

4      Q.    Okay.  Why did that strike you --

5  why did that stick with you?

6      A.    Because as a man, even if my child

7  did do it, it's only so much I can say sorry.

8  It's only so much I can speak as.

9      Q.    Okay.  And what did you feel like

10  about how Ruben was expressing himself to you?

11      A.    He basically express like he did.

12      Q.    Okay.

13      A.    Like I'm about to keep apologizing

14  to a man if I didn't do it, like I see him

15  outside of court and that's the first thing he

16  say to me.

17      Q.    Okay.  Did you see him any other

18  time other than in the courthouse?

19      A.    In Avondale almost every day.

20      Q.    Okay.  Backing up to your father

21  and how he was handling the situation as things

22  were heating up down around his neighborhood,

23  did he give you any specific instructions on

24  what he wanted done if something happened to

25  him?

```
 1          A.    My father told me earlier that week
 2   if he was to die he wanted to be in his blue
 3   jeans, his Timberland boots and white t-shirt.
 4          Q.    Okay.  Did he have clothes like
 5   that?
 6          A.    When we went up there, after my
 7   father had passed, in his room he had a brand
 8   new pair of shoes -- a brand new pair of boots,
 9   a t-shirt and some pants, blue jeans, he had the
10   whole outfit laid out, socks and drawers.
11          Q.    He told you he knew it was coming
12   and it did?
13          A.    (Nods affirmatively.)
14          Q.    Did you talk to your father on
15   Halloween night of 2008?
16          A.    Yes, I did.  I had like earlier
17   that night.
18          Q.    Uh-huh.
19          A.    I had talked to him and he asked me
20   did I need some money?  I had told him no.  And
21   then after that, he had told me -- I had told
22   him I was going out.  He told me to stay in the
23   house, because I really don't too much go out on
24   Halloween.  He told me to stay in the house.
25   And as soon as I got off the phone with him, I
```

1  had received a call about a half an hour later.

2      Q.    A half hour later you got a phone

3  call.  Who called you?

4      A.    This girl I knew from downtown.

5  She said I think it's your father down there

6  laying on the ground.

7      Q.    She called you and told you your

8  father had been killed?

9      A.    Yes.

10     Q.    Where were you when that happened?

11     A.    I was in Avondale leaving off of

12 his street.

13     Q.    Leaving off?

14     A.    I was coming right off Hearne, in

15 Avondale.

16     Q.    And you got that phone call?

17     A.    I got the phone call right at the

18 corner there.

19     Q.    What did you do?

20     A.    Just broke down and started crying,

21 man.  There is nothing I can do.

22     Q.    Did you try to go down there at all

23 that night?

24     A.    Yes, I did.  I went straight down

25 there.

1       Q.    And what happened then?

2       A.    I seen my father laying on the

3 ground, and that's the hurt, that's the man I

4 looked up to.  That was my right hand.  I was

5 his junior, he was any senior, like that was my

6 dog.

7       (Witness crying.)

8       MS. SHANAHAN:  Mr. Davis, I know

9       how hard this is for you, and I'm sorry.

10      Nothing further.

11      THE COURT:  All right.  Cross,

12      Counselor?

13       CROSS-EXAMINATION

14 BY MR. WHALEN:

15      Q.    Can you go on, Mr. Davis?

16      A.    (Nods affirmatively.)

17      Q.    Did you have an occasion to go to a

18 funeral home when a friend's parent died?

19      A.    Sir?

20      Q.    Do you ever occasion to go to a

21 funeral home when a friend's parent died?

22      A.    No.

23      Q.    Never have.  Have you ever gone to

24 any funerals?

