COURT OF COMMON PLEAS

HAMILTON COUNTY, OHIO

- - -

STATE OF OHIO,                    :

          Plaintiff.      :

vs.                            :Case Number B1003262

RUBEN JORDAN,                :Appeal Number C1100833

          Defendant.      :Volume IV of X

TRANSCRIPT OF PROCEEDINGS

- - -

APPEARANCES:

     Seth S. Tieger, Esq.
     Megan E. Shanahan, Esq.
          On behalf of the State of Ohio.

     William P. Whalen, Jr., Esq.
     Amy R. Williams, Esq.
          On behalf of the Defendant.


          BE IT REMEMBERED that upon the Jury

Trial of this cause, on January 14, 2011, before

the Honorable NADINE L. ALLEN, a judge of the

said court, the following proceedings were had,

to wit:

OFFICER ANDREW FUSSELMAN
        Direct Examination ...........Page 426, Line 13
        Cross-Examination ............Page 437, Line 10

DEAN SHADE, JR.
        Direct Examination ...........Page 440, Line 18
        Cross-Examination ............Page 458, Line 20
        Redirect Examination .........Page 472, Line 22
        Recross-Examination ..........Page 475, Line 19

PAUL GLINDMEYER
        Direct Examination ...........Page 478, Line 15
        Cross-Examination ............Page 505, Line 6

JOHN HEILE
        Direct Examination ...........Page 515, Line 3
        Cross-Examination ............Page 539, Line 15

WILLIAM HARRY
        Direct Examination ...........Page 545, Line 13
        Cross-Examination ............Page 559, Line 13
        Redirect Examination .........Page 561, Line 14
        Recross-Examination ..........Page 563, Line 6
        Further Redirect Examination .Page 563, Line 22

MONA GRETEL STEPHENS, MD
        Direct Examination ...........Page 567, Line 1
        Cross-Examination ............Page 602, Line 7

1        MORNING SESSION, January 14, 2011

2            THE COURT:  Good morning.  You may

3        be seated.  Everyone, are we ready to

4        bring in the jury or still working on

5        something, Counsel?

6            MR. TIEGER:  Judge, we are ready.

7            MR. WHALEN:  We are ready.

8            THE COURT:  Everyone is ready.  All

9        right.

10           MR. BRENNER:  All rise for the

11       jury.

12           (The jury entering the courtroom at

13       10:20 a.m.)

14           THE COURT:  All right.  You may all

15       be seated.  I believe the State is ready

16       to call the next witness.

17           MR. TIEGER:  Yes, Your Honor.

18           THE COURT:  And that would be?

19           MR. TIEGER:  Dean Shade.

20           THE COURT:  Good morning, ladies

21       and gentlemen, members of the jury.

22           JURORS:  Good morning.

23           THE COURT:  And we would like to

24       welcome back Dee-Dee Mitchell here today,

25       and you'll be in her care and custody

1    today also.

2              BAILIFF:  Thank you for having me,

3         Judge.

4              MR. TIEGER:  Judge, he might be in

5         the restroom.  I'm going to start with

6         Police Officer Fusselman.

7              THE COURT:  That's fine.

8              OFFICER ANDREW FUSSELMAN,

9    having been first duly sworn, was examined and

10   testified as follows:

11             THE COURT:  You may have a seat

12        right here, Officer.

13                  DIRECT EXAMINATION

14   BY MR. TIEGER:

15        Q.    Sir, would you please state your

16   name and spell your last name.

17        A.    Police Officer Andrew Fusselman,

18   F-U-S-S-E-L-M-A-N.

19        Q.    What's your occupation?

20        A.    Patrol officer, District 4.

21        Q.    And is that for the City of

22   Cincinnati Police?

23        A.    Yes.

24        Q.    How long have you been a Cincinnati

25   police officer?

1          A.     Three-and-a-half years.

2          Q.     And you're assigned to District 4

3     right now?

4          A.     Yes.

5          Q.     What area is the District 4 area?

6          A.     It's Mt. Auburn, Avondale, Walnut

7     Hills, Bond Hill, Roselawn.

8          Q.     And are you -- have you also been

9     in District 4?

10          A.     No.

11          Q.     Where did you start out?

12          A.     District 1.

13          Q.     And we have heard, I think, from

14     another officer that's downtown Over-the-Rhine,

15     the West End, Mt. Adams?

16          A.     Correct.

17          Q.     I'm going to direct your attention

18     back to October 16th of 2008, it was around one

19     in the morning or so.  Did you respond to an

20     area near the corner of Republic and Elder?

21          A.     Yes.

22          Q.     And why did you respond to that

23     area?

24          A.     We had a shooting that occurred

25     that night.

1      Q.    What did you find when you got to

2   the scene?

3      A.    I believe his name was Brian

4   Austin.  He was deceased at the corner of Elder

5   and Goose Alley.

6      Q.    And was there a role that you had

7   at the scene that was particular to this case?

8      A.    I took a post at Elder and Race

9   Street blocking traffic because we extended the

10  crime scene out to that far.

11     Q.    And when you say "a post", what

12  does that mean, Officer Fusselman?

13     A.    Just a traffic post to block

14  traffic from going down that street.

15     Q.    And at a certain point later on

16  down the road, did a potential witness -- did

17  you have contact with a potential witness?

18     A.    Yes.

19     Q.    Could you describe to the jury how

20  that happened?

21     A.    After a witness came forward by, I

22  believe, cell phone, another officer went over

23  and gathered this witness, gave him to me and

24  said will you watch him?

25     Q.    And by watching him, you had -- do

1  you end up watching him, Officer Fusselman?

2      A.    I asked him if he wanted to sit

3  outside or inside my police vehicle.  He said he

4  would rather sit inside my police vehicle.

5      Q.    What was that witness's name?

6      A.    Victor Davis.

7      Q.    How long was Victor Davis in your

8  vehicle that morning, Officer Fusselman?

9      A.    About an hour to an hour and 15

10  minutes.

