1           COURT OF COMMON PLEAS

2           HAMILTON COUNTY, OHIO

3                   - - -

4    STATE OF OHIO,          :

5           Plaintiff.    :

6    vs.                    :Case Number B1003262

7    RUBEN JORDAN,          :Appeal Number C1100833

8           Defendant.    :Volume V of XI

9

10                  - - -

11           TRANSCRIPT OF PROCEEDINGS

12                  - - -

13   APPEARANCES:

14       Seth S. Tieger, Esq.
         Megan E. Shanahan, Esq.
15            On behalf of the State of Ohio.

16       William P. Whalen, Jr., Esq.
         Amy R. Williams, Esq.
17            On behalf of the Defendant.

18

19

20           BE IT REMEMBERED that upon the Jury

21   Trial of this cause, on January 18, 2011, before

22   the Honorable NADINE L. ALLEN, a judge of the

23   said court, the following proceedings were had,

24   to wit:

25

KENNETH HEARD
        Direct Examination ...........Page 618, Line 16
        Cross-Examination ...........Page 638, Line 10

OFFICER DARRIS SNEED
        Direct Examination ...........Page 644, Line 11
        Cross-Examination ...........Page 649, Line 10

1       PROCEEDINGS, January 18, 2011

2           THE COURT:  Good afternoon.  Have a

3       seat, please.  We are back on the record

4       on the matter of State vs. Ruben Jordan,

5       on B1003262.  And my understanding is

6       that counsel would like to put several

7       matters on the record, starting with

8       Mr. Whalen representing Mr. Jordan.

9           MR. WHALEN:  Your Honor, I have had

10      some extensive conversations with my

11      client, and I have advised him I don't

12      think it's in his best interest to take

13      the stand.  He's indicated to me that he

14      is going to take the stand, and I just

15      wanted to put that on the record; am I

16      correct?

17          THE DEFENDANT:  Yes.

18          THE COURT:  All right.  So you have

19      explained to him that he does have a

20      Fifth Amendment right to remain silent,

21      and that he may waive that right and he

22      may take the stand.  But he also needs to

23      know that if he does, he will be

24      cross-examined, et cetera.  And that if

25      you were not to take the stand, and if

you were to remain silent, the State or
no one could comment on that or use it
against him.  So he is aware of what it
means, what the Fifth Amendment right
means.  And he's waived that right, so he
has a right to take the stand in his own
defense.  And that is noted of record.

Is there anything further that the
State would like to put on the record?

MR. TIEGER:  Judge, the only other
thing is that before we started, I think
we started on Monday of last week, I
asked Mr. Whalen was the defendant
interested in working any kind of plea.
Mr. Whalen indicated to me that Mr.
Jordan was not interested in any kind of
plea.  We really didn't talk about the
specifics at all.

And just to make sure we readdress
that a second time, Ms. Shanahan and I
talked to Mr. Whalen and Ms. Williams a
few minutes ago about a plea, and that we
would be willing to check on a plea with
something less than aggravated murder
possibly, something in the flat-time

range, if the defendant was interested,
and that was communicated to Mr. Whalen
and Ms. Williams.

THE COURT:  Okay.

MR. TIEGER:  -- several minute ago.

MR. WHALEN:  And I talked with my
client and he's indicated that he's not
interested, Your Honor.

THE COURT:  Is that correct, Mr.
Jordan?

THE DEFENDANT:  Yes, that's
correct.

THE COURT:  All right then.  Both
of those matters are noted, they are on
the record.  And I think with that, at
this point the next matter is to call the
next State's witness, correct?

MR. TIEGER:  Yes, Your Honor.

THE COURT:  Okay.

(The jury entering the courtroom at
12:50 p.m.)

THE COURT:  You may all be seated.
Good afternoon, ladies and gentlemen of
the jury.  Thank you for coming back and
being ready to proceed today.  We

```
 1          anticipate that this trial -- today's
 2          proceeding will probably end before 4:00,
 3          so we are going to try and go straight
 4          through.  Is there anything further?
 5               Get the notepads, yes.  While they
 6          are getting their notepads, we will call
 7          in the next State's witness.
 8               MR. TIEGER:  Sure, Judge.
 9               THE COURT:  Okay.
10               MS. WILLIAMS:  Sir, would you step
11          up here, please.  Step up here, please,
12          and raise you right hand to be sworn.
13                    KENNETH HEARD,
14     having been first duly sworn, was examined and
15     testified as follows:
16               DIRECT EXAMINATION
17     BY MR. TIEGER:
18          Q.   Good afternoon, Mr. Heard.  There
19     is a mike in front of you here, so you can pull
20     that up so everybody can hear you.
21               Can you tell everybody your name,
22     and spell your last name?
23          A.   Kenneth Heard, H-E-A-R-D.
24          Q.   And you can pull that mike down a
25     little bit.
```

```
 1                    How old are you, Mr. Heard?
 2          A.    Thirty-three.
 3          Q.    And where did you grow up?  Did you
 4    grow up in Cincinnati?
 5          A.    Yes.
 6          Q.    And are you living in Cincinnati
 7    now?
 8          A.    No.
 9          Q.    Are you living in another state?
10          A.    Yes.
11          Q.    When did you move out of
12    Cincinnati?
13          A.    Um, August of '09.
14          Q.    And why did you move out of
15    Cincinnati in August of '09?
16          A.    Because I changed my life.  I got
17    shot.
18          Q.    Was anybody ever prosecuted or
19    charged with that?
20          A.    No.
21          Q.    It would be fair to say that you've
22    got a prior in the last 10 years, a prior
23    criminal history for felonies or theft offenses;
24    is that fair to say?
25          A.    Yes.
```

