1              COURT OF COMMON PLEAS

2              HAMILTON COUNTY, OHIO

3                    - - -

4    STATE OF OHIO,           :

5              Plaintiff.     :

6    vs.                      :Case Number B1003262

7    RUBEN JORDAN,            :Appeal Number C1100833

8              Defendant.     :Volume IV of XI

9

10                   - - -

11           TRANSCRIPT OF PROCEEDINGS

12                   - - -

13   APPEARANCES:

14        Seth S. Tieger, Esq.
          Megan E. Shanahan, Esq.
15             On behalf of the State of Ohio.

16        William P. Whalen, Jr., Esq.
          Amy R. Williams, Esq.
17             On behalf of the Defendant.

18

19

20           BE IT REMEMBERED that upon the Jury

21   Trial of this cause, on January 19, 2011, before

22   the Honorable NADINE L. ALLEN, a judge of the

23   said court, the following proceedings were had,

24   to wit:

25

KAREEM GILBERT

Direct Examination ...........Page 660, Line 10
Cross-Examination ...........Page 702, Line 2
Cross-Examination ...........Page 711, Line 1
Cross-Examination ...........Page 714, Line 15

1    PROCEEDINGS, January 19, 2011

2         BAILIFF:  Court is back in session

3    for now.  You can remain seated.

4         THE COURT:  Did anybody call for

5    the witness?

6         BAILIFF:  Yes, Your Honor.

7         THE COURT:  So the witness isn't

8    here yet?

9         BAILIFF:  Yes, sir, he's being

10   brought down.

11        MR. BRENNER:  He's on his way.

12        THE COURT:  Take this opportunity

13   to advise people who are observing or

14   anybody who's in this courtroom, that if

15   there are any cell phones in anyone's

16   possession that they all have to be off

17   completely; like off, not vibrating, not

18   on at all.  There will be no texting, no

19   picture taking and no communication by

20   cell phone.

21        If you have those, dispose of them

22   right now, put them -- get them out of

23   your hands.  They are not to be in your

24   physical possession or your hands.  This

25   is a warning.  The Court does have the

authority to remove cell phones from
persons who violate that rule.  That will
be the first step.  There are other steps
that can be taken, like contempt of
court, especially in a jury trial or a
charge of this nature.  So that's the
warning.

Bring the defendant (sic) here to
the witness stand.  I'll have him sworn
in before the jury.  He may have a seat
there.

THE WITNESS:  That's all I'm
supposed to tell him?

THE COURT:  Sir, you don't have to
say anything right now.  I'm not sure
what you just said.  The next thing that
is going to happen is I'm going to have
you stand up and raise your right hand to
be sworn when the jury gets here.

(The jury entering the courtroom at
12:15 p.m.)

THE COURT:  You may all be seated.
We are ready to resume with the -- good
afternoon, ladies and gentlemen of the
jury.  We are ready to resume with the

1        State's next witness.  You are calling?

2            MS. SHANAHAN:  We are calling

3        Kareem Gilbert, Your Honor.

4            THE COURT:  Sir, would you stand up

5        and raise your right hand to be sworn.

6        Raise your right hand.

7                    KAREEM GILBERT,

8    having been first duly sworn, was examined and

9    testified as follows:

10                   DIRECT EXAMINATION

11   BY MS. SHANAHAN:

12       Q.    Kareem, please state and spell your

13   name for the record?

14       A.    K-A-R-E-E-M, G-I-L-B-E-R-T.

15       Q.    Okay.  Kareem, you're in prison for

16   the murder of Brian Austin, correct?

17       A.    Right.

18       Q.    And you admitted to that murder and

19   plead guilty to that, correct?

20       A.    Right.

21       Q.    You did agree that you would do an

22   18-year sentence, and the State offered you that

23   as long as you would testify truthfully against

24   a person named Ruben Jordan, correct?

25       A.    Right.

1    Q.    And are you agreeing to come here

2  and testify truthfully against Ruben Jordan?

3    A.    Right, but I'm telling the truth

4  right now, like, man, he ain't did none of that,

5  like.  He ain't do none of that like.

6    THE COURT:  Wait a minute.  I'm

7    going to say right now, there is to be no

8    outbursts in the courtroom before this

9    jury.  If you cannot control yourself,

10    you're going to be ordered to leave.

11    Now, continue -- sir, wait a minute.

12    Respond to the question first.

13    THE WITNESS:  Okay.

14    THE COURT:  Wait until there is a

15    question.

16    Q.    Okay.  Kareem, who is Ruben Jordan?

17    A.    My father.

18    Q.    Okay.  And do you see him here in

19  the courtroom?

20    A.    Right.

21    Q.    Where is he?

22    A.    Right there.

23    Q.    Okay.  And he's wearing the striped

24  shirt, correct?

25    A.    Yeah.

```
 1          Q.    Okay.  You were locked up from
 2    February 31st (sic) of 2008 until May of 2010
 3    without coming forward against your father,
 4    correct?
 5          A.    Right.
 6          Q.    But your father was with you the
 7    night that Victor Davis was murdered, correct?
 8          A.    Yeah.  We was at his house watching
 9    a football game.
10          Q.    Okay.  And ultimately, though, you
11    two left your father's house, right?
12          A.    Nah, we was at his house watching a
13    game.
14          Q.    Okay.  Then what did you do?
15          A.    Chill.
16          Q.    Just chilled out there?
17          A.    Right.
18          Q.    I'm talking about the night Victor
19    was murdered, right, Halloween night of 2008?
20          A.    Yeah, we stayed in and watched TV.
21          Q.    Okay.  Eventually you went down to
22    Republic and Elder Street that night, correct?
23          A.    No.
24          Q.    You never went down there?
25          A.    No.
```

1       Q.    Okay.  Your father never went down

2  there?

3       A.    No.

4       Q.    Your father stayed in with you all

5  night?

6       A.    Right.

7       Q.    Through November 1st, the next day?

8       A.    Right.

9       Q.    You have to answer out loud.  Okay.

10         MS. SHANAHAN:  You Honor, at this

11      time I would like permission to treat the

12      witness as a hostile witness.

13         THE COURT:  Do you object to that?

14         MR. WHALEN:  Yes, I do, Your Honor.

15         THE COURT:  How's that?

16         MR. WHALEN:  Your Honor, he's their

17      witness.  They brought him down from

18      prison, they've talked with him.  He's

19      made an agreement -- he's come in and he

20      agrees he's going to tell the truth.

21         THE COURT:  I understand that.

22         MR. WHALEN:  Now, he's telling the

23      truth and they want to create a -- tell

24      him he's a hostile witness.

25         THE COURT:  Well, you can lay the

1          groundwork for that, Counsel, for the

2          exception that you're attempting to do.

3                    MS. SHANAHAN:  Thank you, Your

4          Honor.

5          Q.     Kareem, you have previously given

6     statements to the Court, correct, on May 17th of

7     2010, right?

8          A.     Right.

9          Q.     And you gave statements to the

10    police on May 17th of 2010, correct?

