1          COURT OF COMMON PLEAS

2          HAMILTON COUNTY, OHIO

3                   - - -

4   STATE OF OHIO,          :

5            Plaintiff.    :

6   vs.                    :Case Number B1003262

7   RUBEN JORDAN,          :Appeal Number C1100833

8            Defendant.    :Volume VIII of X

9

10                  - - -

11          TRANSCRIPT OF PROCEEDINGS

12                  - - -

13  APPEARANCES:

14      Seth S. Tieger, Esq.
        Megan E. Shanahan, Esq.
15              On behalf of the State of Ohio.

16      William P. Whalen, Jr., Esq.
        Amy R. Williams, Esq.
17              On behalf of the Defendant.

18

19

20          BE IT REMEMBERED that upon the Jury

21  Trial of this cause, on January 21, 2011, before

22  the Honorable NADINE L. ALLEN, a judge of the

23  said court, the following proceedings were had,

24  to wit:

25

1   DETECTIVE JENNY LUKE
         Direct Examination ...........Page 724, Line 4
2        Cross-Examination ...........Page 753, Line 7
         Redirect Examination .........Page 785, Line 15
3        Recross-Examination ..........Page 788, Line 7

4   LESHUANDE RAMSEY
         Direct Examination ...........Page 816, Line 11
5        Cross-Examination ...........Page 820, Line 4
         Redirect Examination .........Page 839, Line 21
6
    DETECTIVE KURT BALLMAN
7        Direct Examination ...........Page 841, Line 10
         Cross-Examination ............Page 847, Line 9
8        Redirect Examination .........Page 854, Line 20

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          PROCEEDINGS, January 21st, 2010

2              THE COURT:  All right.  Good

3      morning, everybody, have a seat.  I think

4      we are ready now for the jury to come in.

5      Counsels?

6              MR. WHALEN:  Yes.

7              MS. SHANAHAN:  Yes.

8              THE COURT:  And you have your first

9      witness you're ready to call?

10             MS. SHANAHAN:  We are, yes.

11     Thanks, Judge.

12             THE COURT:  Okay.

13             MR. BRENNER:  All rise for the

14     jury.

15             (The jury entering the courtroom at

16     9:25 a.m.)

17             THE COURT:  You may be seated.  And

18     good morning, everyone.  We are ready to

19     resume.  I think the State has another

20     witness to call at this time.

21             MS. SHANAHAN:  We do, Your Honor.

22     State would call Detective Jenny Luke.

23             THE COURT:  Step forward and raise

24     your right hand to be sworn.

25

1          DETECTIVE JENNY LUKE,

2   having been first duly sworn, was examined and

3   testified as follows:

4              DIRECT EXAMINATION

5   BY MS. SHANAHAN:

6          Q.    Detective, could you please state

7   and spell your last name for the record?

8          A.    Jennifer Luke, L-U-K-E.

9          Q.    How are you employed, Detective?

10         A.    Cincinnati Police Department

11   assigned to the Homicide Unit.

12         Q.    How long have you been with the

13   City of Cincinnati's Police Department?

14         A.    Seventeen years.

15         Q.    Did you start out in the Homicide

16   Unit?

17         A.    No, I started out in District 1,

18   went to District 3, went to the Vice Unit, and

19   then I was based out of Columbus in an

20   undercover task force, and then I went to

21   homicide.

22         Q.    And how long have you been in

23   homicide?

24         A.    Starting my 11th year.  In my 11th

25   year.

1      Q.    You started in homicide in your

2  11th year?

3      A.    No, I started in homicide in my

4  sixth and seventh year.

5      Q.    Okay.  So you are now in your 11th

6  year in homicide?

7      A.    Correct.

8      Q.    Okay.  During the time that you

9  have been in homicide, approximately -- I know

10  it's hard to estimate, approximately how many

11  murders have you investigated?

12      A.    I would say probably 400 or so.

13      Q.    Okay.  Do all those cases get

14  solved?

15      A.    No.

16      Q.    How do the cases come to you and

17  what do you do?

18      A.    They come to us -- obviously, there

19  is a phone call from our uniform personnel who

20  are first on the scene.  Usually fire indicates

21  to the uniform officers that the person is

22  deceased, and there's nothing they can do for

23  them.  Then our office is notified to respond

24  along with the criminalist.

25            What we do is, obviously, try to

1  solve the cases.  We talk to witnesses, we look

2  at evidence, we assist the criminalist with

3  evidence, and it's just -- it's a lot of witness

4  talking to, I would say, for the most part.

5              And then, eventually, we present

6  our case to the Grand Jury.

7       Q.    You go out to the actual crime

8  scenes then?

9       A.    Yes.

10      Q.    Is the body generally still there

11 at the crime scene?

12      A.    Generally, yes.

13      Q.    Okay.  So you're able to see things

14 when you arrive in its natural state as it was,

15 at least when the body was found, if not when

16 the murder occurred?

17      A.    Correct.

18      Q.    Okay.  Are there times when you

19 respond to scenes where the body has clearly

20 been dead for a period of time?

21      A.    Yes.

22      Q.    And there are times, obviously,

23 that you respond to scenes where this is a fresh

24 murder?

25      A.    Just happened.

1     Q.    Okay.

2     A.    Correct.

3     Q.    Were you assigned to the murder of

4  Victor Davis that occurred on October 31st of

5  2008?

6     A.    Yes.

7     Q.    How is it that you got this

8  particular case?

9     A.    My partner, Terry McGuffey and I,

10 were on night shift that night, and, like I

11 said, before there was a call that came into

12 CIS, Criminal Investigation Section, that said

13 that we had a homicide that occurred on

14 Republic, so Terry and I responded from the

15 office to Republic Street.

16     Q.    Now, was this a situation where the

17 body had been dead for some time, or was this a

18 fresh murder scene?

19     A.    Fresh murder scene.

20     Q.    Okay.  What's the first thing that

21 you did when you arrived there on the scene?

22     A.    The first thing I did, as soon as I

23 stepped out of the car, I spoke to the uniformed

24 officers and a sergeant on scene who told me

25 that everyone said this is retaliation because

1     this guy was an eyewitness to another murder.  I

2     didn't know if (A) if that was true, or (B) what

3     murder they were talking about, because, like I

4     said, we have probably 60 to 80 murders a year

5     and not all of them are mine, and I don't know a

6     lot of names attached to them.

7                    From there, there were -- the

8     victim's children were on scene, and I believe

9     his ex-wife.  There was also some people that

10    lived in the apartment that were telling us

11    stuff out of their screens.

12         Q.    I'm going to stop you there.  You

13    indicated when you arrived on the scene that

14    information is coming to you from fellow

15    officers that everyone says this is in

16    retaliation for a murder?

17         A.    Correct.

18         Q.    Is it common that witnesses line up

19    to talk to you, Detective Luke?

20         A.    No, they will do it secretly

21    usually.

22         Q.    When you're there at the scene,

23    people aren't standing around willing to talk to

24    the Cincinnati Police detectives, are they?

25         A.    No.

1        Q.    In fact, you referenced people in

2    that apartment building talking through a

3    screen.  Describe in this particular case, how

4    extreme the situation was.

5        A.    Well, we had a huge crowd and

6    everybody is watching what everybody is doing

7    for fear people don't -- down in that area they

8    don't like people to talk to the police.  They

9    don't know who's watching them.

10             In this instance, like I said, he,

11    Mr. Davis, was right outside of his apartment,

12    so there were people inside of that apartment

13    that were -- I don't want to say whispering,

14    they called us over to the screen so nobody

15    could see, and were telling us information.  And

16    then when we walked over to the family members,

17    they were giving us information as well, as much

18    as they knew.

19        Q.    Was there one in particular

20    individual inside that apartment building that

21    gave you specific orders to not even turn and

22    look at her screened window?

23        A.    Absolutely.  She asked me actually,

24    please don't come back, I'll be next.

25        Q.    Describe that set-up, what you did

1  and how you communicated with her.

2      A.    I stood at the screen and just

3  acted like I wasn't even talking to her, like I

4  was just looking at the body, and I would just

5  ask her questions and she would answer me.

6      Q.    She was behind you?

7      A.    Correct.

8      Q.    So it didn't look like you were

9  looking in her window?

10     A.    Right.

11     Q.    And when you say the screen, the

12  jury was down there, this isn't a screen door,

13  these are the grates that are over the windows,

14  the protective grates?

15     A.    Yeah, there is the iron bars and

16  then the screen.

17     Q.    Okay.  What, if anything, struck

18  you when you arrived on the scene of Victor

19  Davis's murder as far as the natural lay of the

20  land and what was around?

21     A.    Obviously, Victor, himself, where

22  he was shot was very disturbing to me.

23     Q.    Why is that?

24     A.    Because I could see a head shot --

25     Q.    Okay.

1          A.     -- which is very disturbing.  You

2    know, I could see that he was shot once in the

3    chest.  And at that point I could only see one

4    to the head.  I saw the one behind, I think it

5    was the left ear.  I found out later about the

6    one to the top of the head which then,

7    obviously, was even more disturbing when I found

8    that out from the coroner.

9               I also -- about eight feet from the

10   body, there was a pretty big or large glob of

11   spit or phlegm.  And for a moment I got very

12   excited, because I thought wow, this could be --

13   you know, this could be spit of the bad guy, or

14   maybe it's spit of Victor, maybe he was fighting

15   and maybe Victor spit, or maybe it was just

16   anybody that was walking through spit.  When I

17   was praying that it wasn't a fireman or

18   paramedic spit, I thought let's not get excited,

19   this never works out, it's going to be a fireman

20   or paramedic that screwed up in the heat of

21   trying to work on him spit.

22               So we became very interested, me,

23   meaning me and the criminalist and my partner

24   became very interested in the spit and got kind

25   of excited about it.

1       Q.      And that criminalist would be
2   Criminalist Glindmeyer?
3       A.      Yes.
4       Q.      Okay.  What did you do then, as far
5   as your observation of the spit that there was
6   there on the scene?  Did you just say, okay,
7   great, there is spit, criminalist get it?  Tell
8   us exactly what you did.
9       A.      No, I actually got down on my hands
10  and knees, along with my partner, and we were
11  looking at it.  And I remember saying, God, this
12  is good, I'm sure it's a fireman though, we
13  can't be that lucky.  And then I was looking
14  that there was nothing -- there was -- there
15  wasn't any leafs on top of it, there wasn't a
16  footprint on top of it, it hadn't been run over
17  by anything.  There wasn't a bit of debris in
18  it.  It was just a fresh thick frothy, I don't
19  know, phlegm or spit.
20      Q.      Okay.  When you say frothy, what do
21  you mean?
22      A.      Like it -- like if you -- I don't
23  know, like if you hocker, for like lack of a
24  better word, and there is like little, you know,
25  there is some substance to it, like maybe little

1    bubbles, its thicker, its substancy.

2         Q.    Okay.  Detective Luke, in

3    preparation for your testimony today did you

4    check the National Weather Services website for

5    what the weather was on October 31st of 2008?

6         A.    I did.

7         Q.    And what was it?

8         A.    Seventy two degrees.

9         Q.    Okay.  So rather warm for the end

10   of October?

11        A.    I remember it being warm.

12        Q.    Okay.  Was anything found on Victor

13   Davis that linked him, ultimately, to the murder

14   that was referenced to you as far as him being

15   an eyewitness?

16        A.    Yes.  When the coroner got there,

17   we went through his belongings, and inside of

18   his wallet was the business card for homicide

19   Detective Kurt Ballman.  So, obviously, at that

20   point I called Kurt at home and asked him, do

21   you know a guy by the name of Victor Davis?  And

22   it was bad.  I mean it was real bad.  We had --

23   we had asked -- excuse me, we had begged him not

24   to go back down there.  We had asked him to give

25   us three days to get him someplace to live, and

1    please do not go back downtown.  And, obviously,

2    he didn't, so it was we, meaning me and Kurt,

3    and everyone felt horrible for him.

4         Q.    You admit you asked him not to go

5    back to that area until you could find him a

6    safe place to go?

7         A.    Yes.

8         Q.    Was he resistant to that when you

9    told him you wanted to move him out of the

10   neighborhood?

11        A.    Somewhat, yes and no.  I mean, I

12   think he got it, but then he didn't.  I mean,

13   he's from there.

14        Q.    Does he have family there?

15        A.    Yeah, he lived with his sister.

16        Q.    Did he express concern about her?

17        A.    I don't remember him expressing

18   concern about his sister too much more -- it was

19   more for himself in that he understood us, but

20   he could take it, or he wasn't going to let it

21   get him, or --

22        Q.    Okay.  That case, that situation

23   where he was an eyewitness was Detective

24   Ballman's case, correct?

25        A.    Yes.

1      Q.    Okay.  So Detective Ballman had

2   more contact, independent contact with Victor

3   Davis as far as day-to-day and what was going on

4   with Victor down there in Over-the-Rhine?

5      A.    On that case, yes.  I had known

6   Victor previously from another homicide that he

7   was a witness on for me, so I kind of knew him,

8   but I didn't know him personally.

9      Q.    Okay.  What was the next thing that

10  you did then after you were there on the scene,

11  you're examining the spit, what happened next?

12     A.    I spoke to his children the most

13  down there because they were, as you can

14  imagine, beside themselves, telling me their dad

15  knew this was going to happen, their dad knew

16  this was going to happen.  He had his clothes

17  laid out.  He told us what to bury him in.  He

18  knew that the streets were gonna get him.  He

19  knew that -- Victor Davis told me that Kareem

20  was making phone calls to him to try to get a

21  bootleg cab drive, and that Victor knew that

22  that might be a setup and that he wasn't going

23  to give a ride to Kareem and so he kept hanging

24  up on Kareem.

25              And that he told his -- Victor was

1    telling me on scene that you know who did it, if

2    something happens to me, you know who did it.

3         Q.    Okay.  And, ultimately, Kareem

4    Gilbert was charged with the murder of Victor

5    Davis, correct?

6         A.    Correct.

7         Q.    When did you develop a suspicion

8    that Ruben Jordan was involved in that murder of

9    Victor Davis?

10        A.    Um, this is a little bit more

11   difficult for me, because I have to go back to

12   the courthouse when Kareem's case was going on.

13   I was watching Ruben at his son's hearings.  I

14   was approached by his, Victor's children, in the

15   courthouse saying that they had -- that they had

16   some contact with Ruben out on the streets and

17   that they knew he was involved, the way that he

18   was acting, the way he was standing out in front

19   of their house, the way he reacted when he found

20   out that Victor Davis, Jr. was Victor's son,

21   because Victor Davis Jr. and Ruben, apparently,

22   know each other, and would like hang out, I

23   guess, or I don't know what they do, but

24   apparently they know each other from Burnet

25   possibly.

1          And that when "he -- when Ruben

2    found out that Victor Davis, Jr. was Victor's

3    kid, he was so upset and even started to cry in

4    the hallway and said how sorry he was, and that

5    threw them off, and they came to me with that.

6          Of course, that's not enough to do

7    anything with, it's just something I put in the

8    back of my head.  I also, from the very

9    beginning, we thought that -- we always thought

10   that Kareem was either there or had someone do

11   this, but we just didn't know who that other

12   person was.

13        Q.   Why is it that you would assume

14   that Kareem Gilbert, himself, who murdered Brian

15   Austin, wouldn't, himself, then go and murder

16   Victor Davis?

17        A.   Because it's two people.  I mean,

18   that's like really ballsy.  I mean, just to us

19   it would be like wow, he's like a real bad like

20   killer-killer.  Like I just thought that a

21   16-year-old kid, yeah, in the heat of the

22   moment, in the heat of passion with Brian

23   Austin, he did that, but I can't see him like

24   planning this.  I can't see -- I just -- it was

25   just something I didn't think a 16-year-old kid

1    would cross over and do.

2         Q.    Okay.

3         A.    So I always thought that it was

4    somebody close to Kareem.  Although, again,

5    these are, you know, like I said, hunches, and

6    then all these things came about in the

7    courtroom and with their kids.

8              And then Kenny called me and I

9    wanted to find out, you know, about Kenny Heard,

10   so I asked the detectives who you spoke to about

11   Kenny and Kenny's information.  I believe -- I

12   believed Kenny.  I believed everything he told

13   me.  I turned -- I turned Kenny's information

14   over to Kareem's attorney right away, Mr.

15   Issenman was Kareem's attorney, and I said you

16   have to call his attorney, you have to tell him

17   what you know about Ruben.

18        Q.    And did, in fact, you ultimately

19   find out that Kenneth Heard did as you

20   instructed and he did have contact with Kareem's

21   attorney?

