1                COURT OF COMMON PLEAS

2                HAMILTON COUNTY, OHIO

3                    - - -

4 STATE OF OHIO,           :

5          Plaintiff.    :

6 vs.               :Case Number B1003262

7 RUBEN JORDAN,       :Appeal Number C1100833

8        Defendant.   :Volume VIII of X

9

10                   - - -

11           TRANSCRIPT OF PROCEEDINGS

12                   - - -

13 APPEARANCES:

14     Seth S. Tieger, Esq.
    Megan E. Shanahan, Esq.
15        On behalf of the State of Ohio.

16     William P. Whalen, Jr., Esq.
    Amy R. Williams, Esq.
17        On behalf of the Defendant.

18

19

20        BE IT REMEMBERED that upon the Jury

21 Trial of this cause, on January 24, 2011, before

22 the Honorable NADINE L. ALLEN, a judge of the

23 said court, the following proceedings were had,

24 to wit:

25

1          PROCEEDINGS, January 24, 2011

2             THE COURT: Good morning. We are

3    now ready for the closing argument.

4             MR. TIEGER: Yes, Your Honor.

5             THE COURT: And jury instructions,

6    so we can bring in the jury at this time.

7    And I would ask everybody who's back

8    there observing, and for all the

9    participants to please check your cell

10    phone right now. There will be no noise

11    in this courtroom while this is going on.

12    So, take it and do not have it in your

13    hands either because we don't allow any

14    picture taking, texting, e-mails or use

15    of a cell phone. I do have the authority

16    to confiscate it and do other things if

17    there is continued violations of that, so

18    let me check my own.

19          (The jury entering the courtroom at

20    9:20 a.m.)

21            THE COURT: You may all be seated.

22    And, good morning, I'm so glad you all

23    made it here safely in this weather, and

24    we appreciate that.

25          At this point, we are going to be

1    hearing the closing argument of each

2    side, from the prosecution and the

3    defense, followed by -- and, actually,

4    the State does have the chance to also

5    address you in what we call rebuttal

6    argument, rebuttal closing argument.

7          Following that will be the

8    instructions of the jury, and then you

9    will be deliberating this morning.  So,

10    we'll start with the prosecution.  You

11    ready to proceed?

12          MS. SHANAHAN:  Yes, Your Honor.

13    Thank you.

14          May it please the Court, ladies and

15    gentlemen of the jury:  I want to thank

16    you again on behalf of the State of Ohio

17    and the defense, the court system in this

18    case.  We really value the time that you

19    dedicate, the fact that you come down

20    here and do your duty as jurors.

21          Please believe us that any delays

22    in these proceedings, or any time that

23    you are a juror, they are necessary.  We

24    really do respect your time, and we thank

25    you and can tell that you pay attention

1    and that you listen.  You've heard all of

2    the facts and all of the evidence, and we

3    appreciate your attention to this very

4    important matter.

5         Ladies and gentlemen, at the start

6    of this case, I read to you the

7    indictment.  The indictment is not

8    evidence, but it tells you what the

9    defendant has been charged with.  The

10   Judge is going to tell you all of the

11   instructions, the law in this case, but I

12   will tell you now that the burden is on

13   myself and Mr. Tieger, the State of Ohio,

14   to prove this case to you beyond a

15   reasonable doubt.

16        Reasonable doubt means that you use

17   your reason and common sense.  It's very

18   important in this case that you apply

19   your reason and common sense while you're

20   deliberating.

21        Ladies and gentlemen, the defendant

22   is charged with aggravated murder, that

23   he purposely and with prior calculation

24   and design caused the death of Victor

25   Davis.  Those are the elements the Court

1    is going to tell you that the State has

2    to prove to you beyond a reasonable

3    doubt.  Applying reason and common sense

4    that Ruben Jordan purposely, and with

5    prior calculation and design, caused the

6    death of Victor Davis.

7        Ladies and gentlemen, you're also

8    going to receive instructions on a lesser

9    charge, a lesser charge of murder.

10   Murder is all of the same elements of

11   aggravated murder minus the prior

12   calculation and design.  That's not what

13   we have in this case, because as the

14   Judge will tell you, prior calculation

15   and design does not have a necessary time

16   period, a definite time period employed.

17   You don't have to plan something out for

18   a week, two weeks, three days, one day.

19   You don't have to write down your plan,

20   it's just that there was some

21   forethought, there was thought before he

22   went and committed this crime.

23       In other words, ladies and

24   gentlemen, that it wasn't done in the

25   heat of passion, that you -- we were in a

fight and you pulled a gun and shot
somebody, that you had to think about
what you were doing.

Certainly, in this case,
considering the facts and evidence that
Ruben Jordan went to the motorcycle club
in search of Victor Davis, that he waited
on him, that he followed him home, that
he crossed that open lot and he shot
Victor Davis three times certainly there
is prior calculation and design.  This is
not the lesser count of murder, this is
the count as charged in the indictment of
aggravated murder that Ruben Jordan
purposely, and with prior calculation and
design, caused the death of Victor Davis.

There are gun specs on this case.
You're going to be told that the
defendant, if you find he had the gun
under his control, that he used it in the
commission of this crime, he should be
found guilty of gun specs.  Clearly, a
gun was used in this case.  That's really
not at issue.  Victor Davis was murdered
by means of a handgun.  You heard the

coroner and the crime lab people testify as to that fact.

Count 3 being having weapons under disability, it's been stipulated to that the defendant was under a disability. He has five prior convictions for drug-related offenses which means he's under a disability, that he's precluded from owning or carrying or having or using a firearm. The fact that he did it is not stipulated to, but those prior offenses are stipulated to. So, if you find that the defendant used a firearm to kill Victor Davis, then, clearly, he had a weapon while he was under a disability.

Ladies and gentlemen, he, obviously, knew he had been convicted of these five prior offenses. He knew he shouldn't be carrying a gun or using a gun. What we do know from what's been presented to you in this case is that on October 31st, 2008, at 11:27 p.m., Victor Davis was gunned down outside his home. He was shot three times, and he died there in the street.

On October 31st, 2008, Ruben Jordan
had been within seven feet of where
Davis's body came to rest after this
violence was inflicted upon him.  On
October 31st, 2008, we know that Ruben
Jordan knew that Victor Davis was the
only eyewitness to the murder of Brian
Austin, the murder that Kareem Gilbert,
Ruben Jordan's son, committed.

On October 31st, 2008, we know that
Dean Shade heard shots as he laid in his
third and fourth floor apartment above
the street where Victor Davis was gunned
down.  We know that Dean Shade looked out
and he saw a bald man, who had the same
build as Ruben Jordan, standing over
Davis's body.  That person then turned
and fled across the open lot.

Ladies and gentlemen, up to this
point, Victor Davis had lived down there
in Over-the-Rhine, as far as we know,
without any violence being inflicted upon
him.  And you're being asked to believe
that it was purely coincidental that two
weeks after being the only eyewitness to

1   a street murder, he, himself, gets

2   murdered in cold blood, with no apparent

3   reason there out on the street.

4        But you're expected to believe that

5   that's purely coincidence. You're

6   expected to believe that Ruben Jordan was

7   there 12 hours before, 12 hours, and he

8   spit right where Victor Davis's body came

9   to rest after he was brutally murdered.

10   You're expected to believe that that spit

11   stayed fresh, even though it had been

12   laying there for 12 hours on a 72-degree

13   day. You're expected to believe that

14   Dean Shade who saw a bald man with the

15   same build as that man run from the

16   scene, but it wasn't him, even though his

17   DNA is right there, even though the

18   person murdered is the only eyewitness to

19   his son's crime.

20        You're expected to believe none of

21   those things happened, that these things

22   are completely unrelated, that Ruben

23   Jordan was down there 12 hours before and

24   spit on the ground just where Victor came

25   to rest.

But the evidence doesn't stop there, ladies and gentlemen, the most credible witness of all is Kevin Heard. He had no reason to come here and testify. He left Cincinnati because he had been shot. He left Cincinnati, and yet he came back here risking his own safety to testify in a case against Ruben Jordan. Why? Ask yourself why. What is his motive? He's getting no case consideration, he's not paid, he's not asking for fines to be forgiven, he got nothing. He did it because it was the right thing to do.

He came back here risking his own safety to tell you, ladies and gentlemen, that in early 2009, as Kareem Gilbert sat locked up in the jail for the murder of not only Brian Austin but also Victor Davis, that a crackhead who buys from him ultimately, we find out his given name being Ruben Jordan, that Ruben Jordan told him I did something and my son is locked up for it. I killed a witness to a crime that my son committed. I shot

him.  That's an awful lot of detail.  The
fact that he's freaking out, it's about
March or April of 2009, because his son
is sitting in jail for a crime that he,
himself, committed, that that crime
involved a shooting of an eyewitness to
the murder his son committed.

Why, you have to ask yourself,
would Kevin Heard have made that up?
How?  More importantly, why would he risk
himself to come here and testify with no
gain?  He's a former drug dealer, because
guess what, ladies and gentlemen, you're
smart enough to know that Ruben Jordan
isn't going to walk into Findlay Market
and spill his guts to some homemaker from
Blue Ash who happens to be down there
shopping about murdering an eyewitness so
that his son could get off.

Ladies and gentlemen, birds of a
feather.  Ruben Jordan is a crackhead.
He hangs around crack dealers.  Kevin
Heard is a crack dealer.  But you still
have to remember Kevin Heard got nothing
for coming here to testify.

1    Keep in mind all of the intricate

2    details that Kevin Heard had, and how he

3    would have gotten that information.  What

4    about Kareem Gilbert?  Nice little stunt

5    that he pulled here.  He tells the police

6    one thing, the prosecutors, the Court, he

7    tells us all it's one way, then he comes

8    here and he takes the stand and he says

9    it's a whole different way.  Why would he

10   do that?  Why?  You have to ask yourself,

11   why would he risk things that he

12   received?

13   Let me tell you, ladies and

14   gentlemen, people like Kareem Gilbert

15   don't think like you and I.  People like

16   Kareem Gilbert are ignorant.  They are

17   shortsighted, because people like Kareem

18   Gilbert have absolutely no concept of a

19   future.  And when I say a future, ladies

20   and gentlemen, I don't mean I'm going to

21   get married some day and have children.

22   I mean tomorrow.  People like Kareem

23   Gilbert have no concept of their actions

24   and the reactions and what is going to

25   happen tomorrow.  That's how they live.

1    That's why he was willing to pull the

2    stunt that he pulled.  He thinks he's

3    smarter than you.  He's smarter than the

4    Court.  He's smarter than the prosecutor

5    and he's smarter than the police.

6         You saw him, you're told to judge

7    the credibility of the witnesses as they

8    appear on the stand and their behavior,

9    their manner of testifying.  He sat up

10   there and laughed.  He covered his face

11   repeatedly to hide his smile, but he

12   couldn't keep it from you the whole time,

13   you saw him.  Do you honestly believe

14   that when he took the stand he was

15   telling the truth?  This is a game to

16   people like Kareem Gilbert.  It's a joke,

17   and he thinks that he got the last laugh

18   with the little stunt that he pulled.

19        Ladies and gentlemen, he was wrong,

20   because at the end of the day you would

21   have to set aside all reason and all

22   common sense, throw out all of the other

23   evidence, the direct and circumstantial

24   evidence, disregard Dean Shade, Kevin

25   Heard, Victor Davis, Jr., Detective Ron

Avant, the criminalist, the police, the
crime lab employees, and the hard fact
that there is no way, ladies and
gentlemen, applying reason and common
sense, there is no way that that spit
laid in the street on blacktop for 12
hours, on a 70-degree day for 12 hours,
and it remained in that condition and
just so happened to be seven feet from
where Victor Davis died, where he was
murdered.

And it just so happened that there
is a one in 8 quintillion, 432
quadrillion chance that it's Ruben
Jordan.  It's Ruben Jordan's spit.
That's more than the population of the
Earth.  You would have to forget all of
that.  You would have to suspend all
reason and all common sense and believe
that that's what happened on
October 31st, 2008 in order to find Ruben
Jordan not guilty of this crime.