25      A.    Yes.

```
 1          Q.    For who?
 2          A.    My other -- one of my cousin's
 3    friend, I went for his father.
 4          Q.    And when you saw your good friend,
 5    did you go to him and say, man, I'm sorry?
 6          A.    Huh?
 7          Q.    Please?
 8          A.    Yes, but it's only so much I could
 9    say sorry.
10          Q.    Okay.  Now, when you said you were
11    in court and Ruben Jordan told you he was sorry,
12    what were you in court for?
13          A.    My father's case.
14          Q.    Okay.  And who was the defendant in
15    that case?
16          A.    His son.
17          Q.    Okay.  So when he knows his son is
18    in court for killing your father, he comes up
19    and says to you "I'm sorry," did you think that
20    was unusual?
21          A.    No, but when you break down to
22    another grown man, that is.
23          Q.    Okay.  While you were in court, did
24    you get into a shouting match with Shawn
25    Gilbert?
```

1      A.    No.

2      Q.    Okay.  Did Shawn's mother ever take

3 a restraining order out on you?

4      A.    No.  Not that I know of.  I would

5 have got at least something in the mail.  Not

6 that I know of.

7      Q.    You didn't get anything?

8      A.    Nothing.

9      Q.    Okay.

10      A.    Excuse me --

11            THE COURT:  Actually, there is no

12      question, so at this point there may be

13      another question asked.

14      Q.    Sir, was there an investigation of

15 you being involved with a gun and a shooting?

16      A.    No.

17      Q.    You don't know anything about that?

18      A.    No, I do not.

19      Q.    Okay.  And you never were asked

20 about firing shots at Shawn Gilbert?

21      A.    No, but I know -- all I know is I

22 have a restraining order against him, this guy

23 done pulled guns on me several times.  Every

24 time I see this boy, he reaching for his

25 waistband.  And what he expect, me to keep

running?  He keep -- like I see him at UDF, and he basically sat in his car and followed me to Avondale with a gun on his waist.  I had my two-year-old son in the car with me.

Q.    Now, we are talking about Shawn doing this?

A.    Shawn.

Q.    Okay.

A.    Shawn.

Q.    All right.

A.    And right now, to this day I took my son to daycare in Price Hill.  I look -- my friend had to get my attention, because it was snowing outside, he like, Bro, look, there's somebody right there looking all in the car.  I look up, he takes his hood off and it's Shawn.

Q.    Okay.

A.    And he been doing the same exact think, reaching in his pocket.

MR. WHALEN:  Okay.  Thank you.

MS. SHANAHAN:  Nothing further.

THE COURT:  Thank you, sir, for your testimony.  You may step.  You may step down.

(Witness excused.)

1         MR. TIEGER:  Judge, this may be a

2    logical place to break because the next

3    witness is fairly long, and since we know

4    there are time constraints.

5         THE COURT:  Since it is 4:00, we

6    were going to break at 4:30.  So you

7    object -- this is good time to break.  Do

8    you object to that?

9         MR. WHALEN:  Yes.  Yes.

10         THE COURT:  I'm going to say this

11    to the jurors.  We are going to break for

12    the day.  And we are going to resume

13    tomorrow.  If you'll be here tomorrow at

14    10:00 a.m.

15         Meanwhile, I'll remind you of the

16    admonitions not to speak or to think or

17    to come to any conclusions about this

18    case.  And if you will just leave your --

19    actually we have decided that the logical

20    thing to do is for you to just leave your

21    writing pads on your chairs.  That way

22    you'll also know it's yours and we will

23    also know who they belong to.  Who

24    belongs to what notebook.

25         And with that, we are adjourned for

1       the day.

2               (The jury leaving the courtroom at

3       4:00 p.m.)

4               THE COURT:  Okay.  Counsel, is

5       there anything else before we adjourn for

6       the day?

7               MR. TIEGER:  Did we tell them,

8       Judge, ten?

9               THE COURT:  10:00 a.m.  And that

10      may mean 10:30.

11              MR. TIEGER:  That's fine.

12              THE COURT:  10:00 a.m.

13              MR. TIEGER:  The detectives are out

14      there, so they will take control of it.

15              (Proceedings continued in progress

16      until January 14, 2011.)

17

18

19

20

21

22

23

24

25