11      Q.    And did you speak to Mr. Davis?

12      A.    Yes.

13      Q.    What type of things was Mr. Davis

14  saying at the scene?

15      A.    He asked how long it's going to be

16  before he gets transported down to CIS where

17  homicide is located.  And I asked him, you know,

18  we don't know how long it's gonna be, the

19  homicide investigators have to do their work at

20  the scene before they take all witnesses down

21  and question them.

22      Q.    And did he say anything about his

23  visibilty at the scene at all?

24      A.    Yeah, he wanted to know if the

25  windows of the police cruiser in the back seat,

1    if they are tinted or blacked out or anything,

2    because he was scared that someone would see him

3    talking to a police officer in the back of my

4    car.

5         Q.    Is that a normal protocol, Officer

6    Fusselman, in a case like a homicide or serious

7    shooting, for the homicide detectives not to

8    interview somebody on the scene, but for the

9    patrol officer, like yourself, to hold them and

10   then transport them for a more formal interview?

11        A.    Yes.

12        Q.    Have you done that before?

13        A.    Yes.

14        Q.    Let's move on then to, I believe it

15   was Halloween night, October 31st of 2008, were

16   you on duty on that night?

17        A.    Yes.

18        Q.    And were you in uniform in a marked

19   police car?

20        A.    Yes.

21        Q.    And directing your attention to

22   around 11:25 to 11:30 that night, where were you

23   located?

24        A.    I was southbound at Race Street and

25   McMicken.

1      Q.    Did you have a partner?

2      A.    Not that night.

3      Q.    Okay.  Just riding alone?

4      A.    Yes.

5      Q.    Routine patrol?

6      A.    Yes.

7      Q.    And was there anything unusual that

8  happened around 11:25, 11:30 that evening?

9      A.    We had a shots fired which

10 essentially turned into a shooting run come out.

11     Q.    Could you describe to the jury

12 again, Officer Fusselman, in your own words,

13 where you were, what happened and what you did?

14     A.    I'm sorry.  Could you repeat that?

15     Q.    Once you got the run about the

16 shooting, what did you do?

17     A.    Since I was real close to the area

18 that they called it in, which was Republic and

19 Elder, it's a block over from Race Street.  I

20 proceeded down Race, turned eastbound on Elder,

21 turned up Goose Alley, which is a little alley

22 between Race and Republic.  Then came around the

23 breezeway and stopped almost directly right on

24 the person down who was shot.

25     Q.    Okay.  How long did it take you to

1    get to the scene?

2           A.      Fifteen to 20 seconds.

3           Q.      Were you the first officer at the

4    scene?

5           A.      Yes.

6           Q.      Could you describe to the jury what

7    you saw when you got there?

8           A.      I saw a person laying face down,

9    half on the sidewalk, half on the street.  I

10   approached him, asked him if he was okay.  He

11   picked his head up, to me his eyes were kind of

12   closed and just took like his last breath where

13   he gasped for air and collapsed on the street.

14          Q.      Was there something you were trying

15   to figure out from him in terms of who had done

16   this to him?

17          A.      Yes, I asked him, you know, are you

18   okay?  Who did this?  What were they wearing?

19   The usual questions that we ask when we come

20   across a victim.

21          Q.      And why would -- was it obvious to

22   you at the time, Officer Fusselman, that the

23   gentleman on the ground was a shooting victim?

24          A.      Yes.

25          Q.      And are these -- you say they are

1    normal type of questions in a shooting.  Why do

2    you do that right when you get there?

3           A.    We try to establish time frame,

4    suspect, what they were wearing, what type of

5    weapon was involved, and last known direction so

6    we can set up a quadrant position to try and

7    apprehend that individual.

8           Q.    What is a quadrant position?

9           A.    It's a -- you center yourself on

10   the scene with the police officers at the scene

11   and then four other officers take, you know,

12   like a northeast, southwest quadrant positions

13   to try to contain to a block.

14          Q.    Okay.  You were not able to do that

15   in this case?

16          A.    No, I was the officer who was

17   actually on scene.

18          Q.    But in terms of the victim

19   providing you information, in terms of where

20   they went or what the suspect looked like?

21          A.    No, he didn't even say anything to

22   me.  Just took that last breath and then

23   collapsed.

24          Q.    Was there anything that you noticed

25   about the crime scene, Officer Fusselman, that

1    was unusual or drew your attention to?

2          A.    I noticed a big glob of spit about

3    six, seven feet away from the victim.

4          Q.    And what drew your attention to

5    that glob of spit?

6          A.    It just seemed unusual for that

7    night and time because it was Halloween night,

8    but it was kind of cold out.  And I know

9    Republic Street at that time of night is not

10   very well traveled.

11         Q.    And did it seem to you to have a

12   connection to the crime itself?

13         A.    Yes.

14         Q.    Was there anything about the spit

15   that drew your attention to the potential age of

16   it?

17         A.    It was very fresh.  Like it still

18   had phlegm.  It was actually thick on the ground

19   still and had, I guess, you could say bubbles in

20   it still that weren't popped.

21         Q.    And noticing that glob of spit, in

22   your mind, did you think it had just been put

23   there?

24         A.    Yes.

25         Q.    As a result of that fresh spit and

1  your feeling that it was connected to the

2  homicide, what did you do with regard to that

3  spit?

4          A.    Well, the fire department came on

5  scene to do, you know, how they try to save the

6  victim.  I told the fire department try to work

7  on this side of the victim because there is

8  evidence on this side over there.  So they were

9  trying to revive the victim real close to the

10  building, or the wall, I didn't have much room

11  to work with.

12          Q.    So early on you were trying to

13  preserve the integrity of the scene by

14  preserving that --

15          A.    Yes.

16          Q.    -- potential evidence?  Did the

17  firemen, did you keep watch of them to make sure

18  they didn't disturb that?

19          A.    Yes.

20          Q.    Were they able to do anything to

21  him to save his life at all?

22          A.    They hooked up the, what is it,

23  defibrillator pads on him, got the heart rate

24  monitor on him and it didn't advise a shock and

25  they pronounced him pretty much dead right there

1  on the scene.