1      Q.    And how many times have you been to
2  the penitentiary?
3      A.    Three.
4      Q.    Back in '99, you had a felony drug
5  abuse; is that fair to say?
6      A.    Yes.
7      Q.    And then a theft in 2000?
8      A.    Yes.
9      Q.    A trafficking in 2001?
10      A.    Yes.
11      Q.    Intimidation in 2005?
12      A.    Yes.
13      Q.    A trafficking in 2007?
14      A.    Yes.
15      Q.    And before you moved out of
16  Cincinnati, how were you making your money?
17      A.    Selling drugs.
18      Q.    Would it be fair to say you were a
19  drug dealer?
20      A.    Yes.
21      Q.    What area of town did you sell in?
22      A.    Downtown, Avondale, and Price Hill.
23      Q.    And was there a certain kind of
24  drug that you mostly sold?
25      A.    Yeah, crack.

```
 1          Q.    And what is crack?  Is that
 2    cocaine?
 3          A.    Yes.
 4          Q.    And how do you use crack?
 5          A.    You smoke it.
 6          Q.    Okay.  And did you ever -- in that
 7    world that you were in before you moved out of
 8    town, the drug dealing world, did you ever come
 9    into contact with somebody that is in the room
10    right now?
11          A.    Yes.
12          Q.    And who is that?
13          A.    Ruben Jordan.
14          Q.    Okay.  And where is he sitting
15    today, Mr. Heard?
16          A.    Right there.
17          Q.    What color shirt is he wearing?  Is
18    it striped?
19          A.    Yeah, striped.
20          Q.    This gentleman right here?
21          A.    Yes.
22          MR. TIEGER:  Okay.  Would the
23       record show identification of the
24       defendant, Your Honor?
25          THE COURT:  Any objection to
```

1          that --

2                    MR. WHALEN:  No, Your Honor.

3                    THE COURT:  -- fact?

4          Q.    Did you know Mr. Jordan's real name

5    when you first met him, Mr. Heard?

6          A.    No.

7          Q.    What did you know him as?

8          A.    Red.

9          Q.    Red, like the color?

10         A.    Yes.

11         Q.    If you could explain to the jury,

12   Mr. Heard, in your own words, how you first met

13   the person that you knew as Red?

14         A.    Through a mutual friend.  And he

15   wanted to buy some drugs, and I had some and I

16   sold it to him.

17         Q.    Can you estimate for the jury, Mr.

18   Heard, approximately when that would have been

19   that you first met the person you later found

20   out to be Mr. Jordan?

21         A.    Beginning of '08.

22         Q.    You said beginning of 2008?

23         A.    Yes.

24         Q.    And did you say you were introduced

25   to him, or was he just a walk-on customer, so to

1  speak?

2          A.      Introduced.

3          Q.      Introduced?

4          A.      Yeah.

5          Q.      And you said he bought from you

6  that first time?

7          A.      Yes.

8          Q.      What did you sell him?

9          A.      A 20.

10         Q.      Okay.  And if you could explain to

11  the jury what a 20 is.

12         A.      $20 worth of crack.

13         Q.      And how is crack packaged?  Is it

14  powder or is it solid or --

15         A.      It's solid, like a rock.

16         Q.      And would you refer to it as like a

17  $20 rock?

18         A.      Yes.

19         Q.      And is that shortened up just to

20  call it a 20?

21         A.      Yeah.

22         Q.      And if you want to buy $10 worth,

23  what's that called?

24         A.      A dime.

25         Q.      A dime, or a 20-cent piece?

1    A.    Yeah.

2    Q.    I've been doing this a little too

3  long, so I'm somewhat familiar with those words.

4  How often did you see him after -- that first

5  time in early 2008, how often would you see the

6  person you knew as Red?

7    A.    A few times a week, no more than

8  five.