11         A.     Right.

12         Q.     And both of those times you

13    admitted that you and your father went down to

14    Republic Street, and that your father shot and

15    killed Victor Davis, correct?

16         A.     Right, but I was just mad for real,

17    like, man.  Like, he ain't never been there for

18    me, so I was just pissed off, man.  He don't

19    even like guns.  He's scared of guns.

20         Q.     Okay.  So you lied to the police

21    back in May of 2010, right?

22         A.     Yeah.

23         Q.     Okay.  And as a matter of fact, as

24    recently as this past Monday I came to the jail,

25    Mr. Tieger came to the jail and met with you,

1  correct?

2         A.    Right.

3         Q.    And you lied to us then?

4         A.    Right.

5         Q.    Okay.  Your father was never down

6  there on Republic?

7         A.    Never.

8         Q.    That whole night?

9         A.    That whole night.

10        Q.    And you weren't down there on

11 Republic that whole night?

12        A.    Nope, I don't know what happened on

13 Republic.  I don't even know who did that.

14        Q.    Okay.  You don't know who killed

15 Victor Davis?

16        A.    Nope.

17              THE COURT:  Okay.

18              MS. SHANAHAN:  Your Honor, at this

19        time, I would like to introduce the

20        witness's prior statements for that,

21        because we were not anticipating this,

22        obviously.  We need to get a laptop.

23              THE COURT:  It's a surprise?

24              MS. SHANAHAN:  It is.

25              THE COURT:  And it's a reversal of

1    what you thought the testimony would be

2    --

3            MS. SHANAHAN:  Oh, absolutely.

4            THE COURT:  -- of this witness.

5            MS. SHANAHAN:  Yes, ma'am.

6            THE COURT:  And they're asking to

7    call him as if on cross, and there is an

8    exception in the Rules of Evidence.  I'm

9    going to grant that.

10           MS. SHANAHAN:  Thank you.

11           THE COURT:  Overruled.  I'm going

12   to overrule the objection.  It is on the

13   record.  Objection is overruled.  The

14   defendant -- the witness, that is, may

15   answer all the questions.

16           MS. SHANAHAN:  Okay.  Do you have

17   the ability, ma'am, to play?

18           Your Honor, we need to just call

19   for a laptop to be brought in the room to

20   be able to play the witness's statement.

21           THE COURT:  We'll do that now.  So

22   take a recess or continue with something

23   else?

24           MS. SHANAHAN:  It would be a good

25   time to take a recess and get the laptop.

1        THE COURT:  All right.  Well, then
2    I'm going to remove the jury at this
3    point.
4        MR. BRENNER:  All rise for the
5    jury.
6        THE COURT:  Wait a minute.  I think
7    we can do it in a minutes.  Apparently
8    Mine is going to work.  I never know, so
9    I think it's going to be just -- do you
10   want to --
11       MR. TIEGER:  Maybe just a
12   five-minute break to make sure it all
13   works.
14       THE COURT:  At this time because of
15   the surprise, et cetera, there will be a
16   recess.  I will advise the jury that I'm
17   sure it's tempting to discuss what just
18   happened.  And you are under an
19   admonition, you cannot discuss what's
20   happening this morning or any other part
21   of this trial until it's time for you to
22   deliberate, and I'm gonna hope that you
23   will abide by that.  Thank you very much.
24       (the jury leaving the courtroom at
25   12:23 p.m.)

1     MR. TIEGER:  Judge, other things we
2  have, since I know everybody is here with
3  counsel, is that there is a transcript
4  that was made of his statement that we
5  would like to copy and let the jury
6  follow along with the tape with a
7  transcript.
8     THE COURT:  All right.  So, that
9  will take some time.
10    MR. TIEGER:  So we'll need some
11 time to make 18 copies of that or so.
12    THE COURT:  At this point, do you
13 want the defendant --
14    (Recess.)
15    THE COURT:  Counsels, the reason I
16 wanted to come in, because I would like
17 for Mr. Issenmann -- is he already out
18 there?  Do you want to put on the record
19 that since the defendant may be saying --
20 making comments that are against his own
21 best interest, his Fifth Amendment
22 Rights, I thought he should talk to a
23 lawyer first.  And when he comes out, I
24 think -- can we put that on the record,
25 please, get everybody in here?  Okay.

And I'm going to do it outside of the presence of the jury. If I tell them later, because they have to come in and go back out, that's kind of chaotic a little bit. Where is the witness? Can we bring the witness in?

DEPUTY: Come on in. Just go up there and stand.

THE COURT: All right. Back on the record at this point, back on the matter of State vs. Ruben Jordan, 1003262. He can have a seat right there. That's fine. I just want to put on the record that the defendant -- I mean, the witness -- since he's in that uniform -- I keep saying defendant, make this correction for the record, this was a witness also. The prosecution State's witness, Mr. Kareem Gilbert, has recanted or is saying something contrary to what he said before, therefore, the State is getting ready to treat him has a hostile witness and cross-examine him. That means that he has a Fifth Amendment Rights to remain silent, and he does not

have to answer any questions that he
feels may incriminate or subject him to
perjury charges or falsification, or that
there was a deal about a sentence that he
was given.  I'm not sure how this plays
into it.  Not that it matters, I think it
is a possibility.  Therefore, sir, do you
understand what your Fifth Amendment
rights are?

THE DEFENDANT:  No, ma'am.

THE COURT:  No, you don't
understand them?

THE WITNESS:  No.

THE COURT:  That's why I brought in
your attorney, Mr. John Issenman.  Did
you represent Mr. Kareem Gilbert at his
underlying --

THE WITNESS:  Excuse me.  Issenmann
ain't on my team no more.  I don't know
who team he on.  He ain't with me no
more.

THE COURT:  He is here to discuss
with you -- he's not on your team, you
don't trust him?

THE WITNESS:  No, I don't trust

1    him.

2         THE COURT:  How about Dan Burke?

3    Is he still in the room?  Sir, you need

4    to talk to an attorney about what your

5    Fifth Amendment rights are.

6         THE WITNESS:  Okay.

7         THE COURT:  With someone before

8    this trial resumes.  Would you speak to

9    Mr. Dan Burke, who is one of the chief

10   attorneys in the public defender's

11   office?

12        MR. BURKE:  Judge, I can't

13   represent him, or talk to him.  I

14   represented a family member of the

15   Gilbert family in Judge Marsh's room

16   regarding a tampering and intimidation of

17   a witness regarding this case and this

18   trial.  So, I cannot represent -- I

19   represented her in front of Judge Marsh,

20   so I cannot represent anybody in the

21   Gilbert family.

22        THE COURT:  Well, then we will

23   reset this until somebody in the public

24   defender office can.

25        MR. BURKE:  That's fine.

1          THE COURT:  We are going to have

2     counsel come and speak to you.  Is that

3     what you would like, sir?

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  Since you're telling me

6     you don't understand what I just said

7     about your Fifth Amendment Right to

8     remain silent and not answer questions.

9     I would rather have somebody come in and

10    get into depth with that with you

11    outside -- I just made my record, so I'm

12    going to get a defense attorney.