22        A.    Yes.  Mr. Issenmann and Mr. Heard

23   talked.

24        Q.    Okay.

25        A.    Mr. Issenman said, you know, Kenny

1    called him.

2              MR. WHALEN:  Objection to what Mr.

3         Issenman said, Your Honor.

4              THE COURT:  Exception for this

5         comment.

6              MS. SHANAHAN:  No, Your Honor.

7         Q.    Detective --

8              THE COURT:  Sustained.

9         Q.    Thank you.  Detective, you're

10   talking about Kenneth Heard, who, as you know,

11   came here to testify, you had multiple phone

12   conversations with Kenneth and there were

13   recordings of some of those phone conversations,

14   correct?

15        A.    Correct.

16        Q.    Okay.  On February 11th of 2010,

17   did you speak to Kenneth Heard on the telephone

18   about Ruben Jordan?

19        A.    Yes.

20        Q.    And was that phone call taped?

21        A.    Yes.

22        Q.    Okay.  Did you listen to the tape

23   before coming here to court today in preparation

24   for trial?

25        A.    I did.

1          Q.     There is an issue about the

2     transcript of that tape saying that Kenneth

3     Heard told you that the defendant was in his

4     early 20s.  Did you hear that on the tape?

5          A.     No.  I listened to it.  In fact, he

6     says early four -- he says like within and

7     F-O-R, and then I cut him off right away.  He

8     says early "four," and then I say, how did you

9     learn that, or I cut him off before he could

10    finish the age and you can clearly hear that.

11         Q.     So at this point all you have is

12    Victor Davis, Jr -- or Victor Davis's children

13    telling you they believe Ruben was involved.

14    You see his behavior in the courthouse yourself,

15    now you have Kenneth Heard telling you, still at

16    this point Ruben Jordan is not charged.  Explain

17    that.

18         A.     He's not charged because that's

19    just not enough.  I mean, a lot of -- you know,

20    I have to be careful about what family members

21    are telling me because they are, obviously,

22    involved.  They are, obviously, very, you know,

23    emotionally involved.  But I still paid -- we

24    still paid attention to them.  How Ruben was

25    acting in court, in juvenile court in the

1   hallways, Kenny Heard --

2       Q.    I'm going to stop you there.  You

3   interviewed also a person named Bobbi Jones

4   about Ruben Jordan's involvement in this murder,

5   correct?

6       A.    I did.

7       Q.    You did?

8       A.    I did.

9       Q.    Where is Bobbi Jones now?

10      A.    Deceased.

11      Q.    Okay.  Bobbi Jones died of natural

12  causes, nothing to do with a case or a murder or

13  anything, correct?

14      A.    Correct.

15      Q.    Okay.  So did that information also

16  raise your suspicion?

17      A.    She was a great witness.

18      Q.    Ultimately what gave you enough to

19  actually charge Ruben Jordan?

20      A.    When the DNA had came back from Mr.

21  Jordan to the spit that I described at the

22  scene.

23      Q.    Okay.  Backing up to courthouse

24  involvement.  There, you didn't have yourself a

25  swab of Ruben Jordan at that point, did you?

1           A.      No, we had nothing.

2           Q.      District 4 came down to the

3    courthouse to speak with Ruben Jordan about an

4    investigation that they had going on, correct?

5           A.      They did.

6           Q.      And did you witness the

7    conversation that Ruben Jordan had with the

8    investigator?

9           A.      I was there.

10          Q.      Could you tell -- just describe, as

11   the investigator is talking to Ruben Jordan, was

12   he informed of why he was being detained and

13   questioned?

14          A.      Not at first.

15          Q.      And what was his reaction?

16          A.      Looked like he had been punched in

17   the stomach.

18          Q.      Okay.  Then, ultimately, when he

19   was told why he was being questioned and that it

20   had nothing to do with Victor Davis's murder,

21   what was Ruben Jordan's reaction?

22          A.      He smirked, acted like he didn't

23   care and said oh, yeah, I did that.

24          Q.      And then you get the CODIS hit

25   that -- you get notification from the Bureau of

1  Criminal Investigation and Identification,

2  correct, through a letter?

3       A.    Right.

4       Q.    Okay.  And then that is not enough,

5  as far as in Hamilton County, you need a

6  confirmatory, correct?

7       A.    I need to confirm what that lab

8  sheet is telling me.

9       Q.    Okay.  And how is it that you go

10  about then getting permission to get a swab from

11  Ruben Jordan to run a confirmatory test through

12  our lab?

13       A.    I got a search warrant for his

14  buccal swab.

15       Q.    And did you serve that search

16  warrant on Ruben Jordan?

17       A.    I did.

18       Q.    Describe that situation and how

19  that all went down.

20       A.    I had to figure out where Ruben was

21  living.  We did that.  We, along with the

22  uniformed officer, went to Ruben's house and we

23  told him to put on his shoes, that we needed to

24  talk to him about his son's case.  And we took

25  him down in a police car down to our office so a

1    criminalist could properly take his swab.

2         Q.    Now, it was specifically his son's

3    alibi is what you told him you needed to

4    discuss, correct?

5         A.    Correct.

6         Q.    Why did you tell him that, rather

7    than going in there and saying right at his

8    house, we've gotten a CODIS hit on your DNA,

9    we're taking you downtown, we're gonna swab you

10   and we're gonna run it?

11        A.    Two reasons.  The first reason is

12   safety, we didn't want to do it in his house.  I

13   wanted a controlled environment, and I needed a

14   criminalist to do it.  Third of all -- I'm

15   sorry, second of all, I wanted to see his

16   reaction.  I wanted to hear his alibi statement.

17   I knew he had filed one and I wanted to hear

18   about it.  So I knew that if he would speak to

19   me about the alibi statement, I would have him

20   in the office and I could just serve the search

21   warrant.

22        Q.    Okay.  And when you're talking

23   about the alibi statement, he alibied Kareem is

24   what you're referencing, correct?

25        A.    Correct.

1    Q.    Because at this point Ruben Jordan

2  was not charged, so he didn't file an alibi for

3  himself?

4    A.    Right.

5    Q.    But he is an alibi witness for

6  Kareem at that point?

7    A.    Correct.

8    Q.    Okay.  So you take him back to the

9  office and what happens?

10    A.    Take him back to the office.  We

11  start off the interview talking about his alibi,

12  that the reason why he's there is the alibi, and

13  he's very upset and angry with us about why

14  didn't we do this before?  And I basically said

15  well, we just didn't -- we just didn't know

16  about it.  Here's this piece of paper that

17  Kareem's attorney filed, we need to talk to you

18  about it, and he gave us a short statement.  We

19  read him his rights, um, and he didn't want to

20  talk anymore without a lawyer so then we took

21  his swab.

22    Q.    Okay.  When, ultimately, you were

23  telling him that you were going to take the

24  swab, how was his reaction?  What was his

25  reaction?

1          A.     He got upset, said the only reason

2     that you -- the only reason you would do this is

3     because I'm a suspect.  You would -- there is no

4     reason to do this except if I'm a suspect.  He

5     got agitated about him being a suspect.  And to

6     keep things calm we reiterated to him that

7     sometimes DNA is taken to exclude people also.

8     And I was giving him a scenario about a husband

9     and wife, an exclusion scenario.

10          Q.     In the course of that conversation,

11    did you ask Ruben Jordan if he had been down on

12    Republic Street on October 31st of 2008, the day

13    of Victor Davis's murder?

14          A.     Yes, I asked him if he was down

15    there that night, and he said no.  I asked him

16    if he was, I think, or Detective McGuffey asked

17    him the question:  Is there any reason why you

18    would be down there that day or that night, and

19    he said no, not that I know of, unless the kids'

20    mother would have asked us to come down.

21          Q.     Okay.  And, ultimately, did he talk

22    to you about the time -- or did you notify him

23    of the time of the murder --

24          A.     Yes.

25          Q.     -- of Victor Davis?

1    A.    I had Victor Davis's folder out,

2  and I was tapping at it, and I said we are

3  talking about 11:30 at night.  You know, it was

4  11:30 at night.  And he said yes, right.  And he

5  said that he was not down there then --

6    Q.    Okay.

7    A.    -- before or after the homicide.  I

8  asked him, so you didn't see Victor Davis laying

9  there?  You didn't see Victor Davis laying on

10  the street?  And I said a couple of things about

11  him, and he said no, that he wasn't there before

12  or after the homicide.

13    Q.    Did you submit the oral swab that

14  you took from Ruben Jordan on February 10th of

15  2010 to the Hamilton County Crime Lab for

16  analysis?

17    A.    Yes.

18    Q.    And did you get a lab report back?

19    A.    Yes, it confirmed the initial

20  findings that it was, in fact, his DNA.

21    Q.    Okay.  Ultimately, on February 18th

22  of 2010, Ruben Jordan was arrested --

23  February 17th of 2010, correct?

24    A.    Yes.

25    Q.    And you interviewed him on

1    February 18th of 2010?

2         A.    Correct.

3         Q.    Did he tell you at that point that

4    he had been down on Republic Street at any time

5    during the day, during the evening at any time

6    on October 31st of 2008?

7         A.    He said that he may -- he could

8    have or maybe was there at 11:00 in the morning,

9    11:00 a.m., because he visited his children, but

10   he was only there a couple minutes.

11        Q.    Okay.

12        A.    Or his grandchildren.

13        Q.    Now, I think I misspoke.  This

14   conversation was February 18th -- or excuse me,

15   May 18th of 2010, correct?

16        A.    May 18th.  Yes, May 18th.

17        Q.    Okay.  Not February, but May?

18        A.    Right.

19        Q.    The first conversation was in

20   February of '10 when you swabbed him.  The

21   second conversation is when he's charged on

22   May 18th, '10?

23        A.    Right.

24        Q.    Okay.  And he specifically said 11

25   in the morning?

1      A.    Yes.

2      Q.    Okay.  Detective, in preparation

3 for coming here today to testify, did you go to

4 the Official National Football League website?

5      A.    I did.

6      Q.    And did the Steelers play a

7 football game a Friday, October 31st of 2008?

8      A.    No, they did not.

9      Q.    Did any NFL team play on a Friday

10 night, February 31st (sic) of 2008, the day

11 Victor Davis was murdered?

12      A.    No, they did not.

13      Q.    Okay.  I'm hooked on February.

14 October 31st, 2008.

15      A.    No.

16      Q.    Was the day of Victor Davis's

17 murder, correct?

18      A.    Halloween night.

19      Q.    Excuse me?

20      A.    Halloween night.

21      Q.    That was a Friday, correct?

22      A.    Yes.

23      Q.    And you checked the NFL website to

24 make sure that on October 31st, 2008, there were

25 no NFL games?

1      A.     There were no NFL games.  The last
2  time the Steelers played was on the 26th of
3  October, and then again on November 2nd.
4      Q.     I'm going to show you what's been
5  previously marked for the purpose of
6  identification as State's Exhibit 15.
7  Detective, you have seen that item before?
8      A.     I watched the criminalist take it.
9      Q.     You, yourself, did not fill that
10  out, correct?
11      A.     No, I did not.
12      Q.     But you were present when that was
13  filled out?
14      A.     I was present when she took it, not
15  when she filled this out.  She would have done
16  that in her office.
17      Q.     Okay.  What specifically is that?
18      A.     This is the property envelope for
19  Ruben Jordan's buccal swabs that we took in our
20  office.
21      Q.     Did you initial the swabs or
22  anything like that, or does the criminalist take
23  care of all that?
24      A.     The criminalist does that.
25      Q.     Is this something that they're

1  trained to do so they handle all of the

2  collection of evidence?

3      A.    Yeah, we let -- we let that stay

4  with the criminalist so it's all the same.

5      Q.    Okay.  Ultimately, there is a case

6  number assigned by not only your office, but the

7  crime lab, correct?

8      A.    Correct.

9      Q.    And does that case number match

10  this case that we are here on today?

11      A.    Um --

12      Q.    If you need to open it, you can.

13      A.    I don't see -- we only go by one

14  case number for our unit, which is 10 -- or

15  would 08-H-63, and they probably wouldn't list

16  that on there.

17      Q.    They don't list that on there?

18      A.    These are just property numbers

19  that are assigned not by me.

20      Q.    This is the subject of the swab

21  that was taken, this is the actual swab that was

22  taken from Ruben Jordan though on May 18 of

23  2010?

24      A.    Yeah.  I mean, I believe Detective

25  Burns -- I mean Criminalist Burns, this is her

1    handwriting, I have seen it enough, and she

2    labels it as the known buccal swab of Ruben

3    Jordan.

4         Q.   Okay.  And you often rely on each

5    other to do these types of jobs, you can't do

6    the entire investigation from top to bottom,

7    left to right --

8         A.   No.

9         Q.   -- on every case?

10        A.   No.  They are much more trained in

11   it than I am, as far as how to submit it and

12   whatnot.

13        Q.   Okay.  Thank you.  Detective, the

14   person that was interviewed and that submitted

15   that buccal swab, do you see him in the

16   courtroom?

17        A.   I do.  He's in the striped gray

18   shirt sitting next to his female defense

19   attorney.

20             MS. SHANAHAN:  Your Honor, may the

21        record reflect identification of the

22        defendant?

23             THE COURT:  So noted.

24        Q.   And that's the person that you

25   developed a suspicion of being involved in this

1    and, ultimately, charged with the murder of

2    Victor Davis, correct?

3         A.    Yes.

4              MS. SHANAHAN:  Thank you.  Nothing

5         further at this time.

6              MR. WHALEN:  Do you have any cross?

7                   CROSS-EXAMINATION

8    BY MR. WHALEN:

9         Q.    Good morning.

10        A.    Good morning.

11        Q.    First of all, the object that you

12   took from the scene that ultimately was sent to

13   the lab, you're calling it spit now, but the lab

14   report calls it phlegm?

15        A.    To me it's the same, spit/phlegm.

16        Q.    So to you it means the same thing?

17        A.    Yeah.  I think it was a little

18   thick, so I just remember it being thick and

19   frothy, split, phlegm.

20        Q.    So if I just go spit on the carpet

21   here, you would call that phlegm?

22        A.    No, I would call that more just

23   spit.  This had substance to it, like I

24   indicated.

25        Q.    Okay.  And how long had that phlegm

```
 1   been there?
 2           A.    It was fresh.
 3           Q.    How can you tell that?
 4           A.    Because, like I said, it had
 5   substance to it.  There was nothing on top of
 6   it.  Republic is an extremely busy cut-thru from
 7   the park.  If you're asking me for like an hour,
 8   two hours, three hours, I don't know if you're
 9   trying to get to me like a scientific thing.  I
10   would say that it hadn't been there more than an
11   hour.
12           Q.    And what do you base that on?
13           A.    Just from seeing enough of it.
14           Q.    Enough of what?
15           A.    Spit/phlegm at my crime scenes.
16           Q.    So you have watched phlegm from
17   other crime scenes and you have seen how long it
18   takes for it to dry up?
19           A.    No, I don't know how long it takes
20   to dry out, but I have seen spit on the street
21   and you can tell if something is old or new.
22           Q.    Tell me what you mean by new, an
23   hour, two hours, three hours?
24           A.    I would say fresh, and I would say
25   about an hour.
```

1      Q.    Now, you were at the scene and you

2   began your investigation?

3      A.    Correct.

4            MR. WHALEN:  One second, Your

5      Honor.

6      Q.    Did police officers come up and

7   talk to you about other -- I'm sorry, let me

8   retract that.

9            When you were given information

10  about Shawn Gilbert involved with Victor Davis

11  when Brian Austin was killed?

12     A.    We found out that he was Kareem's

13  brother and, yes, he was on our radar.

14     Q.    Okay.  And did you question him?

15     A.    Yes.

16     Q.    Okay.  And didn't get any

17  information from him?

18     A.    No.  He basically said he had no

19  idea where his brother was.  He actually

20  didn't -- wouldn't answer anything for us.

21     Q.    Okay.  Now, when Kareem was

22  indicted, that was by the Grand Jury, am I

23  correct?