Ladies and gentlemen, Ruben Jordan
shot and killed Victor Davis.  He planned
it, he hunted Victor down like an animal.

He carried out his plan thinking the
streets were the streets.  And if a
witness ends up dead, that just means
that witnesses aren't going to come
forward, then cases get dismissed.  But
the streets weren't the streets this
time, because Ruben Jordan, just like his
son, is ignorant and sloppy and he left
hard evidence, he left that DNA at the
crime scene, and now it's up to you.

Ladies and gentlemen, the State is
confident that when you consider all of
the evidence, direct, circumstantial,
testimonial, that you will convict Ruben
Jordan of aggravated murder, gun specs
and the weapons under disability as
charged in the indictment.  Thank you.

THE COURT:  All right.  Mr. Whalen?

MR. WHALEN:  Could we approach the
bench for just a minute?

THE COURT:  Okay.  In the presence
of the jury?

(Unreported sidebar conference.)

THE COURT:  You may proceed,
Counsel.

1     MR. WHALEN:  Thank you, Your Honor.

2     I also, and my client and my co-counsel,

3     thank you for all the attention you have

4     given us.  I know that this has been an

5     unusual situation, both with the weather

6     and the case that you're hearing, and we

7     have taken you to an area where you are

8     not accustomed to in hearing things about

9     what goes on in Cincinnati here that you

10    can find it hard to relate to, I would

11    hope.

12        When the Judge charges you, she's

13    going to tell you that you have to find

14    beyond a reasonable doubt that Ruben

15    Jordan committed this crime, and she's

16    defined it for you once and she's going

17    to define it for you again, and she's

18    going to tell you it's that kind of

19    belief that you would use in the most

20    important of your own affairs.  And let's

21    take a minute and think about what is the

22    most important of your affairs.

23        If you're a parent, your children.

24    Would you let some of these witnesses

25    babysit your child?  If you're buying a

new home, would you accept their word on
buying a house or buying a car?  Those
are the things that are most important in
your own affairs.  And then she's going
to tell you you should find Ruben Jordan
not guilty if they don't do that.  But
she's going to tell you that you must,
she's going use that word, you "must"
find him not guilty if you don't find
beyond a reasonable doubt that they have
proved this case.

     Excuse me.  I have got a bad cold.
They talk about your witnesses.  And
Victor Davis, Jr., came in, and other
witnesses, and there wasn't any doubt
that Victor Davis, Sr. knew that he was
going to die.  He saw a murder committed,
he went to the police and acknowledged
it, and he was being threatened on a
regular basis.  He knew he was going to
die.  You just don't do that kind of
thing down in that community, and he did
it anyway because his friend was killed.

     Witnesses told you that Victor
Davis, Jr., was afraid of Shawn and

Kareem.  He didn't tell you that he was
afraid of Ruben Jordan, never mentioned
the word Ruben Jordan.  The only time he
mentioned -- Victor Davis, Jr. mentioned
Ruben Jordan was he said that after he
found out who Ruben Jordan -- who Victor
Davis was, he went to Victor Davis, Jr.,
put his head on his shoulder and told him
how sorry he was, but he says men don't
do that.  Think about it for a moment.
If you found out your child took
somebody's life and you knew the
relative, would you not go to them and
express not only your sorrow that they
have had that loss, but the particular
sorrow that your son is the one that
committed that?

Victor Davis Jr. also told you that
he was involved in some gun play.  He was
out carrying a gun and he was being
threatened by Shawn Gilbert, Kareem's
brother.  He was walking around, showed
him a gun, pointing it at him.  He wasn't
ever threatened by Ruben Jordan.  It was
Shawn Gilbert that was involved.  Shawn

1    Gilbert is the same one that took Victor

2    Davis aside and was jawing at him when

3    the first killing occurred because he

4    didn't want him talking to the police,

5    not Ruben Jordan.  Ruben Jordan wasn't

6    even mentioned.

7         Now, Dean Shade didn't tell you he

8    saw all that.  He saw from the window,

9    and you're supposed to believe what this

10   man told you beyond a reasonable doubt?

11   But it's amazing because what he saw has

12   improved as time went by.

13        Now, he's 75 percent sure that it

14   was Ruben Jordan.  Before that, he

15   wasn't.  And he also tells you that he

16   saw Victor Davis die, saw him take that

17   last breath.  But there were no police

18   officers there.  And yet a police officer

19   came in and told you that he was talking

20   to Victor Davis and saw him take his last

21   breath and die.

22        Now, how could Dean Shade have seen

23   that?  He couldn't.  He's making stories

24   up, people that are down there at this

25   scene.  There is rumors going around,

people talking, people whispering through
windows and everybody builds their own
case.

You know, there is very few people
that I believe came in here and testified
that don't have their own prejudices.
They want you to believe a certain way.
Detective Glindmeyer came in and he told
us that they avoid contamination of the
scene, that they are down there and they
rope it off and nobody is allowed to come
in except that you've already heard
people testify that there were people
down there, somebody talking to Victor
Davis as he was dying.

And there was a woman down there
picking up stuff off the sidewalk where
the killing had occurred.  What did she
take?  I don't know, and you don't
either.  But it certainly is a
contaminated scene.

And then he tells you, because he
wants you to find Ruben Jordan guilty,
tells you that Victor Davis, there were
scrapes on his knuckles and they were

bleeding. You just don't collapse when
you fall on pavement. Is that he was in
a fight, a fistfight. He was fighting
for his life. And now isn't that
dramatic? Here's a man down there
fighting for his life, and he got the
proof, his knuckles. And now that's what
the officers want you to believe, except
the coroner comes in and says that's not
true.

These are the types of abrasions
that you routinely see from a scrape
against a paved surface wall, something
that is a broad, flat surface. Asked
him, could he get in a fistfight?
They're not exactly the right location
for the average fistfight. You almost
have to scrape somebody this way or this
way on a flat surface, preferably with
more of an abrasive surface like concrete
or brick. But this officer wants you to
imagine that Victor Davis is down there
fighting for his life because it's more
dramatic and gets your emotions involved.

And the doctor went on to say all

very short ones that involved his knee,
and also again a prominence with a broad
surface area, area relatively speaking to
the right side of his forehead, there is
much to appear to be from striking the
pavement, a bit of a skid on the pavement
or falling.  She explains it all
medically, and she doesn't have a reason
to adjust.  I think she's the only one
that was totally unbiased when she came
in and testified.  You saw her up there
on the stand.  She tells you what her
name is, what her credentials were and
what she found in the autopsy.

Officer Glindmeyer was asked by the
prosecutor, but it is your education,
training and experience, 31 years of
experience, that when you collected the
phlegm that night of the crime scene it
was fresh phlegm?  Yes, ma'am.  I asked
him:  Have you had any training in
determining fresh phlegm from stale
phlegm?  He said there is no training,
it's just experience.

So, when he told you from his

1 training, he lied.  He doesn't have any

2 training in that.  I'm not trying to hide

3 something from you, there was phlegm down

4 there and it belonged to my client.  How

5 it got down there, I don't know and you

6 don't know.  His grandchildren live down

7 there and he was down at the scene.

8   Whether it was 12 hours -- and

9 let's extend it a little bit, let's say

10 he was down there when Victor Davis was

11 killed.  That doesn't tell you that he

12 was involved in it.  Did he tell his son

13 to do it?  Did he fire the shot?  You

14 don't know those things.  You have got to

15 speculate.  And what you have to do is

16 find it beyond a reasonable doubt, and

17 it's not there.  The phlegm was there,

18 Ruben Jordan was down there at some time.

19 When, I don't know.  All the officers

20 said it could have been within an hour.

21 I don't know and you don't know.

22   Now, they tell you Kevin Heard came

23 in and said he's got nothing to gain, and

24 he's got all these intimate details.  All

25 these intimate details were in the

1    newspaper and heard out on the street.

2    Now, they want you to believe beyond a

3    reasonable doubt that my client came up

4    and told him that he killed somebody and

5    his son is taking the fall for it.

6        Let's go back to beyond a

7    reasonable doubt in the most important of

8    your affairs. Would you let Kevin Heard

9    watch your children? Would you let Kevin

10    Heard sell you a house? This man, who's

11    Mr. All American, is out every day

12    selling crack cocaine. That's his

13    occupation. People that go out and

14    commit prostitution, commit crimes, high

15    on crack, this is one of the gentleman

16    out there feeding it to them, and he's

17    telling you he came in as a regular

18    citizen.

19        Also, he's somebody that got shot

20    because of his dealings and had to leave

21    this area. Now, has he and Ruben had

22    fights in the past? Does he have a

23    grudge against Ruben? I don't know and

24    you don't either.

25        But you have really got to sit and

1       think about beyond a reasonable doubt

2       with Kevin Heard.  Does he really know

3       what he's telling you?

4            Kareem Gilbert.  One of the pieces

5       of evidence that you're going to have

6       back there is the plea agreement that the

7       prosecutors made with Kareem Gilbert.

8            Now, I want you to remember a

9       couple of things, because this absolutely

10      amazes me.  On May the 17th, Kareem

11      Gilbert was set to go to trial for this

12      murder and the other one that he

13      committed.  The State of Ohio was ready

14      to go into a courtroom and tell you they

15      were going to prove beyond a reasonable

16      doubt that Kareem committed that crime,

17      and they knew about Mr. Heard and they

18      knew about the phlegm, but they're going

19      to prove to you that Kareem did that

20      killing.  Isn't that amazing?

21           The State of Ohio is going to trial

22      against Kareem and prove that he

23      committed that crime while they know all

24      these things now that they tell you

25      proves that Ruben was beyond a reasonable

doubt, and they're going to say, well,
they could have acted jointly.  Nobody
said they did except what you heard here
from the prosecutor.

Now, you have Kareem Gilbert's
statement that he made to the police.
And the Judge is going to tell you that
that is not evidence of what the
statement says.  The evidence is you can
use his statement to judge what he's
saying, whether it's true or not, not any
of the statement as evidence against
Ruben Jordan, and that's difficult.
Somebody tells you this and somebody else
says well, you can only use that little
bit of information for just one purpose,
but that's what you have to do.  You have
sworn an oath that you're going to well
and truly try this case.  I know it's
difficult, but that's what the Judge is
going to tell you.

Now, the State has decided that
they really want Ruben Jordan.  Kareem
Gilbert goes out and chases a man down
because he hit him with a sandwich.

Chases him down like a dog and shoots and
kills him.  And the State agrees that
they are only going to get a plea to
manslaughter, not aggravated murder, not
murder, manslaughter.  And he's agreed
that he's only getting an 18-year
sentence in exchange for that.  He's got
to tell them that his dad was involved.

Do you know what that is like for a
19-year-old?  All the sudden, you're
going away for 18 years and you may be
going away for even more than that for an
aggravated murder because for two of
them, because you're not going to get a
manslaughter if you don't tell us what we
want.

So, now, this 19-year-old and one
of the witnesses says that he's a vicious
killer.  Says, hey, I got an out, I only
have to do 18 years for two killings,
I'll give them what they want, and he
did.  And you're going to have the
letters that he wrote to his father, and
on one of them he says specifically dad,
I have got two body bags, can you take

one of them for me?  He doesn't say in
that letter, tell them what you really
did, dad.

Now, the prosecutor tells you that
there is a part that is scratched out and
that could have said, I don't know what
she said, it could say anything, but it
doesn't fit into what she's trying to
say.  And I will tell you the back of
this one, the yellow letter, is scratched
out.  That letter was a letter from his
father, and he used the same paper, the
back of the paper and sent his letter to
Ruben.

Now, he's asking his dad to take
this body bag off of him.  He doesn't
want to be caught with that because he
knows he's going to go for a long time if
he gets 20 years for each one.  He's
going to be 60 when he gets out, and he
doesn't want to deal with that.  He's
asking his dad to take it and dad won't
take it.  He doesn't do it, he wasn't
involved and he's not going away for an
aggravated murder that his son committed.