2      Q.   When was it, Officer Fusselman,

3  that you made the connection between the Austin

4  homicide to the gentleman that was laying on the

5  ground on the 31st?

6      A.   After the homicide detectives came

7  and they searched the victim's pockets and they

8  opened up his wallet and there was Detective

9  Ballman's business card.  And I knew he looked

10 familiar when I first came on, but he was face

11 down.  When the fire department rolled him, I

12 wasn't connecting it at that time, but it was

13 then, when they pulled out his wallet and his

14 business card, that I was like, this is the guy

15 that I transported down to homicide.

16     Q.   On that Saturday in your car?

17     A.   Yes.

18     Q.   And this area right here, is this

19 all in the City of Cincinnati, Hamilton County,

20 Ohio?

21     A.   Yes.

22     Q.   And did you remain on or about the

23 scene until the homicide -- you talked about the

24 homicide detectives getting the wallet and so

25 forth.  You remained there until they were there

1  at the scene as well?

2          A.    Yes.

3          Q.    Was crime scene tape and everything

4  done on this one the same as it was done on the

5  Austin homicide?

6          A.    Yes.

7                MR. TIEGER:  Just one moment.  No

8          further questions, Officer.

9                THE COURT:  You may cross, Counsel.

10                   CROSS-EXAMINATION

11  BY MR. WHALEN:

12          Q.    Officer Fusselman, you indicated

13  that you were the first officer on the scene.

14          A.    Correct.

15          Q.    Did you see Victor Davis walking

16  when you pulled up?

17          A.    No, he was already laying on the

18  sidewalk.

19          Q.    Okay.  If an officer said that he

20  was on the scene and saw Victor Davis staggering

21  and then falling, how would he have seen that if

22  you were the first one on the scene and he

23  wasn't standing when you got there?

24          A.    I can't answer that.  I don't know.

25          Q.    Okay.  Do you know who the

1    subsequent officers were on the scene?

2         A.    Yes.

3         Q.    Who were they?

4         A.    I believe Officer Rock, Officer

5    Lindle, Officer Knapp, Officer DeFranco were the

6    most immediate ones on the scene.

7         Q.    How long after you were there did

8    Officer Knapp come in?

9         A.    I would probably say a minute and a

10   half, two minutes later.

11        Q.    And DeFranco?

12        A.    With Officer Knapp.

13        Q.    And how about Officer Rock?

14        A.    I would say he was second on scene,

15   maybe 45 seconds to a minute after I was.

16        Q.    And when you saw the victim, he was

17   not face down at the scene?

18        A.    His body position was face down but

19   his head was to the left.

20        Q.    Now, you said that this phlegm, you

21   knew, was connected to the homicide?

22        A.    I believed it was, yes.

23        Q.    And what made you believe that?

24        A.    Just with Republic Street being

25   real close to Findlay Market, I know the workers

1    of Findlay Market do a real good job of keeping

2    that area clean of like trash and debris.

3         Q.    But there is foot traffic up and

4    down the street on a regular basis?

5         A.    Correct.

6         Q.    And anybody could come down and

7    deposit it there?

8         A.    Yes.

9         Q.    Okay.  As a matter of fact, there

10   are people in the apartments that are right next

11   to there?

12        A.    Yes, sir.

13        Q.    802 and 804 and 806?

14        A.    Yes.

15             MR. WHALEN:  Okay.  Can I have one

16        moment, Your Honor?

17             THE COURT:  Yes.

18             MR. WHALEN:  I have no other

19        questions, Your Honor.

20             THE COURT:  Thank you, Officer.

21        You may step down.

22             You interested in keeping him as a

23        witness?

24             MR. WHALEN:  No, Your Honor.

25             THE COURT:  Potential witness?

```
 1          MR. TIEGER:  No, Your Honor.  Thank
 2     you.
 3          THE COURT:  So he may leave?
 4          MR. TIEGER:  He may be excused.
 5     That will be fine.
 6          THE COURT:  Officer, you are
 7     excused.  Thank you for coming.
 8          (Witness excused.)
 9          MR. TIEGER:  Let me see if
10     Mr. Shade is outside, Judge.  Yes, Judge.
11     Judge, he has to be sworn.
12          THE COURT:  That's right, sir.
13     Will you stand up, please and raise you
14     right hand to be sworn?
15               DEAN SHADE, JR.,
16 having been first duly sworn, was examined and
17 testified as follows:
18               DIRECT EXAMINATION
19 BY MR. TIEGER:
20     Q.    Good morning, Mr. Shade.
21     A.    Good morning.
22     Q.    And if you can pull that mike down
23 a little bit so we can all hear you.  Thank you.
24          Could you tell everybody your
25 name, and spell your first and last name for
```

1  me?

2      A.      Dean Shade, Jr., D-E-A-N,

3  S-H-A-D-E, Jr.

4      Q.      Where do you live, Mr. Shade?

5      A.      1804 Republic.

6      Q.      Did you say 1804?

7      A.      Yes, sir.

8      Q.      Could you describe that building

9  for the jury, if you could?

10     A.      It kind of -- it's a huge apartment

11  building.  It goes from like maybe a block long

12  around the corner on Vine Street to Republic,

13  and back around toward Vine.

14     Q.      And the jury, we were all at the

15  scene a few days ago, and I think we saw -- I

16  know I saw you there.  I don't know if the jury

17  did, but was that you that we saw at the scene

18  that day?

19     A.      Yes, sir.

20     Q.      And that's the building that you

21  live in?

22     A.      Yes, sir.

23     Q.      How many ways in and out of that

24  building are there?

25     A.      On the Republic side, where I live

1   at, you can only go through my entranceway.  But

2   there is a back, but my key won't fit that back

3   going toward Vine Street.  And on the other

4   side, the 1802 is like the same way, but my key

5   won't fit those doors going toward the back.

6             Now around on the side is an alley,

7   it's also a part of our building that those keys

8   can fit my door and they'll fit the door going

9   back to the Vine Street side.