9    Q.    A few times a week?

10    A.    Yeah.

11    Q.    What part of town -- you told the

12  jury a few moments ago, Mr. Heard, that you sold

13  in a couple different parts of town.  Was there

14  a certain part of town that you normally sold to

15  Red?

16    A.    Avondale.  Burnet Avenue.

17    Q.    And what's that near, Burnet

18  Avenue?

19    A.    The hospital, UDF, drug rehab.

20    Q.    Like, if you were at Children's

21  Hospital and you went like towards the zoo or

22  from Children's Hospital up towards --

23    A.    South.

24    Q.    -- King.

25    A.    Yeah, that's south.  Yeah.

1    Q.    Or towards like downtown, that kind

2  of part of Burnet?

3    A.    Yes.

4    Q.    Would that be where you sold to

5  Red, or would you ever sell to him in Price Hill

6  or downtown?

7    A.    Nah, I ain't never sold it to him

8  in Price Hill or downtown.

9    Q.    It was always on Burnet?

10    A.    Yes.

11    Q.    Did you know where he lived, Mr.

12  Heard?

13    A.    Somewhere down off Burnet.  I ain't

14  know.  I ain't never been there.

15    Q.    Have you ever heard of a street

16  called Hearne Avenue?

17    A.    Yes.

18    Q.    Okay.  Is that a street off of

19  Burnet?

20    A.    Yes.

21    Q.    Did you ever go to Red's house at

22  all?

23    A.    No.

24    Q.    How would Red make contact with

25  you, or how would he know where you were to buy

1    from you?

2        A.    He had called me.

3        Q.    And did you have a cell phone?

4        A.    Yes.

5        Q.    And did he have your cell phone

6    number?

7        A.    Yes.

8        Q.    How did he get that number?

9        A.    I gave it to him.

10        Q.    And would you ever -- so if you

11    could explain to the jury, Mr. Heard, you would

12    get a phone call.

13        A.    Yes.

14        Q.    And would that person identify

15    themselves?

16        A.    Yes.

17        Q.    And what would that person say?

18        A.    Said Kenny, this Red, are you doing

19    anything?  I'd tell him yep.

20        Q.    I'm sorry.  Go a little slower.  He

21    said, Kenny?

22        A.    Yes.

23        Q.    Is that what he called you?

24        A.    Yes.

25        Q.    And he said, this is Red?

1    A.    Yes.  And he said, are you doing

2 anything?  And I'd tell him yep, and he'd tell

3 me -- I'd tell him to meet me at the spot.

4    Q.    Would you tell him where you were?

5    A.    He knew where I was, because I

6 be -- I was on Burnet.

7    Q.    Okay.  I mean, Burnet is a pretty

8 big street.  Was there a certain spot that he

9 knew that you were normally hanging at?

10    A.    Yeah, by UDF.

11    Q.    Is that on the corner of King and

12 Burnet?

13    A.    Yes.

14    Q.    And then when he would come see

15 you, do you know if he would be on foot normally

16 or in a car?

17    A.    Foot.  I ain't never seen him

18 drive.

19    Q.    How long after the cell phone call

20 would he normally show up on Burnet?

21    A.    About 20 minutes.

22    Q.    Not long?

23    A.    Not long.

24    Q.    And then if you could explain the

25 deals that you made with him, just on a daily

1  basis over the next period of time, you'd have

2  the --

3        A.    Product and he had the money, and

4  we'd exchange.

5        Q.    He's in court today, he's got, it

6  looks like, either a bald or shaved head.  What

7  was his appearance like during that time period,

8  Mr. Heard?

9        A.    The same, bald, shaved head.  I

10  ain't never seen him with hair.

11        Q.    And when he would buy from you, did

12  you normally have any kind of conversation with

13  him at all?

14        A.    No, not until the day he told me

15  what he told me.

16        Q.    How would it normally go when

17  you'd -- he'd show up, would it just be -- if

18  you could let the jury know how that --

19        A.    It just was business.  He want

20  whatever he wanted, whatever money -- amount of

21  money he had, I gave him that much crack, and

22  that was it.

23        Q.    I'm going to ask you now to think

24  back, Mr. Heard, some time prior to you getting

25  shot, do you remember what month you were shot

1  in?

2          A.      April.

3          Q.      Of what year?

4          A.      '09.

5          Q.      '09?

6          A.      Yes.

7          Q.      Before you got shot, some time in

8  March/April of 2009, did you have a conversation

9  with Red that was different than the normal

10  conversation that you had with him?

11          A.      Yes.

12          Q.      And could you explain specifically

13  the specifics of that conversation?

14          A.      He called me, told me he had $15,

15  and I told him I don't sell nothing but 20s, and

16  I told him he will owe me five, and he said he

17  on his way.  When he got up there he was

18  nervous.  Two police drove down the street, and

19  I thought he tried to set me up.  And I said,

20  why you nervous?