13         MR. BURKE:  I'll find somebody,

14    Judge.

15         THE COURT:  So, I would like him to

16    remain just right here in this corridor

17    so we can resume as soon as that is

18    concluded.

19         MR. TIEGER:  Judge, as we said

20    earlier, our plan, basically, when he

21    takes the witness stand again, is we have

22    a prior tape-recorded statement that he

23    made, just to play that in front of the

24    jury and have them listen to what he

25    previously said, and then go on from

there.

THE COURT:  And there may be other questions for him.

MR. TIEGER:  Yes, there would be other questions after that.

THE COURT:  Because I have overruled the objection to treating him as a hostile witness.  The State has established surprise.  There is a change in testimony and, therefore, he'll be subject to cross-examination.

MR. TIEGER:  Yes.

THE COURT:  So with that, put Mr. Kareem Gilbert, the witness, in the hallway, and you're bringing somebody in?

MR. TIEGER:  Judge, I don't know whether the hallway -- because it might take a while.  I don't know whether they --

THE COURT:  You mean this Court?

MR. TIEGER:  -- need to put him back upstairs on six, because it might be a little while.

THE COURT:  Mr. Burke, how long does it take to get somebody in here?

1   You getting somebody quickly?  Mr. Burke,

2   do you think it might be 15 minutes?

3           MR. BURKE:  I'm going to call right

4   now.

5           MR. ISSENMANN:  Mr. Perkins

6   represented him initially in this case.

7           THE COURT:  Is Mr. Perkins in the

8   office?

9           MR. ISSENMANN:  I don't know that.

10  He's happy with Mr. Perkins talking to

11  him.

12          MR. TIEGER:  Hey, Dan.  Judge, the

13  problem with Mr. Perkins is that

14  Mr. Perkins and Mr. Wenke withdrew from

15  his case because they said he had an

16  ethical problem, so I don't think Mr.

17  Perkins could get involved anyway.

18          THE WITNESS:  I fired him.

19          MR. TIEGER:  Right.  I mean, it's

20  going to be a problem.

21          THE COURT:  He doesn't want

22  Perkins?

23          THE WITNESS:  I want Perkins.  No.

24          MR. BURKE:  Judge, I'll get ahold

25  of Mr. Cutcher.

1          THE COURT:  Mr. Tim Cutcher.

2          MR. BURKE:  He's the felony staff

3     leader.

4          THE COURT:  That's right.

5          MR. BURKE:  So I'll call him.

6          THE COURT:  Do you know Attorney

7     Tim Cutcher.  Sir, Mr. Gilbert, do you

8     know Attorney Tim Cutcher?

9          THE WITNESS:  No, I don't know none

10    of them.

11         THE COURT:  You don't know him.

12    Fine, that's good, you don't know him.

13    He's a defense attorney.  He will come

14    and talk to you.

15         MR. TIEGER:  Judge, the problem is

16    going to be that by the time he gets over

17    here, he's going to have to be briefed on

18    what is going on.

19         THE COURT:  So we'll take a

20    half-hour break.

21         MR. TIEGER:  Security-wise, I think

22    it's probably better that he go upstairs

23    and we -- and resume and tell the jury

24    that it's going to be a little while.

25         THE COURT:  Let us do this.  Let's

1  take a recess.  Take the witness back

2  upstairs.  Officially, at this point,

3  parties, I'm going to -- I'm going to

4  make this an official recess, because I

5  don't want to rush it.  I'm sending

6  Mr. Gilbert back upstairs.  His lawyer

7  can come over.  They can spend the time

8  they want to spend discussing this

9  situation.

10       MR. WHALEN:  Can the Court send one

11  of their personnel to tell the jury that

12  it's going to be a little longer than

13  before?

14       THE COURT:  As soon as we get this

15  resolved.

16       MS. WILLIAMS:  I believe they want

17  to take the defendant back up also.

18       THE COURT:  That's what I just

19  said.  He's the witness.

20       MR. WHALEN:  They are taking the

21  defendant upstairs, too.

22       THE COURT:  That's fine, if they

23  want to do that for security.

24       MR. TIEGER:  The problem is that

25  they absolutely have to be separated

upstairs.

THE COURT:  Do they understand
that?  Why are they both going upstairs?
Why are they both going upstairs?  Why
does the defendant need to be going
upstairs?

DEPUTY:  If the Court is not -- if
he needs to remain, Your Honor, we will
let him remain, but I thought the Court
was going to be in recess.

THE COURT:  Will they be able to
have communication with each other?

DEPUTY:  We'll separate them
upstairs.

THE COURT:  Okay.  You would prefer
to have them separated because of
security.  You?  While the jury --

MR. TIEGER:  Yes, Judge.

THE COURT:  While we're in recess.

MR. TIEGER:  Judge, obviously, it's
a very explosive situation.  There is no
more serious type of case that we are
doing.  He's coming now and recanting to
extremes of prejudice.  But for them to
be together would be dynamite at this

1    point, so they need to be totally

2    separated.

3         THE COURT:  Of course, they will be

4    separated.  So let's just take --

5    Mr. Gilbert doesn't need to be here for

6    this conversation at all, let's take him

7    out.  He can leave right now and he will

8    be talking to an attorney shortly.

9    Meanwhile -- there.  One of you can

10   remain here while that's going on.  Leave

11   the defendant here.  You would rather

12   take him upstairs?

13        MR. WHALEN:  Your Honor --

14        DEPUTY:  Whatever you want, ma'am.

15        MR. WHALEN:  -- it's probably going

16   to be a little while, and it'd be in Mr.

17   Jordan's best interest if he went

18   upstairs, that way he could use the

19   restroom and --

20        THE DEFENDANT:  Eat lunch.  We

21   didn't eat lunch.

22        MR. WHALEN:  He needs to eat lunch.

23        MR. TIEGER:  I'm sure he's built up

24   an appetite having gone through all this.

25        THE COURT:  Okay.

1          MR. TIEGER:  Sorry, Judge.

2          THE COURT:  Yeah, we'll retract

3     that.

4          MR. TIEGER:  Yes.

5          THE COURT:  At this point, there is

6     a -- I'm just concerned about the ability

7     for them to pass messages or although

8     they were having some --

9          DEPUTY:  We'll have them in

10    separate cells.  I'll call Deputy

11    Whitaker and let him know he's clear, so

12    he will be put up before we bring him.

13         THE COURT:  They have to be

14    completely separated with no other means

15    to communicate through guards or other

16    prisoners or anybody else.  I want a

17    complete lockdown with those two.

18         DEPUTY:  Do the best we can, ma'am,

19    to work it out.

20         THE COURT:  We can do that.

21         MR. TIEGER:  And Ms. Shanahan and I

22    will remain available.

23         THE COURT:  You can go back to

24    where you were.

25         MR. TIEGER:  We'll give Mr. Brenner

1    and Ms. Smith our cell number.

2         THE COURT:  It may be a while.

3         MR. TIEGER:  Yes.  Thank you.

4         THE COURT:  It could be sometime

5    before we resume.

6         (Recess.)