24     A.    Correct.

25     Q.    And it's my understanding that

1  there are two grand juries in the Hamilton
2  County prosecutor's office that run every day,
3  five days a week, am I correct?
4       A.    I don't know much about it, but
5  there is two rooms, if that's what you mean.
6       Q.    Okay.  Well, when Kareem was
7  indicted, did you go in and testify in front of
8  the Grand Jury?
9       A.    Yes.
10       Q.    Okay.  And who was the prosecutor
11  then?  Let me -- Seth Tieger was the prosecutor
12  then; is that correct?
13       A.    Correct.
14       Q.    And when you go in the Grand Jury,
15  there is nine -- or 11 people in there and a
16  court reporter and a prosecutor.  There is no
17  defendant, no defense attorney, anything like
18  that?
19       A.    Correct.
20       Q.    And at the time that the jury votes
21  after you're done, two of the alternates leave,
22  nine people are in there and they secretly vote
23  on whether to indict somebody?
24       A.    Correct.
25       Q.    And they are given instructions by

1    the prosecutor, Mr. Tieger, in this particular

2    case?

3         A.    I don't know, I'm not in the room.

4         Q.    Okay.  Nobody is, but, I mean, the

5    prosecutor even leaves when they vote?

6         A.    Okay.

7         Q.    And they returned an indictment

8    against Kareem?

9         A.    Okay.

10        Q.    Am I correct?

11        A.    Yes.

12        Q.    If I'm wrong, tell me I'm wrong.

13        A.    Well, he was indicted.

14        Q.    Now, you prepared the case against

15   Kareem?

16        A.    Yes.

17        Q.    Okay.  And on May 17th, you were

18   prepared to go to trial in front of a jury and

19   tell them that you knew Kareem committed that

20   crime?

21        A.    Correct.

22        Q.    Now, you indicated that on February

23   the 10th you took a swab of my client's mouth?

24        A.    May.  It had to have been in May.

25        Q.    May the 10th, okay.  And you were

1  told that you had a hit with the phlegm?

2      A.    In January.  January, I got the

3  hit.  May, I took the swab.

4      Q.    I'm sorry.  I'm lost.  When you say

5  you got a hit?

6      A.    Uh-huh.

7      Q.    That means that the lab was told

8  that they found somebody that matches that?

9      A.    That was in January.

10      Q.    And they told you then that my

11  client matched that?

12      A.    Correct.

13      Q.    Now, you didn't go to the Grand

14  Jury then and charge Mr. Jordan with it, did

15  you?

16      A.    No.

17      Q.    You waited all the way up until May

18  the 18th?

19      A.    I developed more witnesses, Bobbi

20  Jones and Kenneth Heard and Kareem.

21      Q.    But, um, until the 18th, you were

22  ready to go forward against Kareem?

23      A.    18th of, I'm sorry, what month?

24      Q.    May.  I'm sorry.

25      A.    Correct.

1      Q.      So you were all set to go to trial

2  against Kareem?

3      A.      Correct.

4      Q.      So the only thing you had different

5  on the 18th was that Kareem now says my daddy

6  was there and told you what he did?

7      A.      And the CODIS hit.

8      Q.      But you had that in January?

9      A.      Correct.  But I didn't get the swab

10 until May, right?  I can't just go on a CODIS

11 hit, I have to get a confirmation, sir.

12     Q.      That's what I asked you.  When did

13 you get the confirmation?

14     A.      January.  I got the CODIS hit in

15 January.

16     Q.      When did you get the match with

17 Ruben Jordan?

18     A.      It probably -- I don't know.  I

19 don't know.  I know the day that we took the

20 swab, but I don't know when I got the

21 confirmation.

22     Q.      All right.

23     A.      I would have to look at paperwork.

24     Q.      How do you know that the swab that

25 you saw taken from Ruben Jordan is contained

1  within State's Exhibit Number 15?

2         A.    Because my criminalist wouldn't

3  lie, and because it's a match according to the

4  lab, unless they're lying.

5         Q.    So, you're relying on somebody's

6  honesty --

7         A.    Absolutely.

8         Q.    -- to show that that is the same

9  thing.  You didn't see it put in there, you

10  didn't see it marked and you don't know what she

11  did with it when they take it?

12         A.    I saw her take it.  There is no

13  reason why Criminalist Burns would lie.  How

14  else would she have gotten a match?  How else

15  would the crime -- how else would the lab get a

16  match?

17         Q.    There could have been all kinds of

18  answers to that.  They could have -- you know

19  they had prior swabs taken from my client.  He's

20  been swabbed two or three times?

21         A.    Not by my office.

22         Q.    I didn't say by your office.  When

23  a person goes to the penitentiary, there is a

24  swab taken?

25         A.    Well, you might have to take this

1    up with the lab, but I'm telling you I believe

2    my criminalist, they don't lie, and I believe

3    our lab.  There is no reason -- there would be

4    no reason why they would make this some

5    conspiracy.

6         Q.    But the bottom line is you didn't

7    see that, go up to the lab, and you didn't mark

8    it, and you cannot say beyond a reasonable doubt

9    that that's that swab.

10        A.    I'm telling you I believe this is

11   the swab.  I'm telling you Criminalist Burns,

12   this is her handwriting, I saw her take the

13   swab.  No, I did not watch her actually put it

14   in the package.

15        Q.    My question you could answer yes or

16   no and explain.  You can't tell the ladies and

17   gentlemen of the jury of your own knowledge that

18   that's the swab they took from Ruben Jordan?

19        A.    No.

20        Q.    Now, you talk about people that you

21   talked to.  Did you talk to Ernest Seay?

22        A.    Yes.

23        Q.    Ernest Seay told you that Kareem

24   admitted to killing him, didn't he?

25        A.    Yes.

1       Q.   Okay.  And Anthony Jordan told you

2  the same thing, Kareem admitted he did the

3  killing?

4       A.   No, he did not say that.

5       Q.   He didn't say that.  What'd he say?

6       A.   He said --

7          MR. TIEGER:  Objection.  It's

8      hearsay.

9          THE COURT:  Counsel, you have a --

10         MR. WHALEN:  No, Your Honor.

11         THE COURT:  All right.  You are

12      withdrawing that question.

13       Q.   You had several other people that

14  came to you and told you that Kareem did the

15  killing?

16         MR. TIEGER:  Objection.

17         THE COURT:  Basis?

18         MS. SHANAHAN:  Hearsay.

19         MR. WHALEN:  Your Honor, she's

20      talked about all the evidence that she

21      heard, people whispering through windows,

22      all of that is part of her investigation

23      and I'm asking her about that.

24         THE COURT:  Well, the State did put

25      on evidence that persons were at the

1    scene.  The word was this, the word was

2    that.  I think in keeping with that, I

3    will overrule that objection.

4        Q.    Isn't that correct?

5        A.    Can you repeat it?  I'm sorry.

6        Q.    Yes.  Other people came to you and

7    told you that Kareem admitted doing it?

8        A.    No, nobody came to me and said

9    Kareem admitted to doing it.

10        Q.    Other than Ernest Seay?

11        A.    Ernest Seay, in his letter to me,

12    said "he".  And I don't know who "he" is.  Is it

13    Ruben or is it Kareem?  Ernest Seay's letter to

14    me said he killed Kareem, and that something

15    about 3,000, and that he admitted to Brian

16    Austin's murder, and I can't recall all of it.

17        Q.    You sat down and took a recorded

18    statement from Mr. Seay, did you not?

19        A.    I believe we did.

20        Q.    And in that he told you Kareem

21    admitted to him that he did the killing of

22    Victor?

23        A.    That Kareem did the killing or that

24    he did the killing?

25        Q.    That Victor -- that Kareem admitted

1    he did the killing, that he, Kareem, did the

2    killing?

3          A.    I would have to read the

4    transcript.  I'm sorry.

5                MR. WHALEN:  Page 17.

6          Q.    We've already heard the statement

7    that Kareem gave you on May the 17th.

8          A.    Yes, sir.

9          Q.    And in there -- and that statement

10   was done in your presence?

11         A.    Yes, sir.

12         Q.    And you initiated it?

13         A.    What do you mean initiated?  I

14   didn't initiate it.

15         Q.    You didn't initiate it.  Who

16   initiated it?

17         A.    Kareem and his attorney.

18         Q.    They are the ones that asked for

19   the statement to be made?

20         A.    Yes.

21         Q.    Okay.  In there Officer Ballman

22   says you heard Ernest Seay in your motion and he

23   answers yeah, man.  Look, he was on.  And then

24   you, the officer, said that you confessed to

25   him.  You didn't hear that?

1      A.      I don't understand what the

2    question is.  You're asking if that's in the

3    statement, or did I hear that comment being made

4    in our --

5      Q.      Both.  Are there differences from

6    what you heard and what's in his statement?

7      A.      You're saying that Officer Ballman

8    asked him a question?

9      Q.      Asked him.  You heard Ernest Seay

10   testify in your motion and he answered, yeah,

11   man.  Look he was on, and he says that you

12   confessed to him to Ernest Seay.

13     A.      That Kurt says you confessed to

14   him?

15     Q.      Yes.

16     A.      Yes, I believe Kareem said that.

17     Q.      And he acknowledged that -- in

18   there then, they're acknowledging that Ernest

19   Seay told you that Kareem confessed to him?

20     A.      Yes.

21     Q.      All right.  Now, in your statement

22   that was taken on March 13th on Page 17, there

23   is a statement, and the old man is yours.

24   Ernest Seay:  Yeah.  The detective says:  And

25   the second guy is my case, his best friend?  He

1 says: His best friend called the victim.
2 Ernest says: Uh-huh. Detective: Which would
3 be the second victim, and said I am ready to go
4 to talk to detectives, so then they met him.
5 Ernest said: Yeah. Detective: That night when
6 he was killed. Seay: Yes. Did you take -- did
7 you take it like that? Ernest: That's the way
8 I took it.
9            Did Ernest say to you in that
10 statement on Page -- that was Page 10. Ernest
11 Seay answers no. My expert opinion, Kareem was
12 a coldblooded killer. I mean, I've done wrong.
13 I have done some real heinous stuff in my time,
14 but he was no -- he has no compucture
15 (phonetic) whatsoever about killing anyone. He
16 was on the phone with his mother, and his step
17 dad was on the phone, and his mother kept
18 giving his step dad the phone and he got mad.
19 And he said while she was giving him the damn
20 phone, when I get up, I'm going to do him. And
21 in that statement he told you that Kareem
22 killed Victor Davis?
23      A.    You've read all that, but the part
24 that you're saying --
25      Q.    Are you saying that during that

1    statement?

2          A.    I'm saying I would need to -- I

3    have not reviewed that statement.  I'm saying I

4    agree with what you're saying -- what you're

5    reading to me, but -- about Kareem being a

6    coldblooded, I agreed that was said, but I

7    don't --

8          Q.    All right.  We'll come back to

9    that.  As part of your investigation, did you go

10   to Ruben Jordan's house and do any search?

11         A.    Ruben Jordan's house?  Which house?

12         Q.    On Hearne.

13         A.    No.  I think it's demolished now.

14   I think it was demolished.

15         Q.    Are you aware that ESPN shows prior

16   games of football games on some of their shows?

17         A.    No.

18         Q.    Are you aware that there is a disc

19   out that's called Steelers Greatest Moments?

20         A.    No, I'm not aware.

21         Q.    And it shows Steeler football

22   games?

23         A.    I'm not aware.

24         Q.    Not aware of that, okay.  Now,

25   Victor Davis, in your investigation, did you

1   learn that he ran a bootleg cab?

2          A.     Yes.

3          Q.     Okay.  What is a bootleg cab?

4          A.     It's a person that, instead of

5   being a cab driver with a license, they pick up

6   people for money for rides places.

7          Q.     And they don't have a cab license?

8          A.     Correct.

9          Q.     Okay.  Did you learn in your

10  investigation that Victor Davis was selling

11  Ectasy?

12         A.     I think he was selling weed, and I

13  think we heard X.

14         Q.     Okay.  I'm going to Kenneth Heard's

15  statement of February the 11th, and it's Page 3.

16  And you asked -- you say, okay.  And Mr. Heard

17  said:  His name it Ruben Jordan.  He's in his

18  early 20s.

19         A.     No.  Obviously, he's a male black,

20  38.

21         Q.     So this is wrong on Page 3?

22                MR. TIEGER:  Judge, I think the

23         witness should be given a chance to look

24         at Page 3 to see what.

25                MR. WHALEN:  Can I approach the

1          witness?

2                    THE COURT:  Yes.

3          A.      That's exactly the part, if you

4    listen to the tape.  He says -- Mr. Heard:  His

5    name it Ruben Jordan.  He's in his early 20s, is

6    what it says.  That's not what it says on the

7    tape.  I listened to the tape, it says he's in

8    his early for, like that, and I cut him off.

9    Where it says Detective Luke:  When did he tell

10   you?  That's when I cut him off.  He doesn't

11   even get that statement out.  And I said when

12   does he tell you this?

13                   MR. WHALEN:  Can we approach, Your

14          Honor?

15                   THE COURT:  Yes.  The jury can

16          stand up at this point and talk among

17          yourselves except about this case.

18                   (Unreported sidebar conference.)

19                   THE COURT:  You may all be seated.

20                   (Defendant's Exhibit E marked for

21          identification.)

22                   (Playing a portion of Defendant's

23          Exhibit E.)

24                   THE COURT:  You may have to start

25          that over.  Counsel?

1          MS. SHANAHAN:  I don't think it can

2     really be heard.

3          THE COURT:  I didn't hear it.  Is

4     that as loud as it goes?

5          BAILIFF:  Yes.

6          THE COURT:  Can we put a microphone

7     over there.  I don't know if this one

8     will reach over there.  Pull this

9     microphone over there.

10          Can the witness approach on -- do

11     you want the jury to hear this, too?

12          MR. WHALEN:  Yes.

13          MR. TIEGER:  I think it was what

14     you said, 45 to 53.

15          THE COURT:  One second.  Start over

16     again, because I'm going to turn up any

17     microphone.

18          (Playing a portion of the CD.)

19          A JUROR:  We can't understand it.

20          THE COURT:  Why don't we move the

21     whole computer to another part?  Can we

22     do that?  We can't do that, can we?

23          MR. TIEGER:  Let me see if this one

24     stretches a little further.

25          THE WITNESS:  That's about as far

1          as it will go.

2               THE COURT:  You know what I think,

3          I think we'll take a break and try to get

4          our technology.  Start over.  Start over.

5               MR. TIEGER:  I don't think we are

6          at that point yet, Judge.

7               (Playing a portion of CD.)

8               A JUROR:  Your Honor, it's not real

9          clear, still even like that.

10              MR. TIEGER:  Judge, I think that's

11         what the witness was trying to explain,

12         that he said early for, and then it just

13         cuts off.  It very difficult.

14              THE COURT:  I know, but they want

15         --

16              MR. TIEGER:  The fact is the

17         transcript says early 20s.

18              THE COURT:  Counsel, I think you're

19         testifying now.

20              MR. TIEGER:  Okay, Judge.

21              THE COURT:  Right now.  I was able

22         to hear.  I was able to hear.  I just

23         don't know whether we can have them come

24         over here individually or something.

25              MR. WHALEN:  Rather than do that,

1      Your Honor, it's marked as Defense

2      Exhibit E.

3              THE COURT:  Correct, they can play

4      it.

5              MR. WHALEN:  Right.  And we'll ask

6      that it be admitted, and then they can

7      play it back in the jury room.

8              THE COURT:  That's true.  All

9      right.

10             MR. TIEGER:  Judge, the problem is

11     that, um, I mean, that's an entire

12     statement that he gave, and it's -- let

13     me take a look at it real quick, Judge.

14             THE COURT:  So you're objecting to

15     the admission of part of it, but not all

16     of it?

17             MR. TIEGER:  Judge, I guess what

18     I'm asking, if you're going to admit

19     anything that Mr. Heard said, we should

20     admit all of the statements that he's

21     given.  If you're going to admit -- he's

22     playing the statement simply for the fact

23     that it says --

24             THE COURT:  Something.

25             MR. TIEGER:  -- says early 20s just

1           for that one specific point.

2                MR. WHALEN:  Your Honor, we'll

3           withdraw the exhibit.

4                THE COURT:  You're withdrawing it?

5                MR. WHALEN:  Yes.

6                THE COURT:  All right.  Well --

7                MR. WHALEN:  Rather than have them

8           hear the whole thing, yes.

9                THE COURT:  Okay then.

10  BY MR. WHALEN:

11       Q.    As part of your investigation, did

12  you listen to the 911 calls that came in the

13  night that Victor was killed and the

14  Crimestopper calls?

15       A.    I don't think that I listened to

16  them.

17       Q.    Those weren't significant?

18       A.    I probably would have read the CAD.

19       Q.    Explain to me what CAD is.

20       A.    The CAD is a transcript -- or the

21  calls that come in, it's kind of written word

22  about the 911 calls.  I know that we called the

23  911 caller back from that CAD, Mr. Shade.