1    The 911 calls that the police

2    officer testified they got from people

3    around the scene never once mentioned

4    Ruben Jordan.  They sure did mention

5    Kareem and they sure did mention Shawn,

6    didn't mention Ruben Jordan.  Isn't that

7    amazing?

8    And the other calls that they got,

9    Victor Davis Jr. told him that his father

10   was afraid of Shawn and Kareem.  When

11   Victor Davis was still alive, he ran a

12   bootleg cab and he sold drugs.  He isn't

13   the all American hero that they want to

14   make him out to be.  But he told the

15   police he was getting phone calls on a

16   regular basis to come and pick up

17   somebody, take them on a cab ride.  Was

18   it this gentleman here?  No.  It was

19   Kareem that was calling to try to get him

20   to come pick him up.  Why?  Because he

21   knew what he was going to do.  He said he

22   gave him a green card and didn't tell him

23   till that night.

24   You know, Kareem is hit by somebody

25   with a sandwich.  How many times have you

been confronted by somebody that stepped
on your foot or pushed you or slammed the
door in your face?  He is hit with a
sandwich.  And what does he do?  He
leaves the area.  He lives right there
within several, 50 feet, comes back out
to the scene and what's he do?  Pulls a
gun and chases a man down and kills him.
That is a vicious killer.  And wasn't no
doubt he intended to do it.  He came back
with the gun.  He didn't have the gun
there.  And he came back because the man
had hit him with a sandwich.  He shot and
killed him, and he gave Victor Davis a
green card.

That's the kind of person he is,
that the State is telling you he's
indicated his father did it.  We've also
allowed to come into evidence, without
argument, Ruben Jordan's record, and I
don't know whether it's five or six
convictions that he's gotten, and he's
been to prison before.  A man who's 38
years old has got five or six felony
convictions, ought to tell you something

about the kind of person that you're
dealing with.  He likes drugs.  He does
drugs.  People have told us that he's a
crackhead.  But not one of those is for
domestic violence, not one of those is
for assault, not one of those is for a
murder or a felonious assault.  There
isn't one crime of violence in that man's
record.  And then they are telling you
that to save his son he went out and
chased somebody down, followed them, went
down to the scene and shot and killed
them.

        I'm going to ask you when you go
back there, remember the Judge's
instructions beyond a reasonable doubt.
Was Ruben Jordan down there shortly
before or shortly after the killing?  He
might have been.  Was he there when the
killing occurred?  I don't know and
neither do you.  But I'm telling you, the
State cannot prove this matter beyond a
reasonable doubt that Ruben Jordan took
Victor Davis's life, and I'm asking you
to return a verdict that the Judge is

going to tell you you must do if it isn't
proven beyond a reasonable doubt, and
that's a not guilty.  Thank you.

THE COURT:  State have any more --
anything else to add here, closing
argument?

MR. TIEGER:  Yes, Judge.  Thank
you.

THE COURT:  I should tell you that
the reason that the State has the
opportunity to address you twice is
because they have the burden of proof,
and that is the reason.  The law allows
them to have the last word in this.

MR. TIEGER:  Hello, everybody.  It
is hard to go last.  This has been a long
trial, like Ms. Shanahan said.  I'm sure
you're ready to deliberate and finally do
what you are expected to do.  I do have a
few things to say.

First of all, and this is very
common in these kind of cases, you have
seen Ms. Shanahan and especially Mr.
Whalen, and I'm gonna do it as well in my
closing argument, is like pull out a

transcript.  And Ms. Renken, the court
reporter, she's been nice enough to type
up some of the transcripts for us.  We
have got the transcript of Kareem
Gilbert, what he said to the police, the
discs that you listened to.
Unfortunately, you do not get any of
those transcripts.

The only evidence that you're
allowed to receive are the exhibits that
are retained by the court reporter.  So I
know we have been referring to those and
a very common jury question is what's the
deal?  You know they have been referring
to these transcripts, these pages, these
lines, we want those -- we need those.
Well, that is not part of the evidence
that you have, and you're not going to
get those in the jury room.  You will get
actually the discs of Kareem Gilbert's
statement to myself, Ms. Shanahan and the
police officers in the jury room.

So, if you would like to listen to
them, you can definitely listen, and
Mr. Brenner or Ms. Smith can get you a

disc player, whatever that you would need

to play that.

I hate to say the same things as

Ms. Shanahan.  Hopefully, we won't

overlap too much.  Was Victor Davis

murdered?  Absolutely.  He was shot in

the head.  He had no weapon.  He was shot

three times.  He was left to die in the

street.  Was it an unknown killer?  I

think Ms. Shanahan covered that very,

very well.  It was not an unknown killer.

So, the evidence is that as Victor

Davis told Detective Avant, the family,

I'm afraid of the Gilbert family.  So,

now all we are left with is who in the

Gilbert family did this?  Which one of

the -- I'm talking Mr. Jordan is part of

the Gilbert family.  Which part of that

extended family did it?

We really only have three names,

Kareem, Shawn and Ruben Jordan.  Which

one of those three?  And as far as Shawn

goes, I mean, he's kind of an unknown --

he hasn't been a witness, he hasn't been

called.  We really don't know too much

1   about him other than to say there is no
2   evidence whatsoever to suggest in any way
3   that he was part of this, was there, had
4   any involvement in this whatsoever.
5           There is no witnesses, and there is
6   no physical evidence to suggest that he
7   was at the crime scene of the Victor
8   Davis homicide when Victor Davis was
9   murdered.  There is nothing other than
10  the fact that he was confronting Mr.
11  Davis that night and Mr. Davis was scared
12  of that family.
13          So, let's rule him out.  Now, let's
14  go to -- the Court will tell you, I
15  believe, and I don't know whether it's in
16  the instructions or not, but that we
17  don't have to prove motive in a murder
18  case.  But there is always a motive in a
19  murder case.  And in this case, the
20  strongest possible motive is to protect
21  Kareem Gilbert from answering to the
22  murder of Brian Austin.
23          And as far as Victor Davis not
24  specifically being afraid of Ruben
25  Jordan, like Mr. Whalen said, sometimes

the most dangerous enemies are the ones
you don't know about because the ones
that you know about, you don't have to
pick them up in a bootleg cab, like
Kareem Gilbert said he called him for.
You don't have to really -- you can plan
for those people that you know are going
to get you, but the people that you
really don't know about oftentimes are
the most dangerous.  And in this case the
family patriarch, Ruben Jordan, took
over.

Now, as far as the defense
attorney, Mr. Whalen is one of the best
local attorneys there is.  He's a very,
very experienced and talented lawyer.
And you can tell when we saw these
letters that were written, those were not
disclosed.  And when Mr. Whalen saw Mr.
Jordan in the penitentiary, we did not
know about that.

Now, the rules say that the defense
lawyers don't have to do that.  So, I
mean, he did not violate any rules and he
played within the rules, but basically,

1  as a defense attorney, what his job is,

2  and he's done it very well, are to win

3  the case at all costs within the Rules of

4  Evidence.

5  Now, our job, Ms. Shanahan and I,

6  is to see that justice is done in a

7  particular case.  We have got a different

8  burden than the defense has.  And what we

9  are trying to say is that as far as this

10  plan goes, the plan that we are

11  suggesting was used by Mr. Gilbert and

12  Mr. Jordan backfired because Mr. Jordan

13  and Mr. Gilbert were really unaware of

14  the Rule of Evidence because there is a

15  rule, and it's basically called

16  forfeiture by wrongdoing that says that

17  when a witness is killed, that witness's

18  statement can be used if the wrongdoing

19  is by the perpetrators of the act and

20  that witness's unavailability is caused

21  by the people that did the original act.

22  So, when people like Mr. Jordan and

23  Mr. Gilbert are thinking about how do we

24  handle this, let's just kill the witness,

25  that witness's statement will not come

in, you'll walk away from the Austin
murder and everything is going to be
better.  Well, the Rules of Evidence
foresee that type of situation, so what
happens is Davis's statements to the
police are admissible against Mr. Gilbert
in his own trial.

So that, plus, the DNA on his
t-shirt corroborating the crime had been
strong enough to pursue the case against
Mr. Gilbert.  And the plan is so obvious,
this plan that Ruben Jordan's charge,
Kareem Gilbert can come in here and say
he lied, Ruben Jordan will be found not
guilty, as Mr. Whalen asked you to do.
Just remember, this plan has been hatched
a long, long time ago.  We are finally at
the culmination this morning, with you
folks, of his plan to get out of this
from the very beginning.

Don't think this was something that
had not been thought through.  The whole
thing is that they knew there was going
to be a jury somewhere down the road, and
this is his clear final test, his final

obstacle is you folks, and we are asking
that you not let him get past justice by
a jury trial in this particular case,
because when he is found not guilty, I
don't know whether you have heard, it's a
term called double jeopardy.

And at a later point, if Kareem
Gilbert is charged with Davis's homicide,
there is nothing to prevent Ruben Jordan
from coming in here, another jury months
and months from now and saying, yes, I
did do it.

Now, that would be pretty
monumental, and I don't know if anybody
would believe him, but double jeopardy
prevents him from being tried twice for
the same crime.

So, again, this is the kind of plan
that you don't know where it's going to
go, but it's certainly foreseen that type
of thing could happen depending on how
this thing goes with you folks.

And I told you in jury selection
Kareem Gilbert was a dangerous
individual.  We didn't try to hide that

at all, and that you got a 16-year-old
thug like Kareem Gilbert, and I'm a
little bit confused that he got 18 years
flat.  Mr. Whalen is saying that if he
gets a much more significant sentence,
and certainly reinstituting the Austin
murder and perjury charges, all these
things could add up to a lot more time.

     And I will tell you that you will
have this in the jury room, which is
Kareem Gilbert's plea agreement, and you
can see on the back there is a lot of
legal language, my name is on here, I
signed it as well as Mr. Gilbert and
Mr. Issenmann signed this as well Mr.
Gilbert's attorney.  And I'm not naive,
and I have been doing this a while, and I
don't trust anybody to do what they say,
even though we expected Kareem Gilbert to
come in here and tell the truth about
what he had originally told us.

     So, obviously, you know, Ms.
Shanahan and I are not stupid enough to
say here, go ahead and do your 18 years,
just promise to tell the truth, and

that's it.  Because if we did that, we
would be extremely naive, and that would
be wrong of us to do.  So, we do have a
plea agreement, so that there are
consequences and there are going to be
consequences to Mr. Gilbert.

But my contention is that because
he's facing more time, the fact that he
may do more time, 18 years to a
16-year-old thug is the same as 30 years,
40 years.  It's a long period of time.
As Ms. Shanahan said, he doesn't think
past today.  So what if it's 18 years, it
could be life to him.  We wanted to make
sure there are consequences, there are
going to be consequences.  We protected
ourself, but that doesn't mean that he
didn't come in here and lie for his
father.

And I agree with Mr. Whalen, Mr.
Gilbert does not care about rules and
ramifications because of his own murder.
He doesn't care.  He doesn't think past
the moment.  He did what he did with you
folks because of the brains of the

family, Mr. Jordan.

And it's funny that -- I'm a little
bit confused about Mr. Whalen's closing
argument, that he's almost conceding that
Mr. Jordan was actually there at the time
of the murder. And my contention is that
if he was there at the time of the
murder, he's guilty. There is no other
reason to be at the scene of the Victor
Davis murder unless you were involved.

If he were that close to the body
and spit at the time Mr. Davis was
murdered, he's either guilty as the
gunman or guilty as a complicitor, and
you will get the complicity instruction
which means that you aided, abetted,
assisted, encouraged or were part of a
plan. It doesn't matter who the actual
gunman was, and that actual -- and the
complicitor is just as guilty, as Ms.
Shanahan mentioned, of the gun spec as is
the actual shooter.

And what I think is interesting
that Mr. Whalen, really if you think it
through and you all are an intelligent

1    jury, that he is saying that basically is

2    Kareem Gilbert the killer?  Is that what

3    he is saying in his closing argument?