10            Q.    Okay.  How long have you been in

11   that building, Mr. Shade?

12            A.    Approximately about six years.

13            Q.    Who do you stay there with?

14            A.    Myself.

15            Q.    What floor of the building are you

16   on?

17            A.    The third and fourth floor.

18            Q.    You have two floors?

19            A.    Yes, sir.

20            Q.    And do you have windows in that

21   unit?

22            A.    Yes, sir.

23            Q.    What do those look out onto?

24            A.    Toward the Republic side, looking

25   out toward southwest to the Findlay Market.

```
 1          Q.    So if you were in your house and
 2    looking out the windows onto Republic Street,
 3    what would you see?
 4          A.    The Hub Center.  It's like a little
 5    vacant lot across the street where I live at, a
 6    portion of the park, and down toward the
 7    alleyway going toward Race Street.
 8          Q.    Okay.  Do you know the Gilbert
 9    family at all, Mr. Shade?
10          A.    I'm familiar with the mother and
11    her fiance.
12          Q.    Do they stay in your building?
13          A.    They didn't actually live in my
14    building, but, like I say, the building go a
15    whole block long, and their apartment was like
16    off in the alley side of the building.
17          Q.    So if we were looking at your
18    building -- I know there is two different
19    address numbers, what's your address again?
20          A.    1804.
21          Q.    And is there an 1802?
22          A.    There is 1802 also.
23          Q.    And would they have lived on the
24    1802 side, or do you think they still lived on
25    the 1804 side?
```

1          A.    It wouldn't be either side because

2    when you get to 1804 there is an alley, and

3    their apartment building literally sits in the

4    alley.

5          Q.    Okay.  Gotcha.  How long have you

6    been familiar with the Gilbert family, Mr.

7    Shade?

8          A.    Well, I've been knowing Ms. Quinn

9    since we were going to school, her and JT.

10         Q.    And you said you knew her boyfriend

11   or fiance?

12         A.    Yes.

13         Q.    Do you know her kids at all?

14         A.    Not -- I mean, not really because

15   they were kids, but I had an acquaintance on the

16   one boy, Shawn, a couple times.  He got a car

17   out there, I helped him put some speakers in his

18   car one time out there, but other than that I've

19   never really acquainted with him.

20         Q.    And what about Kareem Gilbert, had

21   you ever seen him around?

22         A.    Yes, just in speaking, you know, I

23   just knew that was Quinn's son.

24         Q.    And you knew his face, his

25   experience, what he looked like?

1      A.    Yes, sir.

2      Q.    You recognized him?

3      A.    Yes.

4      Q.    And as far as Shawn Gilbert, are he

5  and Kareem around the same age, maybe within a

6  couple years of each other?

7      A.    Yes.

8      Q.    Teenagers?

9      A.    Yes.

10     Q.    And would you recognize -- know

11  Shawn, what he looked like and so forth?

12     A.    Yes.

13     Q.    And did you know a man by the name

14  of Ruben Jordan?

15     A.    Not -- I didn't.  I don't even know

16  him, no.

17     Q.    Do you -- looking around the room,

18  do you see anybody that looks familiar that has

19  a connection to the area that you live in?

20     A.    I mean, I know of him, but I didn't

21  know him personally.

22     Q.    Okay.  Do you see him here today in

23  the room?

24     A.    Yes, sir.

25     Q.    Where is he?

1    A.    At the defendant's table.

2    Q.    In the striped shirt, right here

3 with the baldhead?

4    A.    Yes, sir.

5    Q.    And how was it that you came to

6 know -- I'll say recognize or be acquainted with

7 him at all?

8    A.    Because for a long time I always

9 thought that JT was Quinn's baby daddy.  And

10 after a while I seen him a couple times around

11 there, and then somebody happened to mention to

12 me that that was some of the kids' daddy, and I

13 really never knew that.  And that's the only

14 reason I had acquaintance with him.

15    Q.    So the connection was that he may

16 have been Kareem or Shawn's father?

17    A.    Yes.

18    Q.    But he didn't stay down there with

19 the family anymore?

20    A.    Right.

21    Q.    How often would you see him in that

22 area, Mr. Shade?

23    A.    I only saw him down there even like

24 maybe once or twice with his people down there.

25    Q.    Over the course of the number of

1    years that you were down there?

2            A.    Yes, sir.

3            Q.    Are you out a lot?

4            A.    Pretty much, yes, sir.

5            Q.    I mean, do you kind of know what's

6    going on in your neighborhood?

7            A.    Yes.

8            Q.    Familiar with the people and so

9    forth?

10           A.    Yes.

11           Q.    Is that common?

12           A.    Yes.

13           Q.    That everybody kind of knows each

14   other in a small neighborhood like that?

15           A.    Yes, sir.

16           Q.    Now, you do have a prior criminal

17   history within the last 10 years in terms of

18   theft, felony, dishonesty, crimes such as that.

19   You have a possession of drug conviction, that

20   was this year?

21           A.    Yes, sir.

22           Q.    And that was the drug Oxycodone, I

23   think?

24           A.    Yes, sir.

25           Q.    And are you on probation to who?

1          A.    Yes, sir.

2          Q.    Do you know what judge you're on

3    probation to?

4          A.    DeWine.

5          Q.    Okay.  And you didn't do time on

6    that at all, you're on probation?

7          A.    Yes, sir.

8          Q.    And with regard to that case, I

9    think a few days ago you had asked me to somehow

10   get involved in that; is that correct?

11         A.    Yes, sir.

12         Q.    What did you ask me to do?

13         A.    I can't pay the fine.

14         Q.    How much do you owe?

15         A.    It's a standard probationary fine

16   that they require.

17         Q.    Do you know around how much that

18   is?

19         A.    Like 1500 bucks.

20         Q.    Okay.  And do you have the funds to

21   pay that?

22         A.    No, sir.

23         Q.    Why can't you pay that?

24         A.    Because I'm disabled.  I'm on

25   disability and I take care of my grandchildren.