21          Q.      And where were you that day?

22          A.      On Burnet.

23          Q.      And any specific part of Burnet?

24          A.      Yeah, it was on a porch by UDF,

25  right down the street from UDF.

1    Q.    All right.  And had he normally

2  acted nervous before?

3    A.    Nah, it was a different type of

4  nervous, something was wrong.

5    Q.    And did you ask him like, what's

6  going on?

7    A.    Yeah.  I asked him what's going on,

8  and he said his son in jail for something he

9  did.  And I said, turn yourself in.  And he said

10  he can't, it's a capital case.  And I said, what

11  that mean, whatchu do?  And he said he collapsed

12  somebody, that mean shot somebody and killed

13  them.

14    Q.    Did he say why he did it?

15    A.    Yeah.  He said so he wouldn't

16  testify against his son.

17    Q.    And what was Red's appearance like

18  when he was saying this to you?

19    A.    He started crying.

20    Q.    He started crying?

21    A.    Yes.

22    Q.    Okay.  And when he told you that he

23  killed somebody that was going to be a witness

24  against his son and he had to do it, what did

25  you say?

1          A.     I told him he going to hell.

2          Q.     Why did you tell him that he was

3     going to hell?

4          A.     Because he killed somebody, and he

5     letting his son go to jail for it.

6          Q.     Did he say how he did it?  How he

7     killed this witness against his son?

8          A.     He said he shot him.  I think he

9     said he shot him twice.

10         Q.     What was your reaction to him after

11    he told you he had killed somebody to protect

12    his son, so this person wouldn't testify against

13    him?

14         A.     I ain't really want to deal with

15    him no more, because somebody let they son go

16    down, he'd let me go down, so I ain't really

17    want to be around him no more.

18         Q.     Prior to moving out of town, then,

19    several months later, did you have another

20    conversation with him about some of the facts of

21    what had been going on?

22         A.     Yeah.  He said --

23         Q.     When was that conversation, if you

24    recall?

25         A.     I don't remember the exact date,

1  but it was around the summertime.

2      Q.      Right, of 2009?

3      A.      Yeah.

4      Q.      And what did Red tell you that

5  time?

6      A.      He said his family tried to set him

7  up to get him to admit it on tape.  The girl had

8  the tape recorder between her legs and he

9  noticed it and walked out.

10      Q.      Okay.  Did somebody try to get him

11  to confess on tape, somebody in his family?

12      A.      Yes.

13      Q.      Did he say that worked at all?

14      A.      No, he said it didn't work, he

15  walked out.

16      Q.      Because he discovered what they

17  were doing?

18      A.      Yeah.

19      Q.      After you had all this information,

20  did you ever tell anybody, like in law

21  enforcement --

22      A.      Yes.

23      Q.      -- about it?

24      A.      Yes.

25      Q.      Who is the first person that you

```
 1   told, Mr. Heard?
 2          A.     Officer Sneed.
 3          Q.     Why did you tell Officer Sneed?
 4          A.     'Cause that's something he need to
 5   go to jail.  That's just wrong what he did.  It
 6   just ain't right.  And plus I got shot, so I
 7   know how it feel.  I don't wish that on nobody.
 8          Q.     Had you known Officer Sneed before?
 9          A.     Yeah, we met in '99.
10          Q.     Was he one of the arresting
11   officers on one of your first felonies?
12          A.     Yes.
13          Q.     And over the years, have you given
14   him information on various things?
15          A.     Yes.
16          Q.     And he's somebody that you trusted?
17          A.     Yes.
18          Q.     When you first talked to Red about
19   what you heard Red say, did you have any
20   specific information about Red, his name, or
21   anything like that?
22          A.     No, I ain't know his name.
23          Q.     Did you know the victim's name?
24          A.     No.
25          Q.     And when you told Officer Sneed
```

1    that some guy named Red had admitted killing

2    somebody, what did Sneed say?

3         A.    He asked for the victim name, Red

4    name, and I ain't know -- I don't know the

5    victim name to this day, and I ain't know Red

6    name.  He said I got to get more information.

7         Q.    And did you ever get more

8    information about the real name of Red?

9         A.    Yeah, he told me.

10        Q.    What name did he tell you?

11        A.    Ruben Jordan.

12        Q.    And after you got the real name of

13   Ruben Jordan, what did you do?

14        A.    I called Sneed back -- nah, I saw

15   him.  I saw him at Kroger's on Vine and he gave

16   me the detective name, number, and I called her

17   and told her.

18        Q.    And what name and number -- what

19   name did he give you?

20        A.    Jenny Luke.

21        Q.    A homicide detective?

22        A.    Yes.

23        Q.    And did you call Detective Luke and

24   leave a message?

25        A.    Yes.

1    Q.    And then over -- do you recall

2  approximately when that would have been?