7         THE COURT:  We are not going to

8    bring --  before the jury comes out,

9    there are several motions before this

10   Court.  Back on the matter of State vs.

11   Ruben Jordan, B1003262.

12         Mr. Whalen, do you have a motion

13   that you wanted to make at this time?

14         MR. WHALEN:  I do, Your Honor.

15   Your Honor, I believe the Court should

16   have stopped the questioning of Kareem

17   Gilbert at the point in time he said no,

18   my daddy wasn't there.

19         But then when he was declared a

20   hostile witness, I think the Court had to

21   stop it and advise him of his Fifth

22   Amendment Rights, and that was not done

23   and he was allowed to continue to answer

24   some questions, so I'm going to ask that

25   his answers, especially after he was

declared a hostile witness, all be

stricken by the Court.

THE COURT:  All right.  Would you

like to respond?  Anything else with

that?

MR. WHALEN:  I'm sorry.

Preliminarily, I'm making this motion

with the assumption that when Mr. Gilbert

is brought back down he's going to take

the Fifth Amendment.  And if the Court

strikes the way that I believe -- strikes

his testimony, then I don't believe the

State is able to play his CD of his prior

statements, and I'm going to ask that

they be excluded from bringing them in.

THE COURT:  All right.  Would you

like to respond?

MS. SHANAHAN:  Your Honor, it would

be inappropriate and premature to do

either of those things.  First of all,

the striking of the testimony is

inappropriate because this was all a

surprise.  You know, we weren't sure how

far the defendant was going to go with

all of the stuff about being at home

overnight and with the football game and
all that, we had to lay the groundwork,
and we had to establish that actually
previously this is not what was said.

Now, at that point the proceedings
were appropriately stopped.  They were
not allowed to go on beyond what they
should.  And until we can establish that,
and even once we are questioning him as a
hostile witness, that doesn't mean the
Court has to stop him and have an
attorney come in and advise him of his
Fifth Amendment Rights.  He didn't say
anything to incriminate himself.  As a
matter of fact, he did just the opposite.

Secondly, the statement just so it
clearly comes in, this was part of a plea
agreement that he accepted.  He agreed to
come here and testify truthfully based on
the statement that he gave the police.
And, now, it is a surprise to the
prosecution, State, that he is not
abiding by the plea agreement.  He's
changing his entire story, and we have a
right to show the jury that this is not

what he had previously testified to,

what -- he was represented by counsel

then when he gave that statement.  The

attorney was there when he gave that

statement.  And basically, a large

portion of this case was based on that.

　　　　So we think that the jury has a

right to hear this.

　　　　MR. WHALEN:  Your Honor, I don't

care what agreement that they had, or

what was involved or how surprised they

were.  Once he is declared a hostile

witness, I think the Court -- the man has

a Fifth Amendment Constitutional Right,

and they have got to be protected.  And

the only person to protect them at that

point in time is the Court.  To say, hey,

wait a minute, you better have an

attorney here to protect those rights,

and that did not occur.

　　　　THE COURT:  Thank you, Counsel.

There is two things that I want to

clarify.  One, is that the State asked to

proceed, to treat him as a hostile

witness and you objected.  At that point

I allowed the State to lay the groundwork
for the fact that they were surprised by
the blurting out of testimony, which, by
the way, wasn't in response to a question
that was asked of him. So, it was a
surprise. It wasn't elicited. I think
she was asking just preliminary, the
name, his address and his relationship.
So at that point he blurted out comments
that indicate he was going to recant what
he had been saying before. The State had
a right to lay the groundwork so that I
could rule on your motion.

At that point I said your objection
is overruled. Then I allowed the State
to treat him as if he's on cross and to
actually cross-examine the witness,
Kareem Gilbert, at which time we recessed
for him to be apprised of his Fifth
Amendment Rights, which has just
occurred.

And so for those reasons I'm
overruling your motion at this time, but
it is on the record. So we need to bring
in -- might as well bring in the

defendant.

MR. WHALEN:  No, the defendant is right here.

THE COURT:  I'm sorry, the witness. You know, the presence of a person in a uniform whose not a defendant is something that is causing me to flip into stereotype.  So, therefore -- but he is a prosecuting witness.  Are we bringing him in, or are we bringing in the jury at this time?  We are going to bring in the witness, Kareem Gilbert.  You are going to advise him of what has occurred.  And for the record --

MR. CUTCHER:  Yes.

THE COURT:  -- mr. Cutcher. Mr. Tim Cutcher.

MR. CUTCHER:  Yes, Your Honor.

THE COURT:  You have come into this courtroom as the attorney advising Mr. Gilbert of his Fifth Amendment Rights.

MR. CUTCHER:  I have, Your Honor. Mr. Gilbert has advised me, and I would like to say this in his presence as well,

that he wishes to inform the Court that
he wishes to assert a Fifth Amendment
privilege not to testify.

    THE COURT:  And he may do that, but
he still must take the stand and assert
that on the record.  So, at this time --
is there something else before we go any
further?

    MR. WHALEN:  No.

    MR. TIEGER:  No, Judge.  Thank you.

    THE COURT:  All right.  Bring in
the prosecuting witness, Kareem Gilbert.
You may have a seat here.

    At this time we are going to have
this on the record.  Counsel, did you
want to put something on the record?

    MR. CUTCHER:  Your Honor, the
witness has just entered the courtroom,
and I had a chance to meet with him
briefly upstairs.  After talking to him,
he has advised me that he wanted me to
tell the Court that he wishes to assert
his Fifth Amendment privilege to not
testify.  Is that right, sir?

    THE WITNESS:  Right.

1   THE COURT: All right. That's on
2   the record. At this point we are going
3   to bring in the jury for the next phase.
4   MR. CUTCHER: May I approach the
5   witness, Your Honor?
6   THE COURT: Yes.
7   (Tim Cutcher conferring with the
8   witness.)
9   THE COURT: And I believe you
10  wanted me to voir dire them about whether
11  or not they saw, observed -- or that's
12  before we even commence and go any
13  further?
14  (The jury entering the courtroom at
15  2:13 p.m.)
16  THE COURT: You may all be seated.
17  Good afternoon, I wanted to bring to your
18  attention that while you were on recess,
19  some of the jurors were in the hallways
20  and the corridors and had left the
21  confines of the jury room, and there is a
22  concern that maybe some of you may have
23  heard or seen either some of the
24  witnesses, some of the spectators, heard
25  fragments of conversation from detectives

1    or any of the parties involved here, and

2    we wanted to ask -- individually, I

3    wanted to ask the jury, as a group, did

4    anyone hear something that was connected

5    to this trial other than in this

6    courtroom.

7         THE JURY:  No?

8         THE COURT:  No.  If you did, and

9    just can't remember that right now. I'm

10   suggesting you must disregard that as not

11   being evidence and cannot consider

12   anything you heard outside this

13   courtroom.  Thank you.

14        State, ready to proceed?

15        MS. SHANAHAN:  We are, Your Honor.

16        Your Honor, permission to play the

17   witness's taped statement from May 18th,

18   2010, and to provide the jury with

19   transcripts of that statement so that

20   they can follow along?