24       Q.    And he wasn't the only one that

25  called?

1      A.    I don't recall.

2      Q.    Okay.  Now, as part of your

3  investigation you called the coroner to come out

4  to the scene?

5      A.    Yes, they automatically respond.

6      Q.    And in this particular instance she

7  came out to the scene, worked with you and then

8  performed a post the next day?

9      A.    I don't know when she did it.

10  We -- usually it is the next day.

11      Q.    Did you get a report from her?

12      A.    Yes.

13      Q.    Okay.  And what type of bullet

14  killed Victor Davis?

15      A.    I believe it was small, but I would

16  have to look at the report.  If I remember

17  right, it was small caliber.

18      Q.    If I told you it was a .22, would

19  you believe that?

20      A.    Yes.

21      Q.    Okay.  So you took a statement from

22  Kareem on May the 18th -- or May 17th, and in

23  there he's giving you what happened at the scene

24  when Victor Davis died?

25      A.    Correct.

1    Q.    And he's talking about his father,

2  and he said afterwards he started to everything,

3  and the next thing I know he started -- he

4  pulled out a .38 and just started shooting.

5  Now, you can't have a .38 by the witness'

6  testimony when it was a .22 that killed

7  somebody, can you?

8    A.    Um, I actually thought we asked

9  about that and it would fire a .22.

10    Q.    It was a what?

11    A.    I believe our office questioned

12  that, and that a .22 could be fired from that

13  gun.

14    Q.    But that night you didn't know

15  that?

16    A.    What night?

17    Q.    The night of May -- or the day of

18  May 17th?

19    A.    Well, no, he's telling us that, so

20  I believe Detective Ballman followed up with

21  that and found out that a .22 can be shot out of

22  that gun.

23    Q.    I'm not asking you that.

24        MR. WHALEN:  I'm going to ask that

25        that be stricken, Your Honor.  I didn't

1       ask that question.

2            THE COURT:  You're asking her

3      answer be stricken?

4            MR. WHALEN:  Yes.

5            THE COURT:  Overruled.  You can

6      rephrase -- re-ask the question.

7      Q.    On May the 17th, Kareem told you

8  his daddy used a .38?

9      A.    Yes.

10     Q.    And that concerns you?

11     A.    Not anymore.

12     Q.    On May the 17th you were concerned

13  when he said it was a .38?

14     A.    We questioned it, yes.

15     Q.    Okay.  And when you said to him, or

16  somebody said when you say .38, do you mean a

17  revolver?  Answer by Kareem:  Yes.  Kind of

18  cowboy pistol?  Yeah, just how you know it.

19  Yeah.  Okay.  Question by one of officers:

20  But -- by you:  But you're not for sure it was a

21  .38, you just know it was a revolver?  Answer:

22  Yeah, it was a .38 special, you know what I

23  mean?

24           You were concerned about that at

25  the time?

1    A.    Yeah, because I probably remember

2    it being a .22, and I was wondering if that

3    would, in fact -- if that round would fit in

4    that gun.

5        Q.    Now, on Page 12 of Kareem's

6    statement, he says that Victor made it in his

7    house.  They were talking like as far as you

8    made it, it was right there in front of the car.

9    And a couple of questions later he says, in the

10   middle of the street?  And he says, yeah, like

11   here, but they were tussling for a minute in the

12   car.

13        There wasn't any evidence that

14   there was any tussling in the car, was there?

15       A.    No.

16       Q.    Okay.  Now, as far as your

17   investigation shows, Victor Davis got out of the

18   car, was killed and never got inside the walkway

19   for his building, am I correct?

20       A.    We heard that people heard tussling

21   and they weren't sure if it was in the hallway

22   or outside.

23       Q.    My question was:  You didn't find

24   any evidence to indicate that Victor Davis was

25   inside that hallway to his building?

1    A.    Correct.

2    Q.    Okay.  And further on Page 12, he

3 says yeah, like right here, but they was

4 tussling for a minute in the car.  They were

5 tussling, yeah.  And as they were tussling,

6 though, he was shooting him, shooting though,

7 like he was moving and he saw bullets, and then

8 he just, shit, hit him in the head.  I'm like

9 damn.

10          You didn't find any evidence that

11 there was any shooting in the car; isn't that

12 correct?

13    A.    I never took it there was a

14 shooting in the car.  I took it as he got out of

15 the car because his car keys were found outside.

16 We never thought that it took place in the car.

17    Q.    So what I have just read you Kareem

18 didn't say?

19    A.    I don't know.  You have to repeat

20 it or can I read it, please?

21    Q.    Sure.

22          MR. WHALEN:  Can I approach the

23       witness, Your Honor?

24          THE COURT:  Yes.

25    A.    I'm reading as far as he made it

1   was like right there in front of the car.

2        Q.    He says they were tussling in the

3   car?

4        A.    He says they was talking, and like

5   as far as he made was like right there in front

6   of the car.

7        Q.    Okay.  What does he say down here?

8        A.    Right where he was -- right.  And

9   then I say right where he was found almost?

10  Yeah.

11       Q.    It says here, but they were

12  tussling like for a minute in the car, does it

13  not say that?

14       A.    Yeah.  Like right here, but they

15  was tussling like for a minute in the car.

16            I don't know if he means in the

17  car.  I would have to again listen to the tape

18  would be most beneficial.

19       Q.    Well, we have listened to that

20  here.

21            MR. TIEGER:  Judge, I believe

22       that's an exhibit also that the jury will

23       get also, so...

24            THE COURT:  Yes.

25       Q.    Now, in Kareem's statement he tells

1  you that he could have killed Victor Davis that

2  night, but he let him go.

3        A.    That was Brian Austin's murder,

4  yes.

5        Q.    And then when you're talking to

6  Ernest Seay -- I'm on Page 4, second statement

7  of March 13th.

8              On Page 3, the detective says

9  okay.  Ernest Seay says:  Okay.  When he start

10  telling me.  He said well, I said what

11  happened.  He said this old man had seen him

12  kill someone.  Detective said:  Did he say who

13  that was that he killed?  Ernest Seay:  He

14  won't talk the names.  Detective:  Okay.

15  Ernest Seay:  That's why I put it in the thing.

16  I said I may have to wear a wire because he

17  won't give names.  Detective:  Okay.  But he

18  tells me the details.  He tells me that, all

19  right, he said the old man was there when he

20  killed him.  And he said he first killed the

21  first individual.  Detective:  All right.

22              MR. TIEGER:  Judge, I'm going to

23        object.  I mean, I don't think we're here

24        to read transcripts of witnesses that

25        aren't even here.

1          THE COURT:  Counsel, do you want to

2          respond?  Are these not statements that

3          --

4          MR. TIEGER:  Judge, I understand

5          that you allowed in some basically

6          conclusions that Officer Luke had reached

7          based on her investigation, but now we

8          are getting kind of to the next step, we

9          are reading transcripts of a person, and

10         I would object at this point.

11         THE COURT:  And do you want to

12         respond to that?  Is this not a public

13         record or report that the defense is

14         introducing, that is -- that was

15         collected by the police department?

16         MR. WHALEN:  Sure, it was

17         collected.  It's a statement this officer

18         made with Ernest Seay.

19         THE COURT:  It may be offered by

20         the defendant under 803(8), so I have to

21         overrule that.

22    BY MR. WHALEN:

23         Q.    And he goes on, he said his friend

24    then calls the old man and tells him, I'm ready

25    to go talk to the detectives.  And he says that

1  when he -- him and his friend went and met the

2  old man that he killed him.  He said he went and

3  he met him and killed him.  And he said -- he

4  said that the reason he did it was because the

5  old man couldn't keep his mouth shut.  He was

6  snitching and he tried to blackmail his mother.

7  You don't remember him telling you that?

8       A.    I do.  My point in all that is who

9  is the "he"?

10       Q.    The subject of your questioning

11  Seay was -- Kareem Jordan -- Kareem Gilbert?

12       A.    Excuse me.  I don't want to -- I

13  know what I'm talking about, but I can't tell

14  you what Kareem, what his thought process when

15  he's talking to Ernest.

16       Q.    I'm talking about you.  My original

17  question was, you took a statement from Ernest

18  Seay?

19       A.    Yes.

20       Q.    And he told you that Kareem

21  admitted to him that he killed Victor Davis?

22       A.    I see where you are, what you are

23  saying, and I do believe he may have been saying

24  that, but I also think that -- I always have to

25  validate the "he's".  When people are telling me

1    he, he, he, who is he?  Who are you talking

2    about?

3         Q.    Ernest Seay told you that Kareem

4    Gilbert admitted to him, Mr. Seay, that he

5    killed Victor Davis?

6         A.    Ernest Seay, I believe, without

7    looking at the transcript, was telling me that

8    he was speaking to Kareem in the jail where they

9    were at, and that Kareem was telling him that he

10   killed Victor Davis.  I'm saying that I'm not

11   sure who the "he" is.

12        Q.    So you didn't know who Seay was

13   talking about then?

14        A.    I assumed then, like you, that it

15   was Kareem himself.  Right now I'm not -- now, I

16   don't know.  I can't answer that.

17        Q.    I'm not talking about now, I'm

18   talking about before.  And as a result of that

19   information that you got and everything else,

20   Kareem was charged with the murder of Victor

21   Davis?

22        A.    Yes.

23        Q.    And when you gave the defense

24   attorney a list of witnesses that you had,

25   Ernest Seay was one of those witnesses?

1          A.      Correct.

2          Q.      And he was going to come in and

3    talk about what Kareem had admitted that he did

4    to Victor Davis?

5          A.      Yes.

6                  MR. WHALEN:  Okay.  Could I have a

7          moment, Your Honor?

8                  THE COURT:  Yes.

9          Q.      In your investigation of Kareem

10   Gilbert, you talked to Anthony Jordan, did you

11   not?

12         A.      Yes.

13         Q.      And you had a lineup, a photo

14   lineup for him to look at?

15         A.      No.

16         Q.      An actual lineup?

17         A.      No.

18         Q.      You never had him identify anybody

19   for you?

20         A.      I did not have a photo array.

21         Q.      Did you have him identify anybody

22   for you?

23         A.      Yes.

24         Q.      How?

25         A.      In a single picture.

1       Q.    And who did he identify?

2       A.    Kareem Gilbert.

3       Q.    And he identified him as being the

4 one that shot Victor Davis?

5       A.    Yes.  He said he saw him running

6 from the scene.

7       Q.    And you're talking about the scene

8 of Victor Davis's -- or Victor's --

9       A.    Correct.

10      Q.    -- killing?

11      A.    Correct.

12      MR. WHALEN:  I have no other

13 questions, Your Honor.

14      THE COURT:  You may proceed.

15          REDIRECT EXAMINATION

16 BY MS. SHANAHAN:

17      Q.    Detective, that witness who said

18 they saw Kareem Gilbert running from the scene,

19 in fact, Kareem was at the scene of Victor

20 Davis's murder, correct?

21      A.    Yes, he was.

22      Q.    And you never did believe that

23 Kareem stayed in the car the whole time, did

24 you?

25      A.    I never believed that.

```
 1          Q.    Okay.  So it's logical he was seen
 2   running from the scene?
 3          A.    Correct.
 4          Q.    You believe that Kareem Gilbert was
 5   there when Victor Davis was murdered, correct?
 6          A.    Yes.
 7          Q.    He's the reason Victor Davis was
 8   murdered?
 9          A.    Correct.
10          Q.    In fact, Victor Davis was murdered
11   because he saw Kareem Gilbert murder Brian
12   Austin?
13          A.    Correct.
14          Q.    Part and parcel, Kareem Gilbert is
15   as responsible as Ruben Jordan for the murder?
16          A.    Absolutely.
17          Q.    Who do you believe the triggerman
18   was?
19          A.    Mr. Jordan, his dad.
20          Q.    Ruben Jordan?
21          A.    Yes.
22          Q.    But Kareem was there?
23          A.    Absolutely.
24          Q.    So the fact that Kareem Gilbert
25   bragged as an 18-year-old kid in the jail to
```

1    some other inmate about his criminal history,

2    does that surprise you?

3         A.    Not at all.

4         Q.    Okay.  In fact, that other inmate,

5    Ernest Seay, you're familiar with his lengthy

6    criminal record?

7         A.    Yes.

8         Q.    He's been convicted of robbing

9    people at gunpoint, correct?

10        A.    Correct.

11        Q.    Attacking a woman on Ludlow with a

12   stun gun, correct?

13        A.    Yes.

14        Q.    Rape?

15        A.    Yes.

16        Q.    Sexual assault in the State of New

17   York, correct?

18        A.    Yes.

19        Q.    He escaped after he faked a heart

20   attack from University Hospital, correct?

21        A.    Correct.

22        Q.    Extremely serious violent crimes,

23   correct?

24        A.    Yes.

25        Q.    And an 18-year-old kid is bragging

1   to this guy that he's stuck in the jail with,

2   right?

3          A.     Right.

4                 MS. SHANAHAN:  Nothing further.

5                 THE COURT:  Anything else from this

6          witness?

7                      RECROSS-EXAMINATION

8   BY MR. WHALEN:

9          Q.     And with all the crimes that Mr.

10  Seay has committed, violent and horrible crimes,

11  he tells you that Kareem Gilbert is a

12  cold-blooded killer?

13         A.     Correct.

14         Q.     And he was impressed by how

15  cold-blooded he was?

16         A.     That's what he said, yes.

17                MR. WHALEN:  I have no other

18         questions, Your Honor.

19                THE COURT:  Do you have anything

20         else?

21                MS. SHANAHAN:  No, Your Honor.

22         Thank you.

23                THE COURT:  Thank you.  You may

24         step down.  Thank you for your testimony.

25                THE WITNESS:  Thank you.

1          (Witness excused.)

2          THE COURT:  Does the State have any

3     other witnesses at this time?

4          MR. TIEGER:  Judge, we were

5     planning on just -- basically, there is a

6     stipulation as to all the crimes that

7     Ms. Shanahan read, as far as the weapon

8     under disability that Mr. Jordan actually

9     had been convicted of.

10          THE COURT:  Are we going to do this

11     in the presence of the jury?

12          MR. TIEGER:  I think we do, because

13     there is a stipulation.  And, quite

14     frankly, Judge, we were going to rest at

15     this point.

16          THE COURT:  You may want to call

17     more witnesses?

18          MR. TIEGER:  No.  I mean, based on

19     Mr. Whalen's question about Exhibit 15,

20     which is the DNA swab, we, quite frankly,

21     did not think that that was an issue.

22     That what's contained in that envelope is

23     actually his buccal swab.

24          THE COURT:  If you want to call

25     more witnesses, that's certainly your

1    prerogative.

2         MR. TIEGER:  Because of his

3    questioning of Detective Luke, and the

4    questioning as to, do we really know

5    whose DNA is in that envelope, we

6    actually -- I had asked Detective

7    McGuffey, who's sitting in the courtroom,

8    to try to get ahold of the Criminalist

9    Burnes who actually took the swabs.  She

10   may not be available till -- she

11   apparently is in physical therapy and

12   might not be able to be here until one or

13   so.

14        THE COURT:  So, do you want to take

15   a lunch break?

16        MR. TIEGER:  I mean if we can get a

17   stipulation that that actually is his

18   buccal swab, then we would not.

19        MR. WHALEN:  Your Honor, we'll

20   stipulate.  That wasn't my point.  My

21   point was that the officer was testifying

22   to something she couldn't testify to.

23        THE COURT:  But you will stipulate

24   that?

25        MR. WHALEN:  Yes.

1      THE COURT:  So, you are stipulating

2    that buccal swab does contain the DNA of

3    defendant, Ruben Jordan?

4      MR. WHALEN:  Yes, ma'am.

5      THE COURT:  So, there is no need to

6    call that witness?

7      MR. TIEGER:  That's correct, Judge.

8      THE COURT:  All right.  At this

9    time, will you be resting, or do you want

10    a moment to do something else?

11      MR. TIEGER:  Maybe just a moment to

12    figure out how we're gonna word the

13    stipulation.

14      THE COURT:  Is this a good time for

15    a break?  I'm willing to give the jury a

16    break at this time.  And would you

17    remember the admonitions not to discuss

18    this testimony.  You promise not to

19    discuss this case while we are on a

20    break, and it will be for 15 minutes

21    until noon, and then we'll figure out

22    what time lunch will be.  Thank you.  I

23    mean 11.  I'm sorry.  Come back at 11,

24    not noon.

25      (The jury leaving the courtroom at

1        10:45 p.m.)