4    Because he doesn't care.  He chased

5    somebody down like a dog, he'll do what

6    it takes, all that kind of stuff.

7         But the funny thing is Kareem

8    Gilbert, what Mr. Whalen wants you to

9    believe, is Kareem Gilbert came in here

10   and told you the truth about his father

11   not being involved.  In fact, the whole

12   thing about the alibi, if you recall,

13   Kareem Gilbert said we were at home

14   together that night.  Believe me, I

15   didn't go down there, he didn't go down

16   there.  But what's also more interesting

17   is that Leshuande Ramsey, if you recall

18   her from Friday, came in here, and not

19   only did she alibi him, but she alibied

20   Kareem Gilbert, didn't she, because she

21   said that he was in his pajamas the whole

22   night so neither one of them could have

23   done it.

24        Was she truthful with you when she

25   said that he and Kareem Gilbert were home

that night with the big thing watching
movies and all that?  So, if you believe
her, it couldn't have been Kareem Gilbert
either.  But Mr. Whalen is saying, hey,
even if he were down there and did spit,
it doesn't mean that he did it.  I would
strongly disagree with that.

And I'm just going to briefly go
through some of these statements with
you.  And, again, you're not going to
have these, and I apologize for almost
reading from them when you're not going
to get them, but what you need to look at
is how these witnesses, and I think the
sign of the truth, how you can test
people is to see what did they say, and
then compare what they said to what
somebody else says and see if there is
anything that is matching.

For instance, if Kareem Gilbert
said something in his May 17th statement
that matches what Kevin Heard said,
Kareem Gilbert and Kevin Heard do not
know each other.  That would be the truth
because they match and they have no idea

what the other one said.

And I would strongly disagree with
what Mr. Whalen said about Mr. Heard.
There is no evidence that these details
were in the paper, because the reporter,
Kimbell Perry, is sitting in the
courtroom.  These papers are all
archived, and it's easy to get copies of
what's in the paper.  There is no
evidence that anybody got any information
in the newspaper on this case.

Kevin Heard told you, and I'm
summarizing, that he previously worked
with Officer Sneed a long time ago, and
there has been no contact since then, and
he called because he trusted Sneed.  But
Sneed told you, as well, that Kevin
Heard's information is corroborated by
Sneed, because Sneed said I knew him, I
had worked with him in the past.  We
hadn't had contact for a while.  He
called me, I called him back.  He had
some vague information about a murder,
that he knew who had done it, but all he
had was a nickname.  He didn't have the

full name.  And I told him to try to find
out what that was.

That's what Kevin Heard told you,
that's also what Officer Sneed told you.
They corroborate each other.  That is the
test that you look at to see whether
somebody is telling you the truth.

Also, both of them said that they
met at Kroger's a couple weeks later.
Again, they corroborate each other.
Sneed told you what Heard did.  Heard
told you the same thing.  When Heard said
I got the name, Sneed corroborates that
and he gave him the name of Luke,
Detective Luke.  And what does Luke tell
you?  That she got a phone call from
Sneed.  And, again, these are the things
that you use to test credibility.  And
going from there that you look at all the
specific case facts.

Does Kevin Heard sell drugs on
Burnet?  Sure.  Does the defendant use
crack cocaine?  Well, Kevin Heard said he
did, Kareem Gilbert said he did, and even
Leshuande Ramsey said that Ruben Jordan

uses crack cocaine.  So, if we can take
that for a given that Ruben Jordan --
even Mr. Whalen says he is a crack user.
Does Kevin Heard sell crack on Burnet?
Yes.  Does the defendant have to buy
crack from somebody?  Obviously.  Did the
defendant buy from Mr. Heard?  Did he?
There is no reason to say that he didn't.
He's on Burnet.  It's walking distance.
He's a known drug dealer.

So, if you ask yourself, do they
know each other?  Do Heard and Jordan
know each other?  I think you could go
back in the jury room and say, yeah, they
did know each other.  So, now, the issue
is, did he say what Mr. Heard said he
said?  He's known by Red.  Everybody said
that that's his nickname.  He said that
he's always had a shaved -- a bald head
or shaved head.  Mr. Heard said ain't
never seen him with hair.  All the
witnesses say that as well.  He does not
want to be labeled a snitch.

Obviously, there is a lot for him
to lose and nothing to gain.  He's saying

1    it because he's coming in here, because

2    he told you it's the right thing to do.

3    He even told Mr. Jordan that he's going

4    to go to hell for what he did.  He

5    told -- Kevin Heard told you that Ruben

6    Jordan told him that his wife and I think

7    daughter or sister were trying to tape

8    him.

9         If you recall, Mr. Heard thinking

10   of one of the conversations Mr. Heard had

11   with Mr. Jordan, I think the second one,

12   Jordan came in and said, hey, my wife and

13   daughter or sister are trying to tape me.

14        At the time that's pretty

15   inconsequential, isn't it?  But these

16   kind of details turn out to be the most

17   important things of the case because

18   Kareem Gilbert in his May 17th statement

19   told the police the same exact thing,

20   that his mom, and I believe sister, were

21   trying to videotape Ruben Jordan and

22   trying to get him to confess on video,

23   but it didn't work like a telephone.  How

24   would Heard know exactly -- would know

25   that other than to hear it from him?

1    MR. WHALEN:  Your Honor, I'm gonna

2    object.  He's violating the instructions

3    that you're gonna give them about Kareem

4    Gilbert's statement.

5        THE COURT:  Do you want to step

6    over here, Counsel?

7        (The following transpired at

8    sidebar as follows:)

9        MR. TIEGER:  Judge, basically what

10   I'm saying, the defense is wanting the

11   jury to believe that what Kareem Gilbert

12   said under oath was true, and I'm saying

13   why?  What he said originally was true,

14   and they can only use it, I agree, for

15   impeachment, but it's a matter of, you

16   know, he's saying believe Kareem Gilbert,

17   we are alibied, he didn't do it, we are

18   together.

19       THE COURT:  And you're saying?

20       MR. TIEGER:  I'm definitely not

21   arguing they use it for truth.

22       MR. WHALEN:  He's telling him to

23   use Kareem Gilbert's statement to

24   coincide with what another witness said

25   to him, that's using it as evidence

1    against the father.

2         THE COURT:  Keep your voice down.

3         MR. WHALEN:  I'm sorry.

4         THE COURT:  Evidence against the

5    father.

6         MR. WHALEN:  And you are telling

7    them you can only use it to judge the

8    truthfulness of what he testified here.

9         THE COURT:  Did you want to say

10   something?  Do you want to say something

11   about that?

12        MS. SHANAHAN:  No.

13        THE COURT:  Are you going to do a

14   lot more comparisons?

15        MR. TIEGER:  No, no.  I'm going to

16   go through some of the specifics that he

17   said, just to say what he said in court

18   was not true.

19        THE COURT:  What he said in court

20   wasn't true?

21        MR. TIEGER:  Yeah.

22        THE COURT:  By contrasting with his

23   statement?

24        MR. TIEGER:  I understand.  I'll

25   try to stay away from that.

1    THE COURT:  I'll make a curative

2    instruction, that's what I'm going to do

3    with it.

4         MR. WHALEN:  Okay.

5         (Sidebar concluded.)

6         THE COURT:  I want to advise the

7    jury again that the statements of Kareem

8    Gilbert that were made in the tape are

9    not evidence, and does -- is not

10   testimony, but it is used for a very

11   specific purpose.  And the purpose of

12   closing argument is it persuade you that

13   the State and the defense have proved

14   their case, and they are referring to

15   matters that come before this Court.  But

16   I'm advising you that you have a limited

17   purpose in using anything connected to

18   Gilbert -- to Kareem Gilbert's statement

19   that he made.  And I will explain what

20   testimony is and the difference between

21   the testimony and using it to weigh

22   credibility.  You're using taped

23   statements to weigh his credibility;

24   therefore, I have advised the State to be

25   careful not to confuse the jury, and they

have agreed to do that.  So, we'll
continue.

MR. TIEGER:  Thank you, Your Honor.
Again, Heard was very accurate in how to
portray exactly what was said.  Moving on
to Dean Shade, the supposed
inconsistencies as to his last breath are
so inconsequential that they are
ridiculous.  Whether somebody dies -- and
you heard Officer Fusselman say that he
was there within, I think he said, 15 to
20 seconds.  I forget what he said.  That
he was around the corner.  He got there
very, very quickly.

As to whether somebody gasped their
last breath at 11:30 or 11:30 and 30
seconds, again, not important as to what
Dean Shade is trying to, as Mr. Whalen
said, elaborate on what he had said
before.  Does Dean shade live in the
building, just to start from the
beginning?  Obviously, he lives in the
building.  Does he have a window over the
street?  Yes, he does.  Is that window
directly over where the homicide

happened?  It is.  Did he have a chance
to observe and see what he said he saw?
Yes, he did.

Some of us live in the suburbs, the
suburbs have been mentioned.  They live
in houses.  Some of those houses are set
back from the street a number of feet or
yards.  It's hard to see sometimes out
50 feet, however far your house is away
from the street.  But where your building
is straight down on the street, very
close, it's the sidewalk and then your
building, it's a lot easier to see as
you're looking down what you saw.  There
are no grudges.  He's got no bad feelings
about anybody.  He's known the Gilbert
boys, Shawn and Kareem, for a long time
because he's lived there for a number of
years.

He told you positively that the man
standing over Victor Davis was not Shawn
Gilbert and it was not Kareem Gilbert.
Positive about that.  He knew both those.
He's a hundred percent sure.  There is no
danger of misidentification with him

because he knows them.

We talked about that in jury selection. Ruben Jordan is not a stranger to Dean Shade. There is no possible way for there to be any confusion or misidentification about what he said. He actually called 911. He said Victor Davis was a great guy. He said Victor Davis was concerned about being a witness, and he said he was 75 percent sure it was him. Why is that important? The percentage isn't important, but what is important is that it's a bald-headed man standing over the body that's not Kareem or Shawn.

If you reach the point in your deliberations that you are certain that it was somebody in the Gilbert family who did this, those two teen-agers are excluded, then you're left with him.

There is nobody else in the world that wanted Victor Davis dead but the Gilbert family. He's the only one left.

He told you that he heard a number of shots. He heard the scuffling and

then he heard the taunting.  And what's
interesting about the taunting is that
again, there has been some testimony
about why he'd spit.

Now, do you spit to taunt somebody,
like get up -- get up, help me up, hey,
you're sitting on the ground.  Hey, get
up now, let's see how good of a witness
you are now.  You get up off the ground.
Now you testify against my son, spit.  Or
do you spit because the activity was so
strenuous, sometimes when you're running
or in athletics, you're worked up, there
is a physical exertion and there is a
spit that happens after that.  Which one
was it?  I don't know, but certainly
there was something spit at that point.

And Kareem Gilbert.  Again, the
defense is asking you to believe what he
said in court was true, that he and his
father were together and neither one of
them could have done it.

But as you play the statement, if
you need to, if you look through that, if
you read that statement, it's -- I mean

five trained people.  I'm not trying to
toot my own horn, but you got Detective
McGuffey and Luke and Vauhgn and they're
all homicide investigators.  And Ms.
Shanahan and myself all part of a plea
agreement, as you can see that it says
that.  The statement has to be truthful.

And as Detective Ballman told you,
a lot of people want to cooperate with us
in investigations, and we have to make an
independent determination of whether what
they are saying is true, because we have
got a duty, we are officers of the court,
we are here to see that justice is done.
So, that's why we -- and I don't want to
say grill him for an hour, but it wasn't
just like, okay, tell us -- you tell us
he did it, and we'll take a couple
minutes and then that's good enough for
us.  Because some of these questions were
hard questions.  Because if you recall,
in part of the questioning, he said he
threw his gun in the river.

But then later on, he said he put
it in a garbage can.  And I think

1     Detective Luke said wait a minute, I

2     thought you said you threw it in the

3     river.  What's the deal?  This wasn't a

4     love fest between anybody and Kareem

5     Gilbert, because then he could say I put

6     it there and then went back and got it.