1    Q.    Is there something wrong, you told
2  me, with your hands?
3    A.    I have -- I can't feel my hands.
4  My hands are numb.  I have no feelings in my
5  hands.
6    Q.    And you asked me to go to Judge
7  DeWine and let him know that you're indigent and
8  can't pay that fine?
9    A.    Yes, sir.
10   Q.    And I think I told you I could
11 speak to him, but there is no promises at all
12 and --
13   A.    Exactly.
14   Q.    -- whatever he decides he decides?
15   A.    Yes, sir.  And I'm ready to do
16 community service if he says no.
17   Q.    Okay.  Did you become aware, Mr.
18 Shade, of a street murder of a Brian Austin on
19 October 16th of 2008?
20   A.    Yes, sir.
21   Q.    How did you become aware of that?
22   A.    I heard the gunshot.  They were so
23 loud that night.  And I watched him stagger and
24 fall in front of the Hub Center and lay down and
25 he died.

1      Q.     Did you see the police arrive and

2  so forth?

3      A.     Yes, I did.

4      Q.     Did you know Mr. Austin prior to

5  that?

6      A.     I just happened to see him back and

7  forth around there.  Like I say, I was pretty

8  much to myself.  I would speak to him.  You

9  know, younger guys like that I don't really deal

10  with them too much.  I just kind of speak.  If

11  they speak, I do; if they don't, I go on about

12  my business.

13      Q.     And were you aware that Kareem

14  Gilbert was a suspect in the Austin homicide in

15  the days or weeks following?

16      A.     Yes.

17      Q.     And did you ever speak to Victor

18  Davis -- first of all, did you know Victor

19  Davis?

20      A.     Yes, sir, I did.

21      Q.     And how did you know Mr. Davis?

22      A.     I met him.  He just welcomed me to

23  the neighborhood when I moved in.  He lived

24  there before I moved over there, and when I

25  moved in he just kind of welcomed me around

there.

Q.    What kind of guy was Victor Davis?

A.    He's a great guy, real great guy.
Heck of a laugh, and that laugh would make you
smile, make the whole room light up.  He was a
real good guy.

Q.    Did he have a nickname at all?

A.    They call him Dread.

Q.    And why was that?

A.    Because he had dreadlocks, you
know, locks.

Q.    Did you ever speak to Victor Davis
after the Austin homicide, Mr. Shade?

A.    Yes, sir.

Q.    And were you aware that he was a
witness to the Austin murder?

A.    Well, basically what he told me is
that he said Brian was his friend, and he wasn't
gonna let him go out like that.  He said he was
gonna tell them whoever done it.

Q.    Was he pretty strong about
cooperating and making sure the truth came out
on that?

A.    Very much so.

Q.    Do you know if he was in any fear

1    at all for his own safety after he acknowledged

2    that he was an eyewitness and would cooperate?

3         A.    Really no fear, but he approached

4    me one day and said come here, man, you hear

5    anyone around here talking about anything about

6    me or something like that?  I said not really,

7    you know, because I don't really associate

8    around by the business.  I was -- you know,

9    didn't know too many people around there.  And I

10   said no, not really.  He said if you do, let me

11   know, I said I will.

12        Q.    Moving now to where Victor Davis

13   lived, Mr. Shade, in relation to where you

14   lived.

15        A.    He lived in 1802 side with his

16   sister on the second and third floor.

17        Q.    Was it your same building?

18        A.    Yes.

19        Q.    And how close or far away was it

20   where he lived to where the Gilbert family

21   lived?

22        A.    Oh, maybe about 10, 15 feet around

23   the alley, because he was here, I was here, and

24   they lived around the alley right there.

25        Q.    Now, moving to October 31st of

1   2008, around 11:25 to 11:30 at night, where were
2   you that evening?
3          A.    On my fourth floor of my apartment,
4   laying across my bed.
5          Q.    And could you describe to the jury
6   what, if anything, you heard or saw?
7          A.    Laying there almost in a nod, and
8   then I heard like a muffle, pop, pop.  So I
9   hesitated for a minute, and I said to myself,
10  like, not again.  And I heard somebody say
11  "Dread, get up."
12              So I said Dread.  So I got up and
13  went to the window, and I kind of looked out the
14  window like Dread, and I could see him laying
15  out there, and like he had a gunshot to his
16  head, and I could see him just kind of
17  flinching.  You know, I watched him take his
18  last two breaths.
19              So I kind of panicked.  I couldn't
20  find my cell phone, so I ran downstairs.  I went
21  back upstairs and I found my phone, and then I
22  called 911 to get him some help.
23         Q.    How long did it take, Mr. Shade, if
24  you could just approximate between the time you
25  heard the pops you told the jury about and the

1  time you went to the window?

2          A.    Like I said, about a -- I laid

3  there for a minute because, like I said, I just

4  watched that boy die out there on the street,

5  and it took maybe about five to seven seconds

6  for me to get up and look out the window.

7          Q.    Doesn't sound like you wanted to

8  look out the window?

9          A.    I didn't.

10         Q.    Was there anybody at or near the

11 body that you saw in the street?

12         A.    Yes, sir, there was.

13         Q.    And could you describe who you saw?

14         A.    I really -- at the time I heard

15 somebody, like he was pulling on Dread's arm,

16 and I seen a guy turn and walk away.  It's like

17 a little trail where we live at, and you can

18 walk through the trail, head back toward to the

19 Findlay Market, you know.

20              Like I say, like I've been saying

21 all along, I really can't say exactly who.  It

22 was a guy about six-foot tall and he did have a

23 clean shaven head.