3    A.    The end of '09, beginning of

4  '010 -- I mean, 2010.

5    Q.    All right.  Now, did you become

6  aware at some point, Mr. Heard, that on

7  February 8th -- and I know this goes back a

8  while, but on February 8th of 2010, let me just

9  throw this out, that Mr. Jordan had to give a

10  swab of his cheek for a DNA sample?

11    A.    Yes.

12    Q.    Do you recall calling Detective

13  Luke on February 11th of 2010, just a few days

14  later?

15    A.    Yes.

16    Q.    And do you recall what you told

17  Detective Luke on February 11th?

18    A.    I don't remember the exact words,

19  but I told her that he shook up, he's nervous

20  because he think he left something at the scene,

21  because he just said you all took his DNA.

22    Q.    And when you're talking about he's

23  nervous or he's shook up, that he thinks he left

24  some DNA behind at the scene, who are you

25  referring to?

1     A.    Ruben Jordan.

2     Q.    How do you know, Mr. Heard, that he

3 was nervous or shook up about leaving something

4 behind at the scene?

5     A.    Because he kept talking about it.

6 Because I was on the phone with somebody and he

7 was in the background.

8     Q.    Who was in the background?

9     A.    Ruben Jordan.

10     Q.    Were you on the phone with a mutual

11 friend?

12     A.    Yes.

13     Q.    What was that friend's name?

14     A.    Johnny Brown.

15     Q.    Does he have a nickname?

16     A.    Goose.

17     Q.    So, Jordan was at Goose's house and

18 you were on the phone with Goose at the time?

19     A.    Yes.

20     Q.    You heard Jordan say that he was

21 worried that he left something behind?

22     A.    Yes.

23     Q.    And you related that to Detective

24 Luke?

25     A.    Yeah.  He thought he left a

1  cigarette.

2      Q.    And then after that, you met with

3  Detective Luke at some point several months

4  later in May of 2010?

5      A.    Yes.

6      Q.    Had you ever seen or talked to Mr.

7  Jordan since then, Mr. Heard?

8      A.    No.  Well, I seen him on TV.

9      Q.    Okay.  I know when you're a CI you

10  might get case consideration for giving

11  information.  Do you know what that means?

12      A.    Yes.

13      Q.    What does that mean to you?

14      A.    Get the charges lowered or dropped.

15      Q.    Okay.  And this information that

16  you gave to Officer Sneed and Detective Luke

17  about Ruben Jordan confessing that he killed

18  Mr. Davis to protect his son, are you getting

19  anything for that?

20      A.    No.

21      Q.    Did you ever ask for anything for

22  that?

23      A.    No.

24      Q.    Why are you coming forward to the

25  police in front of all these people in the

1    courtroom and a jury and telling them what he

2    said?

3        A.    Because what he did was wrong.  I

4    just felt like somebody need to stand up.

5            MR. TIEGER:  Just one moment,

6        Judge.

7            That's all I have, Judge.  Thank

8        you.

9            THE COURT:  Okay.  Cross?

10              CROSS-EXAMINATION

11   BY MS. WILLIAMS:

12       Q.    Mr. Heard, you said that you met

13   Mr. Jordan through a friend, correct?

14       A.    Yes.

15       Q.    What -- do you know what that

16   friend's name is, do you remember?

17       A.    Johnny Brown.

18       Q.    That was Johnny Brown.  This is

19   Goose that you're talking about?

20       A.    Yes.

21       Q.    But you had never met Mr. Jordan

22   personally?

23       A.    Before then, no.

24       Q.    Okay.  And you said that you had

25   sold him drugs on numerous occasions, about two

1   to five times a week, I think you said?

2       A.    Yeah.

3       Q.    How many weeks are we talking?

4       A.    From the time I met him until --

5   for about a year.

6       Q.    About a year.  And you never knew

7   what his real name was?

8       A.    No.

9       Q.    When did you find out his name was

10  Ruben Jordan?

11      A.    When he told me.  When I asked him,

12  and he told me.

13      Q.    Okay.  And that was before you knew

14  all about this case?

15      A.    Nah, that was after.  That's why I

16  asked him his name, because the detective told

17  me she needed his name.

18      Q.    Okay.  Did you ever do drugs

19  yourself?

20      A.    Yes.

21      Q.    Okay.  Were you ever charged with

22  possession or doing drugs, or just trafficking?

23      A.    Yeah, possession and doing drugs,

24  drug abuse.

25      Q.    Okay.  Were you doing drugs at any

1 of the times you say you heard Mr. Jordan make

2 these statements?

3       A.    Nah, they was.

4       Q.    They was?

5       A.    Yeah.

6       Q.    Who was?

7       A.    Goose and Ruben, they snort pills.

8 And Goose used to smoke crack.  He been clean

9 for like six years; but Ruben, he still smoke

10 crack.