21        THE COURT:  Any objection?

22        MR. WHALEN:  I do, Your Honor.  I

23   don't know that they have laid the

24   groundwork to play that at this point in

25   time.

THE COURT:  Is that the only
objection?

MR. WHALEN:  Yes.

THE COURT:  Okay.

MS. SHANAHAN:  I can ask some
preliminary questions, Your Honor.

THE COURT:  All right.  Go ahead.

MS. SHANAHAN:  Thank you.  I
apologize.  It was my understanding
that's how we were proceeding.

BY MS. SHANAHAN:

Q.    Kareem, you gave a statement
previously to the police, correct?  You have to
answer yes or no?

A.    Yes.

Q.    And that statement was taped,
correct?

A.    Yeah.

Q.    And you've actually been provided
with copies of it in the past.  It was made
available to you, correct?

A.    Right.

Q.    Okay.  And it was recorded.  Did
your attorney tell you it was also recorded to
an audio disc?

1        A.    Right.

2        Q.    So back on the date that you took a

3 plea deal in the Brian Austin murder, you did,

4 in fact, then go over to homicide and give the

5 police a taped statement, correct?

6        A.    Yeah, but that was all a lie, like

7 I told them.

8        MS. SHANAHAN:  Permission to play

9      the statement, please.

10      THE COURT:  Yes.  The objection is

11      overruled.  You may play the tape.

12      MS. SHANAHAN:  Could we also

13      provide the jury with transcripts.

14      Sometimes it's difficult to understand.

15      THE COURT:  Yes.  We have 18 copies

16      of that transcript, and so who's got

17      them?

18      MR. BRENNER:  Right here, Your

19      Honor.

20      THE COURT:  Okay.  We are going

21      to -- does the court reporter have one

22      yet?  Give one to the court reporter and

23      to each juror and to the parties.

24      MR. WHALEN:  Your Honor, could we

25      approach?

THE COURT:  So, right now we are
approaching with the jury.  Okay.

(The following transpired at
sidebar as follows:)

THE COURT:  Okay.

MR. WHALEN:  I don't how he's
never -- he can claim his Fifth Amendment
at this point in time.

THE COURT:  Um, why he claims the
Fifth Amendment for them to play the
tape.  They can play that anyhow, just in
their case in chief.  When she begins to
question him, he'll have to assert his
Fifth Amendment rights at that point.
She's not asking him questions right now.

MR. WHALEN:  So, what you're saying
is if he has not said -- if he had not
said it was a lie, they could still play
the tape?

THE COURT:  Right.  Either way, I'm
saying it doesn't matter.

MR. WHALEN:  Okay.  Whether it's a
lie or truth, they are just playing a
tape of his own statement.  This is a
statement, a recorded statement.

1      MR. TIEGER:  Yes.

2      THE COURT:  Okay.

3      MR. WHALEN:  Okay.

4      (Sidebar concluded.)

5  BY MS. SHANAHAN:

6      Q.    Kareem, you heard that whole

7  statement, right?

8      A.    Yeah.

9      Q.    You knew that a revolver was used

10  in Victor Davis's murder.  You knew the

11  direction you all drove to get there, where you

12  parked, that your dad got the gun from the

13  African.  Your dad was in the zone after the

14  murder, and you expect the jury to believe that

15  you made all that up?

16      A.    Yeah.  I made all that up.  You

17  told me to give you something, and I told you

18  anything, to get a deal.  Shit, I was facing

19  double life.  Shit, I make anything up to get a

20  deal to come back home.  Who wouldn't?

21      Q.    And all those little details you

22  made up?

23      A.    All of it.

24      Q.    You did plead out, though, to Brian

25  Austin's homicide?

1          A.     Yeah.

2          Q.     Because you did actually commit

3     that murder?

4          A.     Right.

5          Q.     Okay.  So the deal that you got on

6     that murder of Brian Austin, you made all this

7     stuff up for?

8          A.     Yeah.  Shit, I made everything up,

9     just to try to come back home.  Why wouldn't I?

10         Q.     Okay.  But you murdered Brian

11    Austin because he hit you with a Subway

12    sandwich, right?

13         A.     We were just fighting.

14         Q.     You were fighting.  And your dad

15    knew because you told your dad that you had

16    murdered Brian Austin, right?

17         A.     Right.

18         Q.     And you knew who Victor Davis was

19    and that he was the eyewitness to you murdering

20    Brian Austin, right?

21         A.     I don't know how he knew.  I don't

22    know -- you know what I mean?

23         Q.     Do you know Victor Davis?

24         A.     Yeah.

25         Q.     You knew he was standing there with

1    Brian Austin outside the store, right?

2        A.    Right.

3        Q.    And you knew that he saw you pull

4    out the gun on Brian Austin, right?

5        A.    Right.

6        Q.    And he knew -- you knew that he saw

7    you shoot Brian Austin, right?

8        A.    Right.

9        Q.    Answer out loud.

10       A.    Right.

11       Q.    And you knew that he was still

12   walking around and could identify you as the

13   shooter in Brian Austin's murder, right?

14       A.    Yeah.

15       Q.    And you told your father that,

16   right?

17       A.    I didn't tell my father, though.  I

18   just told him about the murder I did.

19       Q.    Okay.  You never told your dad

20   that, Victor Davis?

21       A.    I ain't tell him nothing about

22   Victor Davis.

23       Q.    Okay.  So the fact that your family

24   was harassing Victor Davis on the street,

25   according to Victor's son, that's not true?

1          A.     Ain't none of Victor's son said it

2     was true.

3          Q.     Okay.  And your dad didn't know

4     that there was a witness to that Brian Austin

5     murder?

6          A.     Nah, why would I tell him?  I don't

7     even know.  Shit, how he know?

8          Q.     Two weeks -- less than two weeks

9     after you killed Brian Austin, Victor Davis ends

10    up dead, right?

11         A.     Probably coincidence.

12         Q.     Just a total coincidence, because

13    you were at home all night with your father the

14    night of the murder.  Your dad was with you?

15         A.     Right.

16         Q.     Okay.  Your dad was actually -- you

17    saw him because you were watching football all

18    night, right?

19         A.     Right.  We was watching the

20    Steelers game.  Man, we don't know what go down.

21    A whole lot of murders go on downtown down here.

22         Q.     But it wasn't like, you know, you

23    and your dad didn't see each other.  You're

24    sitting next to each on the couch watching the

25    Steelers game, right?  Answer out loud.

1      A.    Right.

2      Q.    Okay.  And you all never left the

3   house the night of Victor Davis's homicide?

4      A.    Right.

5      Q.    Tell me about the conversation that

6   you had when you -- when you told your dad you

7   murdered Brian Austin, what was his response?

8      A.    Shit, I don't remember.  That shit

9   was too long ago.  It was too long ago, so...

10     Q.    Did he tell you to leave town?

11     A.    Nah, I don't remember.  I don't

12  know.  I don't remember.

13     Q.    Did he tell you -- did he ask you

14  where it happened?

15     A.    Yeah.

16     Q.    And did you tell him where it

17  happened?