2            MR. TIEGER:  Judge, on the

3        stipulation, we would just read in,

4        either Ms. Shanahan or myself, just

5        the -- I think Ms. Shanahan had already

6        read in, I think, this was opening.

7            MR. WHALEN:  Your Honor, if we have

8        got some things to discuss, and my client

9        has to go to the restroom, is it all

10       right if the officer removes him to go to

11       the restroom?

12           THE COURT:  Yes.  He can take him.

13           MR. TIEGER:  And we can figure that

14       out when he gets back.

15           THE COURT:  Can you all discuss

16       whatever that stipulation is you're

17       trying to get to?

18           MR. TIEGER:  Yes.

19           THE COURT:  And procedurally while

20       he's out of the room --

21           MR. WHALEN:  Yes.

22           THE COURT:  -- procedurally discuss

23       something with you?

24           MR. WHALEN:  Yes.

25           (Recess.)

1    THE COURT:  Court is back in
2    session.  You may remain seated.  Court
3    is back in session.  Okay.  You can
4    advise the jury that we'll probably be
5    another 15, 20 minutes.
6    MR. TIEGER:  Yeah.
7    THE COURT:  Other motions that the
8    lawyers are making.  All right.  Counsel,
9    has the State rested, except for
10   stipulations?
11   MR. TIEGER:  Yes, Your Honor.
12   THE COURT:  So you want to make
13   your stipulations before you rest and
14   then exhibits?
15   MR. TIEGER:  Yes, Your Honor.
16   MS. SHANAHAN:  The State and the
17   defense have entered into a stipulation,
18   as far as the prior record of the
19   defendant that is listed in Count 2 of
20   the indictment, the weapon under
21   disability charge, which includes
22   possession of drugs in B0309177 on
23   February 6th, 2004; preparation of
24   marijuana for sale, under B0006899 on
25   December 14th, 2000; illegal processing

1        of drug documents in B955989 on

2        October 17th, 1995; aggravated

3        trafficking in drugs in B929170 on

4        March 19th, 1993; and drug abuse in

5        B911528 on May 1st of 1991.

6            The defense has agreed that the

7        defendant, Ruben Jordan, is, in fact, the

8        person that was convicted in all of these

9        cases of all of these counts for the

10       weapons under disability purpose, Your

11       Honor.

12           THE COURT:  All right.  And there

13       is already a stipulation to the buccal

14       swab, which is State's Exhibit something.

15           MR. TIEGER:  I believe it's 15,

16       Your Honor.

17           THE COURT:  The exhibit does, in

18       fact, contain the DNA of defendant Ruben

19       Jordan.

20           MR. TIEGER:  Yes.

21           THE COURT:  Is there a stipulation?

22           MS. SHANAHAN:  There is no -- there

23       is just all of the exhibits, which are

24       numbered one through, I believe, it's 31,

25       but I need to check that.

1          THE COURT:  That's quite a few.

2          MR. TIEGER:  I think a lot of them

3     have been admitted.

4          THE COURT:  Have you reviewed

5     these, Counsel, these exhibits that

6     they're about to admit?

7          MR. TIEGER:  I think a lot of them

8     have previously been admitted.

9          MR. WHALEN:  I think the majority

10     have been admitted.

11          THE COURT:  I think they were

12     during the trial.

13          MR. TIEGER:  I'm sure there is some

14     that haven't been.  We want to make sure

15     we go through those.

16          MS. WILLIAMS:  I only wrote 1

17     through 30.

18          MS. SHANAHAN:  They have 1 through

19     31, Your Honor.  We can go through them

20     individually.

21          MR. TIEGER:  I think we should.

22          THE COURT:  Do you know what that

23     31st exhibit is?

24          MS. WILLIAMS:  I got everything but

25     31.

1          MR. TIEGER:  Thirty-one is a taped

2     statement of --

3          MS. WILLIAMS:  Okay.

4          MS. SHANAHAN:  -- of Kareem

5     Gilbert.

6          THE COURT:  I definitely want to

7     know if you object to that one, the taped

8     statement of Kareem Gilbert?

9          MR. WHALEN:  No, we do not.

10          MR. TIEGER:  What am I grabbing,

11     Megan?

12          MS. SHANAHAN:  The diagram that is

13     rolled up sitting there.  State's Exhibit

14     1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 are

15     photographs from the crime scene; State's

16     11 is the DNA lift from the phlegm at the

17     crime scene; State's 12 is the diagram,

18     the large blowup of the diagram of the

19     Victor Davis crime scene; 12-A is the

20     same diagram, but the smaller version

21     that was put on the Elmo; State's 13 are

22     the shell casings from the Brian Austin

23     murder; State's 14 is the autopsy bullets

24     from Victor Davis's homicide; State's 15

25     is the known buccal swab of the defendant

1      Ruben Jordan; State's 16 is lab report
2      CC0802884, report Number 6 from the
3      Hamilton County Crime Lab; State's 17,
4      18 -- or excuse me, I double numbered.
5      There is going to be a State's 16-A,
6      which is a photograph, 17, 18, and 19.
7      These are all autopsy photographs.
8      Twenty and 21 and 22, 23, 24, 25, 26, 27,
9      28, 29 and 30 are all also autopsy
10     photographs, and photographs that the
11     crime lab took during the autopsy of
12     evidence.
13              THE COURT:  All right.
14              MS. SHANAHAN:  And then 31 is
15     Kareem Gilbert's audio-taped statement.
16     With the admission of all of these pieces
17     of evidence, then the State would rest.
18              THE COURT:  Have you had a chance
19     to review all that?
20              MS. WILLIAMS:  That's what I have,
21     Your Honor.
22              THE COURT:  And you don't have any
23     objection to the admission of those
24     exhibits?
25              MS. WILLIAMS:  I don't believe so,

1          no.
2                    MR. WHALEN:  No.
3                    THE COURT:  All right.  So those
4          are admitted.
5                    MS. SHANAHAN:  Thank you, Judge.
6                    THE COURT:  State's Exhibits one
7          through 31.
8                    (State's Exhibit Numbers 1 through
9          31 received into evidence.)
10                   MR. TIEGER:  Now we would rest.
11                   THE COURT:  And now the State is
12         officially resting?
13                   MR. WHALEN:  Your Honor, I'll make
14         a Rule 29 motion that this matter be
15         dismissed.
16                   THE COURT:  Go ahead, Counsel.
17                   MR. WHALEN:  The last exhibit, 31,
18         I believe, is Kareem's statement, and we
19         have all agreed that that was brought in
20         to impeach Kareem.  It wasn't offered for
21         the truth of the matter.
22                   Now, that's impeaching without it
23         being offered for the truth of the
24         matter.  You have no evidence that this
25         man did anything except spit on a

1    sidewalk near a dead body sometime that
2    evening.
3        There is nothing else to bring my
4    client even close to somebody identifying
5    him as the killer.  And with that result,
6    I think the Court has to dismiss it.
7    Even taking the case -- the State's case
8    in the best light, there is nothing to
9    show that Ruben Jordan committed this
10   crime.
11       THE COURT:  Counsel, would you
12   repeat that?  I want you to repeat that
13   for the record.
14       MR. WHALEN:  Sure.
15       THE COURT:  Because this document
16   was introduced for purposes of
17   impeachment?
18       MR. WHALEN:  Yes, not for the truth
19   of the facts.
20       THE COURT:  All right.
21       MR. WHALEN:  And that's what it is,
22   it impeached Kareem Gilbert.  It didn't
23   show any evidence against my client.
24   They just showed that Kareem had made two
25   different statements.  You have no

1    evidence for the jury to consider for the

2    truth of the facts that my client

3    committed this murder, nothing.  You have

4    a tape that was used to impeach him, and

5    that's it.  There is nothing to go in

6    front of the jury that would identify my

7    client as being the person that was there

8    or did anything.

9          The only thing that you have then

10   is that phlegm that was collected that

11   they say matches my client's DNA.

12         THE COURT:  All right.  Do you want

13   to respond?

14         MR. TIEGER:  Judge, I would

15   disagree.  I think there is a lot more

16   than what Mr. Whalen said.  If you

17   recall, Judge, Mr. Shade --

18         THE COURT:  No, I don't believe --

19         MR. TIEGER:  -- indicated he was

20   looking out his window.  Mr. Heard also

21   testified that the defendant confessed,

22   and the defendant is also telling the

23   police that he may have been down there

24   at 11 in the morning, and the transcript

25   is replete, Judge, with many witnesses

1     saying that that actual spit, or whatever

2     you want to call it, was much, much

3     fresher, and that it is basically

4     impossible for it to have been deposited

5     there when the defendant said it was

6     deposited.

7         THE COURT:  So, the question is

8     whether or not the State has put on

9     sufficient evidence on each element?  And

10     circumstantial evidence, I have to

11     determine that there is no jury anywhere

12     who would find that it is sufficient.

13     And just on that basis, because there is

14     circumstantial evidence, then the Rule 29

15     is overruled, Counsel.

16         Do you have other motions?

17         MR. WHALEN:  At this time, I want

18     to call a witness.  I want to call Seth

19     Tieger.

20         THE COURT:  Counsel, that's an

21     unusual thing to do, because if you call

22     the prosecution as a witness that would,

23     of course, require a mistrial.

24         MR. WHALEN:  Correct.

25         THE COURT:  And so you're asking

1       the Court for a mistrial?

2               MR. WHALEN:  I am.

3               THE COURT:  Would you -- and you

4       have to really state some very clear

5       grounds that are unequivocal.  Tell me

6       why this prosecutor should be called as a

7       witness.

8               MR. WHALEN:  Kareem Gilbert's

9       testimony to his statement that he made

10      on the 18th or 17th of May of 2010 is

11      critical to this case.  And both

12      prosecutors sat in on that statement, and

13      Seth Tieger asked questions of him.

14              And I want to go beyond the

15      statement itself and have Mr. Tieger

16      testify as to what Kareem was told

17      beforehand, what his attorney was told,

18      what inducements were involved.  He tells

19      me there is a written document with

20      Kareem about what happens if he doesn't

21      testify correctly, or the way they want

22      him to.  And those things I can only get

23      through Mr. Tieger, and I'm asking the

24      Court to allow me to bring those things

25      out for the jury to understand.

1          THE COURT:  All right.  Are you

2     going to respond, or you have,

3     Ms. Shanahan?

4          MR. TIEGER:  I can respond.  There

5     is a written plea agreement that we

6     disclosed to the defense that I would be

7     happy to make a copy for Mr. Whalen.

8     It's there.  It basically says that --

9     it's a lengthy document, so rather than

10    tell you what it says, I can give him a

11    copy of it.

12         But the basics are that he gave a

13    statement on May 17th that is a truthful

14    statement, that the facts in that

15    statement have been independently

16    verified by the police and corroborated.

17    That if he doesn't testify truthfully in

18    accordance with that statement, that all

19    the original charges could be

20    reinstituted against him, and then the

21    proffered statement could be used as

22    evidence in that new trial, and that's

23    signed by Mr. Issenman.

24         I believe myself, Mr. Gilbert, I'm

25    sure the Court signed it, it's a record

1          in the Kareem Gilbert case.  So, I would

2          be happy to -- that's been disclosed.  I

3          would be happy to give him a copy.

4                    Secondly, Judge, in terms of the

5          statement that Mr. Gilbert gave, it's

6          common in a serious cases where you have

7          got cooperating witnesses, for a

8          prosecutor to be present at a statement

9          that that person gives because you want

10         to assess their credibility, look at

11         them, see what they are saying, does it

12         make sense, do I believe this person?

13         Because if you don't, then that's going

14         to determine which way the investigation

15         goes.  If you do, that will determine

16         another path of where the investigation

17         goes.  Everything that Mr. Gilbert said

18         on that day is on that tape.

19                    There is also three other witnesses

20         who have testified.  Detective Luke,

21         Detective Ballman, who could be

22         questioned about the content of what was

23         said, if there is any other inducements

24         or anything like that, and Detective

25         McGuffey was also present for that.

1          So, for those reasons, I think it
2     would be improper to call a prosecutor
3     that was present at a plea when that
4     proffered statement -- when the entire
5     conversation was tape recorded.  And I
6     agree, I did ask questions during that
7     statement.
8          THE COURT:  All right.  Now, the
9     questions that he asked are on the
10     statement.  How long have you known about
11     the fact that Mr. Tieger, Seth Tieger was
12     present during the questioning of the
13     witness?  I think that's been information
14     you have had for some time.
15          MR. WHALEN:  It is.
16          THE COURT:  Okay.
17          MR. WHALEN:  We just got the --
18          THE COURT:  You have been knowing
19     that the prosecutor was present during
20     the questioning --
21          MR. WHALEN:  No, we just got the
22     statement this week.  But not only did we
23     not know until this week, and we did know
24     a couple of days ago, but we didn't know
25     the significance that that statement was

1    gonna play until Kareem Gilbert took the

2    stand and said it was all a lie.  That

3    took on a different shade at that point

4    in time.

5         THE COURT:  Okay.  The statement is

6    already contained in there.  You did not

7    know about the other witnesses?  Officer

8    Ballman and the other witnesses who were

9    present during this statement?

10       MR. WHALEN:  I do know, but Seth

11    Tieger made a deal with Kareem Gilbert

12    and his attorney, the police didn't.  And

13    I want to be able to tell the jury what

14    Seth told him was going to happen if he

15    didn't come in and say the statement that

16    he first gave them, because I think the

17    jury is going to understand with that

18    kind of leverage, and somebody comes in

19    and says my daddy didn't do it, he knows

20    what he's doing to himself at that point

21    in time, and that shows the jury that

22    he's coming in and telling the truth.

23       THE COURT:  Which is something you

24    can still argue.  And now they are

25    telling you, you can even introduce the

1          agreement --

2                  MR. TIEGER:  Yes, Your Honor.

3                  THE COURT:  -- the State entered

4          into.

5                  MR. WHALEN:  I don't know, I

6          haven't seen it.  But I want to be able

7          to tell the jury that Seth Tieger made

8          that deal with Kareem's attorney and they

9          sat down and talked.

10                 THE COURT:  That's the State.  If

11         you were to provide that, doesn't the

12         statement --

13                 MR. TIEGER:  It speaks for itself

14         at that point.

15                 THE COURT:  Is it signed by you?

16                 MR. TIEGER:  It's either signed by

17         me or Ms. Shanahan, one of us.

18                 THE COURT:  I think that could be

19         accomplished, and you can make that

20         argument with that document provided.

21         So, I'm going to ask you to provide that

22         document.

23                 MR. TIEGER:  Yes, Judge.

24                 THE COURT:  I don't know how -- it

25         almost has to be stipulated to, because

1          --

2                MR. TIEGER:  I understand.

3                THE COURT:  -- you're resting by

4          stipulation.

5                MR. WHALEN:  And I disagree with

6          the Court.

7                THE COURT:  Okay.  I'm saying that

8          you can bring in the document.  You can

9          still make an argument without calling

10         him as a witness, because that would

11         force the Court to impose a mistrial

12         when, in fact, it is speculation.  There

13         is nothing other than your speculation

14         that there may have been something

15         improperly said or done to induce

16         Mr. Kareem Gilbert.

17               MR. WHALEN:  I'm not saying

18         anything improperly was done.  I'm saying

19         it was properly done, but him and his

20         attorney listened to Mr. Tieger explain

21         the thing and then they signed the

22         document, and there were other things

23         that went on in getting him to sign that

24         document.  And I think the jury needs to

25         know exactly what Kareem Gilbert had

1    threatening him when he came in here and

2    said daddy didn't do it.

3         THE COURT:  Counsel, I'm gonna

4    overrule that.  But at this point, you

5    can proffer whatever you would like to

6    put in the record about that.

7         MR. WHALEN:  Well, I just did.

8         THE COURT:  We'll call that a

9    proffer.  I'm going to make sure for the

10   record, I'm not gonna grant that motion

11   for the retrial in order to call the

12   prosecutor as a witness because it causes

13   me to impose a mistrial in this matter.

14        So, at this time, would you like to

15   proffer what you think calling of Mr.

16   Tieger would accomplish for the defense?

17        MR. WHALEN:  I want to call Seth

18   Tieger to indicate that he met with

19   Kareem Gilbert and Kareem Gilbert's

20   attorney to work out a plea bargain

21   whereby the case was -- I don't know

22   whether it was put on hold or dismissed,

23   but he understood if he didn't come in

24   and testify to what he told them in that

25   statement, they were going to initiate

1       another murder charge against him.