7     Was he in the middle of the bridge and

8     threw it off?

9          MR. WHALEN:  Your Honor, can we

10    approach?

11         (The following transpired at

12    sidebar as follows:)

13         MR. WHALEN:  I'm going to ask for a

14    mistrial.  He has just stepped over the

15    line.  He's now being a witness to what

16    occurred when he was in there, and he's

17    testified now about what was going on in

18    that room and how many were there and why

19    they asked this or that.  He can't do

20    that.  He's a witness now and he can't be

21    both the witness and the prosecutor.

22         THE COURT:  Okay.  So, you're going

23    to make a motion?

24         MR. WHALEN:  Yes.

25         THE COURT:  You're going to

respond?

MR. TIEGER: Judge, I mean, I'm not saying anything other than what everybody said. It's been testified as to who was there, that the five of us were there, and I'm using, as you were instructing me and will tell the jury, what he said in court was not true, and how it was impeached and why you should not believe what he said in court.

THE COURT: I will caution you probably not to talk about what happened in the room at this point, but you made a motion, and for the record I don't find that it rises to the level of persuading the jury just off what he's saying, and probably is not durable enough for me to grant that, but I'm going to remind you, you have to stop.

MR. TIEGER: I'm going to go through his statement, Judge, and say what he said and how.

THE COURT: You can't be a witness, what you heard said.

MR. TIEGER: Okay. I'll just read

from the transcript.

THE COURT:  Stop supporting your
comment.  You can make those without
referring to what you said, what you hear
and did in the room.

MR. TIEGER:  Thank you, Judge.

THE COURT:  You can do that.  So,
that's my ruling.  I'm going to deny the
mistrial, but it's in the record.

(Sidebar concluded.)

THE COURT:  We are going to take a
comfort break at this time.  Would you
leave your notes here, jurors, and again
I know you want a comfort break before we
start deliberating on this matter and
talking about the testimony and any
argument.  So, you know you cannot do
that at this time.

Remember your admonitions, but
there will be a comfort break for ten --
we'll say 15 minutes so you all get
prepared.  Thank you.

(The jury leaving the courtroom at
10:30 p.m.)

THE COURT:  while they're gone,

1    there is new spectators that have come

2    into the room, so at this time remove

3    your cell phones, turn them off.  I don't

4    want them vibrating or doing anything.  I

5    don't know whether you have any cell

6    phones or not, but get them out of your

7    pockets and purses, and also do not have

8    them in your hands.  You're not allowed

9    to have cell phones in your hands or

10   using them.

11            (Recess.)

12            (The jury entering the courtroom at

13   10:45 p.m.)

14            THE COURT:  And, Mr. Tieger, you

15   may continue with your closing argument.

16            MR. TIEGER:  Okay.  I only have a

17   few more minutes.  With Kevin Heard, just

18   one more thing about Mr. Heard.  He told

19   you that he called Detective Luke on

20   February 11, that's the disc that was

21   played where the controversy was over

22   when he said how old Mr. Jordan was.  And

23   I think the transcript said 20s, but

24   Detective Luke said she thought it said

25   four -- and then she interrupted him.

1    Those aren't introduced.  I think there

2    was a little dispute between the defense

3    and us in terms of let's put it all in

4    and there was an objection, so they were

5    not put in.

6         Regardless of that, that phone call

7    was made on February 11th of 2009.  And

8    what's critical about that is that Mr.

9    Heard told Detective Luke that he had

10   spoken to Mr. Jordan, and Mr. Jordan was

11   concerned at the time because he had just

12   given a swab for DNA and that he was

13   afraid that he dropped something at the

14   crime scene.

15        Again, very interesting because

16   that's corroborated because Detective

17   Luke told you that they did take a DNA

18   swab from the defendant on February 8th

19   of 2000, which is just three days before

20   the Heard phone call which explains why

21   Ruben Jordan was nervous right after that

22   because he was afraid that he had dropped

23   something at the crime scene.

24        And just going through the

25   statement of Kareem Gilbert, and, again,

you can listen to it, if you want.  You
don't have to listen to it if you don't
want to, but just to use it for the
purpose of saying that he -- what he said
in court the other day about he wasn't
there, his dad wasn't there, neither one
did it because they were watching the
Steeler's game, to impeach him as far as
why that isn't true, going into the
details that he gave to everybody on
May 17th, he said that they found Mr.
Davis at a motorcycle club where he
bootlegs, that he parked there on the
side.  And he said what his father did,
where he pulled out a .38, a revolver,
like a cowboy pistol and just started
shooting.  Remember, no shell casings at
the scene, which is consistent with a
revolver.  That when his father, after he
got in the car, he was asked what did
your father say about what he had done?
And Mr. Gilbert repeatedly, and this is
throughout the interview, he really
didn't -- he really ain't really say
nothing to me.

And, basically, like, he gave those
details, they just basically drove back
and that was over. And, again, somebody
that was trying to mislead the police
like he told you under oath that he was
doing, would come up with a lot of
details in a statement. What did he say?
I killed that guy. I'm glad I did. You
should have seen this, you should have
seen that. He didn't give any of those
details to the police.

Again, why -- what he said under
oath was not true, that he really had an
alibi. He talked about the blue and
white car that Mr. Davis had. He talked
about how the car was parked. He talked
about the tussle or the scuffling by the
car. He talked about how they went back
to Ruben Jordan's house, and it goes on
and on. And rather than read through
this, I will, again, let you review it if
you want on your own, but he was correct
about the number of shots that were
fired. These were not leading questions.
And if you recall what leading questions

are, they are questions that suggest an
answer.

So, the police were not saying,
isn't it true that he parked here?  Isn't
it true that he did this?  Isn't it true
that he went there?  Isn't it true that
he fired three or four shots?  All the
words came from Mr. Gilbert's mouth in
terms of specificity.  Again, why what he
said under oath was not true, that he
just shot him in the head.  Again, why
what he said in court was not true?  And
then it goes on about the taping and so
forth that I told you about.

In jury selection, Mr. Whalen asked
a lot of questions about would you
believe police, do they lie?  And a lot
was asked about police lying, and you all
talked about that with him.  And I really
didn't understand where he was going with
that at the time, because this isn't
really a police case, so to speak.  It's
not a case where police involvement is
that critical.

Now, if he wants to tell you that

Criminalist Glindmeyer is lying about the injuries to Mr. Davis's hands, that Officer Glindmeyer thought he had got them by way of a fistfight. Well, I mean, certainly at the time, that's one of the things you're thinking about. There is injuries to your hands, maybe there was a fight, maybe this is part of the crime scene. I want to make sure that the hands are protected and somebody notices the hands. It turns out he was wrong. There wasn't -- there was a tussle, but the injuries were from a fall. But I wouldn't characterize that, the evidence shows is a lie that Officer Glindmeyer is trying to mislead you at all.

And as far as the spit, all I can think about, that there would be a controversy about these police officers telling you the age of the spit, that it was fresh. But Mr. Whalen, in his closing argument, again seemed to indicate that his client was there at the time of the murder. So, that really

obviates the need to determine the
freshness of the spit, but certainly this
has been -- the opinion about the spit
isn't something new.

If you remember, Officer Fusselman
came into court, he's the first
responding officer to the Victor Davis
homicide.  He got there within a few
seconds.  He gets there, and right away
he notices the spit.  He thought it was
fresh.  He thought that that's something
that needs to be preserved, and he was
hoping that another police or fire
officer who's trying to save Victor
Davis's life didn't put it there.  This
was done prior to Luke, anybody getting
involved in the case.  This is his
opinion and what he said.

Glindmeyer and Luke, the same way,
they had no reason at the time to think
it was fresh because they didn't know
what his alibi would be that he wasn't
even there, that he hadn't been there for
12 hours.  So, this isn't like something
that has come at the last minute that

1 everybody thought this was important,

2 it's fresh, like Detective Luke saying

3 God, these firefighters or another

4 uniformed cop must have spit right there

5 by the body.

6     So, not knowing what the defense

7 would be, these are opinions that were

8 reached at the time.

9     Obviously there is a lot at stake

10 in this case for both sides.  This is an

11 important case for Cincinnati law

12 enforcement.  You know a witness is

13 killed, and I'm not saying that Brian

14 Austin's life isn't important, certainly

15 it is, but when you have actually got

16 somebody that is going to step up, and

17 you wonder where is it going to stop?

18 Everybody is always saying they want

19 Cincinnati crime curbed.  They want it

20 eradicated.  They want people to come

21 forward.  There is Crimestoppers.  There

22 is Cash for Clues.  There is all kind of

23 programs.  There is community

24 involvement.  Let's let the murders stop.

25     Well, finally when somebody comes

forward, like Victor Davis, that's why

it's an important case for everybody, Mr.

Jordan, the State, for you all to decide,

because when a witness is gunned down in

the street with impunity, then the

shooter of Mr. Austin and the shooter of

Victor Davis, who is this man, a father

and son play the kind of games that they

are playing and have been demonstrated in

this courtroom, don't let this

grade-school simplistic trick work on

you.

       We would ask you, as Ms. Shanahan

says, to find Mr. Jordan guilty and see

through his desperate and deliberate

tactics to subvert justice, thank you.

       THE COURT:  Thank you.  At this

time, ladies and gentlemen of the jury,

I'm going to give you your instructions.

I want you to just listen right now

because you will each have a copy, and,

therefore, I do not want you to become

distracted trying to memorize everything

that I'm getting ready to tell you.

       This case is the State of Ohio vs.

Ruben Jordan.  Members of the jury:  You have now heard the evidence and the arguments of counsel.  The Court and the jury have separate functions.  You decide the disputed facts and the Court provides the instructions of law.  It is your sworn duty to accept these instructions and to apply the law as it is given to you.

You are not permitted to change the law nor to apply your own conception of what you think the law should be.  Indictment.  That is a criminal case begins with a filing of an indictment.  The indictment informs the defendant that he has been charged with an offense or offenses.  The fact that it was filed may not be considered for any other purpose.  The plea of not guilty is a denial of the charges and puts in issue all of the essential elements of each offense.

The burden of proof.  The defendant is presumed innocent until his guilt is established by proof beyond a reasonable doubt.  The defendant must be acquitted

unless the State produces evidence which
convinces you beyond a reasonable doubt
of every essential element of the
offenses charged offenses charged in the
indictment or of any lessor offense
included within that indictment.  And
that you will be given instructions about
all of that.

Reasonable doubt is present when
the jurors, after they have carefully
considered and compared all the evidence,
cannot say they are firmly convinced of
the truth of the charge or charges.  It
is a doubt based on reason and common
sense.  Reasonable doubt is not mere
possible doubt, because everything
relating to human affairs or depending on
moral evidence is open to some possible
or imaginary doubt.  Proof beyond a
reasonable doubt is proof of such
character that an ordinary person would
be willing to rely upon it in the most
important matters of the person's own
affairs.

What is evidence?  Evidence is all

1    the testimony received from the
2    witnesses, including depositions and the
3    exhibits admitted during the trial and
4    facts agreed to by counsel, and any facts
5    which the Court requires to you accept as
6    true.  Evidence may -- and you will get
7    some of that also in a moment.
8         Evidence may be direct or
9    circumstantial, or both.  Direct evidence
10   is the testimony given by a witness who
11   has seen or heard the facts to which he
12   or she testifies.  If I say he or she, I
13   mean both.  It includes exhibits admitted
14   into evidence during the trial.  So
15   exhibits admitted into evidence during
16   the trial are considered to be direct
17   evidence.
18        Circumstantial evidence is the
19   proof of facts or circumstances by direct
20   evidence from which you may infer -- you
21   may reasonably infer other related or
22   connected facts which naturally and
23   logically flow according to the common
24   experience of mankind.  To infer or to
25   make an inference is to reach a

1   reasonable conclusion of fact which you

2   may, but are not required to make, from

3   other facts which you find have been

4   established by direct evidence.  Whether

5   an inference is made rests entirely upon

6   you, each individual as jurors.  Direct

7   and circumstantial evidence are of equal

8   weight.