24         Q.    Okay.  And you've identified Ruben

25 Jordan as the person that you seen in the area a

1    couple times over the years.  Was there any --
2    if you could tell the jury, in your own words,
3    Mr. Shade, any similarity between the man, the
4    baldheaded man standing over the body, and Mr.
5    Jordan?
6          A.    Yes.
7          Q.    Could you describe that similarity
8    to the jury?
9          A.    I mean, cleanness of the head and
10   the size, stature.  I mean, he wasn't as big as
11   he is now.  This guy was a little slimmer then,
12   you know.  But, like I said, I never did see his
13   face.  I just happened to see him walk through
14   the trail, and I said, well, maybe he's going to
15   get some help because it's a telephone down on
16   the corner by the Findlay Market.  And I said
17   maybe he's gonna get dude some help or
18   something, you know.  And once I made the 911
19   call and they called me back, I was the only one
20   that made the 911 call, so...
21         Q.    And the baldheaded man with the
22   similarities to Mr. Jordan, did he ever come
23   back?
24         A.    No, sir.
25         Q.    You say he's a little like bulkier

you mean like weight wise, like maybe he looks
little?

    A.    Yeah.  This guy wasn't that big.

    Q.    Okay.  And in terms of -- I don't
know if you can put it in a percentage, Mr.
Shade, how sure are you that it was or wasn't
Mr. Jordan?

    A.    I could say about 75 percent.

    Q.    Sure that what?

    A.    That it could have been.

    Q.    Okay.  At the time that he -- I
think you spoke to police officer -- Detective
McGuffey about what had happened.  When you
talked to him, you had thought that the
baldheaded guy or the shaved head guy was trying
to help your friend on the street.  Had you
rethought that at all?

    A.    Yes.  I mean, because I'm thinking
I heard him say "Dread" before I heard the
shots, and they sounded so muffled, so I don't
know if he was -- if he had cornered him out
there or caught him coming out there or
whatever, 'cause I was with him earlier in the
day and he had no fear of nothing going on or
anything, you know.

1              So I don't know if they -- whoever

2    it was cornered him out there, caught him

3    getting out of the car or something and he kind

4    of -- like because I heard a little scuffling

5    sound before, but I really didn't pay it no

6    attention because it was all the way -- I really

7    didn't pay it any attention until after I heard

8    the shots.

9         Q.    And the person was trying to -- was

10   over his body grabbing his arm you said?

11        A.    Yes.

12        Q.    And you initially thought he was

13   trying to help him?

14        A.    I thought he might have, like I

15   also heard somebody -- like somebody might have

16   said get up, Dread.  And I'm thinking to myself,

17   I know Dread probably got drunk out there and

18   fell, you know, that's what my thinking was at

19   first.  And so that's what made we want to get

20   up and look too, because something I wanted to

21   laugh at if it was, you know, and I seen what

22   had happened.

23        Q.    Thinking back now, the person is

24   like get up, get up, are you thinking now that

25   was a friendly gesture or a taunting gesture?

1     A.    More like a taunting, now that I
2  think about it.
3     Q.    And you had said, Mr. Shade, that
4  you were familiar with Kareem Gilbert, his
5  appearance, Shawn Gilbert and so forth, the
6  shaved head, baldhead guy standing over the body
7  of Victor Davis, could that have been Kareem
8  Gilbert?
9     A.    Absolutely not.
10    Q.    Could it have been Shawn Gilbert?
11    A.    No, sir, absolutely not.
12    Q.    And then did the police come on the
13 scene then?
14    A.    Yes.
15    Q.    And try to tend to Mr. Davis' body?
16    A.    Yes.
17         MR. TIEGER:  Just one moment,
18       Judge.  No further questions, Judge.
19         THE COURT:  Cross?
20            CROSS-EXAMINATION
21 BY MR. WHALEN:
22    Q.    Mr. Shade, you have had a good deal
23 of time to think about this, have you not?
24    A.    Yes, sir.
25    Q.    Do you remember when it occurred?

1      A.    Halloween.

2      Q.    What year?

3      A.    '08.

4      Q.    Okay.  And you got up and you

5  called the police?

6      A.    Yes, sir.

7      Q.    And then before you called the

8  police you heard someone say "Dread, get up," am

9  I correct?

10      A.    Yes.

11      Q.    Was that the first thing you heard

12  this person say?

13      A.    Yes.

14      Q.    Okay.  Do you remember that you

15  came in and gave an interview to Officer

16  Terry -- Detective McGuffey a couple days after

17  the shooting?

18      A.    I think so.

19      Q.    Do you know whether you went down

20  and gave an interview?

21      A.    I did, but I don't know if it was a

22  couple days afterwards or not.

23      Q.    Okay.  But it was within a week of

24  when it occurred?

25      A.    It could have been, sir.

1    Q.    But you disagree with me, or are
2 you saying it was longer?
3    A.    No, I just can't remember at the
4 time how long it was after that.
5    Q.    Do you have trouble with your
6 memory?
7    A.    No, sir, I don't.
8    Q.    Okay.  And in that interview,
9 McGuffey said -- Officer McGuffey asked you a
10 question, but he asked a question:  But he
11 called him Dread?  And your answer was, yeah, he
12 called him Dread, but I heard him call him
13 Roots.  Get up, Roots.  You all right.  You all
14 right, Roots.  You all right.  Dread, you all
15 right?
16    A.    True.
17    Q.    You didn't mention the name Roots
18 here today?
19    A.    I don't recall Roots.  I never
20 called anybody Roots.
21    Q.    I didn't ask you if you called him,
22 did you hear somebody call Dread Roots?
23    A.    No, I didn't.
24    Q.    So your information that you gave
25 the officer, within a week of when this

1   occurred, is not correct?

2          A.    I never called anybody Roots.  I

3   always called him Dread or by their name.

4          Q.    You indicated to McGuffey that what

5   you heard out on the street was someone saying

6   he called him Dread, but I heard him call him

7   Roots, get up, Roots?

8          A.    I don't remember that.

9          Q.    You don't remember that at all?

10         A.    No, sir, I don't.

11         Q.    Okay.  And Officer McGuffey said

12  are you saying Roots?  And you answered he said

13  Roots at first, and then he said Dread also.

14  Roots, yeah, like friend, Roots.  Did you say

15  that?

16         A.    I don't recall that.  Like I said,

17  I don't remember calling anybody Roots.

18         Q.    If someone is saying to the man

19  that is laying, Mr. Davis, on the ground, get

20  up, are you all right, you all right?  You all

21  right?  You all right?  Does that sound like

22  taunting to you?