11       Q.    How do you know that?

12       A.    Because he was buying it from me.

13       Q.    How do you know he was actually

14 using it, though, just because he was buying it

15 from you, or so you say?

16       A.    Because he be having crack pipes

17 and he get busted at people's house pushing the

18 pipe, trying to get a hit.

19       Q.    How -- I mean, if you're looking at

20 Mr. Jordan right now, how old would you say he

21 looks?

22       A.    About 40.

23       Q.    About 40.  Do you remember an

24 interview that you gave to Detective Luke on

25 February 11th of 2010?

          A.    Yes.
          Q.    Do you remember how old you said
Mr. Jordan was to her?
          A.    About 40.
          Q.    Okay.  Do you remember telling her
he's in his early 20s?
          A.    No.  That's a misprint.
          Q.    Thanks.  I'll show you the
transcript that was taken from that.  If you
could just read what you -- what they said you
said?
          A.    His name is Ruben Jordan, and he's
in his early 20s.
          Q.    Okay.  Thank you.  But Mr. Jordan,
obviously, isn't in his early 20s, correct?
          A.    I know.  Because I knew he was
older than me, and I'm 33, so I wouldn't have
said that.  That's a misprint.
          Q.    Okay.  And you said that you were
testifying today because you didn't -- you
thought this was wrong and you wanted him to go
to jail, correct?
          A.    Right.
          Q.    And you don't get anything
personally for testifying in this case?

1    A.    No.

2    Q.    Okay.  And you had worked as a

3 snitch for the officers for some time, correct?

4    A.    I wasn't no snitch.

5    Q.    Okay.  You didn't do any work for

6 the officers?

7    A.    Yes.

8    Q.    Okay.  So, you didn't get

9 anything -- you had done some work for officers

10 in exchange for some deals on your prior cases?

11    A.    Yes.

12    Q.    Okay.  But you didn't do any

13 snitching work?

14    A.    Nah, that ain't snitching.

15    Q.    Okay.  So, you don't get anything

16 for testifying today?

17    A.    No, again.

18    Q.    And you said that he actually told

19 you that he shot Mr. Davis?

20    A.    Yes.

21    Q.    And that he shot him twice?

22    A.    Yes.

23    Q.    Okay.  So if I told you that Mr.

24 Jordan was actually shot three times, that would

25 surprise you?

```
 1          A.    No.
 2          Q.    Okay.  But he actually said, I only
 3   shot him twice?
 4          A.    Yeah, that's what I thought he
 5   said.
 6          Q.    Okay.  And you said that you had
 7   been shot back in April of 2009, correct?
 8          A.    Yes.
 9          Q.    Okay.  And that had nothing to do
10   with Mr. Jordan or Kareem Gilbert or anything
11   related to this incident, correct?
12          A.    Nope.
13              MS. WILLIAMS:  Okay.  No further
14          questions, Your Honor.
15              THE COURT:  Thank you, sir.
16              Do you have anything else from the
17          State?
18              MR. TIEGER:  No, Your Honor.
19              THE COURT:  Thank you very much for
20          your testimony, sir.  You may step down,
21          and you're probably released.
22              MR. TIEGER:  That will be fine,
23          Judge.
24              THE COURT:  Both sides.  He's being
25          released.  Do you object?  All right.
```

1      Thank you, sir.

2           (Witness excused.)

3           MR. TIEGER:  Police Officer Sneed.

4           THE COURT:  Officer, you may step

5      forward.  Officer, you do need to be

6      sworn in.

7           THE WITNESS:  Yes, ma'am.

8           OFFICER DARRIS SNEED,

9  having been first duly sworn, was examined and

10 testified as follows:

11                DIRECT EXAMINATION

12 BY MR. TIEGER:

13      Q.    Good afternoon.

14      A.    Good afternoon.

15      Q.    Could you please tell us your name,

16 and spell your first and last name for me.

17      A.    My name is Darris, D-A, double R,

18 I-S.  Sneed is S-N-E-E-D.

19      Q.    And what's your occupation,

20 Mr. Sneed?

21      A.    Police officer.

22      Q.    And is that for the City of

23 Cincinnati?

24      A.    Yes, it is.

25      Q.    How long have you been a Cincinnati

1  police officer?

2        A.    Fourteen years.

3        Q.    The gentleman that just left, Mr.

4  Heard, did you know Mr. Heard prior to today?

5        A.    Yes.

6        Q.    And, in fact, were you involved in

7  his arrest for a drug case in 1999?

8        A.    Yes, that's true.

9        Q.    Were you part of the drug squad

10 back then?

11       A.    Yes.

12       Q.    And what are you doing now?

13       A.    I'm a detective in District 3.

14       Q.    Investigating whatever crimes

15 happen in the west side of the City?