18     A.    I told him everything about the

19  murder, but I didn't tell him like nothing about

20  should I leave town, none of that.  We didn't

21  discuss none of that.

22     Q.    You did tell him everything about

23  the murder?

24     A.    Yeah.

25     Q.    And yet, you didn't tell him there

was an eyewitness to the murder?

     A.    Nah.  Shit, we don't need to know all that.  I just told him what happened with me and him.  We ain't tell him who was around there.

     Q.    What did you tell him exactly?

     A.    Shit, I just told him we got into a fight and I shot him.

     Q.    Okay.  And then what did you tell him?

     A.    Shit, I left and ran.

     Q.    Okay.  And then what did you tell him?

     A.    That's it.  Shit, what else -- what do they got to do with it?  They ain't got nothing to do with the fight or nothing.  I ain't got no reason to bring none of them up for.

     Q.    What was his reaction when you told him that you murdered somebody and you were on the run for it?

     A.    Shit, he was hard.  He was hurt.  He was disappointed at me, shit.

     Q.    And so, what did he do?

     A.    We just talking, man.  We didn't

1    say nothing.  He was just talking about how I

2    screwed up and shit like, you know what I mean?

3            Q.    Did he tell you what to do, give

4    you any advice?

5            A.    Shit, he told me to turn myself in

6    and do the right thing.

7            Q.    So, did your mom tell you that?

8            A.    Yeah, all my family did.

9            Q.    Okay.

10           A.    Definitely, when they seen me on

11   the news, they told me to turn myself in, do the

12   right thing, man.

13           Q.    And yet --

14           A.    That's what I'm doing right now.

15   That's what I told you, man.  I copped out to

16   what I did.  I did the right thing, shit.

17           Q.    Who murdered Victor Davis then?

18           A.    Shit, I don't know who murdered

19   Victor Davis.  Victor Davis was a drug dealer,

20   brother.  Everybody downtown, bro, anybody could

21   have been down there.  There's hell of murders

22   go on downtown all the time.

23           Q.    But it certainly wasn't you and

24   your father, because you were at home?

25           A.    Right.

1    Q.    You indicated in your statement
2    that Victor Davis hung out at a motorcycle club.
3    A.    Right.
4    Q.    How'd you know that?
5    A.    Shit, 'cause everybody hang out out
6    there, shit.
7    Q.    What?
8    A.    The bootleg.  That's where the
9    bootlegs be at.  They be over there by the
10   motorcycle club by Kroger.  He be one of them,
11   man.
12   Q.    So you knew that that's where you
13   could find Victor Davis, right, if you needed
14   him?
15   A.    Shit, I call him.
16   Q.    Okay.
17   A.    I ain't actually know where, but I
18   just know the bootlegs be right there, so I had
19   his number.  I ain't need to know where he was
20   at.
21   Q.    Because he would come to you?
22   A.    Yeah.
23   Q.    But you knew he had hung out at the
24   motorcycle club, because that's where the
25   bootlegs --

1        A.    Like I just said, man, shit, I

2   don't need to know where he was at.  Bootleg,

3   that's the only two spots bootleg be at.

4        Q.    Okay.  And you knew that Victor was

5   a bootleg, right?

6        A.    Right.

7        Q.    And you told the police that he

8   hung out at the motorcycle club; is that right?

9        A.    Shit, I told them bootlegs be over

10  there by the motorcycle club and over there.

11       Q.    When you gave such great detail

12  about the night that you and your father went

13  and hunted down Victor Davis to murder him, you

14  said your father was on crack.  Your father uses

15  crack, right?  Yes or no?

16       A.    Right.

17       Q.    Okay.  Was he on crack that night?

18       A.    Nah, because, shit, he was with me.

19       Q.    He was with you that whole night

20  but he wasn't on crack?

21       A.    Man, listen, I just told you we was

22  watching a Steelers game, man, he ain't gonna be

23  smoking crack in front of me.

24       Q.    He wouldn't smoke crack in front of

25  his kids?

1      A.    Nah, man.  He got a family and

2  everything over there, so why would he be doing

3  that in front of them, if he did do it?  I mean,

4  shit, he wasn't around me doing it.

5      Q.    He didn't smoke crack in front of

6  you?

7      A.    Right.

8      Q.    Then why did you tell the police

9  that he did?

10      A.    Man, because they told me they

11  would give me a deal to let me come back home.

12  I told them anything that came to my mind right

13  then and there.

14      Q.    You thought to give details that

15  had nothing to do with a murder like that, your

16  dad was a crackhead, even though you weren't

17  with him that night, he wasn't smoking crack?

18      A.    Shit, he smoke crack, shit,

19  anything brother.  I know he got crack cases on

20  his motherfucking record, so everything that I

21  was saying was gonna fill out every detail.

22          MS. SHANAHAN:  One moment, please.

23      Nothing further at this time, Your Honor.

24          THE COURT:  Nothing further.  All

25      right.  Counsel, you may cross.

1      MR. WHALEN:  Thank you, Your Honor.

2            CROSS-EXAMINATION

3  BY MR. WHALEN:

4      Q.    Kareem, just so that I know some of

5  the terms that we are using here.  You said

6  Victor Davis was a bootleg?

7      A.    Yes.

8      Q.    Bootleg is a person that has a car

9  and is not a taxi cab, but he acts like a taxi

10  cab, giving people rides for money, am I

11  correct?

12      A.    Right.  Excuse me.  Whatever they

13  got, they can have money, drugs, anything, he'll

14  do it.

15      Q.    Okay.  Now, in your statement you

16  referred to Victor Davis doing X.  Can you

17  explain what X -- X is Ectasy, right?

18      A.    Right.

19      Q.    And he was known to be dealing in

20  Ectasy?

21      A.    Yeah, I bought some X from him.  I

22  do X.  Like, shit, he was selling it, that's how

23  I know he had it.

24      Q.    After Brian was killed, you went to

25  your father's house?

1      A.    I been out my father's house.

2      Q.    Okay.  And your father -- if you

3  told him about it, your father told you that you

4  had to turn yourself in?

5      A.    Right, and do the right thing.

6      Q.    Every day that you got up, he was

7  on you about turning yourself in?

8      A.    Right.

9      Q.    And, in fact, one day he left and

10 went to talk to an attorney about making the

11 arrangements for you to turn yourself in?

12     A.    Right, right.

13     Q.    And that was what he was telling

14 you you had to do, to do the right thing?

15     A.    Yeah.

16     Q.    Now, when you went to prison --

17           (Phone ringing.)

18           THE COURT:  Phones have to be

19      turned off, please, immediately.

20           Ma'am, you have to leave the room.

21      Leave the courtroom.

22           UNIDENTIFIED SPEAKER:  Yes, ma'am.

23      Sorry, I tried to turn it off.  Sorry,

24      Judge.

25           THE COURT:  Don't say anything,

1        ma'am, period.  Move on.

2        Q.    I'm gonna show you what's been

3   marked as Defendant's Exhibit C, and there is

4   three pieces of paper in here.  Do you recognize

5   the handwriting on that?

6        A.    Yeah, them my letters.

7        Q.    Okay.  When you say "your letters,"

8   your letters were being sent from prison?