2           And I want to know what other

3       inducements may have been made before

4       they actually put it in writing to get

5       Mr. Gilbert's attorney to advise him to

6       take the deal and what Mr. Gilbert was

7       going to suffer if he walked into this

8       courtroom and did what he did the day

9       before yesterday.

10          THE COURT:  All right.  And, again,

11      is the statement something you don't

12      want, the plea agreement that was entered

13      into between --

14         MR. WHALEN:  I do want it.  I want

15      it to go to the jury.

16         THE COURT:  All right.  Then would

17      you agree to stipulate that is the

18      agreement?

19         MR. TIEGER:  Yes, Your Honor.

20         THE COURT:  So, that's going to

21      come in.  That's going to be provided

22      like right now.  Do you have it with you?

23         MR. TIEGER:  I have got a -- I'm

24      going to have to get it.  I have got --

25      our whole file is not over here, we'll

1       get it together.  I mean, it's --

2           THE COURT:  Do you want to go

3       forward with your other witnesses and

4       then take a break to get this exhibit

5       that they are talking about?

6           MR. WHALEN:  I can do that.

7           THE COURT:  Okay.  And then we are

8       going to have lunch anyway, so it is

9       11:30.  So, does that mean we are going

10      to be taking a long lunch until 1:00?

11          MR. TIEGER:  Judge, I guess the

12      thought was to --

13          THE COURT:  We would be adjourned

14      anyway?

15          MR. TIEGER:  I don't know whether

16      they have got another witness or not.

17      They weren't sure when we talked as to

18      whether there is a --

19          THE COURT:  I think we may -- I

20      think we should adjourn until you get the

21      document, because you're going to call

22      your witnesses and we were going to

23      adjourn for the day.

24          MR. WHALEN:  Right.

25          THE COURT:  So let's just have an

1       early lunch.

2               MR. TIEGER:  That's fine.

3               THE COURT:  It's lunchtime now.

4       They have until -- they have until

5       quarter till, is that 20 till, quarter of

6       one.  Come back at --

7               MR. WHALEN:  Can I be excused from

8       the room for a minute?

9               THE COURT:  Yes.  I'm going to

10      adjourn for recess.  I'm sorry, for

11      lunch.  Lunch recess.  And when we come

12      back, all the documents will be in hand,

13      and your defense witnesses is going to go

14      forward.

15              MR. TIEGER:  And I assume that all

16      the admonishments you gave previously

17      over the lunch hour --

18              THE COURT:  Do you want me to give

19      them again?

20              MR. TIEGER:  No, Judge, just as

21      long as the bailiff does that, that's

22      fine.

23              (Lunch recess.)

24              THE COURT:  Do you want to bring in

25      the jury?  They want me to advise them

1    that they do not have to worry about

2    having to remain past Wednesday.  Three

3    of them is going to have to leave, and

4    they are wanting me to -- they want to

5    hear that from me, so they can be assured

6    they will not be forced to remain past

7    Wednesday.  I guess that's Wednesday

8    morning, if matters are not concluded.

9         (The jury entering the courtroom at

10   1:10 p.m.)

11        THE COURT:  You may all be seated.

12   Before we commence with testimony, I do

13   want to assure the jury that those of you

14   who have to leave as of Wednesday morning

15   will be permitted to do so.  We are not

16   going to force anyone to remain in jury

17   duty, because I know two of you are --

18   three of you have already advised us in

19   advance during voir dire, and so that's

20   why we have alternates, in case that does

21   happen.

22        All right.  So with that, we are

23   ready to proceed with the defense case in

24   chief.

25        MS. SHANAHAN:  I believe, Your

1    Honor, that I have to reread the

2    statement.

3        THE COURT:  Yes.  Reread the

4    stipulation that we already agreed to.

5    So, if the State is going to enter

6    documents into evidence, and there are

7    stipulations that we would like you to

8    hear, although you'll get this in writing

9    when we have jury instructions also.

10        MS. SHANAHAN:  Your Honor, the

11    State and defense have agreed to

12    stipulate to the five prior convictions

13    of the defendant that are contained in

14    Count 2 of the indictment, the weapon

15    under disability charge.  Those counts

16    are -- or excuse me, those prior

17    convictions include possession of drugs,

18    in B0309177 on February 6, 2004;

19    preparation of marijuana for sale in

20    B0006899 on December 14th of 2000; the

21    illegal processing of drug documents in

22    B955989 on October 17 of 1995; aggravated

23    trafficking in drugs in B929170 on

24    March 19th, 1993; and drug abuse in

25    B911528 on May 1st, 1991.

1          The defense has agreed that it is,

2     in fact, Ruben Jordan, the person who was

3     named in the indictment that was

4     convicted of these prior charges alleged

5     in the weapon under disability charge.

6          And with that stipulation, and the

7     entry of all the State's evidence that we

8     have already discussed during the break,

9     the State would rest, Your Honor.

10          THE COURT:  So we are admitting

11     State's Exhibits 1 through 31, and those

12     stipulations.  So, with that, is the

13     defendant ready to proceed?

14          MS. WILLIAMS:  Your Honor, the

15     defense is going to call Leshuande

16     Ramsey.

17          THE COURT:  Okay.  She's in the

18     hallway.  So, all your witnesses are in

19     the hallway.  We still have a continuous

20     motion for separation that anybody who's

21     in this courthouse -- first of all, turn

22     off cell phones.  Some of you weren't

23     here earlier, so any cell phones have to

24     be turned off now and taken out of

25     pockets and out of hands, otherwise they

1          will be seized.

2                Also, you cannot discuss or

3          disclose anything that is occurring

4          during this trial by stepping in the

5          hallway, talking to witnesses.  Okay.  If

6          you would have a seat up here.  If you'll

7          raise your right hand to be sworn.

8                      LESHUANDE RAMSEY,

9     having been first duly sworn, was examined and

10    testified as follows:

11                   DIRECT EXAMINATION

12    BY MS. WILLIAMS:

13          Q.    If you could state your name and

14    spell your last name for the record?

15          A.    Leshuande Ramsey,

16    L-E-S-H-U-A-N-D-E, Ramsey, R-A-M-S-E-Y.

17          Q.    And you're familiar with a Ruben

18    Jordan, are you not?

19          A.    Yes, I am.

20          Q.    Okay.  And how do you know Mr.

21    Jordan?

22          A.    I have been knowing Mr. Jordan all

23    my life.  Presently, he's my fiance.

24          Q.    Okay.  And do you live with Mr.

25    Jordan?

```
 1        A.      Yes.

 2        Q.      Where is that at?

 3        A.      Our last address was McGregor.

 4        Q.      McGregor.  And where were you

 5  living on October 31st, 2008?

 6        A.      We were living on Hearne in

 7  Avondale.

 8        Q.      Okay.  And at that time, how long

 9  had you lived with Mr. Jordan?

10        A.      About three-and-a-half years.

11        Q.      Three-and-a-half years.  And do you

12  remember what you were doing the night of

13  October 31st, 2008?

14        A.      The night of 2008, we got the kids

15  dressed for Halloween, sent them out for

16  Halloween.  We had Ruben spent some time in our

17  room, Kareem was upstairs in his room.  Um,

18  later on that night, maybe about something to

19  ten, Ruben told me that it's getting late, the

20  girls haven't returned from trick or treating,

21  where are they.  A little bit after that, Kareem

22  had some company.  The kids came in, maybe like

23  10:15.  A little bit after that, some more of

24  Kareem's friends came over.

25        Q.      So you were all home this night on
```

1    October 31st, 2008?

2          A.    Yes, ma'am.

3          Q.    And what was everyone doing at

4    home?  I know you said the kids had come back

5    from trick or treating?

6          A.    Earlier, Kareem and Mr. Jordan was

7    watching television.  Ruben fixed a breaker for

8    the whole family.  I was in my bedroom watching

9    television.  Later on that night we all watched

10   movies, Halloween, we watched Saw, I don't know

11   what, first Saw, second Saw.

12         Q.    And Mr. Jordan was home this entire

13   time?

14         A.    Yes, ma'am.

15         Q.    Okay.  And you're -- obviously, you

16   have mentioned Kareem a couple times, that's Mr.

17   Jordan's son, correct?

18         A.    Yes, ma'am.

19         Q.    Okay.  And he knew about the legal

20   troubles that Kareem was having during this

21   time, right?

22         A.    Yes, ma'am.

23         Q.    Did he attempt to help Mr. Gilbert

24   in any way?  Did he attempt to help him get an

25   attorney?  Did he tell him to turn himself in?

```
 1   What kind of conversations did they have
 2   regarding that?
 3          A.    Several times Mr. Jordan had went
 4   down to talk to some attorneys for Kareem to
 5   turn hisself in.  Kareem asked his father on one
 6   occasion, not today, Mr. Jordan went back down
 7   to talk to the attorneys and told Kareem today
 8   is the day that you have to turn yourself in.
 9   That day, I'm not for sure what day it was, but
10   Kareem left the house.
11              When Mr. Jordan went to talk to the
12   attorneys, he told me that he was going out to
13   get a cigar and he never returned.
14          Q.    Okay.  So, basically, did Ruben
15   give him an ultimatum, you said, today has to be
16   the day?
17          A.    Yes, he did, today has to be the
18   day that you turn yourself in.
19          Q.    And if you didn't, what was Mr.
20   Jordan going to do?
21          A.    That he had to turn him in.  He was
22   going to turn him in.
23          Q.    So if Kareem didn't turn himself
24   in, Ruben was going to turn him in?
25          A.    Yes.
```

1          MS. WILLIAMS:  No further

2     questions, Your Honor.

3          THE COURT:  Cross?

4               CROSS-EXAMINATION

5  BY MR. TIEGER:

6     Q.    Ms. Ramsey, have you ever been in

7  trouble with the law at all?

8     A.    I have one misdemeanor.

9     Q.    What was that for?

10    A.    Disorderly conduct.

11    Q.    Okay.  And you keep calling

12 somebody Mr. Jordan.  Do you see this person

13 here today in court?

14    A.    Yes, sir.

15    Q.    Where is he?

16    A.    Right there.

17    Q.    Okay.  Right here?

18    A.    Yes, sir.

19    Q.    The one smiling right here?

20    A.    Yes, sir.

21    Q.    Okay.  And then what do you call

22 him, Ms. Ramsey?

23    A.    I call him Ruben.

24    Q.    You do?

25    A.    Yes.

1    Q.    Okay.  Does he have any other names
2  he goes by?
3    A.    He goes by Red.
4    Q.    Red.  How long has he had that
5  nickname, Ms. Ramsey?
6    A.    I have been knowing Mr. Jordan
7  since he was seven years old.  He used to have
8  red hair, so he's been going by that name all
9  his life.
10    Q.    How old are you, Ms. Ramsey, if you
11  don't mind me asking?
12    A.    Thirty-eight.
13    Q.    How old is Red?
14    A.    Thirty-eight.
15    Q.    Okay.  And you have known him since
16  he was seven?
17    A.    Yes.
18    Q.    But you recently started, did you
19  call it dating?
20    A.    Yes, sir.
21    Q.    Okay.  And when was that?
22    A.    Years ago, but I also dated him
23  when we were about 14 years old.
24    Q.    And then you're aware he's been to
25  prison a number of times?

1          A.     Yes, sir.

2          Q.     Okay.  And do you have children?

3          A.     Yes, I do.

4          Q.     How old are your children?

5          A.     My children are 20, 19, 18, 14 and

6     11.

7          Q.     And the kids that were trick or

8     treating, which ones of those were trick or

9     treating?

10          A.     At the time my nine-year-old and --

11     I believe she was nine.

12          Q.     She's 11 now?

13          A.     Yes.

14          Q.     But nine then?

15          A.     Uh-huh.

16          Q.     Okay.  Who else?

17          A.     And my 14-year-old that was, what,

18     12.

19          Q.     Do you know the hours for trick or

20     treating, Ms. Ramsey?

21          A.     I believe it started at six.

22          Q.     Till?

23          A.     Until nine.

24          Q.     Okay.  I thought it was eight.

25          A.     Well, I thought it was nine.

1      Q.    But you're saying it was somewhere
2  around 10:00, and you had not -- they left at
3  what, six?
4      A.    Yes, sir.
5      Q.    And you hadn't heard from them for
6  around four hours.  This is a nine-year-old and
7  12-year-old out on the street at night in the
8  dark?
9      A.    Well, they had a ride with a
10 neighbor.  They went out trick or treating with
11 a neighbor.
12     Q.    To another neighborhood?
13     A.    Yes, sir.
14     Q.    Okay.  But you hadn't heard from
15 them in around four hours?
16     A.    Yes, sir.
17     Q.    Had no idea where they were other
18 than they were with a neighbor?
19     A.    Exactly.  Mr. Jordan got concerned,
20 asked me where are your children at, why haven't
21 they came back?  When the kids came back with my
22 neighbor --
23     Q.    So you didn't get concerned?
24     A.    Yes, sir, I was concerned.
25     Q.    Okay.  When you said he got

1   concerned, not you?

2        A.    Well, he asked me.

3        Q.    So you really hadn't thought

4   anything about it, because you said you were in

5   the bedroom with Mr. Jordan, right, Ms. Ramsey?

6        A.    Yes, sir.

7        Q.    Okay.  And what were you doing in

8   the bedroom?

9        A.    We was watching television.

10       Q.    Okay.  There is a -- do you have

11  any other televisions in your house besides that

12  one?

13       A.    Yes, I do.

14       Q.    Where is it?

15       A.    In my living room.

16       Q.    Okay.  Any other ones?

17       A.    Yes, I do.

18       Q.    And where is that?

19       A.    I had a second living room.

20       Q.    And where is that?

21       A.    Next to my original living room.

22       Q.    On the first floor?

23       A.    Uh-huh.

24       Q.    And the room Kareem was in, what

25  room was that in?

```
 1        A.      That was on the third floor.

 2        Q.      There is no TV up there?

 3        A.      Yes, sir, there was.

 4        Q.      Well, you didn't mention that to

 5   the jury, Ms. Ramsey, did you?

 6        A.      No.

 7        Q.      Why not?

 8        A.      It wasn't asked.

 9        Q.      Okay.  Because I thought I asked

10   you how many TVs you had, and you said you had

11   three there on the first floor.

12        A.      Okay.  I do have three on the first

13   floor, and also one on the third floor.

14        Q.      Okay.  And what kind of cable do

15   you have in your house?

16        A.      I had a satellite dish.

17        Q.      Okay.  Do you work?

18        A.      At the present time, no, but then I

19   did.

20        Q.      All right.  What did Red do during

21   the day?

22        A.      What did Ruben do during the days?

23   He would find little work.  He's a plumber,

24   sometimes he would work with his brother.  He

25   didn't have a permanent job.  He started school,
```

1    going to college.

2        Q.    Have you spoken to Mr. Jordan since

3    he's been arrested on May 18th of 2010?

4        A.    Yes, sir.

5        Q.    How many times would you say you

6    have spoken to him?

7        A.    I have visited Mr. Jordan since

8    he's been locked up every day, except for maybe

9    twice.

10        Q.    And you have written him as well?

11        A.    No, sir.

12        Q.    But you speak every day?

13        A.    Yes, sir.

14        Q.    Either on the phone or in person?

15        A.    Yes, sir.

16        Q.    Have you spoken about your

17    testimony at all?

18        A.    No, sir.  I told Mr. Jordan that I

19    would not speak about the testimony because I

20    didn't want to mess up any chances of me getting

21    up on this witness stand.

22        Q.    Okay.  So, in terms of how it all

23    got started that you were a potential alibi

24    witness, did you contact Mr. Whalen or Ms.

25    williams, or how did that come about?

1      A.      It actually came about because of

2  Kareem's case, that I was a witness for Kareem.

3      Q.      And you alibied Kareem, and you

4  said that he could not have done that murder

5  because he was with you?

6      A.      All day in pajamas.

7      Q.      And you said that -- you're saying

8  that there is no way Kareem Gilbert -- he was in

9  the house at -- do you know what time the murder

10  happened?

11     A.      From my understanding, when I

12  talked to the detective the day that Ruben was

13  arrested, she told me that it was about 10:00.

14     Q.      Ten at night?

15     A.      Uh-huh.

16     Q.      Okay.  So, you're saying that Mr.

17  Jordan nor Mr. Gilbert could have done this

18  because they were with you at 10:00?

19     A.      Yes, sir.

20     Q.      Okay.  When was the last time you

21  saw Mr. Jordan that night?  For instance, was

22  there any time period, Ms. Ramsey, that he was

23  out of your sight?

24     A.      No, sir.

25     Q.      So you're telling the jury that the

1    whole night that night, from whenever till

2    whenever, you never left his sight and he never

3    left yours?