9        The evidence does not include the

10  indictment, the opening statements or

11  closing arguments of counsel.  The

12  opening statements and closing arguments

13  of counsel are designed to assist you,

14  but they are not evidence.

15       Statements that were stricken by

16  the Court or which you were instructed to

17  disregard are not evidence and must be

18  treated as though you never heard them.

19  You must not speculate as to why the

20  Court sustained the objection to any

21  question or what the answer to such

22  question might have been.  You must not

23  draw any inference or speculate on the

24  truth of any suggestion included in a

25  question that was not answered.  As

previously instructed, the view of the

premises is not evidence, but it may help

you understand the evidence.

Credibility.  You are the sole

judges of the facts, the credibility of

the witnesses and the weight of the

evidence.  To weigh the evidence, you

must consider the credibility of the

witnesses.  You will apply the tests of

truthfulness that you apply in your own

daily lives.  These tests include the

appearance of each witness upon the

stand; his or her manner of testifying;

the reasonableness of the testimony; the

opportunity he or she had to see, hear

and know the things concerning which he

or she has testified; his or her accuracy

of memory, his or her frankness or lack

of it, his or her intelligence, and his

or her interests and bias, if any;

together with all of the facts and

circumstances surrounding the testimony.

Applying these tests, you will

assign to the testimony of each witness

such weight as you deem proper.  You are

not required to believe the testimony of
any witness simply because it is under
oath.  You may believe or disbelieve all
or any part of the testimony of any
witness.  You should decide what
testimony is worthy of belief and what
testimony is not worthy of belief.

Eyewitness means a person who
observes another person at or near the
scene of an offense.  Some things you may
consider in weighing the testimony of an
identifying witness are:  The capacity of
the witness, that is the age,
intelligence, defective senses, if any,
and the opportunity of the witness to
observe.  The witness's degree of
attention at the time he or she observed
the offender; the accuracy of the
witness's prior description or
identification, if any; whether the
witness had observed the defendant in the
past; the interval of time between the
event and the identification and all
surrounding circumstances under which the
witness has identified the defendant.

1          Evidence was received that some

2   witnesses had been convicted of a

3   criminal offense.  If you find that a

4   witness was convicted of a criminal

5   offense, you may consider that evidence

6   solely for the purpose of testing the

7   witness's credibility and the weight to

8   be given that witness's testimony.  It

9   cannot be considered for any other

10   purpose.

11       You heard a tape-recorded statement

12   of Kareem Gilbert.  This recorded

13   statement was admitted for the sole

14   purpose of impeaching the witness.  The

15   statement is not testimony and may only

16   be used to evaluate the credibility of

17   the witness.

18       The testimony of the defendant.  It

19   is not necessary that the defendant take

20   the stand in his own defense.  He has a

21   constitutional right not to testify.  The

22   fact that he did not testify must not be

23   considered for any purpose.

24       Expert witnesses.  Definition.

25   Generally a witness may not express an

opinion, however one who follows a special line of work may express their opinion because of his or her education, knowledge and experience. Such testimony is admitted for whatever assistance it may provide to help you to arrive at a just verdict.

Questions have been asked in which an expert witness was permitted to assume that certain facts were true, and to give an opinion based upon such assumption. You must determine whether the assumed facts upon which the expert based their opinion are true. If any assumed fact was not established, you will determine its effect upon the opinion of the expert.

As with other witnesses, upon you alone rests the duty of deciding what witness -- what weight should be given to the testimony of the expert. In determining its weight, you may take into consideration their skill, experience, knowledge, veracity, familiarity with the facts of this case, and the usual rules

1  for testing credibility and determining
2  the weight to be given to the testimony.
3      Stipulations have occurred in this
4  matter.  They've made several
5  stipulations.  They have stipulated that
6  the Cincinnati Police collected Exhibit
7  15, a buccal swab from the defendant,
8  Ruben Jordan.  Further proof of that fact
9  is unnecessary.  Further weighing of this
10  fact is not necessary.  The jury is
11  instructed to accept that as proven.
12      The parties have stipulated that
13  the defendant, Ruben Jordan, was indicted
14  on May 24th, 2010.  They have stipulated
15  that Exhibit F is Kareem Gilbert's plea
16  agreement.  They have also stipulated to
17  the prior convictions of the defendant,
18  Ruben Jordan, for the following offenses
19  in Hamilton County, Ohio, Court of Common
20  Pleas.  Possession of drugs on
21  February 6th, 2004; preparation of
22  marijuana for sale on December 14th,
23  2000; illegal processing of drug
24  documents on October 17th, 1995;
25  aggravated trafficking of drugs on

March 19th, 1993; and drug abuse on May
the 1st, 1994.

With regard to Count 2, a prior
conviction is an element of the offense
of having a weapon while under a
disability.  This stipulation was not
made to prove the character of the
defendant, but in order to show that the
defendant acted in conformity with that
character.  And you may not consider it
to prove the character of the defendant
or to show that he acted in conformity
with that character.

The definition of complicity.
Complicity is an offense.  Act in an
offense.  Complicity in an offense means
the conduct of one who knowingly aids and
abets another for the purpose of
committing such an offense.

If you find beyond a reasonable
doubt that Ruben Jordan purposely aided,
helped, assisted, encouraged or directed
himself with another in the commission of
an offense, he is to be regarded as if he
were the principal offender and is just

as guilty as if he had personally
performed every act constituting the
offense.

When two or more persons have a
common purpose to commit a crime, and one
does one part and a second performs
another, those acting together are
equally guilty of the crime; however, the
mere association with one who perpetrates
an unlawful act does not render a person
a participant in the crime as long as his
act are innocent.

Complicity applies to the firearm
spec as well as the underlying criminal
charges.  So that there -- so that where
one is acting in conformity with another
in the commission of an offense with the
use of a firearm, he is criminally
responsible for the firearm regardless of
whether he was the principal offender or
an unarmed accomplice.

Exhibits.  A number of exhibits and
testimony related to them have been
introduced.  You may consider whether the
exhibits are the same objects and in the

same condition as originally taken by the
deputies or the police officers.  You
will determine what weight, if any, the
exhibits should receive in light of all
the evidence.

Alibi has been introduced here.
The defendant claims that he was at some
other place at the time the offense
occurred.  This is known as alibi.  The
word "alibi" means elsewhere or a
different place.  If the evidence fails
to establish that the defendant was
elsewhere, such failure does not create
an inference that the defendant was
present at the time when, and at the
place where, an offense may have been
committed.

If after consideration of the
evidence of alibi, along with all the
evidence, you are not convinced beyond a
reasonable doubt that the defendant was
present at the time in question, you must
return a verdict of not guilty.

Count one, aggravated murder with
specifications.  The defendant, Ruben

1    Jordan, is charged with aggravated

2    murder, in violation of Revised Code

3    2903.01(A) of the Ohio Revised Code.

4    Before you can find the defendant guilty,

5    you must find that beyond a reasonable

6    doubt that on or about the 31st of

7    October, 2008, and in Hamilton County,

8    Ohio, the defendant purposely, and with

9    prior calculation and design, caused the

10   death of Victor Davis.

11          Purposely.  Purpose to cause the

12   death of another is an essential element

13   of the crime of aggravated murder.  A

14   person acts purposely when his specific

15   intention to cause a certain result.  It

16   must be established in this case that at

17   the time in question there was present in

18   the mind of the defendant a specific

19   intention to cause the death of Victor

20   Davis.  Purpose is a decision of the mind

21   to do an act with a conscious objective

22   of producing a certain result or engaging

23   in specific conduct.  To do an act

24   purposely is to do it intentionally and

25   not accidentally.

Purpose and intent mean the same thing.  The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.  The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all the facts and circumstances in evidence.

Inference.  Use of a deadly weapon. You may infer a purpose to cause the death of another with a natural or probable consequences of the defendant's act is to produce death, in light of all the surrounding circumstances.  Such circumstances include the weapon used and its ability to destroy life.  If you find that the defendant used a deadly weapon against another in a manner calculated to destroy life, the purpose to cause death may be, but is not required to be, inferred from the use of the deadly weapon.  Whether an inference is made rests entirely with you.

1    Prior calculation and design means
2    that the purpose to cause a death was
3    reached by definite process of reasoning
4    in advance of the homicide, which process
5    of reasoning must have included a mental
6    plan involving studied consideration of
7    the method and the means or instrument
8    with which to cause the death.  To
9    constitute prior calculation, there must
10   have been sufficient time and opportunity
11   for the planning of an act of homicide,
12   and the circumstances surrounding the
13   homicide must show a scheme designed to
14   carry out the calculated decision to
15   cause the death.  No definite period of
16   time must elapse and no particular amount
17   of consideration must be given.  But
18   acting on the spur of the moment or after
19   momentary consideration of the purpose to
20   cause the death is not sufficient.
21        Cause is an essential element of
22   the offense of aggravated murder.  Cause
23   is an act which directly produces the
24   death of another and without which it
25   would not have occurred.

1      Deadly weapon means any instrument,

2      device or thing capable of inflicting

3      death and designed or specifically

4      adapted for use as a weapon, or

5      possessed, carried, or used as a weapon.

6          Capable of deadly weapon -- I'm

7      sorry.  Capability of deadly weapon.  A

8      deadly weapon is any instrument, device

9      or thing which has two characteristics.

10     The first characteristic is that it is

11     capable of inflicting or causing death.

12     The second characteristic is in the

13     alternative when the instrument, device

14     or thing was designed or specifically

15     adapted for use as a weapon, or it was

16     possessed, carried or used in this case

17     as a weapon.

18         These are questions of fact for you

19     to decide.  The lesser included offense

20     to Count 1 is murder.  Under 29 --

21     Revised Code 2903.02, murder is a lesser

22     included offense of aggravated murder.

23         Before you can find the defendant

24     guilty of murder, you must find beyond a

25     reasonable doubt that on or about the

1    31st day of October, 2008, and in

2    Hamilton County, Ohio the defendant

3    purposely caused the death of Victor

4    Davis.  The offense of murder is

5    distinguished from aggravated by the

6    absence or failure to prove prior

7    calculation and design.

8    Findings on Count 1.  If you find

9    that the State failed to prove beyond a

10    reasonable doubt any one of the essential

11    elements of the offense of aggravated

12    murder as charged in Count 1 of the

13    indictment, then your verdict must be not

14    guilty as to such charge according to

15    your findings.

16    Guilty as charged.  If you find

17    that the State proved beyond a reasonable

18    doubt all the essential elements of the

19    offense of aggravated murder, your

20    verdict must be guilty as charged.

21    Guilty of a lesser included

22    offense.  However, if you find that the

23    State failed to prove beyond a reasonable

24    doubt any one of the essential elements

25    of aggravated murder, or you're unable to

agree on a verdict, then your verdict
must be not guilty of that offense.  And
in that event you will continue your
deliberations to decide whether the State
has proved beyond a reasonable doubt all
the essential elements of the lesser
included offense of murder.

Lesser included offense.  If the
evidence warrants it, you may find the
defendant guilty of an offense lesser
than that charged in the indictment;
however, notwithstanding that right, it
is your duty to accept the law as given
to you by the Court, and if the facts and
the law warrant a conviction of the
offense charged in the indictment, namely
aggravated murder, then it is your duty
to make such a finding uninfluenced by
your power to find a lesser offenses.
This provision is not designed to relieve
you from the performance of an unpleasant
duty, it is included to prevent failure
of justice if the evidence failed to
prove the original charge, but does
justify a verdict for the lesser offense.

1    There is Specification 1 to Count

2    1.  If your verdict is guilty of

3    aggravated murder or murder, you will

4    separately decide beyond a reasonable

5    doubt if the defendant, Ruben Jordan, had

6    on about his person or under his control

7    a firearm while committing the offense of

8    aggravated murder, or murder, and

9    displayed the firearm, brandished the

10   firearm, indicated that he possessed a

11   firearm, or used it to facilitate the

12   offense of aggravated murder or murder.

13   If your verdict is not guilty to murder

14   or aggravated murder, you will not

15   consider this specification.