23         A.    Depending on the way you look at

24  it.

25         Q.    Well, I'm asking how you look at

1  it.

2        A.    It could be, yes.

3        Q.    You never once mentioned, when you

4  talked to the police, that you heard Mr. Davis

5  being taunted?  Why didn't you tell them that?

6        A.    Because I had time to look at it

7  and think about the way it happened.  I seen the

8  whole case and the whole scenario in a different

9  light.

10        Q.    What made you see it in a different

11  light?

12        A.    Because the way that it happened,

13  and there was nobody else out there that night.

14  It was only one person over him, that was the

15  person I seen walk away and go to the trailway.

16        Q.    And you don't think it might have

17  been somebody who tried to help?

18        A.    At this point now, looking back at

19  it, I don't think so.

20        Q.    Well, what's occurred that made you

21  change your mind?

22        A.    Just the way that it's been going

23  on.  I thought that maybe like a week or so

24  after it happened that the guy that went through

25  the trail was the guy that killed Dread.

1    Q.    So you never mentioned that to the

2    officers?

3    A.    There's a whole lot of things that

4    I didn't mention that -- I mean, a whole lot of

5    things I didn't want to be -- I didn't want to

6    be involved with or be bothered with in the

7    first place.  I don't want to be here now.

8    Q.    But you made the 911 telephone

9    call?

10   A.    I would have made that 911 call for

11   anybody.

12   Q.    But the fact you made it and you

13   know --

14   A.    Yes.

15   Q.    -- the police were going to know

16   who made that call?

17   A.    Yes, because I -- really I didn't

18   know that, you know, I was going to be the only

19   one that made the call, because I thought the

20   one that walked away from Dread was going to the

21   phone booth down the street and get him some

22   help.  And since come to figure out that he

23   didn't, that I was the only one that called.

24   Q.    Nonetheless, you thought about this

25   now and you've changed your mind and there was

1    taunting going on?

2           A.    It could have been, sir, that's

3    what I said.

4           Q.    It could have been?

5           A.    Yes.

6           Q.    Now, you understand these ladies

7    and gentlemen of the jury have a very important

8    job in deciding whether this gentleman committed

9    this murder?

10          A.    Yes, sir, I do.

11          Q.    How sure are you that it was

12   taunting?

13          A.    Like I say, I go back to the

14   75 percent that it might have been the defendant

15   that done it.

16          Q.    And it could have been somebody

17   trying to help him?

18          A.    Yes, sir, it could have been.

19          Q.    Okay.  Now, you said this was an

20   individual walking away that was six-foot tall

21   and bald?

22          A.    Pretty much, yes.

23          Q.    And I think you said that you saw

24   Dread, am I correct?

25          A.    Yes, sir, I did.

1    Q.    And his body was jerking at the
2    time that you saw him?

3    A.    Yes, sir.

4    Q.    Okay.  Now, you also saw a woman
5    there?

6    A.    Yes, I did.

7    Q.    Now, didn't you just tell us that
8    the only person you saw was the bald man?

9    A.    I said standing over him that
10   walked away.  Miss Leah walked up the street
11   this way.  I seen her pick an object off the
12   ground.  She picked up another object off the
13   ground.  She happened to see Dread, and she
14   screamed oh, that's Dread.  And she started
15   calling for the guy that lived up on the second
16   floor, which his name was James.  And by that
17   time I was already on the phone looking out the
18   window.

19   Q.    Now, the items that she picked up,
20   were they near the body?

21   A.    They was basically -- he lived at
22   1802, and that's the way she was coming.  And
23   she was picking them up coming toward where I
24   live at, where the body was laying at.

25   Q.    How far away was she from the body

1    when she picked up the first thing?

2          A.    Maybe about three or four feet.

3          Q.    And did you see what it was that

4    she picked up?

5          A.    I couldn't see what it was.  I

6    couldn't see what it was.

7          Q.    And how much closer to the body was

8    she when she picked up the second thing?

9          A.    The two items was like

10   simultaneous.  She picked up one and she picked

11   up another one as she was walking.  And she

12   happened to look up like that and saw his body

13   laying out there.

14         Q.    Now, did you tell the police about

15   the man that you saw walking down the path?

16         A.    Yes, sir.

17         Q.    And you indicated to the police

18   this man was between 30 and 40 years old; is

19   that correct?

20         A.    Yes, sir, at the time.

21         Q.    And you say he was kind of short?

22         A.    I said about six feet tall.

23         Q.    Detective McGuffey --

24               MR. WHALEN:  I'm on Page 5.

25               MR. TIEGER:  Thank you.

1      Q.    Do you remember anything about his

2  physical description, Mr. Shade?  Not really.  I

3  just remember he was kind of short.  I think he

4  had on a brown jacket, or something like that.

5  But the way it just seemed to me, it was more he

6  was trying to help him.

7      A.    That's what I said, sir.

8      Q.    And you told the officer he was

9  short?

10      A.    I said about six feet tall.  I

11  mean, I may have said that, but that's, you

12  know, that's what I said.

13      Q.    What's what you said?

14      A.    I said he was short and had on a

15  brown jacket.  He might have been trying to help

16  Dread.

17      Q.    And that's what you believed when

18  you talked to the police a couple days later?

19      A.    Exactly.

20      Q.    And now you have changed your mind?

21      A.    I never changed my mind.  I just

22  happened to look at the scenario in my head and

23  what happened, sir.