16       A.    Yes, that's correct.

17       Q.    Not only involved in the drug

18 world, like you were before, but kind of

19 anything that goes on?

20       A.    Right.  Burglaries, felonious

21 assaults, things like that.

22       Q.    Okay.  Since 1999, did Mr. Heard

23 provide information to you in exchange for case

24 consideration?

25       A.    Since '99?

1    Q.    Or during that case in '99?

2    A.    Yes, he did.

3    Q.    And you have kept in touch with him

4 over the years?

5    A.    Yes, up to like maybe about -- I

6 don't know, maybe seven, eight years ago.

7    Q.    Okay.  I'm going to direct your

8 attention now till some time in maybe the summer

9 of 2009.  Did you get involved with Mr. Heard

10 again?

11    A.    Yes, I did.

12    Q.    And can you tell the jury how you

13 got involved with him?

14    A.    He called me on my phone.  He got

15 my number and he called my work phone and left

16 me a message, said it's very important that I

17 get in touch with him, that he had information

18 on a homicide.  So, he left the number for me to

19 call him back.

20        I -- after I got the message, I

21 called him back and I couldn't reach him.  He,

22 in turn, called me back, maybe a couple days or

23 so later and we talked, and he told me that he

24 had information on a homicide and he didn't have

25 a name.

1    So, I told him that he had to get
2 more information, you know, had to get a name
3 and things like that in order for me to pass it
4 on, because I would say we have a lot of
5 homicides here in Cincinnati, and it's just not
6 enough information for me to pass on.
7    Q.   When you say he didn't have a name,
8 he didn't have any -- maybe he had a nickname,
9 but he didn't have any kind of formal names?
10    A.   Yes.  He didn't have a formal name,
11 anything that we can look up in the computer or
12 something that a homicide detective will say,
13 okay, I'm familiar with that name.
14    Q.   Okay.  So you told -- you asked
15 him, I can't really -- what did you say to him?
16    A.   I told him, I can't really do
17 anything with it, or it's not enough information
18 for me to give to a homicide detective because
19 they need more to go on.
20    Q.   Okay.  A period of time passes, and
21 then what happened next, Officer Sneed?
22    A.   Working an off-duty detail at the
23 Kroger's on Vine Street, 1420 Vine, across the
24 street from where Smitty's Clothing Store used
25 to be at, and I see him on Vine Street, and

he -- I'm out in the parking lot.  And he comes
in the parking lot, he said, hey, I have more
information for you, he said, I have a name for
you now.  I said, okay, well, here's what I am
going to do, because I can't do much with it, I
don't work in homicides at all.  So I said, I'm
going to give you a number of one of the
homicide detectives to call.  And I gave him
that number and he left.

      Q.    Okay.  And whose number did you
give him, Officer Sneed?

      A.    Detective Jen Luke.

      Q.    And did you have her phone number?

      A.    Yes.

      Q.    Did you ask Mr. Heard to give you
the name, or did you stay out of it and let him
deal directly with Detective Luke?

      A.    I stayed out of it.  I think it's
more important with anybody's case to do that.
I always try to stay out of it because I don't
want them talking to me, telling me information,
you know, and then they come and tell the
detective that they need to talk to, you know --
basically, you know, something that I can't help
them with really.  I couldn't go into too much

1    detail to help him out, so I just stayed out of

2    it.

3         Q.    Okay.  Was that basically the end

4    of your involvement with Mr. Heard, other than

5    getting notified for court?

6         A.    Yes.

7              MR. TIEGER:  Just one moment.  No

8         further questions, Judge.

9              THE COURT:  Okay.

10                   CROSS-EXAMINATION

11   BY MS. WILLIAMS:

12        Q.    Detective Sneed, I'm sorry, how

13   many conversations did you say you had with Mr.

14   Heard?

15        A.    He left me a message on my

16   voicemail, and I called him back, couldn't reach

17   him.  Then he called me and we talked, and then

18   I saw him downtown on Vine Street, so with -- in

19   reference to this incident, two.

20        Q.    Okay.  Two conversations and one

21   message?

22        A.    Yes.  The message that he left me,

23   and I also left him a message.

24        Q.    Okay.  When you tried to call him

25   back and didn't reach him, did you just leave

1  him a message, or did you get a voicemail, or

2  did it say that the phone wasn't available?

3          A.     I just -- I remember leaving him a

4  message telling him that this is Sneed calling

5  you back, you know, call me when you get the

6  message.

7          Q.     And he said that you were the first

8  person that he called?

9          A.     Did he say I was the first person?

10         Q.     Yes.

11         A.     He didn't say either way, that I

12 was the first person or not.

13         Q.     Okay.  And you said you hadn't had

14 any contact with him for seven or eight years?