9        A.    Right.

10       Q.    And they were sent to your father?

11       A.    Right.

12       Q.    And you wrote him letters on a

13  regular basis several times a week; am I

14  correct?

15       A.    (Nods affirmatively.)

16       Q.    And this particular letter, is this

17  true and accurate?

18       A.    Yeah, that's everything.  Yeah.

19            MR. WHALEN:  Okay.  Your Honor, I'm

20       gonna ask that Exhibit C be admitted into

21       evidence?

22            THE COURT:  Be admitted.  Do you

23       object if it's admitted?

24            MR. TIEGER:  Judge, for the record,

25       we -- I don't know how long Mr. Whalen or

the defense has had these letters. We
were not made aware of these until just
several minutes ago, but we got a chance
to just look at them briefly while his
statement was being played, so...

THE COURT: Do you want me to
recess the jury while you make a motion
or something?

MR. TIEGER: No. Judge, I just
want to let you know that we had never
seen these or they were never disclosed.
We never heard of them until, again, just
today, sometime before --

THE COURT: Well, you're asking me
to admit them now. They can be marked as
an exhibit. And do you want to challenge
the authenticity of them?

MR. TIEGER: No. That's fine,
Judge. I just wanted the Court to be
aware that this is something that's a
surprise to us that we had not seen.

THE COURT: And you don't want a
continuance --

MR. TIEGER: No.

THE COURT: -- to consider these

1  letters?

2        MR. TIEGER:  NO.  NO.

3        THE COURT:  So, therefore, I'm

4  going to admit them at this point, if

5  there is no objection.

6        (Defendant's Exhibit C received

7  into evidence.)

8  BY MR. WHALEN:

9        Q.    Now in the letter on the first

10 page, it's dated September 16, 2010?

11       A.    Right.

12       Q.    And you state, "you know I don't

13 want to do this".  What are you talking about?

14 What is it you don't want to do?

15       A.    Testify.

16       Q.    Okay.  I'm going to show you what's

17 been marked as Defendant's Exhibit B.  This is a

18 copy.  It's not the original.  Do you know what

19 that is?

20       A.    Yeah, all them letters, we kept

21 writing constantly back, you know what I mean?

22 Just checking up on each other, seeing how each

23 other was doing.

24       Q.    And is this an exact duplicate of

25 what you sent to your father --

```
1    A.    Right.

2    Q.    -- on June 3rd of 2010?

3    A.    Right.

4    Q.    And you authored it, right?

5    A.    Right.

6    Q.    You're the one that wrote it?

7    A.    Right.

8         MR. WHALEN:  Your Honor, I'll ask

9    this be admitted into evidence also.

10        THE COURT:  Does the prosecution

11   object to the admission of this document?

12        MR. TIEGER:  Judge, maybe we can

13   argue -- I mean, not really.  I mean,

14   we -- again, this is something that we

15   have not seen again until just a few

16   moments ago.

17        THE COURT:  Okay.  So, there is a

18   surprise.  Normally, there is -- you have

19   a right to a continuance or some other

20   sanction, and you don't want that.

21        MR. TIEGER:  We briefly looked at

22   it, Judge, during the taped statement

23   being played, so we probably would want

24   to look at it overnight again, but other

25   than that --
```

1    THE COURT:  I don't have to admit

2    it now.  It's an exhibit.

3        MR. TIEGER:  That's fine, Judge.

4        THE COURT:  You can use it as an

5    exhibit.  They want an opportunity to

6    challenge its admissibility.

7        MR. WHALEN:  I can't read it unless

8    it's put into evidence.

9        MR. TIEGER:  Judge, that's fine.

10    We can keep doing what he's doing, that's

11    not a problem.

12        THE COURT:  You withdraw your

13    objection?

14        MR. TIEGER:  Yes.

15        THE COURT:  All right.

16    BY MR. WHALEN:

17        Q.    If you'll look at -- on this

18    Exhibit B -- or Evidence B, about midway down it

19    says here, "I got a court date, plus I asked

20    you" -- can you read that part to me, what it

21    says?  Right here.  Start here.

22        A.    I don't even really see it.  You

23    got the regulars, the regular copy of it?

24        Q.    No, I don't.  But does this say, "I

25    got a court date, plus I asked you on" -- I

1  don't know what that word is -- "some real shit
2  like.  Pop, take one of these body bags off my
3  back and this stress off my life;" is that
4  correct?
5         A.    Right.
6         Q.    And the body bags that you were
7  talking about you wanted him to take, you were
8  talking about being charged with the death of
9  Victor Davis; am I correct?
10        A.    Right.
11        Q.    In Exhibit C, in the end of the
12 third sentence you say "I know you didn't do
13 nothing."
14        A.    Right.
15        Q.    And you're talking about him being
16 charged with Victor Davis?
17        A.    Right.
18        Q.    Now you were asked about being
19 separated after this was over with, you told
20 them that you were afraid of your dad in that
21 statement we just heard.
22        A.    Right.
23        Q.    And that you didn't want to be near
24 him.
25        A.    Right.

1          Q.     After you gave them that statement

2    and you entered a plea on Austin's killing, you

3    were housed at the Justice Center, correct?

4          A.     Right.

5          Q.     And your father was arrested for

6    Victor Davis's killing?

7          A.     Right.

8          Q.     And you both were housed in the

9    Justice Center?

10          A.     Right.

11          Q.     And, in fact, you two were in the

12    same cell together for a while, were you not?

13          A.     Right.

14          Q.     For what period of time?

15          A.     Shit, I don't know.  I really

16    wasn't specific, though.

17          Q.     But you two were in there, and you

18    had no fear about being with your father?

19          A.     Nah.

20               MR. WHALEN:  I have nothing else,

21          Your Honor.

22               THE COURT:  Any redirect or

23          recross?

24               MS. SHANAHAN:  Thank you.

25

1   CROSS-EXAMINATION

2   BY MS. SHANAHAN:

3       Q.    On this Exhibit 1 that you just

4   referenced where it says, "I know you didn't do

5   nothing," then very heavily the next line is

6   scratched out.  Can't read what's under there,

7   right?

8       A.    Right.

9       Q.    So it might have said:  I went in

10  to ask myself, I know you didn't do nothing to

11  admit to what you did?

12      A.    Possibility.

13      Q.    Possibility?

14          MR. WHALEN:  Your Honor, I'm going

15      to object and ask that be stricken.

16      Everything is possible.

17          THE COURT:  Overruled.  It's

18      cross-examination.

19      Q.    So it's possible, because that's

20  scratched out so heavily you can't even see what

21  you were talking about when you wrote that, did

22  you?

23      A.    Yeah.

24      Q.    And as a matter of fact, when you

25  said you didn't want to testify because he's

1    your dad, right?

2          A.    (Nods affirmatively.)

3          Q.    It's not that he never killed

4    Victor Davis, it's because he's your father?

5          A.    It ain't like, because, like, I

6    knew he was innocent.  So, I mean, I didn't want

7    to keep lying on him like that.  It was just

8    over.  For real, it was over, grieving over the

9    years, for real, that's all.