4        A.    No, sir.

5        Q.    And the same thing with Mr.

6    Gilbert?

7        A.    Mr. Gilbert would go upstairs.

8    Like I said, he had company that night.  He had

9    two male friends that came over, a female friend

10   that came over, and also his sister that came

11   over.

12       Q.    And he greeted his company in his

13   pajamas?

14       A.    Yes, he did.

15       Q.    Okay.  And stayed in his pajamas,

16   right?

17       A.    Yes, sir.

18       Q.    And you're certain that he never

19   left your home that evening at all?

20       A.    I'm positive.

21       Q.    The street that you lived on at the

22   time was Hearne, correct?

23       A.    Yes, sir.

24       Q.    And what does Hearne run into?

25       A.    Burnet.

1        Q.      And you talked about Kareem's legal

2    troubles, I think is what -- the way the

3    question was phrased?

4        A.      Uh-huh.

5        Q.      What did you mean by that, legal

6    troubles, Ms. Ramsey?

7        A.      Well, from my understanding of the

8    beginning, that Kareem had ran away from

9    Hillcrest and that his father had to take care

10   of him getting back into Hillcrest in the

11   beginning, but detectives let me know that

12   Kareem was in trouble with a murder.

13       Q.      When was the first time you knew

14   that Kareem was wanted for a murder?

15       A.      When detectives knocked on my door.

16       Q.      Which was when?

17       A.      I can't tell you a date.

18       Q.      And was it before Halloween of

19   2008?

20       A.      I'm not for sure.

21       Q.      Could it have been before Halloween

22   of 2008?

23       A.      I couldn't -- I couldn't tell you.

24       Q.      Okay.  And then you knew Kareem was

25   wanted for murder?

1      A.    Yes.

2      Q.    But at the very least, you knew a

3  person that had run away from a facility was --

4  you were harboring him in your house?

5      A.    Which Mr. Jordan was trying to take

6  care of the situation.  I didn't think that it

7  was really a big deal about him being there when

8  Mr. Jordan was taking him down to turn hisself

9  in.

10      Q.    Okay.  And you're telling the jury,

11  Ms. Ramsey, that this whole time that all this

12  was going on that your understanding was that

13  you knew nothing about a murder?

14      A.    No, I didn't.

15      Q.    And Mr. Jordan may have known about

16  a murder but wasn't telling you, correct?

17      A.    I'm not for sure.

18      Q.    Well, would that be fair to say,

19  that Mr. Gilbert and Mr. Jordan may have talked

20  about that it was more than just running away

21  from Hillcrest and they didn't tell you?

22      A.    Maybe, I don't know.

23      Q.    Because certainly he keeps things

24  from you, does he not, Ms. Ramsey?

25      A.    I mean, I haven't had a problem

1    with him keeping things from me.

2        Q.    Do you know if he smokes crack?

3        A.    Yes, I do.

4        Q.    Okay.  And does he?

5        A.    He has recently stopped smoking

6    crack, got hisself into college, was working.

7        Q.    How recently?

8        A.    Some months before you guys came

9    and swabbed his mouth and did that kind of thing

10   to him, he had stopped.  He was getting his life

11   together, going to Kaplan College for

12   electrician.

13       Q.    Okay.  Which was when, when you say

14   that he stopped smoking crack, Ms. Ramsey?

15       A.    He's been locked up for nine

16   months.  I would say maybe four or five months

17   before.

18       Q.    Okay.  So he got locked up on

19   May 18 of 2009.

20       A.    Uh-huh.

21       Q.    So, let's say it's eight months?

22       A.    Uh-huh.

23       Q.    So, you're saying several months

24   prior to that he quit?

25       A.    Yes, sir.

1      Q.    So, in January/February of '09 he
2  was still using crack?  In 2008, he was using
3  crack?
4      A.    I would say prior to you guys
5  coming to pick him up from the house that he had
6  stopped about four or five months, I'm not for
7  sure of the dates.
8      Q.    Okay.  Where would he buy his
9  crack, Ms. Ramsey?
10     A.    I have no clue.
11     Q.    Well, I mean, when he bought his
12 crack, did he ever tell you he bought it up on
13 Burnet?
14     A.    I have no clue where Mr. Jordan
15 would buy his crack.  I don't smoke crack, so I
16 don't deal with them kind of people.
17     Q.    Well, I mean, you deal with him and
18 he smokes crack?
19     A.    I never went with him to buy crack,
20 so...
21     Q.    How did you know that he was using
22 crack then if you never were with him?  Did you
23 ever see him smoke crack?
24     A.    I have never seen him smoke crack.
25     Q.    How do you know he was on crack and

1    got off of it?

2         A.    Because he let me know that he

3    smokes crack.

4         Q.    Okay.  Tell us how he let you know

5    that.

6         A.    I mean --

7         Q.    Is it pretty obvious?

8         A.    We had discussions, yes, it's

9    pretty obvious that you, you know, that you have

10   money and it's gone and you know.  I got family

11   members that smoke crack, you know, so I know

12   when somebody is smoking crack.

13        Q.    And is there a difference in his

14   personality when he is smoking crack?

15        A.    It's pretty much quiet.

16        Q.    Quiet.  Okay.  If somebody

17   described him as like deacon one night, like

18   real hyper and all that, have you ever seen him

19   like that on crack?

20        A.    No, he's pretty much quiet.

21        Q.    Mellows him out?

22        A.    (Nods affirmatively.)

23        Q.    Is that what you're saying?

24        A.    Yes, sir.

25        Q.    What I'm just trying to get at,

1   Ms. Ramsey, that you say you know when he's on

2   it, for instance, could he be on it every day?

3   When you're addicted to crack, it's something

4   that you have to smoke all the time, would you

5   agree?

6          A.    No, I wouldn't agree.

7          Q.    Okay.  How often would you say he

8   smoked it back in 2008, in early 2009?

9          A.    Sometimes I would not even know

10  that he done smoked, so I don't know.

11         Q.    So it's fair to say that he hides

12  things from you, is that correct, Ms. Ramsey?

13         A.    Probably smoking crack, yeah.

14         Q.    Is there anything else?

15         A.    Not that I know of.

16         Q.    Because you wouldn't know if he

17  were hiding it from you, correct, Ms. Ramsey?

18  Just like the crack, you don't get up in his

19  business all the time, do you?

20         A.    I don't know what you mean by that.

21         Q.    You said you were at work, he's

22  somewhere during the day, you have no idea where

23  he is, you don't know what he's doing, you don't

24  know what he's smoking, you don't know who he's

25  with or what he's doing, fair to say?

1        A.    That's correct.

2        Q.    And there is a large part about him

3    that you really don't know about, correct,

4    Ms. Ramsey, is that fair to say?

5        A.    I know a lot about him, but, I

6    mean, if he leaves the house when I'm at work,

7    you know, I come home at four, 4:30 every day.

8        Q.    And it's fair to say that if you

9    come home, he would not disclose to you, hey,

10    guess what, I walked up on Burnet, I met Kenny,

11    I got a 20-cent piece and I smoked some crack.

12    Would he ever tell you that, Ms. Ramsey?

13        A.    No, sir.

14        Q.    Okay.  So, there were things that

15    he was hiding about himself to you, fair to say?

16        A.    I wouldn't say hiding, but I don't

17    think he would tell me that, hey, I had smoked

18    crack today.

19        Q.    Okay.  Well, tell me what word you

20    would use to define it, if it's not hiding it,

21    keeping it secret from you?

22        A.    I would say that's his personal

23    preference of what he do when he go out and

24    smoke crack.

25        Q.    I mean, wasn't it important to you,

1   Ms. Ramsey, you have got a number of kids, you

2   were working, and I'm sure money is tight, and

3   he is out smoking crack, spending his money, not

4   doing anything during the day, didn't that

5   irritate you at all?

6          A.     Very much so.

7          Q.     Okay.  And did you argue about

8   that?

9          A.     We done discussed it.

10         Q.     Okay.  Because even Kareem said

11  that he knew that his father used crack.  It

12  wasn't a secret to him, or it sounds like really

13  to anybody.  Do you know if there is drug

14  dealers that stand up on Burnet and sell crack?

15         A.     All day long.

16         Q.     Okay.  And how do you know they

17  were drug dealers?

18         A.     I lived in the neighborhood.

19         Q.     So, it's fair to say that crack

20  dealers set up shop, so to speak, by hanging out

21  on the street and then a buyer, like your

22  fiance, would approach and there would be a

23  hand-to-hand transaction between cash and a rock

24  of cocaine?

25         A.     I have never seen that, but that

1    goes on every day.

2         Q.    And if you want to get crack

3    cocaine, it's known that a place to get that is

4    on Burnet from the crack dealers, fair to say?

5         A.    That place and several others.

6         Q.    And you're telling the jury,

7    Ms. Ramsey, that in all the times in the, gosh,

8    200 plus times that you visited him, you have

9    never spoken once about that night, what you

10   did, don't you remember this, this is what we

11   did, this is what I'm going to say?  He's never

12   asked you, and you have never told him?

13        A.    I have made sure that Mr. Jordan

14   would not speak to me about the case, because I

15   did not want to mess up getting on this witness

16   stand.  So, if he did want to say anything to

17   me, I would stop him, I don't want to hear it.

18   I know that they listen to the phone calls, so,

19   no, don't say anything to me about this case.

20        Q.    Okay.  So, he has tried to bring it

21   up?

22        A.    Somewhat, but --

23        Q.    Tell me about how he's tried to

24   bring it up, Ms. Ramsey.

25        A.    I wouldn't allow him.  I didn't

1    want to hear it.  I'll put the phone down.  I

2    don't want to hear nothing about this case,

3    because I didn't want to mess up getting on this

4    stand.

5         Q.    Okay.  But you're saying that he

6    tried to talk to you about it on a number of

7    occasions about that night, about your alibi?

8         A.    Oh, no, not about an alibi.

9    Actually, I don't know what he was going to try

10   to say, but I was not going to allow him to say

11   anything to me.

12        Q.    In any way, shape or form about the

13   situation that we are in here today?

14        A.    No, sir.

15        Q.    Would you agree with me,

16   Ms. Ramsey, to get from where you live on Hearne

17   down to Republic and Elder is a very short

18   distance, maybe less than a 10-minute car ride?

19        A.    Yes, in a car.

20        Q.    Okay.  Especially on an evening or

21   time when there is very little traffic, you

22   could just go straight from Hearne to Burnet?

23        A.    Ten, 15 minutes probably.

24        Q.    Down Burnet, down the hill, maybe

25   cut over Liberty, straight into Over-the-Rhine

1   would be a very short car ride to get there and

2   get back?

3         A.     Yes.

4         Q.     Fair to say?

5         A.     Yes, sir.

6         Q.     And you're saying to the jury that

7   Mr. Jordan cared very much about his son and his

8   legal situation?

9         A.     Very much so.

10         Q.     And he wanted to take it on himself

11   too, you said, try to clear up the legal

12   difficulty that he was in, you said, by trying

13   to get an attorney, is that what you said?

14         A.     Yes, sir.

15         Q.     But that he was very much involved

16   in solving Kareem's legal problems, fair to say?

17         A.     Yes, sir.

18         MR. TIEGER:   Just one moment,

19       Judge.   That's all, Judge.   Thank you.

20         THE COURT:   Anything else, Counsel?

21         REDIRECT EXAMINATION

22   BY MS. WILLIAMS:

23         Q.     Ms. Ramsey, regardless of what Mr.

24   Jordan does or Ruben does or does not share with

25   you, he didn't have to share with you where he

1  was that night because you were with him the

2  entire time, correct?

3          A.    Yes, ma'am.

4                MS. WILLIAMS:  No further

5          questions.

6                THE COURT:  All right.  Thank you,

7          ma'am.  You may step down.  Do you have

8          another witness?

9                MR. WHALEN:  Can I have a moment,

10         Your Honor?

11               THE COURT:  Yes.

12               MR. WHALEN:  Could we approach a

13         moment, Your Honor?

14               THE COURT:  Yes.

15               (Unreported sidebar conference.)

16               THE COURT:  Rather than recess, we

17         are waiting for the next witness who is

18         on their way.  So, just continue to relax

19         and talk among yourselves.  Kind of

20         relax, recess mode.

21               All right.  So you want to continue

22         with the witness, Counsel?  All right.

23         On the record, and who's the next defense

24         witness?

25               MS. WILLIAMS:  The defense is going

1          to call Detective Kurt Ballman.

2               THE COURT:  All right, Detective

3          Ballman.  Detective, you're still under

4          oath, so I don't need to give you the

5          same oath.

6               THE WITNESS:  Yes, ma'am.

7               DETECTIVE KURT BALLMAN,

8    having been first duly sworn, was examined and

9    testified as follows:

10                  DIRECT EXAMINATION

11   BY MS. WILLIAMS:

12        Q.    Thanks, Detective, for coming in on

13   your day off.

14        A.    Yes, ma'am.

15        Q.    I just have a few extra questions

16   for you, Detective.  I know that you had

17   testified -- I'm sorry, I don't remember which

18   day it was that you testified -- that you had

19   learned from other officers on the scene that

20   Victor Davis had had as an argument with Shawn

21   Gilbert, correct?

22        A.    That is correct.

23        Q.    And you didn't see this yourself

24   though?

25        A.    I wouldn't call it -- I don't know

1    if it was an argument.  I believe my testimony

2    was I believed Mr. Gilbert was influencing or

3    intimidating the witness.

4          Q.    Okay.  And you also said that once

5    you found out he was Kareem's brother you did

6    interview him?

7          A.    Yes.

8          Q.    Okay.  Now, I know Detective Luke

9    testified earlier today that Shawn didn't really

10   give that much information.  Did he give any

11   further information to you?

12         A.    No.  He basically denied being

13   involved and his brother being involved and

14   things like that.

15         Q.    Was Shawn pursued any further or

16   was he dropped from your suspect list at that

17   point?

18         A.    As far as which case, ma'am?

19         Q.    As far as Victor Davis's murder.

20         A.    Victor Davis was Jenny Luke's case.

21   I don't -- at the time I interviewed Kareem on

22   the 31st in our mind he was -- still might be

23   still somehow involved.

24         Q.    Okay.  On December 31st, 2008, you

25   and Detective Schare interviewed Kareem Gilbert,

1  correct?

2         A.    That's correct.

3               THE COURT:  Would you repeat the

4         date again, on what day?

5               MS. WILLIAMS:  December 31st, 2008.

6               THE COURT:  Okay.

7         Q.    And did you get a chance to review

8   the Crimestopper tips from either the Brian

9   Austin or the Victor Davis murder?

10        A.    At some point I did.  I can't say I

11  have looked at it in some time.

12        Q.    Okay.  Do you remember how many

13  tips there were?

14        A.    No, ma'am.

15        Q.    Okay.  Do you remember who the

16  tipsters ID'd as the offenders in the case?

17        A.    There was, I believe, at one point

18  a tip that Shawn --

19              MR. TIEGER:  Objection.

20              THE COURT:  Objection to the tip?

21              MR. TIEGER:  Judge, what a

22        Crimestopper -- anonymous Crimestopper

23        said.

24              THE COURT:  Counsel?

25              MS. WILLIAMS:  It's in the

1    preceding interview that he had with

2    Kareem Gilbert on the Crimestopper tips

3    as to who was ID'd by those people.

4         THE COURT:  Who was ID'd in the

5    interview with -- I'm confused again.

6    What are you trying to get in here?

7         MS. WILLIAMS:  This detective and

8    Detective Schare interviewed Kareem

9    Gilbert.

10        THE COURT:  Yes.  Was he one of the

11   tips involved?

12        MS. WILLIAMS:  Yes.

13        THE COURT:  Okay.  So you need to

14   refer to it as a tip.  It's just an

15   interview with him, was it not?

16        MS. WILLIAMS:  It was an interview

17   where they were asking him about the tips

18   and identifying Mr. Gilbert.

19        THE COURT:  So these are questions

20   contained in the transcript?

21        MS. WILLIAMS:  Correct.

22        THE COURT:  Overruled.  In response

23   to questions, so it's overruled.  Go

24   ahead.  I don't remember if you remember

25   the question, Detective.  Why don't you

1          ask it again.

2          Q.    Do you remember who was ID'd in

3    those tips?

4          A.    I believe at one point we did have

5    one tip that ID'd Shawn Gilbert as somehow being

6    involved.

7          Q.    If I can show you, Detective, also

8    transcripts from an interview starting at line

9    23 and going to line 2, if you could read that,

10   please.