16       Firearm means any deadly weapon

17   capable of expelling or propelling one or

18   more projectiles by an action of an

19   explosive or combustible propellent.

20       Firearm includes an unloaded

21   firearm and any firearm which is

22   inoperable which can be readily rendered

23   operable.

24       Count 2 is having a weapon while

25   under disability under Ohio Revised Code

2923.13(A)(3).  The defendant, Ruben
Jordan, is charged with having weapons
while under a disability, in violation of
2923.13.  Before you can find the
defendant guilty, you must find beyond a
reasonable doubt that on or about the
31st day of October, 2008, and in
Hamilton County, Ohio, the defendant,
Ruben Jordan, knowingly acquired, had,
carried or used a firearm, to wit: a
firearm, and at the time the defendant
knew he was under indictment for or had
been convicted of an offense involving
the illegal possession of, sale of, use
of, administration of, distribution or
trafficking in any drug of abuse, to wit:
possession of drugs in Hamilton County,
Ohio, Court of Common Pleas, Case Number
80339977 on October 6, 2004, and
preparation of marijuana for sale in
Hamilton County, Ohio, Court of Common
Pleas, Case Number B006899, on
December 14th, 2000; and illegal
possession of drug documents in Hamilton
County, Ohio, Court of Common Pleas, Case

B955989 on October 17th, 1995; and

aggravated trafficking in drugs in

Hamilton County, Ohio, Court of Common

Pleas, Case Number B929170 on October 19,

1993; and drug abuse in Hamilton County,

Ohio, Court of Common Pleas, Case Number

13911528 on May 1st, 1991; and at the

time the defendant had not been relieved

from such disability.

     All applicable definitions and all

the essentially elements of the offense

of having a weapon while under a

disability are described above.

     Findings as to Count 2.  If you

find that the State failed to prove

beyond a reasonable doubt any one of the

essential elements of the offense of

having a weapon while under a disability

as charged in Count 2 of the indictment,

then your verdict must be not guilty as

to such offense according to your

findings.

     If you find that the State proved

beyond a reasonable doubt all the

essential elements of the offense of

1     having a weapon while under disability as

2     charged in Count 2 of the indictment,

3     your verdict must be guilty as to such

4     offense according to your finding.

5           There are multiple counts here.

6     So, if you find that the State proved

7     beyond a reasonable doubt all the

8     elements of any one or more of the

9     offenses charged in the separate counts

10    in the indictment, your verdict must be

11    guilty as to such offense or offenses

12    according to your findings.

13          Not guilty.  If you find that the

14    State failed to prove beyond a reasonable

15    doubt any one of the essential elements

16    of any one or more of the offenses

17    charged in the separate counts in your

18    indictment, your verdict must be not

19    guilty as to such offense or offenses

20    according to your findings.

21          Consider the counts and

22    specifications separately.  The charges

23    set forth in each count in the indictment

24    constitute a separate and distinct

25    matter.  You must consider each count and

1    the evidence applicable to each

2    count separately, and you must state your

3    finding as to each count uninfluenced by

4    your verdict as to any other count.

5        The defendant may be found guilty

6    or not guilty of any one or all of the

7    offenses charged.  The indictment charges

8    that the offenses took place on or about

9    October 31st, 2008.  It is not necessary

10   that the State prove that the offenses

11   were committed on the exact days as

12   charged in the indictment.  It is

13   sufficient to prove that the offenses

14   took place on a date reasonably near the

15   date claimed.

16       Before you can decide whether the

17   State of Ohio has proved beyond

18   reasonable doubt all of the essential

19   elements of the offenses with which the

20   defendant is charged, you must first

21   decide whether this is the correct --

22   counsel, can we stipulate to that?  Mr.

23   Whalen?

24       MR. WHALEN:  Yes, Your Honor.

25       THE COURT:  So, the jury does not

1    have to consider whether these offenses

2    occurred in Hamilton County, because the

3    parties agree.  Normally, venue is

4    something that the jury may have to, if

5    it's disputed.  That it is not disputed

6    here.  So, this did take place in

7    Hamilton County.

8         The verdict forms you will have

9    with you in the jury room include the

10   following, I'm going to read each of

11   those separately now.  You will have with

12   you one, two, three, four, five sheets of

13   paper relating to the verdicts.

14        There is one verdict form that says

15   guilty as to Count 1, aggravated murder.

16   We, the jury, find the defendant, Ruben

17   Jordan, guilty of aggravated murder and

18   there are 12 signatures, and the

19   foreperson has a special place to sign.

20        If you find the defendant guilty of

21   aggravated murder, continue to the

22   verdict form for Specification 1.

23   Specification 1 states, we, the jury,

24   find the defendant, Ruben Jordan, guilty

25   of the Specification to Count 1,

aggravated murder, or the lesser included

offense of murder.

There is a separate form for guilty

as to Count 1, lesser included offense of

murder.  We, the jury, find the

defendant, Ruben Jordan, not guilty of

aggravated murder, and guilty of murder,

a lesser included offense of aggravated

murder.

If you find the defendant guilty of

murder, continue to the verdict form for

Specification 1.  I just read that to

you.

Counsel, I believe that applies to

both of them, correct?

MR. TIEGER:  Yes, Your Honor.

THE COURT:  In addition to that, it

does have the 12 lines for your

signatures and the place for the

foreperson.

Verdict form not guilty as to Count

1, aggravated murder or murder.  We, the

jury, find the defendant, Ruben Jordan,

not guilty of Count 1, aggravated murder

and not guilty of the lesser included

1  offense of murder.  It has the 12

2  signature lines and a place for the

3  foreperson.

4     Count 2.  We, the jury, find the

5  defendant, Ruben Jordan, guilty or not

6  guilty of having a weapon while under a

7  disability.  And should there not be a

8  verdict form for we, the jury, find the

9  defendant guilty of murder?  I didn't --

10     MR. TIEGER:  Judge, I think that

11  was the second one that you read.

12     THE COURT:  As long as it was

13  covered.

14     MR. TIEGER:  I believe it was,

15  Judge.

16     THE COURT:  All the possibilities

17  have been covered, and you will have that

18  with you in your jury room.  I will

19  explain to you who is to take care of

20  that and handle that.

21     When you have reached a verdict,

22  you will complete the forms that

23  correspond to your decision and sign the

24  verdict forms in ink.

25     Punishment.  You may not discuss or

1  consider the subject of punishment.  In

2  the event you find the defendant guilty,

3  the duty to determine the punishment is

4  placed by law upon the Court.  We are

5  almost finished.

6          Just verdict.  You must not be

7  influenced by any consideration of

8  sympathy or prejudice.  It is your duty

9  to carefully weigh the evidence, to

10 decide all disputed questions of fact, to

11 apply the instructions of the Court to

12 your findings, and to render your verdict

13 accordingly.  In fulfilling your duty,

14 your efforts must be to arrive at a just

15 verdict.  Consider all the evidence and

16 make your finding with intelligence and

17 impartiality, and without bias, sympathy

18 or prejudice so that the State of Ohio

19 and the defendants -- defendant will feel

20 their case was fairly and impartially

21 tried.

22          If during the course of the trial

23 the Court said or did anything that you

24 consider an indication of the Court's

25 view on the facts, you are instructed to

disregard it.

Initial jury room conduct. The
Court has given you the instructions on
the law applicable in this case. I will
now instruct you on how to conduct your
deliberations and prepare your verdict.
When you go to the jury room, your first
function will be to select one of your
number to serve as foreperson. The
person you select to preside over your
deliberations does not have any greater
power, nor does that person's vote have
any more importance than others. He or
she serves the purpose of helping you
conduct your deliberations in an orderly
manner, and to give each of you the
opportunity to express your opinion. One
additional duty of the foreperson is to
see to it that the verdict forms and any
exhibits are turned to the court after
you have reached a verdict.

Your initial conduct upon entering
the jury room is a matter of importance.
It is not wise immediately to express a
determination, to insist upon a certain

1    verdict, because if your sense of pride

2    is aroused, you may hesitate to change

3    your position even if you later decide

4    you are wrong.

5        Consult with one other, consider

6    each others' views, and deliberate with

7    the objective of receiving an agreement

8    if you can do so without disturbing your

9    individual judgment.  Each of you must

10   decide this case for yourself.  But you

11   should do so only after a discussion and

12   consideration of the case with your

13   fellow jurors.  Do not hesitate to change

14   an opinion if convinced that it is wrong;

15   however, you should not surrender honest

16   convictions in order to be congenial or

17   to reach a verdict solely because of the

18   opinion of other jurors.

19       Questions.  If during your

20   deliberations you have a question, it

21   should be discussed in the privacy of

22   your jury room.  It should not reflect

23   the status of your deliberations, meaning

24   it should not be that we are -- we have

25   got six -- we are deadlocked six to six,

1    or we got nine going one way and three

2    going the other way.  That's an improper

3    thing to put in your question.  It should

4    be reduced to writing, so that there will

5    be no misunderstanding as to what you

6    request, and it should then be delivered

7    to the bailiff who will submit it to the

8    Court, and the foreperson will do that,

9    will write the question and serve it to

10   the bailiff.

11        It may be difficult to remember all

12   the evidence or the law.  If you disagree

13   as to the evidence, as to the law, the

14   Court may under certain circumstances

15   furnish such information.  Do not make a

16   request at this moment.

17        If after you return to the jury

18   room, you require such information, the

19   foreperson should reduce the request to

20   writing indicating specifically what you

21   request.  Such communication must be

22   delivered to the bailiff who will submit

23   it to the Court.

24        Also, you have engaged in note

25   taking.  Some of you decided to take

notes.  All notes are confidential and
for the consideration of the jury only.
Each note taker will leave that note with
the bailiff during recesses and until
deliberations begin.  So, at that time
you will be allowed to take your notes to
the jury room.  All notes will be
returned to the bailiff for destruction
at the time the jury is discharged.

Also, you should be -- I should
tell you that your notes are not to be
used as though they were fact, and no
juror is required to believe or
disbelieve your notes.  They're for your
purposes only and for purposes of
discussion.

A juror selected as an alternate is
not permitted to participate in a jury's
deliberation, for the three of you who
have sat there patiently.  But, there may
be an occasion -- we have not -- since
the verdict has not been reached, and
because this may take several days, we're
not sure, that means that one of you may
be pressed to serve as jurors,

1    deliberating jurors.

2    So, you will be called in if one of

3    the jurors is unable to complete his or

4    her service due to illness or some other

5    misfortune or because there is -- some of

6    you have indicated that you cannot remain

7    past Wednesday.  The alternate jurors

8    will remain in the courthouse under the

9    supervision of the bailiff, but will not

10   accompany the jury to the jury room or

11   participate in deliberations unless

12   directed by the Court.

13   The alternate jurors continue to be

14   part of the jury panel while the jury is

15   deliberating, until the jury has reached

16   a verdict.  The alternate jurors cannot

17   discuss the case with anyone or disclose

18   to anyone how they would have voted.

19   After the jury has returned its

20   verdict and the verdict is announced in

21   open court, the alternate jurors will be

22   released from all restrictions.  So,

23   alternate jurors, it will not be

24   necessary for you to serve any further.

25   And you are not to discuss this case or

tell anyone how you would have voted
until the jury has reached -- has
returned a verdict.

On behalf of the public and
parties, the Court expresses appreciation
for your service in performing this most
important function, and I think you may
be on standby.  So, I'm going to suggest
they be released to the Jury Commission,
and they have agreed that they will not
discuss this case.

MR. TIEGER:  Judge, I thought they
would have to be, not necessarily
sequestered, but kept together.  I don't
know what room the Court would have for
them, but just not to discuss the case.
But I don't know if they can -- certainly
want to make it as comfortable for them
by way of --

THE COURT:  So, you object to --

MR. TIEGER:  -- way of magazines or
books or something.

THE COURT:  So, that means that
they can not return to the Jury
Commission office.  Normally kept

separated from the Jury Commission
office.

MR. TIEGER:  I'm sorry, Judge?