24      Q.    But do you think that six foot tall

25  is short?

```
 1        A.    I mean, depending on who you
 2   talking to.
 3        Q.    Well, I know.  But if you're
 4   talking to Kareem --
 5        A.    If you're talking to me it's not
 6   short.
 7        Q.    Six foot is not short to you?
 8        A.    No, sir.
 9        Q.    Okay.  But you told the police he
10   was short?
11        A.    Yes.
12        Q.    Okay.  And you told the police you
13   thought he was trying to help?
14        A.    Yes, sir.
15        Q.    Detective McGuffey --
16              MR. WHALEN:  On Page 12.
17              MR. TIEGER:  Thank you.
18        Q.    Okay.  Well, who's the little guy
19   that shot the guy?  And you said the Gilbert
20   boy.
21        A.    What?
22              MR. WHALEN:  May I approach, the
23        witness, Your Honor?
24              THE COURT:  Yes.
25        Q.    This is a transcript of what you
```

said to the police.  Detective McGuffey said

okay.  Well, who's the little guy that shot that

guy?  And you said the Gilbert boy.

     A.    Okay.  They shot what guy?

     Q.    Mr. Davis that was down on the

street.

     A.    I don't remember never saying that.

     Q.    Okay.  Sir, did you call 911 two

times that night?

     A.    No, sir.

     Q.    So if they had gotten two 911

calls, one of them was somebody else other than

you?

     A.    I called them and then they called

me back.

     Q.    Did you tell them that there was a

minivan that drove off?

     A.    Nope.

     Q.    When you called, did the 911

operator tell you that they already had a call

already and the police were on their way?

     A.    No, not that I know of.  I thought

I was the only one that called.

     Q.    You indicated to the 911 operator

that you saw this man take his last breath?

1      A.      Yes, sir.

2      Q.      Okay.  Was there a police officer

3  --

4      A.      That I thought.

5      Q.      Was there a police officer standing

6  by him when he did that?

7      A.      Nope.

8      Q.      How much longer after he took that

9  last breath did the police officer show up?

10     A.      After I saw that, I got out the

11 window.  I laid on my bed, everything went

12 blank, quiet, black.  I didn't want to see

13 anymore.

14     Q.      When the police show up, there is

15 usually sirens?

16     A.      Yes.

17     Q.      Did you hear sirens?

18     A.      Yes, I did.

19     Q.      How long after you made the phone

20 call?

21     A.      Oh, they was pretty quick that

22 night.  They was there almost immediately that

23 night.

24     Q.      Okay.  And you see blue lights

25 flashing in the air?

1          A.     Yes.

2          Q.     And those were almost immediate?

3          A.     Yes.

4          Q.     But you don't know what they were

5    doing down there?

6          A.     I knew what they was doing.  A man

7    just got killed out there.  I knew what they was

8    doing.  I just didn't want to see it.

9          Q.     I think you indicated -- how many

10   shots did you say you heard?

11         A.     I think I heard like two shots.

12         Q.     Okay.  We are going back to your

13   discussions with Officer McGuffey.

14                MR. WHALEN:  I'm on Page 2.

15                MR. TIEGER:  Thank you.

16                MR. WHALEN:  And 3.

17         Q.     Detective McGuffey said, do you

18   remember how many you heard?  They were talking

19   about shots.  I'm sorry.  I'll go forward.

20                Detective McGuffey said, okay.

21   Can you tell me what you saw or heard.  Mr.

22   Shade:  First like sound like a little -- like

23   a little rustling, then I heard shots pow, pow,

24   pow.  Detective McGuffey:  Do you remember how

25   many you heard?  Mr. Shade:  It was like three

1  to four shots.

2       A.    I may have, sir.

3       Q.    Do what?

4       A.    I may have said that.

5       Q.    You may have said that?

6       A.    Yes.

7       Q.    Okay.  And you had forgotten about

8  that?

9       A.    No, it was just -- it was just so

10 crazy to see him laying out there.  I mean, it

11 was just -- like I said, I had -- I couldn't

12 find my phone.  I panicked.  I was running up

13 and down them stairs trying to find a phone.  It

14 was just kind of crazy at that time.

15      Q.    So you were in an excited state?

16      A.    Yes.

17      MR. WHALEN:  I have no other

18      questions, Your Honor.

19      THE COURT:  Okay.  Go ahead,

20      Counsel.

21      MR. TIEGER:  Thanks, Judge.

22        REDIRECT EXAMINATION

23 BY MR. TIEGER:

24      Q.    Mr. Shade?

25      A.    Yes.

1       Q.    I don't know if you have looked at
2  this transcript or not.  I don't think we went
3  over it at all.  Basically what happened is the
4  conversation you had with Officer McGuffey was
5  taped, that was transcribed, which means that a
6  court reporter typed up what you said and then,
7  as with all the statements, a copy of that is
8  given to us, but then a copy is given to the
9  defense team so they would have that to review
10 as well before the trial.
11             But I'm not sure if you understood
12 one of the questions Mr. Whalen was asking.
13 Going to page -- the bottom of Page 11, where
14 you had said, you know what, sir, this little
15 guy got killed over there in front of the Hub.
16 Were you referring to Mr. Austin?
17       A.    Yes.
18       Q.    And McGuffey said, right.  And you
19 said a couple weeks ago.  McGuffey said uh-huh.
20 And then you said, all right.  Now, about like a
21 week or so after, it was kind of peculiar
22 because Dread asked me, like what you hear about
23 me out here, man?  You know, what they talk
24 about me out here like that?  And let me know
25 the little guy shot and killed that guy over

1  there.  And then he asked you:  Well, who was

2  the little guy that shot that guy?  And that's

3  when you said?

4         A.    The Gilbert boy.

5         Q.    The Gilbert boy.  Is that -- you

6  weren't referring to Mr. Davis, you were

7  referring to Mr. Austin?

8         A.    Exactly.

9         Q.    He didn't read the first part of

10  the transcript, just that last little bit?

11         A.    Exactly.

12         Q.    Okay.  And when you said it was the

13  Gilbert boy that choked that guy around the

14  corner, would you have said "choked that guy

15  around the corner"?

16         A.    Choke?

17         Q.    That's -- and it wasn't Ms. Renken,

18  but a court reporter was trying to understand

19  your words and put "choked that guy".  Did you

20  say that?

21         A.    I don't -- I don't believe I meant

22  to say choke.

23         Q.    Okay.  She might have got --

24  misunderstood what you said?

25         A.    Yeah.