15         A.     As far as him working with us.

16         Q.     Okay.

17         A.     Yeah.  I have seen him in the

18 streets of Price Hill, you know, just in

19 passing, but we didn't talk or anything.

20         Q.     Okay.  So, you don't know why you

21 would be the first person he would call if he

22 knew this information -- if he knew information?

23         A.     I believe it's because -- I mean,

24 we had a relationship where he worked with us,

25 you know, with our drug task force, and so we

1  developed sort of a rapport, you know, over

2  those years.

3        Q.    Okay.  What kind of work did he do

4  for you?

5        A.    He was an informant for us.

6        Q.    Okay.  What they call on the street

7  "a snitch" --

8        A.    Yes.

9        Q.    -- basically?  Okay.  When he did

10  finally know a name, that's when he came back

11  and you saw him on the street?

12        A.    Actually, I was working.  It was

13  sort of just a coincidence.  I was downtown

14  working and he was downtown and he saw me, and

15  he said, hey, I got a name for you, you know.

16        Q.    And how many days after -- how long

17  after your original conversation, when you told

18  him you needed a name, was this?

19        A.    I'm not sure.

20        Q.    Okay.  Was it like a couple of

21  weeks, or just a couple of days?

22        A.    I know it was a couple of weeks.

23        Q.    Okay.  Did he say how he got that

24  name?

25        A.    No, he didn't tell me, and I didn't

```
1   ask him.
2       Q.    Okay.  But you told him he needed a
3   name, and then just suddenly he has a name?
4       A.    I told him he needed more
5   information, like a name, you know, that would
6   connect what he is saying to what actually
7   occurred.
8           MS. WILLIAMS:  Okay.  No further
9           questions, Your Honor.
10          THE COURT:  Anything else, Counsel?
11          MR. TIEGER:  Just one moment,
12          Judge.  Nothing further, Judge.
13          THE COURT:  All right.  So, the
14          State is adjourning for this moment,
15          right?
16          MR. TIEGER:  Yeah, we don't -- I
17          have no further questions for Detective
18          Sneed, so it's fine if he's excused.
19          THE COURT:  He's excused, counsel.
20          MR. WHALEN:  Fine, Your Honor.
21          THE COURT:  All right.  Thank you,
22          Officer.  You are excused.
23          THE WITNESS:  Thank you.
24          (Witness excused.)
25          THE COURT:  And, at this point, the
```

1    State is not going to call any further

2    witnesses today, correct?

3         MR. TIEGER:  Judge, I know we

4    talked before court about how it's all

5    gonna happen.  I think we have two more

6    witnesses to present, and I think for the

7    convenience of everybody it would be

8    easier if we did -- and I apologize to

9    the Court and jury for the timing, I know

10   it's --

11        THE COURT:  Well, I'm just going to

12   explain to the jury that due to new

13   developments, we are going to be

14   adjourning for today.  I don't think the

15   jury is going to explain to the Jury

16   Commissioner.

17        So, at this point, we want to thank

18   you and excuse you for today, and you are

19   to remember your admonitions.  But you

20   are released for today, and you do not

21   have to report to the Jury Commission

22   because you are in this case and this

23   case alone, so you are free to go and do

24   whatever you need to do today.  Thank you

25   very much for your time and attention.

1    MR. TIEGER:  Judge, what time

2 tomorrow did you want to try to start?

3    THE COURT:  Tomorrow, we are going

4 to do it at noon.  Start at noon, because

5 I do have a morning docket.  Thank you.

6    MR. TIEGER:  Thank you, Your Honor.

7    BAILIFF:  All rise for the jury,

8 please.

9    (The jury leaving the courtroom at

10 1:28 p.m.)

11    THE COURT:  Anything further,

12 counsels?

13    MR. TIEGER:  Judge, like I think we

14 talked about before, our last two

15 witnesses would probably be Kareem

16 Gilbert and then Detective Luke, and then

17 we would most likely rest at that point.

18 So I don't know if the Court could ask

19 the defense if, depending on how much

20 time they're gonna take with Mr. Gilbert

21 or Detective Luke, if the Court would

22 want them to be prepared with their

23 witnesses tomorrow or not?  Judge, either

24 way, we'll see what happens.

25    THE COURT:  Right.  I'm just --

1          MR. WHALEN:  Your Honor, I believe

2     we should be able to go forward tomorrow.

3          THE COURT:  You'll be ready and

4     have your witnesses in case, and if they

5     aren't called tomorrow, they may have to

6     come back on Thursday or Friday.

7          MR. TIEGER:  Thank you, Judge.

8          THE COURT:  Okay.  With that, we

9     are adjourned for the day.

10         MR. TIEGER:  Thanks, Judge.

11         MS. SHANAHAN:  Thank you, Your

12    Honor.

13         (Proceedings continued in progress

14    until January 19, 2011.)

15

16

17

18

19

20

21

22

23

24

25