10         Q.    You pled out to this in May of

11   2010.  You pled out to the Brian Austin murder

12   with the agreement you were going to come and

13   testify truthfully --

14         A.    Right.

15         Q.    -- right?  And you certainly can

16   write letters to your father, right?  You never

17   told any corrections officers up there that you

18   needed to talk to the Cincinnati Police to let

19   them know that your dad was innocent, did you?

20         A.    Nah.

21         Q.    You never, since you have been

22   brought back down here weeks ago, told anybody

23   in Cincinnati that your father was innocent

24   until you came and took the stand there, right?

25         A.    I mean, shit --

         Q.    Yes or no?

         A.    You can't just tell anybody like
that, you don't know like who family you --
like, I could have just got --

         Q.    Yes or no?

         A.    Somebody could have just got -- I
could have got hurt in there telling anybody
like that.  That's his business.  I ain't
supposed to be talking about that.  I'm just
talking so you want me to tell the truth when I
come to court.

         Q.    Yes or no, you did not tell anybody
specific since you have been here?

         A.    No.

         Q.    And as a matter of fact, you were
safe and secure in a room with only me, Mr.
Tieger and Jen Luke on Monday and you didn't
tell us, did you?

         A.    Shit, you all for the right?  You
all ain't for the right.

         Q.    Yes or no?

         A.    No.

         Q.    As a matter of fact, you just asked
if you could get out sooner, right?

         A.    I don't remember that.

Q.    Yeah.  You asked your dad to take
one of these body bags off your hand because you
both did the murder together, didn't you?

A.    No.

Q.    You wanted him to take the body bag
off your hands because you knew he was the
trigger man that killed Victor Davis?

A.    No.

Q.    You've never told anybody, until
you took that stand, something different since
May 17th, have you?

A.    Right.

MS. SHANAHAN:  Nothing further.

THE COURT:  Counsel?

CROSS-EXAMINATION

BY MR. WHALEN:

Q.    Kareem, did you send a letter to
your dad and ask him to come up -- have me come
up to the prison?

A.    Right.

Q.    And I came up and you talked with
me?

A.    Right.

MR. WHALEN:  I have no other
questions.

1  THE COURT:  At this point, anything

2  else from this witness?

3  MS. SHANAHAN:  No, Your Honor.

4  Thank you.

5  THE COURT:  You may step down.  He

6  may be removed.

7  (Witness excused.)

8  THE COURT:  And, at this point, are

9  you calling another witness?  It is 3:30,

10  you have an opportunity to call another

11  witness?

12  MR. TIEGER:  Judge, I don't know if

13  the jury needs a short break.  Our last

14  witness would be Detective Luke.  It

15  could be a while.  I don't know how long

16  she'll be on the witness stand, so

17  however the Court wants to proceed.

18  THE COURT:  I do know the jury

19  needs to leave before 4:30, because some

20  of their cars are parked in places they

21  need to -- there is some heads shaking

22  yes.  I suppose we could go until 4:15,

23  but if it's in the middle of somebody's

24  testimony, that might not be a good thing

25  to do.  So, you would rather just have

all the testimony and the cross at one
time, Counsels?

MR. TIEGER:  Judge, if we can
approach.  I know we were trying to
figure out the alleged snow situation,
so...

THE COURT:  The alleged snow.  Is
anybody concerned about the snow
tomorrow?  Any jurors concerned about
that?  They don't know that the three to
five to six inches of snow are arriving
on Thursday, according to the weather
channel and news cast.  And so, we are
concerned about jurors having to come in
in severe snow, which the other day we
also did not have the jury trial.

Nobody is in favor of causing
citizens, who are voluntarily serving
their country and our democracy, to come
in in bad weather, so we're not going to
have a jury on Thursday.  We are just
going to go ahead and believe the weather
report.  We think Friday there will be
the State's witness.  Now some jurors
look like they want to come in.  I'm

1    trying to assess that situation.  How

2    many jurors want to come in tomorrow and

3    fight the weather?  And how many would

4    prefer not to have jury trial tomorrow?

5         Okay.  Since there are some who

6    don't want to, I'm just going to -- and

7    they may not make it.  If we have a

8    problem where there is some jurors

9    missing, then this whole trial could be

10   mistried and that would be a real

11   problem, and we'd have to start over

12   again.  And so, because of that, I'm

13   going to rule that we will not have a

14   jury trial on Thursday.

15        MR. WHALEN:  Your Honor, if the

16   prosecution only has Officer Luke to

17   testify, the defense does not have that

18   many witnesses to put on, we could finish

19   by Friday.

20        THE COURT:  We can finish on

21   Friday.  On Friday you mean.

22        MR. WHALEN:  Yes.

23        THE COURT:  And because on Friday,

24   we'll be able to start at like 10:00 a.m.

25   We can start at 9:00 a.m.  I don't have a

docket Friday.  We are going to start
Friday at 9:00 a.m. instead of noon.
That means we'll get through all the
testimony, and we may even be having some
deliberation.

So, at this time, I'm going to
thank and -- well thank and excuse the
jury for the day, but I'm going to read
the admonition again in total because of
what has transpired here today, and
because the media is present and there
will be media reports about this.  So,
all right then.

So, members of the jury, it is very
important that you be fair and attentive
throughout this trial.  Do not discuss
this case among yourselves or with anyone
else.  Do not permit anyone to discuss it
with you or in your presence.  Do not --
even on elevators.  You can even ask
people to stop talking about it on
elevators.

Do not form or express any opinion
on the case until it is finally submitted
to you.  It may be difficult for you to

understand why you may not discuss this
case among yourself until it is finally
submitted to you, because it would be
unfair to discuss the case among
yourselves before you receive everything
necessary for your decisions.

You have not heard my instructions
of the law yet.  I gave you some
preliminary instructions, but certainly
much more is left for you to be told.
You should explain this rule prohibiting
discussion of the case to your family and
friends.  And, of course, when the trial
is over, you are released from this
instruction.

Do not talk with the attorneys, the
parties or witnesses during the trial.
Likewise, participants in a trial must
not talk with you.  If anyone should
attempt to discuss the case with you,
report the incident to the Court or to
the bailiff immediately.  You may not
investigate or attempt to obtain
additional information on this case
outside the courtroom.  It's highly

1    improper for any one of you to attempt to

2    do so.  You are instructed not to read or

3    view or listen to any report in the

4    newspaper, radio or television on the

5    subject of this trial.  Do not permit

6    anyone to read or comment upon them to

7    you in your presence.  Such reports may

8    be incomplete and are sometimes

9    inaccurate.  You may only consider and

10   decide this case upon evidence received

11   at the trial.  If you acquire any

12   information from an outside source, you

13   must report it.

14        And, again, that's sufficient at

15   this point.  I have advised the jury of

16   what their duties are, and you are

17   adjourned until 9:00 here on Friday

18   morning.  Thank you very much.

19        (The jury leaving the courtroom at

20   3:32 p.m.)

21        (Proceedings continued in progress

22   until January 21, 2011.)

23

24

25