11         A.    It says:  We have got about eight

12   Crimestopper tips in here and all of them name

13   you.  And one of them name -- two of them name

14   your brother as a person that -- or a person

15   that shot Victor Davis.

16         Q.    Okay.  So of eight Crimestoppers

17   tips, six name Kareem Gilbert and two named

18   Shawn Gilbert?

19         A.    As being involved, yes.

20         Q.    And none of those tips were Ruben

21   Jordan?

22         A.    No, ma'am.

23         Q.    Okay.  You were also involved in

24   the interview of Kareem Gilbert on May 17, 2010,

25   correct?

1       A.      Yes, ma'am.

2       Q.      And in that interview you made the

3   statement, Victor told me that Shawn was telling

4   him to keep his mouth shut about it, so Victor

5   Davis actually told you that he was being

6   threatened or coerced?

7       A.      Yes.  When we subsequently did talk

8   to Mr. Davis, that's what was going on up at the

9   bank.

10      Q.      Okay.  Did Victor ever tell you

11  that Ruben was harassing him or just that --

12      A.      He was -- his main concern was more

13  with his sister and his family.  My

14  understanding, talking to Victor Davis, is he

15  was receiving threats from the Gilbert family

16  and that he had pretty much written himself off

17  as probably going to get shot.

18      Q.      So he just said the Gilbert family,

19  he didn't identify specific people?

20      A.      That's correct.

21      Q.      Other than this one time he had

22  said Shawn?

23      A.      That's correct.

24      Q.      On those Crimestopper tips,

25  Detective, was any reward or compensation paid

1    to the people who made those tips, if there was

2    an arrest?

3         A.    I don't know that, ma'am.

4              MS. WILLIAMS:  Okay.  No further

5         questions, Your Honor.

6              THE COURT:  All right.  You may

7         recross.

8              MR. TIEGER:  Thank you, Your Honor.

9                  CROSS-EXAMINATION

10   BY MR. TIEGER:

11        Q.    Detective Ballman, with regard to

12   the statement that Kareem Gilbert gave on, I

13   believe it was May 17th of 2009?

14        A.    Yes, sir.

15        Q.    Excuse me, 2010, the way this

16   scenario unfolded to the best of my

17   recollection, you were set for trial on Mr.

18   Gilbert.  He, Mr. Issenmann, approached Ms.

19   Shanahan and myself that Kareem wanted to tell

20   the truth about what happened to Victor Davis?

21        A.    Yes.

22        Q.    And either that day or the next day

23   Mr. Gilbert was taken to homicide?

24        A.    I believe the day the trial was

25   going to start this information came forward.

1   We delayed the beginning of the case.  And in

2   the following day, we interviewed Kareem

3   Gilbert, if my memory serves correctly.

4        Q.    And I believe you were there with

5   Detective Luke and Detective McGuffey, and Ms.

6   Shanahan and I were there as well in an

7   interview room with Mr. Issenman and Mr.

8   Gilbert?

9        A.    That's correct.

10        Q.    And would it be fair to say,

11   Detective Ballman, that you have done these type

12   of interviews of cooperating witnesses,

13   co-defendants, people like that before?

14        A.    Yes.

15        Q.    On a number of occasions?

16        A.    Yes.

17        Q.    And would it be fair to say,

18   Detective Ballman, that when you're

19   interviewing, and I think you and Detective Luke

20   were the lead interviews in that, I think I

21   asked a few questions and Detective McGuffey

22   asked a few questions as well, that you're

23   trying to get as much detail from Mr. Gilbert,

24   as much specificity about what he has to say?

25        A.    Yes.

1      Q.    About his own involvement in his

2  own crime and either his own involvement or what

3  he's saying this other person did, in this case

4  Mr. Jordan?

5      A.    Yes.

6      Q.    Is there a reason that you go into

7  so much detail with a cooperating individual

8  instead of just saying okay, you say it was Mr.

9  Jordan, we believe you?

10      A.    Fact checking is why we do it.  We

11  know certain things.  One of the things, I have

12  a younger partner I'm breaking in now that I

13  tell him, we learn certain things from the crime

14  scene, we learn certain things from witnesses,

15  but we never know the whole story.  The only

16  person in the room that ever knows the whole

17  story is the individual that committed the crime

18  or committed the act.

19          So the certain -- we ask certain

20  key questions and, you know, see if he responds.

21  For instance, if the guy shot with a .22, we

22  might ask what gun did you use?  And he might

23  say I used a .22.  Well, that would be in line

24  with what we know.  Or if he says I used a .45,

25  now we got a problem in his statement.  He may

1  be giving a false confession, he doesn't know or

2  whatever.

3          Q.    For instance, in this case, did you

4  go through the facts and circumstances of the

5  Austin murder with Mr. Gilbert in terms of how

6  it happened, the weapon he used and so forth?

7          A.    Yes.

8          Q.    And my recollection of the

9  statement, and the jury is going to have that is

10 that he said that he got into a verbal

11 altercation.  Did that match with what Victor

12 Davis said?

13         A.    Absolutely.

14         Q.    That he left and came back with a

15 weapon?

16         A.    Yep.

17         Q.    Did that match?

18         A.    Yep, that he got hit in the face

19 with a sandwich and the caliber, the weapon he

20 used, matched the shell casings we had at the

21 scene which is something probably only the

22 shooter with know and the police know who

23 collected shell casings.

24         Q.    And the fact that he, Mr. Austin,

25 turned around and ran, but Mr. Gilbert continued

1  to chase him and shoot him as he fell in the

2  street?

3       A.    Exactly like Victor Davis told.

4  Even to the point where he knew where Victor

5  Davis was running.  Victor Davis told us he fled

6  as soon as the shooting, the gun came out, he

7  ran along a Cadillac SUV.  Kareem Gilbert says

8  he ran along and he says I thought about chasing

9  him down and shooting for a second, but then I

10  spared him.  And he said I could have caught him

11  because Victor Davis was injured in the war, the

12  Gulf War, had a bum leg and he said I could have

13  caught him easily, but I decided to let him go.

14       Q.    And in terms of like talking to

15  witnesses, do you always believe what a witness

16  or a defendant tells you, or is that the reason

17  that you ask for specificity?  For instance,

18  Kareem Gilbert would have come in, and in your

19  experience, training and background in

20  interviewing defendants and suspects come in and

21  try to pull one over on you in terms of just

22  tell you what you wanted to hear, would you have

23  told him, hey, you can say what you want, but we

24  are not going to use you now?

25       A.    Yes.  A lot of times we have that

1    with what we call people that call from the

2    jail, you know, people that want to be a witness

3    or in a pod with a guy locked up or something.

4    If they are not, you know, if a lot of time

5    those individuals want to add extra stuff into

6    the story and a lot of times you kind of put

7    them aside because you kind of are getting the

8    feeling they may not be, you know, they may be

9    enhancing or whatever to make the story better.

10         Q.    And I understand in this case,

11   Detective Ballman, that sometimes when there is

12   an incentive, you kind of look at this to see

13   whether they are being honest or not.

14              In this particular case, if Kareem

15   Gilbert was given a plea deal that if he

16   testifies, for instance, in this case, he said

17   none of what he told us that day was true, that

18   that plea agreement could be torn up and he's

19   back to square one on his original murder

20   charges which could result in a lot more time

21   for him?

22         A.    Yes.

23         Q.    And you're aware of that plea

24   agreement?

25         A.    Yes, sir.

1          Q.     And would you look at that as well
2     to see if somebody is telling the truth as far
3     as there is something out there, a detriment to
4     him if he doesn't testify truthfully?
5          A.     That's correct.
6          Q.     And you felt comfortable at the
7     time, and do you still feel comfortable that's
8     what he told you on May 17th in terms of his
9     confession to the Austin murder and his story
10    about what happened on the evening of the 31st
11    of October?
12               MR. WHALEN:  Objection, Your Honor.
13               THE COURT:  Basis?
14               MR. WHALEN:  How he feels has
15          nothing to do with the issues here.  He's
16          entitled to his feelings, but it doesn't
17          have to come out in the courtroom.
18               THE COURT:  Overruled.
19          A.     I believe -- I believe that Kareem
20    Gilbert that day was telling us the truth based
21    on the details of the Austin shooting, Brian
22    Austin shooting that he gave matched fairly well
23    with the description that Victor Davis -- or
24    Victor Davis had given us in that case and what
25    we had at the scene, so I believed he was being

1 honest at that point and fairly accurate as to

2 what happened.

3      Q.    And if you felt in any way that a

4 witness is trying to pull one over on you, or

5 tell you what you want to hear, does that matter

6 at all? Is it solve, solve, solve, solve, or is

7 it like hey, I don't care what you're saying, we

8 want to do the right thing here?

9      A.    Well, yeah, I want to put the right

10 person in jail for the incident. Despite what

11 anybody says, I'm not looking to just put

12 anybody in jail. I want to put the correct

13 people in jail for the things that they have

14 done. I don't want to put an innocent person in

15 jail.

16      MR. TIEGER: Just one moment,

17     Judge. Nothing further, Judge.

18      THE COURT: Do you have something

19     else?

20       REDIRECT EXAMINATION

21 BY MR. WHALEN:

22      Q.    Officer, Kareem Gilbert gave you

23 details that were very explicit because he was

24 there, he committed the crime, am I correct?

25      A.    Yes, sir.

1          Q.    Okay.  And when he gave you
2    descriptions of his father being there at one
3    point in time on Page 11, he said he could see
4    that corner though, that he had to look over a
5    wall, and he could see a little bit.
6               And then on Page 34, he tells you
7    that he heard his father talking to Victor
8    Davis, and he said if you can it now, if he's
9    that far away, you believe that he's going to
10   be able to hear what his father is saying at
11   that time?
12         A.    Now, it depends on how loud his
13   father is talking.  Where he's parked the car,
14   from his description, is near what is in front
15   of the Findlay Market business offices which
16   would if the car is here, the incident is
17   happening here, he would probably be looking at
18   some angle if he's telling the truth about where
19   the car was parked.  And from there you can
20   probably see where this happened.  I think the
21   wall he's probably talking about in that
22   statement is the wall where he had the gun
23   hidden in the Brian Austin case in the shoe box.
24         Q.    But what I'm saying, nobody else
25   told you that they heard anybody yell fuck it?

1          A.     I believe, and this is simply from

2     talking to Jenny Luke and Terry McGuffey in

3     their case, they did have people in the

4     apartment building hear the argument or the

5     arguing which some believed near the entrance to

6     the building or in front of the building.

7               So, if people inside the apartment

8     building are hearing it through their walls, I'm

9     sure somebody sitting outside could hear an

10    argument.

11         Q.     But you don't know what the people

12    inside the building said they heard?

13         A.     Not specifically, no.

14              MR. WHALEN:  Okay.  Nothing else,

15         Your Honor.

16              MR. TIEGER:  Nothing further.

17              THE COURT:  You have something

18         else?  Thank you.  Thank you, Detective,

19         and thank you for being here today.

20              THE WITNESS:  Thank you, ma'am.

21              THE COURT:  Did you guys want to

22         hold this witness?  Is he released?

23              MS. WILLIAMS:  No, Your Honor.

24              MR. TIEGER:  That's fine, Judge, we

25         don't --

1          (Witness excused.)

2          THE COURT:  And now we're awaiting

3     another document.  So we're in a resting

4     recess.  He's here now.  All right.

5     Okay.  We are going to take a -- we are

6     going to take a recess here.

7          Counsel, would you step over here?

8          (Unreported sidebar conference.)

9          THE COURT:  All right, counsel.

10         MR. WHALEN:  Your Honor, for the

11    record, I believe that a document has

12    been produced and given to the Court from

13    Kareem Gilbert's case.  I believe the

14    Court unsealed that document and has made

15    copies of the document and then resealed

16    the original.

17         THE COURT:  That is correct.  It's

18    my understanding that the copy will be

19    marked as Defendant's Exhibit F and

20    stipulated into evidence?  That's my

21    understanding, correct?

22         MR. TIEGER:  That is right, Judge.

23         THE COURT:  The agreement?

24         MR. TIEGER:  Yes.

25         THE COURT:  Is Defense Exhibit F.

1          MR. WHALEN:  In that case, we will

2      offer exhibits -- Defense Exhibits A

3      through F.

4          THE COURT:  Is there a stipulation?

5      You stipulated?

6          MR. TIEGER:  Yes, Judge.

7          THE COURT:  All right.  So, the

8      Defense Exhibits A, B, C, D and F, he is

9      moving to admit them.  Do you object to

10     any of them?

11         MR. TIEGER:  You know what, maybe

12     if Mr. Whalen could remind me of what

13     they are.  I think a couple have already

14     been admitted.

15         MR. WHALEN:  Can we approach?

16         THE COURT:  Yes.  Go through the

17     exhibits, please.  Okay.

18         MR. TIEGER:  Judge, I have got -- I

19     don't have a problem with A, B, C or F.

20     D is the actual indictment, which I think

21     the Court would tell them, the jury, that

22     the indictment is not evidence in the

23     case, so I don't really --

24         THE COURT:  Normally, we don't

25     submit the complaint or the indictment.

1      Did you want to submit that for some
2      reason?
3           MR. WHALEN:  Yes.  I want to submit
4      it because of the date on the back when
5      it shows it was issued.
6           THE COURT:  Okay.
7           MR. TIEGER:  Judge, I think we can
8      agree it was reported the 24th of May,
9      2010.
10          THE COURT:  Do you want to
11     stipulate about that stipulation?  Would
12     that serve the same purpose?
13          MR. WHALEN:  Yes, that's fine.
14          THE COURT:  So, what is that
15     stipulation again, that it was?
16          MR. TIEGER:  5/24 of 2010.
17          THE COURT:  Will you incorporate
18     that into -- remind me.  There will be a
19     point when I read jury instructions, and
20     I'll be reading stipulations, so you make
21     sure that that is so noted.
22          MR. TIEGER:  Judge, and E is the
23     Kenneth Heard disc from February 11th.
24     My recollection is that when that was
25     played a number of times, that was where

1    they were trying to figure out if Mr.

2    Heard said 20 or 40.

3         MR. WHALEN:  We withdrew that.

4         THE COURT:  So, therefore, E is

5    withdrawn, correct?

6         MR. WHALEN:  Yes.

7         THE COURT:  So, therefore, we have

8    A, B, C and F.

9         MS. WILLIAMS:  Correct.

10        THE COURT:  Admitted as defense

11   exhibits.  Four exhibits.  All right.

12        (Defense Exhibits A, B, C and F

13   received into evidence.)

14        THE COURT:  So, you rest at this

15   time?  And my understanding is that the

16   attorneys would like to have the closing

17   arguments and jury instructions read

18   together.  That's normally how it goes.

19   We have not concluded with what the jury

20   instructions should be completely,

21   correct?

22        MR. TIEGER:  That is right.

23        THE COURT:  Still in the process.

24   They have to be precise, and they may not

25   even agree what should be contained

1    therein, so we're gonna do that next.

2    So, for that reason, are we adjourning

3    for the day?

4          MS. SHANAHAN:  We are.

5          THE COURT:  Correct?

6          MR. WHALEN:  Yes.

7          THE COURT:  All sides agree.  The

8    jury is adjourned for the day, and I have

9    read to you several times what the

10   admonition is.  Do you think you remember

11   that?

12         JURY:  Yes.

13         THE COURT:  All parts contained

14   therein.  You are adjourned for the day.

15   We are going to start Monday at 8:30.

16         MR. WHALEN:  Yes.

17         THE COURT:  Monday at 8:30, because

18   I have another one going on, and we want

19   to get your instructions and you can

20   begin to deliberate.  So, thank you very

21   much for coming so far.

22         (The jury leaving the courtroom at

23   2:25 p.m.)

24         THE COURT:  Did you say the defense

25   rests?  We'll have to say that when we

1        come in on Monday.  The defendant rests,

2        and then would you remind me?

3               MR. TIEGER:  Yes, Judge.

4               THE COURT:  Thank you.  Is there

5        anything else, Counsel?

6               MR. TIEGER:  Judge, we would have

7        no rebuttal.

8               THE COURT:  No rebuttal?

9               MR. TIEGER:  We are ready to go

10       straight into closing.

11              THE COURT:  Okay.  I probably could

12       have done that today, but --

13              MR. TIEGER:  Yeah, I think so.  If

14       only they said the defense rests, but

15       they didn't, so --

16              THE COURT:  It's their fault.

17              MR. TIEGER:  We'll call surprise

18       witnesses on Monday.

19              (Continued in progress until

20       January 24, 2011.)

21

22

23

24

25