THE COURT:  Keep them separate from
the Jury Commission office?

MR. TIEGER:  If they could just
find a room somewhere for them, and
certainly -- yeah.

THE COURT:  They might even have a
TV in there.  We'll take care of that.
At this time, the Court will place in
your possession the exhibits and the
verdict forms.  The foreperson will
retain possession of these records,
including the verdicts and return them to
the courtroom.  The foreperson will see
that your discussions are orderly and
that each juror has the opportunity to
discuss the case and to cast his or her
vote.  Otherwise, the authority of the
foreperson is the same as any other
juror.

Until your verdict is announced in
open court, you are not to disclose to
anyone, that includes the bailiff, the

1    Judge, certainly the parties and the

2    litigants and participants, to anyone

3    else, the status of your deliberations or

4    the nature of your verdict.

5        After you have retired, select a

6    foreperson.  And whenever all 12 jurors

7    agree upon a verdict, you will sign the

8    verdict in ink and advise the bailiff.

9    You will then be returned to your

10   courtroom.  I think it's appropriate at

11   this time to -- maybe they can select a

12   foreperson, or should -- Counsel, do you

13   think they should be going to lunch?

14       MR. TIEGER:  Judge, whatever is

15   comfortable for them.

16       THE COURT:  I'm going to ask the

17   jury.  Would you prefer to go to lunch

18   now and come back and choose a

19   foreperson?  All right.  Some saying yes

20   adamantly.  At this time, you will return

21   to the courtroom then at 12:30.  You are

22   released now for lunch.

23       Remember your admonition that you

24   are not to discuss this case among

25   yourselves at lunch, as tempting as it

1    may be, and you understand what the

2    admonition is.  Okay.  All right.  At

3    this time we'll rise for the jury.

4    They're going to go to lunch.

5         (The jury leaving the courtroom at

6    11:30 a.m.)

7         THE COURT:  Exhibits and

8    stipulations, all this will remain in the

9    courtroom until they come back at 12:30,

10   and then we'll take that in to them.

11        Counsel, anything else?

12        MR. TIEGER:  No, Judge.

13        MR. WHALEN:  Your Honor, the

14   instructions that the Court will give the

15   jury during the day, including when they

16   are gone for the evening, my client will

17   waive his presence while you give them

18   the instructions.  I will be here.

19        THE COURT:  Instructions when?

20        MR. WHALEN:  At the end of day.

21        THE COURT:  At the end of today.

22   Okay.

23        MR. WHALEN:  Or when they go to

24   lunch.  I told him if they have a

25   question or reach a verdict --

THE COURT: All right then. So, you're waiving the defendant's presence?

MR. TIEGER: I guess our point would be that we don't -- and maybe it's the same thing as Bill is saying, but Megan and I don't need to be here. For instance, when they come back from lunch they can return to the jury room at 12:30 without us being here. And if they don't get a verdict today -- I mean, I don't have a problem if the Court releases them with the admonishment.

THE COURT: I'll tell you what I will do. I'm going to reread, because of the nature of this charge, I'm going to read the admonitions again in full.

MR. TIEGER: And if you want us here, we'll be here, but --

THE COURT: No. I mean, I'll let them know you have waived your appearance.

MR. WHALEN: All right.

MS. SHANAHAN: Your Honor, a couple of things. And just with anybody's schedules, just a thought, because we do

1 have some jurors with time constraints.

2 Can we perhaps let them go as late as

3 they want, within reason deliberating

4 today?  I mean, like not cut them off at

5 3:30 or 4?

6   THE COURT:  I think five is

7 reasonable, usually.

8   MR. TIEGER:  Five is fine.

9   THE COURT:  5:00.

10   MS. SHANAHAN:  Rather than cut them

11 off and send them away early.

12   THE COURT:  Let them know we are

13 going to -- they can deliberate until

14 five.

15   MR. TIEGER:  Or just don't say

16 anything and maybe at quarter till, if

17 they are still here at 4:45, say unless

18 you're close, we are going to cut you

19 loose for the day in a few minutes.

20   THE COURT:  All right.  I can do

21 that, too.

22   MS. SHANAHAN:  Page 11, one thing I

23 would want to add.  Under murder, the

24 second line.  The offense murder is

25 distinguished from aggravated.  You just

1   have plugged in murder.  It doesn't say

2   aggravated what.  And then, similarly, on

3   Page 12 -- you ready, Scott?

4        THE COURT:  Page 12.

5        MR. BRENNER:  I didn't see where it

6   was on 11.

7        MS. SHANAHAN:  Page 11 at the

8   bottom of murder.

9        THE COURT:  Definition -- last

10  sentence of murder.

11       MR. TIEGER:  She wrote it in,

12  Scott.

13       MR. BRENNER:  Okay.

14       MS. SHANAHAN:  And then on Page 12,

15  the third line from the bottom, if your

16  verdict is not guilty, I think we should

17  plug in aggravated murder or murder, you

18  will not consider the specification.

19  It's just for clarification purposes for

20  them.

21       MR. BRENNER:  Okay.

22       THE COURT:  I don't object to that.

23       MR. TIEGER:  We are good then,

24  Judge.

25       THE COURT:  Okay.  Fine.

1          MR. WHALEN:  Your Honor, can we

2     come back in chambers for a moment?

3          (Luncheon recess.)

1    AFTERNOON SESSION January 24, 2011

2    (The jury entering the courtroom at

3    3:30 p.m.)

4    THE COURT:  You may all be seated.

5    Thank you.  And will the foreperson

6    please stand, okay.  And this is on the

7    matter of State vs. Ruben Jordan, Case

8    Number B-003262.  And, ma'am, state your

9    name.

10   JUROR MESSERSCHIMTT:  Beverly

11   Messerschmitt.

12   THE COURT:  And you did submit this

13   question, these three questions to the

14   Court?

15   JUROR MESSERSCHIMTT:  Yes, I did.

16   THE COURT:  As to the first

17   question, if we find Ruben Jordan guilty

18   of aggravated murder, can we find him not

19   guilty on Specification 1 to Count 1?

20   And the answer to that is yes.

21   Will this discredit issue one?  The

22   answer to that is no.  The third question

23   is:  Does it matter who shot the gun?

24   And the answer to that is to read and

25   follow the instructions on complicity.

1    And with that, I will relieve the
2    jury so you can continue to deliberate.
3    Thank you.
4        (The jury leaving the courtroom at
5    3:31 p.m.)
6        (Jury deliberating.)
7        THE COURT:  We ready to bring in
8    the jury?
9        MR. WHALEN:  Yes, Your Honor.
10       THE COURT:  Counsels, do you object
11   to the alternates who have been separated
12   sit in the usual seats?
13       MR. TIEGER:  That's fine, Judge.
14       THE COURT:  Because they have to be
15   separated -- they cannot be released
16   until the verdict is read in open court.
17       MR. TIEGER:  Yes, Judge.  I was
18   hoping we wouldn't forget about them.
19       THE COURT:  All right.  Then, so
20   let's bring the jury in.
21       (The jury entering the courtroom at
22   4:12 p.m.)
23       THE COURT:  Thank you.  You may all
24   be seated.  And to the foreman, please
25   stand, and has the jury reached a

1    verdict?

2           JUROR MESSERSCHIMTT: Yes, we have,

3    Your Honor.

4           THE COURT: All right. I'm going

5    to pass this back to the foremen and let

6    her read the verdict in open court.

7           JUROR MESSERSCHIMTT: We, the jury,

8    find the defendant, Ruben Jordan, guilty

9    of aggravated murder. We, the jury, find

10    the defendant, Ruben Jordan, guilty of a

11    specification to Count 1, aggravated

12    murder or lesser included offense of

13    murder. We, the jury, find the

14    defendant, Ruben Jordan, guilty of Count

15    2, having weapons under disability.

16           THE COURT: All right. Thank you.

17    You may be seated. Would you like to

18    poll the jury, Counsel?

19           MR. WHALEN: Yes, Your Honor.

20           THE COURT: All right. I need,

21    please, the list of the names. I know

22    that Juror Number 1 --

23           MR. TIEGER: Judge, I think it is

24    essentially just a short statement that

25    you would read. You heard the verdict

1       read, is that your true and accurate --

2               THE COURT:  Right.  I'm going to do

3       that.  Just a second.

4               MR. TIEGER:  You could refer to

5       them by Juror Number 1, 2 and so forth

6       instead of by name.

7               THE COURT:  Having heard that jury

8       verdict, I would like to ask Jury Number

9       1, is that your -- is that your decision,

10      your verdict?

11              JUROR OBST:  Yes.

12              THE COURT:  Juror number 2?

13              JUROR McKINNEY:  Yes.

14              THE COURT:  Juror 3?

15              JUROR MESSERSCHIMTT:  Yes.

16              THE COURT:  Juror 4?

17              JUROR KEMPER:  Yes.

18              THE COURT:  Juror Number 5?

19              JUROR SHELTON:  Yes.

20              THE COURT:  Juror Number 6?

21              JUROR FITZGERALD:  Yes.

22              THE COURT:  Juror 7?

23              JUROR CISKO:  Yes.

24              THE COURT:  Juror 8?

25              JUROR COFFMAN:  Yes.

THE COURT:  Jury Number 9?

JUROR BURCK:  Yes.

THE COURT:  Juror 10?

JUROR RICKETTS:  Yes.

THE COURT:  Juror Number 11?

JUROR BESSEY:  Yes.

THE COURT:  Juror Number 12?

PROSPECTIVE JUROR 12:

JUROR BURKE:  Yes.

THE COURT:  Thank you for the alternates, and thank you for the jury for you service here today.

Many times -- you are released from the obligation to not talk to anyone you want to speak to about this matter.  Many times attorneys would like for you to remain, because it's for them a learning experience, and so you are free to leave, though you don't have to.  We want to thank and excuse the alternates also who remain in this matter.

This matter is adjourned.  Jury may rise.

(The jury leaving the courtroom at 4:15 p.m.)

1    THE COURT:  You may be seated.

2    Counsel, at this time there will be a

3    date for sentencing, or --

4        MR. WHALEN:  We set a date for

5    sentencing.

6        THE COURT:  Yes.  It does not

7    need -- did you want to prepare anything

8    in mitigation of that sentence?

9        MR. WHALEN:  I do, yeah, but I

10   guess --

11       THE COURT:  How long did you --

12       MR. WHALEN:  There has to be a

13   presentence investigation.

14       MR. TIEGER:  I know.  There

15   probably should be a victim impact

16   statement as well.  I think two weeks or

17   so should be fine.

18       THE COURT:  If they can do that.

19   I'm going to say three.

20       MR. TIEGER:  Okay.

21       THE COURT:  Three weeks.  Do you

22   want this?  All right.  So, what's that

23   date?  Dee-Dee, get the date, please.

24   Did you get a date?

25       MR. WHALEN:  Yes.

1          THE COURT:  All right.

2          MS. SMITH:  February 15th.

3          MR. WHALEN:  That's fine.

4          THE COURT:  All right.

5          MR. TIEGER:  Judge, I'm assuming

6      the defendant would be remanded without

7      bond?

8          THE COURT:  He is remanded without

9      bond pending sentencing.  And at this

10     time we are adjourned, are we not?  That

11     takes care of that.

12         (Proceedings continued for

13     sentencing until February 15, 2011.)

1

CERTIFICATE

2        I, SHERI D. RENKEN, RPR, the

3    undersigned, an Official Court Reporter for the

4    Hamilton County Court of Common Pleas, do hereby

5    certify that at the same time and place stated

6    herein, I recorded in stenotype and thereafter

7    transcribed the within 985, and that the

8    foregoing Transcript of Proceedings is a true,

9    complete, and accurate transcript of my said

10   stenotype notes.

11        IN WITNESS WHEREOF, I hereunto set my

12   hand this 15th day of January, 2012.

13

14        _____

15        SHERI D. RENKEN, RPR
          Official Court Reporter
          Court of Common Pleas
16        Hamilton County, Ohio

17

18

19

20

21

22

23

24

25